UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

BD DEVELOPMENT, LLC

                               Docket No.: 14-cv-4876

                    Plaintiff,

      -against-                             COMPLAINT

LOCAL 79, LABORERS INTERNATIONAL
UNION OF NORTH AMERICA,

                    Defendant.
-----------------------------------------------------------------x

      Plaintiff BD Development LLC ("BD" or "Plaintiff"), by and through its attorneys, Milman Labuda Law Group PLLC, as and for its complaint against the defendant, Local 79, Laborers International Union of North America, AFL-CIO ("Local 79" or "Defendant") in the above-captioned action hereby allege as follows:

## NATURE OF ACTION

      1.    This is an action brought pursuant to Section 303 of the Labor Management Relations Act, 1947, as amended ("LMRA"), 29 U.S.C. § 187, to recover damages for injuries suffered by BD from illegal secondary boycott activity. Local 79 threatened, coerced and restrained Bank of America, CBRE Richard Ellis, Brookdale Hospital, Gap Inc. and Macerich Co. with an objective being to force these business entities to cease doing business with BD because BD is not a signatory employer to a collective bargaining agreement with Local 79; and to force Bank of America, CBRE Richard Ellis, Brookdale Hospital, Gap Inc. and Macerich Co. to award and/or re-assign work being performed or scheduled to be performed by BD to employers with collective bargaining agreements with Local 79.

**JURISDICTION AND VENUE**

2.      This action is brought pursuant to and jurisdiction is founded upon the existence of a question arising under 28 U.S.C. § 1331 and § 303 of the Labor Management Relations Act, as amended, 29 U.S.C. § 187 ("the Act").

3.      Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. §§ 185, 187.  The events complained of have and are continuing to occur within the Eastern District of New York and BD's primary office location is located in Amityville, New York.

**PARTIES**

4.      BD is a limited liabilty company established under the laws of the State of Delaware, whose headquarters is located at 162 Broadway, Amityville, New York, 11701.

5.      At all relevant times BD has been  a signatory employer to a collective bargaining agreement ("CBA") with United Service Workers of America Local 621 ("Local 621"), a construction and building labor organization within the City of New York. The CBA pursuant to its terms is effective February 1, 2011 up through and including the present date.

6.      The CBA's Recognitional Clause is comprised of a bargainining unit covering BD's employees engaged in the job classifications of apprentices, journeymen, superintendents, and assistant superintendents performing trade work including, but not limited to, general labor work, demolition, carpentry work, painting, and cement work.

7.      Local 79 is a labor organization as recognized under the National Labor Relations Act with its principal place of operation located at 520 8th Avenue, Suite 679, New York, NY 10018.

**A. Local 79's unlawful secondary conduct against Bank of America and CBRE Richard Ellis.**

8.     In or about April 27, 2012, Bank of America awarded BD a contract to perform general contractor work on its branch location at 95 Wall Street in Manhattan ("BofA jobsite"). The price of the contract was  approximately $ 2,331,312. CBRE Richard Ellis ("CBRE") was the managing agent for the BofA jobsite.

9.     In or about April 2013, Local 79 demanded that BD hire Local 79 members to perform the work on the BofA jobsite. BD refused because its employees were already represented by another trade union, Local 621.

10.     Upon information and belief, when Local 79 was unsuccessful in its direct attempt to persuade BD to hire Local 79 members to work at the 95 Wall Street jobsite, agents of Local 79 threatened, restrained and coerced Bank of America, a neutral secondary employer, with a purpose of forcing Bank of America to terminate its contract with BD, the primary employer on the jobsite, by intentionally and deliberately threatening Bank of America with unqualified, general threats to picket and inflate a rat balloon at Bank of America places of operation irrespective of whether BD employees were present. The unqualified, general threats also had a purpose to force BD to recognize Local 79 as the exclusive employee bargaining representative of BD's employees even though BD's employees were represented by Local 621, another trade union. Upon information and belief, Local 79 also claimed the work for itself.

