# MILMAN LABUDA LAW GROUP PLLC

**3000 MARCUS AVENUE**
**SUITE 3W8**
**LAKE SUCCESS, NY 11042**
_____

**TELEPHONE (516) 328-8899**
**FACSIMILE (516) 328-0082**

† Also admitted in New Jersey
Author: Joseph M. Labuda – Member †
Direct E-Mail Address: joe@mllaborlaw.com
Direct Dial: (516) 303-1380

November 18, 2016

**VIA ECF & FEDERAL EXPRESS**
Hon. Joanna Seybert, U.S.D.J.
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 1030
Central Islip, NY 11722-9014

    Re:    BD Development, LLC. v. Local 79, Laborers Int'l Union of N. Am.
            Civil Case No.: 2:14-cv-4876 (JS) (AKT)
            **MLLG File No.: 126-2014**

Dear Judge Seybert:

      This firm represents Plaintiff BD Development LLC ("BD" or "Plaintiff") in the above-referenced matter. Plaintiff writes to respectfully request a pre-motion conference in anticipation of BD's motion for summary judgment and encloses its Local Civil Rule 56.1 Statement and Defendant's Responses. BD respectfully submits that the undisputed facts establish that Defendant, Local 79, Laborers International Union of North America ("Local 79" or "Defendant"), engaged in unlawful secondary activity in violation of § 8(b)(4) of the National Labor Relations Act ("NLRA") and § 303 of the Labor Management Relations Act ("LMRA") by threatening and coercing companies to cease using or doing business with BD.

**Legal Standard for Unlawful Secondary Activity**

      The Supreme Court has held that a union's conduct violates § 8(b)(4)(B) if it is coercive, if it is "aimed directly at [parties] . . . not involved in the dispute," and is intended to force a neutral third party to cease doing business with another. See NLRB v. Local 825, Int'l Union of Operating Engineers, 400 U.S. 297, 303 (1971). Thus, a union's conduct violates § 8(b)(4) of the NLRA "if *any* object of that activity is to exert improper influence on secondary or neutral parties," See Local Union No. 501 v. NLRB, 756 F.2d 888, 892 (D.C. Cir. 1985) (emphasis in original). Unlawful secondary activity occurs whenever union pressure, albeit threats, picketing, and other economic pressure is "brought to bear, not 'upon the employer who alone is a party [to a dispute with the union], but upon some third party who has no concern in it' with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands." See Local 825, Int'l Union of Operating Engineers, 400 U.S. at 303; see also NLRB v. International Brotherhood of Teamsters, 454 F.2d 875, 879 (9th Cir. 1972). When examining a party's conduct, threats may be implied by viewing the "totality of the circumstances." See NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 685-692 (1951); see also N.L.R.B. v. Homer D. Bronson Co., 273 Fed. Appx. 32 (2d Cir. 2008).

Summary judgment is appropriate here because no material issues of fact exist and the material facts demonstrate that Local 79 engaged in a campaigns of: (i) threatening various neutral secondary employers ("neutrals") with picketing, shutdowns, walk-offs, inflation of a rat, leafletting, and other union activity; (ii) picketing, shutdowns, walk-offs, inflation of a large, menacing rat, leafletting, and other union activity at the premises of neutrals; and (iii) unqualified, general threats to neutrals of "issues" and "problems" if their demands were not met, though their dispute was with BD.

**Factual Background**

BD is a general contractor whose clients include banks, hospitals, and retail establishments. Since 2011, BD has been signatory to a collective bargaining agreement ("CBA") with the United Construction Trades and Industrial Employees Local 621 ("Local 621"). Local 79 represents laborers and, together with other local unions, is a member of The Building and Construction Trades Council of Greater New York ("BCTC").