11.     On or about April 25, 2013, Local 79 commenced general picketing and put up an inflated rat balloon at Bank of America's premises. Neither the picketing nor the balloon identified Local 79's dispute with BD for refusing to hire Local 79 members and/or for refusing to recognize Local 79 at the jobsite; nor were the picketing and use of an inflated rat baloon

restricted solely to the target of BD. Several of the picketers blocked and/or impeded the ingress and egress of the entrance to the BofA jobsite.

12.    On or about late April 2013, NYC Acoustics another contractor performing trade work on the BofA jobsite, failed to report to the jobsite at its scheduled 7 am starting time. At 7:30 am BD discovered that NYC Acoustics was not at the jobsite to meet with BD and as such, called NYC Acoustics and asked where they were. NYC Acoustics responded that they did not report to work at the BofA jobsite because Local 79 insisted that NYC Acoustics not cross the Local 79 picket line at the BofA jobsite.

13.    Also, on or about April 25, 2013, Local 79 stated to BD that if BD would hire a Local 79 member on the jobsite, Local 79 would immediately cease and desist its picketing and remove the rat balloon.

14.    As a result of Local 79's unlawful threats, restraint and coercion of Bank of America, Bank of America demanded that CBRE either ensure that BD utilized Local 79 members for the BofA jobsite or else terminate BD's contract and hire a different company whose employees are represented by Local 79.

15.    Accordingly, as a result of the pressure Bank of America applied to CBRE relating to the dispute created by Local 79 against BD, BD reluctantly hired a Local 79 member to perform some work on the BofA jobsite. As such, based on the employment of the Local 79 member, BD was forced to incur additional labor costs exceeding its budgeted expense in the approximate amount of $32,000 that BD would otherwise would not have incurred had it not been for Local 79's relentless unlawful threats, restraint and coercion of Bank of America.

16.    Local 79's unqualified, general picketing and use of an inflated rat balloon at the BofA jobsite threatened, restrained and coerced Bank of America and CBRE with an object to

force Bank of America and CBRE to cease utilizing BD at the BofA jobsite or to force BD to hire a subcontractor whose employees were represented by Local 79.

17.     Local 79's conduct constituted unlawful secondary activity that caused BD to incur additional costs by hiring a Local 79 member, thereby directly reducing the profits it would have otherwised earned on the BofA job.

**B.     Local 79's unlawful secondary activity against Brookdale Hospital.**

18.     In or about April 1, 2014, BD entered into a contract with Brookdale Hospital for the building and construction of a 5,000 square foot hospital clinic ("Clinic") located at 1100 Pennsylvania Ave., Brooklyn, NY. The price of the contract was $ 2,527,458.

19.     In or about late April 2014, Mike Labate ("Labate"), an agent of Local 79, asked BD whether any Local 79 workers would be employed on the project.

20.     BD notified Labate that BD was a signatory to a collective bargaining agreement with Local 621 and therefore would not be employing Local 79 members.

21.      Later in April 2014, BD began work on the Clinic.

22.     In or about early May 2014, upon information and belief, Local 79 contacted Brookdale Hospital and issued unqualified, general threats to picket Brookdale Hospital direclty if BD was permitted to perform the work on the Clinic without Local 79 members. Local 79's unqualified, general threats to picket and inflate a rat balloon at Brookdale Hospital irrespective of whether BD employees were present at or performing work on Brookdale Hospital's property, constitutes unlawful threatening, coercive and restraining conduct in violation of the National Labor Relations Act ("NLRA" or " the Act") that had an objective to force Brookdale Hospital to terminate its contract with  BD and/or to force BD to recognize Local 79, even though BD's

employees are represented by Local 621. Such conduct constitutes unlawful secondary activity strictly prohibited under the Act.