### i. The Old Navy Job at the Kings Plaza Shopping Mall

BD was awarded its first contract with the Gap to construct a retail Old Navy store in the Kings Plaza Shopping Mall (the "Mall"). All construction projects at the Mall are supervised by Lucien Zito ("Zito"), the Operations Manager of Macerich Management Company ("Macerich"), which owns the Mall. Prior to the Old Navy job beginning, agents of the Defendant contacted Zito to warn Zito that there were going to be "problems" if BD performed work there. After BD commenced construction, Local 79 and ten to fifteen other business agents of various BCTC local union members stormed Zito's office – unannounced and unexpected – in a show of force to intimidate Zito into shutting down the Old Navy job site. Local 79 threatened to picket the mall and have Local 3 – who runs the Mall's stand-alone power plant – to shut down the entire Mall's electricity if BD was going to continue performing work at the Old Navy job site. Local 79's gambit worked. Zito shut down the job, resulting in delays which made BD look bad, ruin its first impression with the Gap, and created a domino effect of delays which ultimately hurt both BD and the Gap. Additionally, though BD subcontracted with All City Interior Contracting Inc. ("All City") – a Local 79 contractor – to perform demolition work there, Local 79 doubled down on its campaign against BD by denying All City additional manpower it had requested to timely complete its work, further hurting BD and the Gap. After demolition had been completed, the Mall notified BD and the Gap that Local 79 has threatened to conduct a picket line if their demands to place another laborer on to perform "general conditions" work were not met. Local 79 threatened various forms of union activity again in mid-August when a new business agent of Local 79 entered the fray. BD's first impression was a bad impression because of Local 79's conduct, and BD has not performed any work for the Gap since completing the Old Navy job. In fact, BD was removed from the Gap's approved vendors list. Plaintiff submits that Local 79's conduct caused this to happen, resulting in damages.

### ii. The BofA, Brookdale, and Mount Sinai Jobs

BD does work for CB Richard Ellis ("CBRE"), which contracts with Bank of America ("BofA") to serve as its project manager. BD constructed a BofA branch at 95 Wall Street in

Manhattan. Local 79 raged on to the scene of the BofA job site, blocked the doors to the job site and began picketing, handing out leaflets, and walking around a large, inflatable rat. Additionally, Local 79 signaled to employees of New York City Acoustics, Inc. ("NYC Acoustics") – a BCTC local union contractor, signatory to the Carpenters' Union, which was subcontracted the carpentry work at the BofA job site by BD – to stop all work, and leave the job site. Employees of NYC Acoustics told BD that it could not "cross the line" until the "issue" was resolved. Representatives of BofA contacted BD about this problem. BD was removed from CBRE's approved vendor list for approximately two (2) years, and was not considered for "high profile" jobs in New York City as a result. BD was awarded a contract to build a clinic for Brookdale University Hospital and Medical Center ("Brookdale"), which was about a mile-and-a-half away from Brookdale's Hospital. Local 79 directly contacted Brookdale to demand that its workers perform work on the project. When its efforts failed, Local 79 commenced a campaign of picketing the hospital, handing out defamatory leaflets, walking around a large inflatable rat, and temporarily blocking the hospital entrance, for over twenty (20) days. BD has performed no other jobs for Brookdale since Local 79's unlawful conduct. BD was awarded a contract to renovate a twenty (20) bed observation unit for The Mount Sinai Hospital ("Mt. Sinai"). While BD was performing its work, Local 79 contacted Mt. Sinai and threatened to picket the hospital. Then, Local 79 did indeed picket the hospital, handed out leaflets, and walked around a large inflatable rat. As a result of Local 79's conduct, BD was forced to hire a Local 79 laborer to perform work at the Mt. Sinai job site. BD has performed no other jobs for Mt. Sinai since Local 79's unlawful conduct.

**The Undisputed Facts Demonstrate that Local 79 Engaged in Unlawful Secondary Activity**

Based on the above indisputable facts, Local 79 utilized coercive, unlawful tactics and threats to the neutrals if it continued to use BD on the aforementioned projects. These actions caused expensive delays, hassle, and embarrassment to the BD. As a result, these neutrals were motivated to stop doing business with BD now and in the future. It is not in dispute that Local 79's problem was with BD. Local 79 wanted BD to sign a CBA or use its laborers. Instead of dealing directly with BD, Local 79 threatened the neutrals and actually engaged in picketing, work stoppages, shut downs, walk-offs, and issuing unqualified general threats such as "there are going to be problems." Similarly, Local 79 indisputably brought economic pressure to bear upon the neutrals for the express purpose of pressuring BD to capitulate to its demands. The clear implication of Local 79's threats was that the neutrals should either force a change in the BD's policy or terminate its contract. This is prohibited by the NLRA. See Local 825, Int'l Union of Operating Engineers, 400 U.S. at 303; see also Local Union No. 25, A/W International Brotherhood of Teamsters, etc. v. NLRB, 831 F.2d 1149 (1st Cir. 1987); Kaynard on behalf of NLRB v. International Brotherhood of Teamsters, etc., 576 F.2d 471 (2d Cir. 1978). In sum, summary judgment is appropriate because Local 79's threats constitute unlawful secondary activity as a matter of law. These indisputable facts require Defendant to compensate BD for the damages it suffered as a result of its unlawful secondary activity. BD respectfully requests that the Court grant it leave to file a motion for summary judgment. Respectfully submitted,

_____/s_____
Joseph M. Labuda, Esq.

cc:   Counsel for Defendant – via ECF.