23.     On May 12, 2014, Local 79 put up  an inflated rat balloon at Brookdale Hospital's main campus, located at Brookdale Plaza, Brooklyn, New York. The rat balloon was placed outside directly in front of the entrance to the main campus that includes its urgent care facility, rather than at the jobsite of the Clinic where Local 79 was demanding BD to hire its members  to perform work. This deliberate act by Local 79 had a purpose of threatening, restraining and coercing Brookdale Hospital, a neutral secondary employer to the labor dispute created by  Local 79's against BD, with an objective to exert unlawful pressure on Brookdale Hospital to terminate its construction contract with BD.

24.     Local 79 inflated an approximatly 15 to 18 foot high rat balloon in coercively close proximity to the main entrance of one of the busiest hospitals in the city. The rat did not identify Local 79's dispute with BD; nor did the rat or any placards identify or indicate any reference about a protest for alleged lack of payment of so-called "area standards" wages and benefits.

25.     Members of Local 79 picketed and patrolled around the entrance of the hospital passing out leaflets to patients and other visitors of the hospital who were clearly in dire need of the hospital's services. Futher, the leaflets did not contain truthful information; nor were any BD employees present at the entrance of the hospital or on the hospital's property. Local 79 directed its unlawful conduct at Brookdale Hospital in order to threaten, restrain and coerce Brookdale Hopsital, a neutral secondary employer to the labor dispute created by Local 79 against BD, with an objective to pressure Brookdale Hospital to terminate its contract with BD.

26.     Upon information and belief, the members and/or agents of Local 79 recklessly and callously impeded patients' and visitors' access to enter and exit the hospital. Local 79's illegal activity was intended to threaten, restrain and coerce Brookdale Hopsital, a neutral secondary employer to the labor dispute created by Local 79 against BD, with an objective to pressure Brookdale Hospital to terminate its contract with BD and to replace BD with a company whose employees were represented by Local 79.

27.     BD was made aware of the rat baloon inflated by Local 79 and the milling and patrolling of Local 79 members and agents directly in front of Brookdale Hopsital's entrance by hospital administrators who specifically demanded BD take immediate action to end the picketing and cause the removal of the menacing rat balloon. Further, the patrolling of the picketers, protestors and patrollers at the hospital entrance unequivically amounted to more than peaceful handbilling protected by the NLRA.

28.     On or about May 13, 2014, Domenico Flavoni ("Flavoni"), BD's owner, notified Labate of Local 79 that Brookdale desperately wanted the rat taken down and the picketing to stop at Brookdale Hospital. Labate responded to Flavoni by demanding that he wanted Flavoni to immediately hire  Local 79 laborers to perform the work at the Clinic irrespective of the fact that BD's employees working on the Clinic were represented by Local 621.

29.     On May 14, 2014, Flavoni and Labate met. During their conversation, Labate made it clear that the intent and object of Local 79 was to force BD to hire members of Local 79 at the Clinic jobsite; and that if BD did not agree to Labate's demands, Local 79 would then picket BD and/or Brookdale Hospital.

30.     The following day on May 15, 2014, Flavoni called Labate and told him that BD could not afford to hire any Local 79 workers for the Clinic.

31.     On May 16, 2014, Local 79 inflated a rat balloon of about 15 to 18 feet high with menacing eyes and claws in close proximity to Brookdale Hospital's main entrance located at Brookdale Plaza directly in front of the urgent care facility entrance and picketed that included patrolling in front of the entrance that impeded ingress and egress to patients and visitors of the hospital. As before, during  Local 79's first round of picketing at the Hospital and the use of the the rat, Local 79 did not have any markings or denotation that Local 79 was targeting BD nor publicizing its labor dispute with BD. Furthermore, Local 79 completely ommitted any reference to "area standards" or " prevailing wage and fringe benefit" compliance issues. In fact, as before, there were no BD employees located at the hospital entrance where Local 79 deployed its pickets and rat balloon.

32.     At one point, because of Local 79's deliberate blockage of the emergency entrance and intimidation of the personnel in the immediate area, Brookdale Hospital called the New York City Police Department to disband the picketers and the rat monitors who were deliberately and callously blocking and impeding the access to the main hospital entrance.

33.     In or about the same day, representatives of Brookdale Hospital informed  Flavoni that Brookdale Hospital wanted an immediate cease and desist of the picketing and removal of the rat. These same representatives also told BD that Local 79 had claimed the Clinic jobsite work for itself because it was "Local 79's jurisdiction".

34.     Local 79's unlawful picketing, utilization of the giant rat and its unqualified, general threats to Brookdale Hospital that it would (and in fact did)  picket and inflate a giant rat balloon constituted unlawful threats, restraint and coercion; a purpose of which was to force Brookdale Hospital to either force BD to hire a Local 79 subcontractor or to terminate its contract with BD and replace BD with a company that is a signatory to a collective bargaining

8

agreement with Local 79. As a direct and proximate result of the unlawful pressure by Local 79, Brookdale Hospital required BD to hire Local 79 members to perform demolition work that BD would otherwise perform with its own labor forces and general conditions laborer work at the Clinic jobsite or face termination from the Clinic job.

35.     Local 79's conduct immediately and directly caused BD to suffer damages in the form of lost profits as a result of increased labor and overhead costs in excess of its original contract price. The additional cost in hiring a subcontractor in the amount of $42,000 was for work that would have otherwise been performed by BD had it not been for Local 79's unlawful secondary activity. The damages caused by Local 79's unlawful coercion continue to increase to date in that BD continues to be compelled to utilize a Local 79 member thereby increasing BD's costs and reducing its profit.

**C.  Local 79's unlawful secondary activity against Kings Plaza Mall and Gap Inc.**

36.     BD is an approved vendor for Gap Inc. ("Gap"). As such BD is a "preferred status" contractor when submitting bids to build out new retail spaces for Gap.

37.     On or about April 24th, 2014, Gap awarded BD the tear down (demolition) and build out of its new Old Navy retail store space in the Kings Plaza Mall located at 5100 Kings Plaza Brooklyn, New York ("Old Navy job"). Gap is not a signatory employer to a CBA with Local 79.

38.     Macerich Co. is the owner and landlord of the the Kings Plaza property. Macerich's operations manager at the property is Lucien Zito ("Zito"). Macerich's Senior Manger, Tenant Coordinator is Brian Lindsey ("Lindsey"). Macerich is not a signatory employer to a CBA with Local 79.

39.     During the process of bidding on the Old Navy job, Flavoni, asked Zito if there were any "preferred unions" that must be recognized and used for the Old Navy job, to which Zito unequivically stated "no" and that as long as BD was "union" there would not be an issue.

40.     BD's approved contract price for the Old Navy job was $1,282,833.45 and was scheduled to begin on May 24, 2014 and end within nine and one-half weeks thereafter.

41.     The Kings Plaza property's power source is self-contained via a stand alone power generator that does not rely upon connection to a local utility power grid. The power generator is manned and controlled by members of Local 3, International Brotherhood of Electrical Workers.

42.     While still performing work back on the Clinic jobsite for Brookdale Hospital, Labate of Local 79 told Flavoni that BD would have a problem at the Old Navy job if BD did not hire Local 79 members to perform the laborer work at the Old Navy job. BD did not want the same pressure and risk of termination by  Macerich and Gap like it had received from Brookdale Hospital that was triggered by Local 79's unqualified threats of general picketing and use of a giant rat.

43.     On or about May 20, 2014, Labate, on behalf of Local 79, appeared at the Old Navy job after BD commenced work on the job.  Labate reiterated his demand to BD that Local 79 wanted the work performed by members of Local 79 and threatened that Local 79 would put up a general picket line in conjunction with the use of a giant rat as Local 79 did Brookdale Hospital. BD turned the work over begrudgedly to Local 79.

44.     Soon thereafter, BD subcontracted the Old Navy job demolition work to All City Interior Contracting, Inc. ("All City"), a company whose employees are represented by Local 79.

45.     The additional cost to BD to utilize All City was approximately $44,000 over its original budget cost for this work. This additional overhead labor cost would not otherwise have been incurred by BD had it not been for Local 79's unqualified, general threats including but not limited to: 1) shuting down the Old Navy job; 2) putting up a picket line at Kings Plaza and 3) the inflation of a giant rat balloon.

46.     BD hired All City in the foolish hope that the gesture would appease Local 79 and as such BD could achieve permanent peace at the Old Navy job. But, Local 79 viewed BD's act as weakness and it just made the bully hungrier.

47.     On May 21, 2014, Zito of Macerich was confronted in his office by 15 business agents (who barged into his office unannounced and without an appointment) from the various NYC building trades that normally perform work at Kings Plaza in the jurisdictional classification trades of i.e electrical, carpentry, fireproofing, painting, and plumbing.

48.     Among the business agents was Labate from Local 79. Also, in attendance was a business agent from Local 3, IBEW, another NYC building trades union that acts in solidarity with Local 79.

49.     Local 79, along with the other business agents from the other trade unions in attendance, complained to Zito that "non-union" companies were performing work on the Old Navy job, including BD, (which, in fact, is a signatory to a the Local 621 CBA). The various trades unions threatened Zito with unqualified, general threats, including but not limited to, 1) to picket Kings Plaza again; 2) inflate a giant rat balloon again; and 3) to shut down the power to the Kings Plaza property.

50.     Macerich made it well known that it was critical to it that none of these threats materialize. Zito stated in an email to Gap and cc'd to BD, and Lindsey, *inter alia*, that "**We**

**cannot have union issues here.**" (emphasis in original). Zito further stated that, "from talking to the crowd I get the impression BD development (sic) is going to have a hard time satisfying their requirements..." Zito also demanded that, "these issues need to go away now." Zito concluded by stating, "based on the severity and depth of this union grievance, through this email I suggest the job be put on hold until the issues are resolved."

51.    John Ciuzio ("Ciuzio"), a representative of Gap, responded to Zito's email within minutes stating that he thought the workers on the Old Navy job were "100% union labor" and concluded by stating that "we need to get this resolved immediately."

52.    True to his distressed email, Macerich in fact shut down the work on the jobsite because of Local 79's unqualified, general threats to picket Kings Plaza, inflate a giant rat and Local 3 IBEW's threat to shut down the power to the Kings Plaza property.

53.    As such, the Old Navy jobsite was shut down for approximately three days. The forced shutdown interfered with BD's ability to comply with its contractual obligations and commitment to the Gap to promptly conclude the build out which triggered a heightened  risk to BD that it would be assessed liquidated damages for not completing the work timely in accordance with the terms of its contract with the Gap.

54.    The email exchange between Macerich (via Zito) and Gap (via Ciuzio), prompted a conversation amongst Lindsey, Zito and Flavoni in or about late June 2014 and early July 2014.  During that call Lindsey told Flavoni that the lease agreement between Macerich and Gap contains a union harmony clause whereby the tenant, Gap was required to maintain harmony amongst the unions performing work at the Old Navy jobsite. Lindsey further reminded Flavoni that as a contractor BD agreed to follow Macerich's rules and regulations and maintain union

harmony. Lindsey emphasized to Flavoni that Macerich "doesn't want any problems at our property" and that Macerich needed to have union harmony on the Old Navy job.

55.     Lindsey further warned Flavoni that if a picket line is formed or a rat is put up that Macerich would have to shut down the job until BD resolved the issue.

56.     Zito stated to Flavoni on that call that Kings Plaza is a "a blue collar mall" and that Macerich could not have customers of the mall subjected to and confronted with a picket line. Zito further stated that there was "too much at stake to have a picket line anywhere near our mall"; and could not risk Local 3 making good on its threat to shut down the power by its members who operate the power plant that provides power to the Kings Plaza property.

57.     Local 79's unqualified, general threats to picket Kings Plaza, inflate a giant rat balloon and risk Local 3 shutting down the power to Kings Plaza directly and unlawfully threatened, restrained and coerced Macerich with an object to cause BD's termination from the Old Navy jobsite or in the alternative force BD to subcontract work to a company whom is signatory to a collective bargaining agreement with Local 79 notwithstanding that BD had been approved to perform that work.

58.     In or about late early July 2014, Gap confronted BD wherein Gap notified BD that Macerich was concerned that union harmony was not being achieved according to Local 79's satisfaction at the Old Navy jobsite thus, due to the union strife, Gap was in contravention of the lease agreement. Macerich directed Gap that if Gap did not achieve union harmony immmediatley it would have to shut down the Old Navy job. As such, Gap was unlawfully subjected to Local 79's unqualified, general threats to picket Kings Plaza, inflate a giant rat balloon and risk Local 3 shutting down the power to the Kings Plaza property (vis-à-vis Macerich's notification) with the intent, and an object, being to cause the termination and

removal of BD from the Old Navy job or, in the alternative, to force BD to subcontract the work to a Local 79 company notwitstanding the fact that BD had already been approved to perform the work.

59.     In or about the middle of July 2014, Labate confirmed to Flavoni that Local 79 had threatened Macerich with unqualified, general threats of establishing a picket line at King's Plaza if BD did not utilize Local 79 members to perform work.

60.     In or about the middle of July 2014, another representative of Macerich corroborated Local 79's unlawful threats in a conversation with BD. The Macerich agent stated that Labate directly threatened Macerich by stating that if Macerich did not straighten out BD's refusal to employ Local 79 laborers then the matter would be out of Labate's hands and be referred to Local 79's organizers for further action.

61.     Because of Local 79's unqualified, general threats to picket Kings Plaza, inflate a rat balloon and risk Local 3 shutting  down the power to Kings Plaza, all of which were intended to have an object to force both Macerich and Gap to remove BD from the Old Navy job or, in the alternative, to force BD to subcontract work to a Local 79 company notwithstanding the fact  that BD was approved to and would otherwise have performed the work. Ultimately, BD was forced to utilize a Local 79 employer to perform some of the work at the Old Navy job at an increased cost of approximately $44,000 over its labor budget and has delayed BD from completing the work timely pursuant to its contractual obligations and commitment to Gap, thereby creating a heightened risk of a contractual liquidated damages assessment by the Gap. In fact, on several occassions, All City, the Local 79 demolition contractor, was notified and admonished by BD that it was falling behind schedule in completing its job. All City responded that it requested additional manpower from Local 79 and that Local 79 responded to the request stating it did not

have any available laborers. Simultaneously, BD had heard from another contractor that Local 79 was "putting the screws" to BD at the Kings Plaza location and that Local 79 in fact had many other laborers who were in need of employment.

62.     As a result of this unlawful activity, BD suffered loss of the profits it would have otherwise earned by employing its own employees at the the Old Navy job, including the increased cost associated with the hiring of All City to perform the demolition work. Accordingly, had it not been for Local 79's unlawful secondary conduct,  BD is in severe risk that it will not complete the work at the Old Navy job on time; and, as such is in jeopardy of  a contractual mandate to pay liquidated damages for not completing the Old Navy job on time.

**D.  Local 79's unlawful secondary activity against Gap, vis-à-vis Banana Republic.**

63.     Gap owns the brand known as Banana Republic.

64.     On or about March 31, 2014, BD submitted a bid to Gap pursuant to its preferred status with Gap to perform a portion of the construction work for a build out of a Banana Republic store located at 105 5th Ave, New York, New York ("Banana Republic job").

65.     Upon information and belief, based upon pre-award meetings with Gap, BD's bid price of $6,634,895 was one of, and may in fact have been, the lowest bid submitted to Gap for the Banana Republic job.

66.     Upon information and belief, notwithstanding BD's successful bid, Gap awarded the work to a company whom is a signatory to a collective bargaining agreement with Local 79.

67.     Upon information and belief, Local 79's activities pertaining to BD threatened, restrained and coerced Gap for the purpose of coercing and pressuring Gap to refrain from awarding the Banana Republic job to BD.

68.     Upon information and belief, Gap considered Local 79's unqualified, general threats to picket and inflate rat balloons at locations of employers and/or entites whom contract with BD, such as the Kings Plaza location, to be coercive and restraining and caused Gap to reject awarding the Banana Republic job to BD.

69.     Upon information and belief, as a result of Local 79's unlawful secondary activity against employers and entities in contract with BD, BD's submitted low bid for the Banana Republic job was rejected.

70.     BD incurred damages in an amount of all lost profits for the work that BD should have been awarded but for the fact of the unlawful pressure and coercion directly caused by Local 79's deliberate and intended unlawful threats, restraint and coercion.

## AS AND FOR A FIRST CLAIM FOR RELIEF

71.     BD repeats and re-alleges each and every allegation contained in the complaint as if fully set forth herein.

72.     Local 79, by and through its agents and/or representatives has threatened, coerced and/or restrained neutral secondary employers and persons, including Bank of America and CBRE Richard Ellis, where an object thereof was to force or require such secondary employers and persons to cease using, selling, handling, transporting or otherwise dealing in the products of or business with BD or to cease doing any business with BD because BD is not a signatory employer to a CBA with Local 79.

73.     The conduct of Local 79 as aforesaid constitutes unlawful secondary activity which is prohibited by Section 8(b)(4)(ii) of the Act, 29 U.S.C. § 158.

74.     The conduct of Local 79 is unlawful pursuant to Section 303 of the Act, 29 U.S.C. § 187, and BD is entitled to seek relief for all available and applicable damages therein pursuant to Section 303(b) thereof.

75.     As a direct and proximate result of the above-described unlawful conduct of Local 79, both Bank of America and CBRE ordered and instructed BD to utilize Local 79 manpower to perform work in order to retain the contract and work on the BofA jobsite thereby greatly increasing BD's budgeted labor costs and reducing the profit BD would have otherwise earned had it not been for Local 79's unlawful secondary conduct.

76.     By reason of the foregoing, BD is entitled to damages in an amount of its lost profits, additional costs or in such other amount as may be determined upon the trial of this action.

## AS AND FOR A SECOND CLAIM FOR RELIEF

77.     BD repeats and re-alleges each and every allegation contained in the complaint as if fully set forth herein.

78.     Local 79, by and through its agents and/or representatives has threatened, coerced or restrained neutral secondary employers and persons, including Brookdale Hopsital, where an object thereof was to force or cause such entities, agents and persons to cease using, selling, handling, transporting or otherwise dealing in the products of and/or with BD or in the alternative to cause the cessation of business with BD because BD is not a signatory employer to a CBA with Local 79.

79.     The conduct of Local 79 as aforesaid constitutes unlawful secondary activity which is prohibited by Section 8(b)(4)(ii) of the Act, 29 U.S.C. § 158.

80.     The conduct of Local 79 is unlawful pursuant to Section 303 of the Act, 29 U.S.C. § 187, and BD is entitled to seek relief for damages therein pursuant to Section 303(b) thereof.

81.     As a direct and proximate result of the above-described conduct of Local 79, Brookdale Hospital required BD to utilize Local 79 manpower on the Clinic job site in order for BD to keep work on the Clinic jobsite. BD hired a Local 79 demolition subcontractor to peform a portion of the demolition work to keep the Clinic job, thereby greatly increasing BD's costs and reducing the profit it would have otherwise earned had it not been for Local 79's unlawful secondary conduct.

82.     By reason of the foregoing, BD is entitled to damages in an amount of its lost profit, additional costs to hire a Local 79 demolition subcontractor, plus interest or in such other amount as may be determined upon the trial of this action.

## AS AND FOR A THIRD CLAIM FOR RELIEF

83.     BD repeats and re-alleges each and every allegation contained in the complaint as if fully set forth herein.

84.     Local 79, by and through its agents and/or representatives has threatened, coerced or restrained neutral second employers and persons, including Gap and Macerich, where an object thereof was to force or require such neutral secondary employers and persons to cease using, selling, handling, transporting or otherwise dealing in the products of BD or to cease doing business with BD because BD is not a signatory employer to a CBA with Local 79.

85.     The conduct of  Local 79 as aforesaid constitutes unlawful secondary activity which is prohibited by Section 8(b)(4)(ii) of the Act, 29 U.S.C. § 158.

86.     The conduct of Local 79 is unlawful pursuant to § 303 of the LMRA, 29 U.S.C. § 187, and as such, BD is entitled to seek relief for damages therein pursuant to Section 303(b) thereof.

87.     As a direct and proximate result of the above-described conduct of Local 79,  Gap and Macerich required, instructed and demanded BD to hire Local 79 members on the Old Navy job in order to retain is contracts for the construction work on the Old Navy job. BD was thereby compelled to hire a Local 79 subcontractor to perform a portion of the work that BD was approved to work and would have otherwise performed, thereby substantialy increasing BD's budgeted labor costs and reducing the profit it would have otherwise earned had it not been for Local 79's unlawful secondary conduct. Furthermore, as a direct and proximate result of the above-described conduct of Local 79, in addition to Local 79 denying additional manpower to All City,  BD has been impeded in completing the work on time and, therefore, is at risk of being assessed liquidated damages by Gap.

88.     By reason of the foregoing, BD is entitled to damages in an amount of its costs, lost profit or in such other amount as may be determined upon the trial of this action.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

89.     BD repeats and re-alleges each and every allegation contained in the complaint as if fully set forth herein.

90.     Local 79, by and through its agents and/or representatives has threatened, coerced or restrained neutral secondary employers and persons, including Gap, where an object thereof was to force or require such neutral secondary employers and persons to cease using, selling, handling, transporting or otherwise dealing in the products of or business with BD or in the

alternative to cease doing business with BD because BD is not a signatory to a CBA with Local 79.

91.     The conduct of Local 79 as aforesaid constitutes unlawful secondary activity which is prohibited by Section 8(b)(4)(ii) of the Act, 29 U.S.C. § 158.

92.     The conduct of Local 79 is unlawful pursuant to Section 303 of the Act, 29 U.S.C. § 187, and, as such,  BD is entitled to seek all available and applicable relief for damages therein pursuant to Section 303(b)of the Act.

93.     Upon information and belief, as a direct and proximate result of the above-described unlawful conduct of Local 79,  Gap rejected BD's low bid on the Banana Republic job thereby depriving BD of profits it would have otherwise earned had it not been for Local 79's ulawful secondary conduct.

94.     By reason of the foregoing, BD is entitled to damages in an amount of its costs, lost profit or all such other amounts as may be determined upon the trial of this action.

**WHEREFORE**, by reason of the foregoing, BD prays for a judgment against Local 79 as follows:

1.     On the first claim for relief for an order awarding damages in the amount of its costs, lost profit or in such other amount as may determined upon the trial of this action.

2.     On the second claim for relief for an order awarding damages in the amount of its costs, lost profit or in such other amount as may determined upon the trial of this action.

3.     On the third claim for relief for an order awarding damages in the amount of its costs, lost profit or in such other amount as may be determined upon the trial of this action.

4.     On the fourth claim for relief for an order awarding damages in the amount of its costs, lost profit or in such other amount as may be determined upon the trial of this action.

9.     On all claims, BD's interest on any judgment, attorneys' fees, injunctive relief and further relief as this court deems just and proper.

**Plaintiff demands a trial by jury of the within action of all issues so triable.**

Dated: Lake Success, New York
   August 15, 2014

        /s/_____
        Joseph M. Labuda, Esq.
        Michael J. Mauro, Esq.
        MILMAN LABUDA LAW GROUP PLLC
        Attorneys for Plaintiff
        3000 Marcus Avenue, Suite 3W8
        Lake Success, New York 11042
        516-328-8899