**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BD DEVELOPMENT, LLC.,

        **Plaintiff,**

  **-against-**


LOCAL 79, LABORERS INTERNATIONAL
UNION OF NORTH AMERICA,

        **Defendant.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Case No.: 2:14-cv-4876 (JS) (AKT)**

**PLAINTIFF'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff, BD Development LLC (hereinafter "Plaintiff" or "BD"), by its attorneys, Milman Labuda Law Group, PLLC, pursuant to Rule 56.1 of the Local Rules for the Eastern District of New York, hereby respectfully submits this Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgment (hereinafter "SOUF"), as to which Plaintiff contends there is no genuine issue to be tried.

**PLAINTIFF BD DEVELOPMENT LLC'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT**

**BD Development LLC**

1. BD Development LLC is a foreign limited liability company formed under the laws of the State of Delaware and is authorized to do business in the State of New York.  Flavoni 1; P64.

2. BD's principals are Domenico Flavoni (hereinafter "Flavoni") and Jimie Deliteris (hereinafter "Deliteris"), who are the President and Vice President of BD, respectively.  Flavoni Dep. 24:16-18; Weigel Dep. 18:17-18; Flavoni Aff. ¶¶ 1-2.

3. BD is signatory to a collective bargaining agreement (hereinafter "CBA") with the United Construction Trades and Industrial Employees ("UCTIE") Local 621 United Service Workers Union ("USWU"), International Union of Journeyman and Allied Trades ("IUJAT")

(hereinafter "Local 621" or "BD's Union") since February 1, 2011 through the present.  Flavoni 1; Flavoni Dep. 24:13-25:25, 25:19-26:11, 26:12-24.

4.   The CBA's recognitional clause is comprised of a bargaining unit covering BD's employees engaged in the job classifications of apprentices, journeymen, superintendents, and assistant superintendents performing trade work including, but not limited to, general labor work, demolition, carpentry work, painting, and cement work.  Weigel 2 (P551-P568); Local 621-2.

**Local 79, Laborers International Union of North America**

5.   Local 79, Laborers International Union of North America (hereinafter "Local 79" or "Defendant") is a labor organization with its principal place of operation located at 520 Eighth Avenue, Suite 679, New York, NY 10018.  Labate Dep. 293:6-17.

6.   George Zecca (hereinafter "Zecca") was a business agent for Local 79 at all relevant times.  Rynkiewicz Dep. 29:18-32:16; Zecca Dep. 13:6-14:16.

7.   Mike Labate (hereinafter "Labate") was a business agent for Local 79 at all relevant times.  Williamson Dep. 94:3-8; Rynkiewicz Dep. 29:18-32:16.

8.   Barry Smith (hereinafter "Smith") was a business agent for Local 79 at all relevant times. Rynkiewicz Dep. 29:18-32:16; Smith Dep. 12:2-8, 14:4-15, 50:3-7.

9.   Dennis Lee (hereinafter "Lee") was an organizer in Local 79's Market Development Department at all relevant times.  Lee Dep. 15:24-16:8; 60:9-61:18.

10. Lee was previously arrested and charged with unlawful assembly as a result of union activities against a different contractor who is not a signatory to Local 79.  Lee also alluded to the fact that he was arrested numerous times.  Lee 8:10-11:20.

11. Anthony Williamson (hereinafter "Williamson") is an organizer in Local 79's Market Development Department and has served as one for thirteen (13) years.  Williamson Dep. 87:8-9, 49:20-50:5.

12. Chaz Rynkiewicz (hereinafter "Rynkiewicz") is the Director of the Market Development Department or Organizing Department.  Rynkiewicz was arrested twice previously for civil disobedience relating to his duties as a Local 79 member; once for protesting an immigration issue, and another for rallying against the New York City School Construction Authority. Rynkiewicz Dep. 12:8-19, 44:18-46:21; 95:2-96:17.

13. The Building and Construction Trades Council of Greater New York (hereinafter "Building Trades" or "BCTC") is an umbrella group consisting of local affiliates of various national and international unions.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22.

14. There is exclusivity amongst the Building Trades that prevents other unions that perform the same work as the Building Trades local unions from joining the Building Trades.  Zecca Dep. 34:19-40:25; Flavoni Dep. 21:22-22:11.

15. Local 79 is affiliated with the Building Trades.  Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2.

16. The New York City District Council of Carpenters (hereinafter "Carpenters" or "Carpenters' Union") is a labor organization with its principal place of operation located at 395 Hudson Street, New York, NY, and is affiliated with the Building Trades.  Rynkiewicz Dep. 129:19-131:21.

17. Local Union No. 3, International Brotherhood of Electrical Workers (hereinafter "Local 3") is a labor organization with its principal place of operation located at 15811 Jewel Avenue, 4th Floor, Flushing, NY 11365 and is affiliated with the Building Trades.  Jordan Dep. 13:3-8.

**The Old Navy Kings Plaza Job at 5100 Kings Plaza, Brooklyn, NY**

***BD is Approved as a General Contractor for the Gap and is Awarded Work***

18. Tenny Vujicic (hereinafter "Vujicic") was a project manager at Gap, Inc. (hereinafter the "Gap") at all relevant times.  Ross Dep. 143:21-144:20.

19. Old Navy is owned by the Gap.  Zito Dep. 16:20-25.

20. The Gap has a process by which they preapprove contractors.  The Gap maintains a list of approved contractors, and the list has contractors added to and removed from it on a quarterly basis.  Kruse Dep. 16:19-20:1.

21. Vujicic worked with Lauren Kruse (hereinafter "Kruse"), the Director of Construction for the Northeast at the Gap at all relevant times.  Vujicic worked closely with BD on jobs for Bank of America.  Kruse had conversations with Vujicic about BD and learned that Vujicic liked working with BD and that they had a close relationship. On November 21, 2013, Vujicic introduced BD to the Gap.  The same day, Kruse forwarded a request to Joseph James, a Gap employee, requesting that James begin the approval process for BD.  Kruse met with BD sometime afterwards.  On December 4, 2013, James contacted BD to begin the process, which involved financial disclosures and the execution of various documents.  On January 27, 2014, BD followed up and James responded to inform Flavoni that they are waiting for internal approval signatures.  BD was ultimately approved as a prequalified contractor.  Kruse Dep. 8:9-9:16, 28:4-32:10; Kruse 1 (P83-P85).

22. Gap's online system for bids confirmed that BD had placed a bid on the Old Navy job on February 27, 2014 at 5:34 PM, which was submitted by Flavoni.  Ross Dep. 16:25-19:25; Ross 13 (P467).

23. BD was awarded the Old Navy job.  Kruse Dep. 22:9-16.

***The Mall***

24. The Old Navy is located within the Kings Plaza Shopping Mall (hereinafter the "Mall"), which is located in Brooklyn, NY.  Zito Dep. 9:17-25.

25. Macerich Management Company (hereinafter "Macerich") owns the Mall.  Lucien Zito (hereinafter "Zito") is a representative of Macerich, while Dawn DeGarbo (hereinafter "DeGarbo") is his assistant, and Brian Lindsey (hereinafter "Lindsey") and Steve DeClara (hereinafter "DeClara") are Zito's superiors.  Ross Dep. 39:2-24.

26. Zito worked at Macerich as operations manager, and – in that capacity – managed the Mall until September 2014.  The Mall was previously owned by "Vornado," and Zito worked for Vornado for three (3) years in the same position managing Kings Plaza, until Macerich purchased the Mall from Vornado. In both positions, Zito worked on-site at the mall.  Altogether, Zito worked in this capacity for approximately four-and-a-half years.  Zito Dep. 8:5-9:10, 10:2-11:7.

27. In his capacity as operations manager for both Macerich and Vornado, Zito has overseen more than fifty (50) construction projects at the Mall.  Zito Dep. 11:8-15.

28. Zito's primary role with respect to construction project was to represent the landlord's interests, and ensure that rules and regulations were adhered to.  Zito Dep. 11:16-12:15.

29. Prior to Local 79's union activity at the Mall, business agents of various unions would communicate with Zito about a problem they had and Zito would facilitate communication

5

between the business agent, the tenant, and – at times – the general contractor.  Some unions who Zito had previously dealt with included the Carpenters, Local 79, the electrical union, and the concrete, painters, and steamfitters unions.  Zito Dep. 14:20-15:14.

30. Focusing specifically on Local 79, Zito previously dealt with a business agent named Carl Cully (hereinafter "Cully") who would complain to Zito on numerous occasions that there was no laborer on site or that Local 79 was not being used from time to time on various jobs. Zito Dep. 14:20-15:14.

31. Zito typically facilitated communication between business agents of Local 79 and those involved in the project to the point where Local 79 was satisfied, as he would with any union's business agent.  Zito Dep. 15:15-16:2.

32. Zito never initiated contact with Local 79 because it was not his business to look for problems. Zito Dep. 16:3-14.

### ***Local 79 Descends Upon the Mall and the Gap***

33. Labate learned about the Old Navy job by seeing the barricades and visiting mall management to obtain information about what store and which contractor will be working on it from the mall manager.  Labate Dep. 174:19-176:3.

34. Prior to the Old Navy job beginning, Zito was contacted by Labate.  Zito recalls one particular conversation outside of the mall prior to the commencement of construction at Old Navy in which Labate would typically request information about the job.  When Zito informed Labate that BD was performing the work, Labate told Zito that there would be problems with the job if BD is performing the work.  Specifically, Labate told Zito that he had problems with BD in the past and that the Mall should anticipate that there were going to be problems.  Zito recalls that Labate attempted to persuade Zito to exclude BD from the job.  Zito Dep. 24:5-27:14.

6

35. BD commenced construction of an Old Navy store at the Mall, and Kenneth Ross (hereinafter "Ross") was the project manager at BD for the Old Navy job.   Zito Dep. 10:25-11:10, 16:15-19.

36. On May 16, 2014, BD and All City Interior Contracting Inc (hereinafter "All City") signed an agreement for All City to perform demolition work at the Old Navy Job Site.   Ross 4 (P502-P523).

37. Ross recommended – and Flavoni and Deliteris accepted – All City solely due to the issues raised by Local 79.   Ross Dep. 45:9-15.

38. John Rodopoulos (hereinafter "Rodopoulos") is the owner of All City.   Ross Dep. 59:6-60:17.

39. Williamson went to the Old Navy Job Site twice.   The first time he went there, he visited the Mall's management office.   When Williamson met with a Mall management representative, he identified himself, who he represented, and asked whether BD was performing work there. When the Mall representative answered in the affirmative, Williamson said that he is here to remind the representative that there is a labor harmony clause that exists that Williamson asserted is being violated, and which he would like to resolve.   Williamson Dep. 81:15-82:23.

40. Williamson met with the same Mall representative a second time, repeating what he said the first time.   Williamson Dep. 91:15-92:16.

### _In a Show of Force, Local 79 and the Building Trades Locals Storm Zito's Office_

41. On May 21, 2014, at 11:51 AM, Lucien Zito sent Ross and John Ciuzio an e-mail stating:

> "Apparently we have some big union issues with your build out.  I was just unexpectedly greeted with about 15 [business agents] that all had issues with the subs on your job.  Most notably, Local 3 - electricians as well as carpenters, carting, laborers and painters. This mall is a stand-alone power generator.  If a picket line was established you bare [sic] the [responsibility] of having our plant

potentially shut down.  **We cannot have union issues here.**  From talking to the crowd I get the impression BD development [sic] is going to have a hard time satisfying their requirements, but I leave that to you to decide.  These issues need to go away now.

Based on the severity and depth of this union grievance, through this e-mail I suggest the job be put on hold until the issues are resolved."

Ross Dep. 46:4-24; Ross 7 (P206) (emphasis in original).

42. In Zito's office.  Labate asserted that BD's Union was not acceptable to Local 79.  Labate threatened Zito that Local 79 would picket the Mall if BD was to perform work at the Old Navy job site.  There were times that Labate directly threatened a picket line and a rat being blown up, which the Macerich would be very sensitive to as a blue-collar mall.  Zito Dep. 27:22-28:23, 28:24-29:20, 29:21-30:16.

43. The threats of picketing were directly related to whether BD would cooperate in using Local 79 laborers on the job site.  Zito Dep. 30:17-31:2.

44. Labate also discussed shutting the job down with Zito and, in fact, requested that Zito shut the job down.  Labate told Zito that if you allow BD to keep working without putting on Local 79 laborers, "there was essentially going to be a problem, or a picket line[.]"  Labate did so in a loud, threatening manner.  Zito Dep. 31:23-34:6.

45. There was an intense concern and sensitivity by Macerich representatives to any public union activity at the Mall.  One concern was that it would reduce shoppers.  Another concern was a total mall shutdown, because all of the Mall's workers – including 32BJ members, security, operations, maintenance, and the power plant – are union members who may sympathize and honor any picket line set up by Local 79.  Finally, the risk of an electrical shutdown of power was a major concern for Macerich.  Zito Dep. 34:7-36:12.

46. On May 21, 2014, Zito was visited by about fifteen business agents from various Building Trades' local unions in the morning at the Mall's management office where Zito worked.  The business agents arrived unannounced, which was odd to Zito because he had a very good working relationship with all of the business agents.  In the course of Zito's tenure as operations manager, he had never been visited in such a manner despite working on much more difficult jobs than the Old Navy job.  Zito Dep. 36:13-48:16; Zito 1 (MACERICH9); Ross 7 (P206).

47. Zito viewed the unannounced visit as an intimidation tactic, and that various business agents had told him as much and apologized for it afterwards.  In fact, almost every business agent apologized to Zito and stated it was not the appropriate move to make, except Labate.  At the meeting, Labate threatened to picket the Mall.  Id.

48. As a result, Zito was concerned that the potential picket line could result in a potential shut down of power to the Mall.  Id.

49. Zito had other concerns about Local 79's threatened union activity, such as the disappearance of materials, problems with building systems, lines being cut, potential sabotage, and other consequences.  At the unannounced meeting, Zito was told that problems would occur if BD was allowed to perform work at the Old Navy job site, and Zito relayed his concerns to Ciuzio.  Id.

50. To Zito, this meeting was a "show of force."  Zito considered Local 79's threats a major issue and a major problem because fifteen business agents had never shown up in his office before, despite the fact that Zito previously dealt with more severe union issues with bigger contractors and bigger projects than the Old Navy project.  Id.

9

51. Zito got the impression that BD will have a hard time satisfying Local 79's requirements because of its show of force and the tone they set forth, i.e., "this needs to stop now, this is the end of the world[,]" with five to seven of the fifteen business agents communicating this to Zito. The business agents communicated that they wanted BD to hire Local 79 laborers for the Old Navy job, and that – if BD would not do so – the Mall would be subject to problems, picket lines, rats, shutdowns, and/or other union activity by the Building Trades locals.  The business agents also relayed that if BD did not hire Local 79 laborers, BD should not be doing the work at the Mall.  Id.

52. During a telephone conversation between Angela Giovinazzi (formerly known as Angela Parisi) (hereinafter "Giovinazzi") and Zito, Zito informed Giovinazzi that he was surprised by an unannounced visit by twelve to fifteen business agents at his office, and that he did not appreciate this.  Zito informed Ross first.  Because Ross was on the road, Ross asked Giovinazzi to call Zito and get the particulars.  Giovinazzi called Zito and discussed what happened in detail. Zito remarked that if BD did not resolve this, the Mall would have no choice but to shut the Old Navy job site down.  Zito also told Giovinazzi that Local 79 threatened to go to Local 3 and have the Mall's power shut down if this was not resolved.  Giovinazzi Dep. 74:6-83:8.

53. Zito put the job was on hold as a direct result of the issues between Local 79 and BD. Zito Dep. 54:20-55:20; Zito 1 (MACERICH9); Ross 7 (P206).

54. Zito confirmed that he had shut the job down on the same day he was visited by fifteen business agents.  Zito Dep. 59:8-62:3.

55. Zito knew that there would be no risk of union activity if he shut the job down both because BD would not be performing work and because Labate told Zito he wanted Zito to shut the job down.  Zito Dep. 58:21-59:7.

56. In a letter dated May 21, 2014, counsel for BD wrote to Zito and stated, among other things, that the mall has improperly locked BD out of the construction site that it was working on for Old Navy based on the claim that BD is performing work with nonunion labor, and Ross confirmed that the job was shut down as a result of the union activity.  Ross Dep. 92:11-95:9; Ross 6 (P524-P525).

### *The Mall is a Stand-Alone Power Plant*

57. Macerich employed Local 3 electrical workers directly to staff the Mall's power plant, as the Mall is a stand-alone entity and does not have a "co-generation plant."  In fact, the Mall is "an island completely independent of the grid" and its power is generated on-site and solely provided to and by itself.  Zito Dep. 19:18-21:3; Jordan Dep. 32:18-33:13.

58. The provision of power to the Mall is very important to the mall.  Jordan Dep. 33:14-34:5.

59. The Mall is maintained by two Local 3 members who work for "Penguin." Jordan Dep. 49:25-51:2.

60. If the Mall's power got shut down, there were no backups for energy and the entire mall and all its stores would be forced to close. Zito Dep. 21:4-14.

### *Building Trades Grievance*

61. Local 79 and other Building Trades' unions communicate with one another regarding campaigns they take against contractors and have a meeting place at the Building Trades where they meet face-to-face to discuss such matters.  The unions within the Building Trades also communicate with one another via telephone calls, e-mails, and meetings at a particular restaurant where they have a back room.  Rynkiewicz Dep. 83:22-85:14.

62. According to Smith, there are thirty-one (31) Building Trades locals. Smith Dep. 109:12-21.

63. A Building Trades grievance may be called by a Building Trades local union for all the business agents from all of the Building Trades locals to meet on a job site at a particular date and time. Notification of a Building Trades grievance is typically circulated amongst all the Building Trades locals. Notification goes out to all of the Building Trades locals within the Building Trades to let them know that one of the Building Trades locals is having some issue on a particular job site. Zecca Dep. 50:24-56:3.

64. A Building Trades grievance, according to Labate, is called to notify all the other Building Trades local unions about a job so that they could meet to determine whether they want to raise an issue with the job. Labate calls one by contacting the Building Trades, providing information, and waiting to be notified. As for why he cited that the grievance with BD at the Old Navy job was "nonunion," Labate said it was because "621 is maybe a union, but not to [Labate] ..." Labate controls which Building Trades locals the grievance goes out to. It appears from the grievance form and Labate's testimony that the e-mail was sent to the business managers of each local who then send it down. The primary purpose for filing a Building Trades grievance is to notify all the various trades that there may be some type of issue with respect to a non-trades contractor performing work, and the secondary purpose is to follow the proper protocol so that a job action, protest activity, etc. is sanctioned by the Building Trades. Labate Dep. 179:25-194:22; Jordan 2.

65. Michael Jordan (hereinafter "Jordan") has been a business agent of the Carpenters' Union at all relevant times. Jordan Dep. 37:23-25, 38:3-8.

12

66. Smith explained that in order to file a grievance with the Building Trades, you call the Building Trades directly and make the grievance by identifying yourself and stating that you would like to have a Building Trades grievance, provide the area, the lot, the address, and what is going on.  Smith Dep. 104:21-23.

67. On May 16, 2014, a grievance was announced by Lizmary Rodriguez (hereinafter "Rodriguez") of the Building Trades against BD for being a "non-union" contractor.  The grievance was filed by Labate from Local 79, and all notified were directed to meet at the Mall's management office on Wednesday, May 21, 2014 at 10:00 AM.  The grievance notice was sent to approximately sixty-nine people from all sorts of unions within the Building Trades.  The specific trades to be notified were the Carpenters, Painters, Sheetmetal Workers, Electrical Workers, Plumbers, and Tile Marble Terrazzo unions.  Jordan Dep. 12:9-13:2.

68. Smith said that you can have a grievance as "nonunion" or you can have it where someone else is covering Local 79's jurisdictional work.  Smith Dep. 104:13-20.

69. When a Building Trades grievance is filed, it gets disseminated to the business agents at all the other Building Trades.  Smith Dep. 107:9-13.

70. Whenever a Building Trades grievance is filed and other Building Trades local's business agents are notified of it, they must attend the grievance.  Smith Dep. 108:4-23.

71. The purpose of a Building Trades grievance is to have other business agents from the Building Trades locals show support for the grieving local union and to help try to resolve the grievance.  Smith Dep. 109:22-110:18.

72. Smith said that a Building Trades grievance is usually filed when a contractor refuses to put a laborer on.  Smith Dep. 117:23-118:10.

13

73. Williamson expects that other Building Trades unions performing work on a job site with a non-Local 79 contractor would come out in solidarity with Local 79 if Local 79 holds a job action on such a job site.  Williamson Dep. 95:25-96:23.

74. If a non-Local 79 contractor was performing work together with other Building Trades contractors, Williamson would reach out to the other Building Trades unions and he would ask the Building Trades to be in solidarity with Williamson, which could mean not entering the building, passing out leaflets, and making telephone calls.  Williamson Dep. 95:24-96:23.

75. Jordan attended the May 21, 2014 grievance.  Jordan Dep. 20:4-23.

76. Though a third party, such as Brookdale University Hospital and Medical Center (hereinafter "Brookdale"), has nothing to do with the Building Trades grievance, a Building Trades grievance would be held at Brookdale, and Brookdale would be notified about the grievance occurring "out of respect."  Smith Dep. 274:15-20.

77. Similarly, if a Building Trades grievance is to be held at the Mall, Smith would let Mall management or the landlord know about the Building Trades grievance, but the issue would be resolved directly with the contract, and the mall or the landlord would have nothing to do with it. Smith Dep. 276:3-20.

78. Despite this, on May 21, 2014, a Building Trades grievance was held at the Mall's management office directly with Zito and BD was not present at, nor was BD notified of, any such Building Trades grievance.  Smith Dep. 276:21-278:6; Ross 7 (P206); Jordan 2.

### ***Lack of Manpower***

79. During the demolition phase, Ross had trouble obtaining manpower for the Old Navy Job from All City to complete the demolition work, an apparent result of the labor issues between BD and Local 79.  Ross Dep. 57:13-58:7.

14

80. Ross had several conversations with representatives of All City regarding the need for more manpower.  Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24.

81. Four people from BD - Ross, Mike Deliteris, Giovinazzi, and Deliteris - admonished All City for falling behind schedule.  Ross Dep. 110:15-112:12.

82. Ross and/or Giovinazzi requested a letter from All City concerning the lack of manpower from the hiring hall.  Ross Dep. 62:3-13; Ross 2 (P270).

83. At the time Smith placed himself on the out-of-work list in 2015, there were two hundred (200) members on the list. Smith Dep. 33:13-34:2.

84. There were under a thousand employees on the out-of-work list at Local 79 in 2014, when the Old Navy job was underway.  Smith Dep. 34:3-12.

### *Hiring Hall*

85. Local 79 has a hiring hall.  Members are chosen from the hiring hall according to seniority, qualifications, and preferences.  Local 79 has 9,300 members and approximately 400 are currently out of work.  Lee Dep. 66:9-12, 66:15-68:7, 68:8-15.

86. According to Rynkiewicz, Local 79's hiring hall works pretty good and that Local 79 is one of the very few locals in the city that actually has a hiring hall that requires contractors to take members.  Rynkiewicz Dep. 88:5-90:25.

87. Luann Piecora (hereinafter "Piecora"), the Secretary of Rite Way Internal Removal Incorporated (hereinafter "Riteway"), generally did not experience problems requesting men from Local 79's hiring hall, but did experience a problem a couple of times.  Piecora Dep. 18:21-19:18.

88. Piecora generally sent Local 79 requests for manpower the day before and did not have issues getting men.  Piecora Dep. 25:8-27:23.

89. Labate said that: (i) you would never run out of guys; (ii) Brooklyn never runs out of available laborers in the hiring hall; and (iii) demolition is done predominantly at night.  Labate Dep. 70:18-77:10.

90. Rodopoulos requested men from the hiring hall for the Old Navy job site but none were available.  Rodopoulos Dep. 44:13-18.

91. Though Rodopoulos disagreed with BD's demands for additional manpower, to appease them, Rodopoulos requested additional manpower from the union hiring hall.  Rodopoulos was told no men were available.   At the request of Giovinazzi, Rodopoulos submitted a letter explaining that he requested men from the hiring hall and none were available.  Rodopoulos Dep. 46:6-50:12; Ross 2 (P270).

### *Local 79's Campaign Against BD at the Old Navy Job Site*

92. On July 1, 2014, Local 79 agents issued another threat directly to Zito at the Mall that they would set up a picket line on Friday, July 4, 2014, if BD did not meet Local 79's demands. Ross Dep. 128:24-130:5; Ross 10 (P54).

93. On July 1, 2014, at 10:33 AM, Flavoni told Zito about Local 79's latest threat towards Zito of picketing the Mall if BD did not meet Labate's demands by Friday, July 4, 2014.   In response, at 10:47 AM, Zito stated that the issue has now escalated to a level that requires Lindsey's involvement.  As a result of the pressure Local 79 placed on Macerich, Zito wanted to discuss with BD how the dispute can be resolved because Macerich had to meet with the Gap and BD to assist in a resolution, which Zito was trying to facilitate.  Zito reported to Lindsey and requested that Lindsey be involved in trying to resolve the issue between Local 79 and BD. Lindsey had the same concerns Zito had regarding picket lines, rats, and job shutdowns.  Zito Dep. 73:2-77:9; Zito 5 (MACERICH31-MACERICH 33).

94. Zito received threats from Local 79 to picket the Mall regarding BD and spoke to Lindsey regarding Local 79's threats.  Zito relayed any threats he received to Lindsey.   Zito Dep. 81:15-85:3; Zito 7 (MACERICH62-MACERICH64).

95. Ross had several conversations with Zito on the phone and in person concerning threats Local 79 made to Zito.  Zito asked Ross what he is going to do about this problem and stated that he needs to stop Labate from coming to his office every two to three days and threatening to shut down and picket the mall.  Ross Dep. 131:20-133:4.

96. Smith spoke to Lindsey at Macerich on the phone sometime in August 2014 for approximately ten (10) to fifteen (15) minutes.  Smith explained his problem with a laborer only working one (1) day a week at the Old Navy job site to Lindsey.  Smith Dep. 125:11-127:7.

97. Evelyn Jew (hereinafter "Jew") is an in-house attorney for the Gap.  Jew was party to a telephone conference between representatives of the Gap, Macerich, and BD.  The subject of the conference was Macerich's concern that Local 79 would picket the Mall   After Flavoni outlined his efforts at achieving union harmony, Macerich demanded that the Gap reach out to Local 79, that Local 621 and Local 79 representatives meet, or for someone to ask Local 79 to put what they want in writing.  Macerich demanded that the Gap make a good faith effort to resolve the dispute.   Macerich also pointed out the union harmony clause in Gap's lease and stated unequivocally that the job site will be shut down in the event of any picketing by Local 79. Lindsey explained that, under the labor harmony clause, the tenant has to immediately take action to reasonably eliminate such a dispute including by (1) removing all disputants from the job site until the dispute no longer exists; (2) seek a judgment for a breach of contract between Tenant and Tenant's contractor; and (3) file appropriate unfair labor practice charges in the event of a union jurisdictional dispute.  Because Lindsey informed Kruse that the Gap had to try and

create labor harmony with any unions and make a fair attempt at trying to maintain labor harmony, Gap considered using Local 79 labor on the project in order to do so.  The only concerns the Gap had on the Old Navy job were possible shut downs, subsequent delays, and its relationship with Macerich.   Kruse Dep. 55:7-58:16; Ross 11 (P235-P237); 712014 43334 PM.m4a;[1] Flavoni Aff. ¶¶ 26, 33.

98. On July 7, 2014, at 7:48 AM, Flavoni e-mailed Ciuzio and Kruse regarding Labate's demands and relayed that it would be a problem to have a Local 79 laborer work alongside BD's labor force.  Ciuzio understood that to mean that Local 79 wanted all the work for itself and that, barring such an agreement, Local 79 would continue to take action to interfere with the Old Navy project.  Ciuzio Dep. 81:15-84:2; Ciuzio 10 (GAP160-161).

99. During a telephone conversation between representatives of Gap, Macerich, and BD the following day, Flavoni explained the inherent bad faith displayed by Local 79 in reneging on their previous deals and taking acts to sabotage the Old Navy Job as manpower was not provided.   Zito 11 (782014 91322 AM.m4a; Flavoni Aff. ¶¶ 27, 33).

100.      On July 10, 2014, at 4:11 PM, DeClara sent Flavoni correspondence regarding a potential compromise proposed by DeClara to resolve the union issues.  The following morning, Flavoni forwarded the correspondence to Kruse and Ciuzio, to which Kruse responded that she is willing to learn about the cost – but is not committing to do it – solely to find out how much it will cost to make Local 79 go away.  The Gap had no desire or need for any Local 79 laborer. Ciuzio Dep. 89:16-92:11.

101.      On July 11, 2014, at 10:03 PM, Flavoni sent representatives of Gap a list of all subcontractors and their union affiliations to exhibit the union harmony displayed by BD in

---

[1] The reference to a file ending with ".m4a" refers to an audio recording.

hiring various locals, including various Building Trade locals.  Two of the subcontractors listed were signatories to Local 79.  Ciuzio Dep. 88:2-89:15; Ciuzio 12 (GAP148- GAP 149).

102.　　　On July 16, 2014, Ciuzio ultimately rejected the change order for $40,000.00 in costs for a Local 79 laborer, but approved a separate change order for $4,500.00 in costs for a Local 79 laborer resulting from Local 79's second set of threats in July.  Prior to receiving the numbers for the new compromise, Ciuzio told Lindsey that he believes they have a plan in place based on his understanding of the numbers.  Ciuzio Dep. 92:12-97:9; Ciuzio 14 (GAP189-191); Ciuzio 15 (GAP208- GAP 209).

103.　　　The Gap viewed the Old Navy job as a high risk job due to Local 79's conduct. Ciuzio Dep. 98:12-100:22, 105:21-108:8; Ciuzio 16 (GAP70-71), Ciuzio 19 (GAP72-73), Ciuzio 19A (GAP74-GAP75).

104.　　　On July 17, 2014, Flavoni corresponded with Lindsey to inform him that a compromise had been reached.  Lindsey responded with approval and stated that he would support BD.  Ciuzio Dep. 97:10-98:11; Ciuzio 15A (GAP210-GAP211).

105.　　　On July 23, 2014, Ciuzio moved the Store Effective Date to September 24, 2014 primarily due to "labor actions (work stoppages)[.]"　Ciuzio Dep. 108:9-112:8; Ciuzio 20 (GAP105-GAP106).

106.　　　On August 13, 2014 at 9:38 AM, Flavoni returned Smith's phone call, and Smith introduced himself, explained that Labate is now in Manhattan, and wanted to discuss the Old Navy job with Flavoni.  Smith explained that there is a laborer coming in only once a week, which is a problem for Smith because if there are any other trades on board, "labor should be there."  Smith requested that the laborer come in three (3) times a week. Flavoni explained that the laborer was put on the Old Navy job once a week as a direct result of negotiations and that

19

there was no agreement to increase the number of days the laborer was present.  Smith Dep. 128:25-135:10; Smith 3 (8132014 93846 AM.m4a; Flavoni Aff. ¶¶ 28, 33).

107.    On August 14, 2014, Flavoni corresponded with Kruse and others about the fact that a new business agent - Smith - had been contacting BD and demanding that a laborer be placed on the Old Navy job site for three (3) days per week as opposed to one (1) day per week as previously agreed to.  Faced with the advent of triple the cost for a cost the Gap did not want in the first place, Kruse agreed with Flavoni that there will be no further agreements regarding Local 79 laborers on the Old Navy job site.  Ciuzio Dep. 112:9-113:22; Ciuzio 21 (GAP113-GAP115).

108.    On August 19, 2014, at 9:26 AM, Christie Johnson (hereinafter "Johnson"), a representative of Linear Contracting, Inc. (hereinafter "Linear"), notified BD that "[i]n light of the circumstances surrounding between BD Development and Local 79, effective immediately, Linear Contracting will no longer be providing the Local 79 [l]aborer for the Old Navy Kings Plaza project."  P570.

109.    On August 19, 2014, at 11:34 AM, Smith and Flavoni had another telephone conversation.  Smith informed Flavoni that Linear is pulling off the job, which was news to Flavoni (as he only received an e-mail from Linear a couple of hours earlier).  Smith asked that Flavoni agree to put a laborer on for three (3) days a week, and Flavoni informed Smith that his client did not agree to that.  Smith responded by threatening to put a picket line up.  Smith specifically asked Flavoni to call his client and let them know what Smith said.  Flavoni responded that they already made an agreement and expressed his disappointment with the threat made by Smith.  Smith responded by again requesting that Flavoni reach out to his client about Smith's request.  Smith also said that he would give Flavoni until the end of the week to attempt

to resolve this dispute before he puts up a picket line, explaining that he would rather not put a picket line up. Flavoni confirmed that he will reach out to his client pursuant to Smith's request and get back to him. Smith Dep. 139:20-146:2.

110.    On August 19, 2014, Flavoni relayed to Gap and Macerich representatives that he received a call from Smith threatening a picket line if BD does not increase the amount of time a laborer is placed on the Old Navy job site. Zito replied to ask for Smith's number, and Flavoni responded to provide it. Zito does not recall any conversation with Smith, but understood that the line threatened by Smith was a picket line. Zito Dep. 85:6-88:5; Zito 8 (MACERICH77).

111.    On August 19, 2014, Flavoni wrote to Kruse and Ciuzio advising them of the filing of the instant lawsuit. Additionally, Flavoni advised that Smith reached out to BD seeking a laborer for three (3) days per week with a new threat to picket the Mall if BD does not acquiesce to Local 79's demands. Ciuzio understood Smith's threat to be a threat of picketing, and the threat raised concerns about Local 79 interfering with work on the Old Navy project in light of a picket line. Ciuzio 115:2-117:2; Ciuzio 22 (GAP253-GAP254).

112.    Ciuzio agreed with Jennifer Rondholz's (hereinafter "Rondholz") (another Gap employee) assertion that Local 79 was bullying the Gap and that the Gap was otherwise being taken advantage of. Ciuzio also agreed with Kruse's sentiment that Local 79 was terrorizing the Gap. Ciuzio Dep. 117:4-122:6; Ciuzio 23 (GAP247-GAP248).

113.    This being the third time that Local 79 made threats to picket the Mall, and the second time Local 79 reneged on a compromise, representatives of Macerich stepped in and – somehow – convinced Local 79 to back off, informing representatives of BD and Gap as much on August 20, 2014. BD continued to hold their end of the bargain throughout the completion of the Old Navy project. Ciuzio Dep. 124:4-126:14; Ciuzio 25 (GAP24-GAP26).

***Local 79's Threats and Conduct towards the Mall and the Gap Caused BD Harm***

114.     Every time Local 79 made a threat or conducted any union activity at the Mall, Flavoni and/or Deliteris spoke to Zito, Lindsey, DeClara, Ciuzio, and/or Kruse about it.  <u>Flavoni Aff. ¶ 34.</u>

115.     Zito, Lindsey, DeClara, Ciuzio, and/or Kruse and other representatives of Macerich and/or the Gap referred their communications from Local 79 to Flavoni and/or Deliteris.  <u>Flavoni Aff. ¶ 35.</u>

116.     Zito, Lindsey, DeClara, Ciuzio, and/or Kruse and other representatives of Macerich and/or the Gap wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity.  <u>Flavoni Aff. ¶ 36.</u>

117.     When Local 79 agents discussed the Old Navy Job Site or any threats or union activity directed at the Mall or the Gap, Flavoni informed the Local 79 agents that he would relay their message to Zito, Lindsey, DeClara, Ciuzio, and/or Kruse and other representatives of Macerich and/or the Gap.  <u>Flavoni Aff. ¶ 37.</u>

118.     As a direct result of Local 79 apparently being forced to back down on the Old Navy project, agents of Local 79 began to picket the Gap at its corporate office on 55 Thomas Street, New York, NY and other Gap locations.  The union activity was apparently short-lived, however, as they were forced to leave because they were blocking the sidewalk.  <u>Ciuzio Dep. 126:15-133:7, 154:17-155:16.</u>

119.     There were financial penalties in BD's contract with the Gap for BD's failure to complete its work within the schedule set forth by the Gap.  <u>Ross Dep. 109:14-110:2.</u>

120.     Ciuzio's assessment of BD as a company was directly impacted by Local 79's union activity.  <u>Ciuzio Dep. 145:18-151:15.</u>

121.     If Gap had its preference, it would not have had Local 79 on the Old Navy project at all, as it relates to participating in the cost to pay for a Local 79 laborer.  Ciuzio Dep. 253:10-255:3.

122.     Labate and the other business agents raised concerns about "rogue unions" on the Old Navy project and that they should not be working at the Mall.  Zito Dep. 104:8-105:19.

123.     Zito had conversations with Labate about what it would take for Labate to stop harassing Zito and threatening union activity at the Mall.  Zito Dep. 127:19-23.

124.     In assessing the differences between Cully and Labate, Zito found that Cully was a gentleman who was very diplomatic, political, and professional, while Labate was much more pushy, aggressive, intimidatory, and constantly arrived unannounced.  Zito Dep. 24:17-21, 138:11-139:6.

125.     If a picket line had formed, he would have locked BD out of the Old Navy job site. Zito Dep. 139:20-140:14.

126.     Ciuzio recalls that there were threats of shutting down the power to the Mall, threats of picketing, and other unions threatening to picket the Old Navy job site.  Because of the delays caused by these threats, Ciuzio had to visit the Old Navy job site more frequently than before, and he estimated that the Gap collectively spent about forty (40) hours dealing with these union issues.  Ciuzio Dep. 54:24-66:6.

127.     Smith confirmed that he wanted Flavoni to contact Macerich and the Gap as a result of this conversation, and wanted Flavoni to relay his threats to BD's client.  Smith Dep. 156:13-157:4.

128.     Smith's goal in relaying these threats is to get Local 79 laborers to work on the job.  Smith Dep. 157:16-20.

129.     Smith hoped that Flavoni would relay his threat to the client.  <u>Smith Dep. 160:20-162:23.</u>

130.     Smith spoke to Lindsey at Macerich and mentioned setting up a picket line at the shopping mall where the Old Navy job site was.  Lindsey responded with words to the effect of "oh, G-d.  Not again[,]" expressed that he did not want to be dealing with this, and pleaded with Smith to avoid setting up a picket line.  <u>Smith Dep. 196:5-197:21.</u>

131.     A picket line was eventually set up at Brookdale.  <u>Smith Dep. 197:22-25.</u>

132.     Labate admits to threatening to put up a picket line, and that the reason for doing so is because he is not getting any response from the contractor.  <u>Labate Dep. 283:2-284:19.</u>

133.     Local 79 hopes that good union members will honor a picket line, and one of the intentions of having the rat up is to let others know as a signal.  <u>Zecca Dep. 47:19-50:23.</u>

134.     All union activity stops once a resolution is reached either by a signed contract with Local 79, a signed paymaster agreement, if a substantial resolution (something in writing).  <u>Labate Dep. 119:4-121:14.</u>

135.     Labate considers it normal to threaten picket lines at jobs.  Labate failed to deny that he threatened a picket line to Zito.  Macerich representatives may have told him they were threatened with picketing just to shake Flavoni up and that "[m]aybe they don't want an issue either."  Labate further testified that "I might have said, hey, you got to get this thing resolved or these guys are going to do a picket line here."  Labate testified that it is more accurate for him to say if we do not get things resolved, I am going to turn it over to the organizers, who may place a rat up, do leafletting, or picketing,, and that it sounded to him like the people at Macerich were "trying to shake this tree to do something."  Labate testified that he did not feel the need to

disagree with what Flavoni said because Labate threatened picket lines so often.  <u>Labate Dep.</u>
<u>304:15-309:14.</u>

136.    Kruse agreed with Rondholz that the Gap was being downright bulled.   In
response, Kruse wrote: "They are like terrorists.  And we don't negotiate with terrorists."  Kruse
felt like she was being extorted by Local 79's demands to add its laborers to its job site and
Local 79's threats.  <u>Kruse Dep. 96:16-98:8; Ciuzio 23 (GAP247-GAP248).</u>

137.    Kruse observed that Local 79 agents placed a rat outside of the Gap's corporate
headquarters at 55 Thomas Street, New York, NY - where Kruse worked - and had four or five
Local 79 agents picketing with signs.  Kruse called 311 and complained that Local 79's picketing
was blocking their entrance and the rat was taken down.  The rat and/or the protesters blocked
the entrance to the building for Gap employees.        <u>Kruse   Dep.   99:10-100:22;   Ciuzio   26</u>
<u>(GAP21-GAP23)</u>

138.    Once Lindsey at Macerich no longer had any concerns about Local 79, neither did
Kruse at the Gap.  <u>Kruse Dep. 164:19-166:2.</u>

139.    BD incurred damages as a result of Local 79's conduct, including lost Gap bids.
<u>Flavoni 7.</u>

**The Bank of America Job at 95 Wall Street, New York, NY**

***<u>BD is an Approved General Contractor for CBRE and is Awarded a job for BofA</u>***

140.    BD serves as a construction company that executes construction projects for CB
Richard Ellis (hereinafter "CBRE") throughout Bank of America (hereinafter "BofA") branches,
while CBRE serves as the project manager for various BofA branch projects.  <u>Wilde Dep. 9:25-</u>
<u>10:15.</u>

141.     In or about April 27, 2012, CBRE – as construction manager for BofA – awarded BD a contract to perform general contractor services for a branch located at 95 Wall Street, New York, NY (hereinafter the "BofA Job Site").  Wilde Dep. 10:16-23, 11:11-15; Flavoni Dep. 53:5-7.

142.     BD commenced work at the BofA Job Site before October 2012.  Lapidus Dep. 14:2-25.

143.     BD used its own work force – Local 621 laborers – to perform laborers work at the BofA job site.  Weigel Dep. 11:10-13; 28:20-29:5; Ferazzoli Dep. 11:19-21; Williamson Dep. 37:11-23; Capozza Dep. 8:9-9:3; Lapidus Dep. 6:21-7:16; Ross Dep. 12:3-21; Giovinazzi Dep. 54:18-55:25.

144.     BD hired a subcontractor called New York City Acoustics, Inc. (hereinafter "NYC Acoustics") to perform the carpentry work at the BofA job site.  Lapidus Dep. 86:3-5; DePetro Dep. 14:23-25; Flavoni Dep. 55:11-17.

145.     NYC Acoustics is signatory to the Carpenters' Union.  Flavoni Dep. 55:11-17.

146.     Jonathan Lapidus (hereinafter "Lapidus") is an employee of BD who works as a laborer and began working at the BofA Job Site in February 2013 until mid-May 2013, and worked at the BofA Job Site regularly from 6:30 AM to 3:30 PM.  Lapidus Dep. 6:13-20, 10:4-10, 14:2-25, 15:1-6, 16:6-17:8.

147.     Giovinazzi was employed by BD from November 1, 2012 through March 13, 2015, primarily as an assistant project manager.  Giovinazzi Dep. 9:15-22, 10:5-23, 12:25-3:5.

***Local 79 Descends Upon BofA and CBRE***

148.     In early April, Zecca stopped by the BofA Job Site and represented himself to be a business agent of Local 79.  Lapidus Dep. 17:12-18:24.

149.      On April 25, 2013, without any prior notice that it would do so, agents of Local 79 arrived at the entrance of the BofA Job Site and: (i) inflated a rat balloon; (ii) formed a picket line; (iii) blocked the entrance to the job site; and (iv) handed out leaflets. Lapidus Dep. 27:25-28:5, 29:14-30:13, 30:16-31:17, 32:3-8, 32:9-12, 40:22-41:2; Lee 1 (L79:8); Lapidus 3-14 (P14-P24); Lapidus 1 (P106-P107); Lapidus 2 (P315-P317); Lee Dep. 69:3-7, 71:24-72:2., 106:13-107:13, 107:14-24, 107:25-109:6, 110:16-19; Zecca Dep. 62:8-65:15; Flavoni Dep. 60:2-9.

150.      There were four or five Local 79 agents present, including Lee, an organizer, and Zecca, the business agent.  Lee Dep. 55:7-10, 108:6-109:6.

151.      Lapidus arrived at 7:30 AM on the day the rat was blown up instead of his usual arrival time of 6:30 AM because the bus was running late that morning.  Lapidus Dep. 27:16-24.

152.      When Lapidus arrived, he saw a rat blown up in front of the building and about five agents of Local 79 standing in front of the doors handing out fliers and picketing.  Lapidus recognized Zecca was present amongst the Local 79 agents.  Lapidus Dep. 27:25-28:5, 29:3-13.

153.      Local 79's agents were handing out fliers and Lapidus collected one of them. Lapidus Dep. 29:14-30:13; Lee 1 (L79:8).

154.      When Lapidus arrived, the Local 79 agents were stationed in front of the BofA Job Site entrance, blocking it.  After Lapidus asked the Local 79 agents to move twice, they moved and Lapidus walked into the job site.  Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12.

155.      Lapidus was intimidated by the Local 79 agents.  Lapidus Dep. 34:13-35:3.

156.      Lapidus took photos of Local 79's union activity and e-mailed the photos to Flavoni and Deliteris.  Lapidus Dep. 32:13-33:12, 35:4-36:18, 37:3-38:9; Lapidus 3-14 (P14-P24); Lapidus 1 (P106-P107); Lapidus 2 (P315-P317).

### *Carpenters' Union Employees Stand in Solidarity with Local 79's Picketing*

157.     Sal DePetro (hereinafter "DePetro") works for NYC Acoustics and performed services as a carpenter foreman at the BofA Job Site and was at the BofA Job Site every day. DePetro Dep. 10:7-20, 13:4-8, 20:25-21:13.

158.     DePetro has been a member of the Carpenters' Union and an employee of NYC Acoustics for fifteen (15) years.  DePetro Dep. 13:21-25, 14:4-18.

159.     DePetro has seen inflatable rats before and understands that the rats symbolize a labor dispute.  DePetro Dep. 27:6-11.

160.     NYC Acoustics' carpenters were expected to be present at the BofA Job Site at 6:30 AM on the day Local 79 conducted its union activity.  Lapidus called DePetro because they were supposed to be doing sheetrock and framing, and DePetro said that they arrived and left because of the presence of Local 79 agents.  Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107).

161.     The protocol for a Building Trades local member arriving to work at a job site where a rat is present is to: (i) call their employer to inform them of the presence of the rat; (ii) go inside to work while the employer assesses the situation; (iii) meanwhile, the employer calls the union to inform them and a business agent is occasionally dispatched to the job site; (iv) the employer finds out whether to honor the picket line (simply by the presence of the rat) and informs the employee; and (v) if the employee is told to honor the picket line, the employee stops all work and leaves, but if the employee is told not to honor the picket line, the employee will continue working.  DePetro Dep. 28:11-29:23.

162.     It would be commonplace for an employee who is a member of another Building Trades local to speak with the business agent for the Building Trades local who is conducting the union activity.  It would also be common for the business agent to speak to the other Building

Trades local's business agent to assess the situation.  Also, DePetro had previously been told by business agents to honor another Building Trades local's picket line whereby he would drop all of his tools and go outside of the job site to stand outside with the Building Trades' union agents until the dispute was resolved.  DePetro Dep. 29:24-30:14, 30:15-31:24.

163.     DePetro has no recollection – and did not expressly deny – that he honored any picket line or protest activity Local 79 conducted at the BofA Job Site by stopping all work and leaving the BofA Job Site.  DePetro Dep. 31:25-32:9.

164.     DePetro concedes that there have been instances where an incident like the one at the BofA Job Site occurs and Carpenters' members are asked to honor another union's picket line, it would not be unusual for Carpenters not to cross a picket line at the BofA job site in which the Local 79 conducted union activity.  DePetro Dep. 44:2-46:1.

165.     When Lapidus spoke to DePetro, DePetro informed him that they cannot show up to the job site to perform work due to the presence of Local 79 agents outside.  Lapidus Dep. 51:8-52:5.

166.     In fact, DePetro informed Lapidus that he and his coworker were not allowed to cross the line and have been asked not to cross the line.  DePetro furthermore told Lapidus that he would return to perform work after everything was resolved.  Lapidus Dep. 52:6-54:12.

167.     Giovinazzi spoke to Michael Ceciliani (hereinafter "Ceciliani"), the owner of NYC Acoustics, regarding the BofA Job Site.  Ceciliani told Giovinazzi that his employees could not cross the picket line.  Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816).

168.     Lapidus sent daily logs of events that occurred at the BofA Job Site.  Lapidus' daily log for April 25, 2013 – which he sent the following day – stated, among other things, "7am in front of building a rat was blown up and picketers were handing out flyers.  Local 79

29

representative George Zecca was on scene organizing this protest.  After about 45 minutes I was informed by domenic Flavoni that it was resolved and the rat was taken down and everyone left."

Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45).

169.    Lapidus e-mailed Flavoni and Deliteris, among others, on the morning of April 25, 2013 regarding Local 79's conduct at the BofA Job Site.  His e-mail said, in part:

(i)     "This morning when I arrived at 95 wall street to work.  There were 3 guys handing out flyers and there was a very large inflatable rat blown up in a truck right in front of door on water street.  I got to the doors where the guys were standing at first they didn't move then after I said to them That I needed to enter they moved from the front of the doors and proceeded to hand out the flyers … At around 720am Mr. George Zecca from local 79 arrived on the scene[;]"

(ii)     "The contractors … were all here … I called nyc acoustics to ask what time they would come here … they told me that they were asked not to cross the line and to wait till it is resolved[;]"

(iii)     "George zecca said that a laborer had to be on site and that the rat would be up until the issue is resolved[;]" and

(iv)     "After speaking with bd on the phone and George zecca … the rat was taken down and they left the site … at 830 am."

Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

170.    As a result of Local 79's union activity, the NYC Acoustics' employees stopped working and/or refused to work and left the BofA Job Site.  Lapidus Dep. 67:21-68:13, 71:1-4.

171.    At some point in time, Jeannie Choi (hereinafter "Choi") – a representative of BofA – contacted BD to discuss Local 79's conduct.  Specifically, Choi stated that BofA had been contacted by Local 79.  Giovinazzi Dep. 25:18-28:18.

172.    Christine Wilde (hereinafter "Wilde") is the Director of Project Management at CBRE at all relevant times.  Wilde Dep. 6:10-25.

173.     Howard Martin (hereinafter "Martin") was the Project Manager at CBRE for the BofA Job Site at all relevant times.  Wilde Dep. 16:13-25; Lapidus Dep. 25:2-14.

174.     Furthermore, Flavoni and/or Deliteris spoke with Martin to discuss Local 79's conduct.  In no uncertain terms, CBRE requested that BD take care of this problem immediately. Deliteris Dep. 82:24-84:25.

175.     Wilde learned from Martin that: (i) Local 79 had set up an inflatable rat with three men handing out fliers; (ii) Lapidus was blocked from entering the job site; and (iii) that NYC Acoustics informed BD that they were asked not to cross the line and to wait until the problem was resolved.  Wilde Dep. 22:16-25:16.

176.     Both CBRE and BofA have serious concerns about any union activity going on at their job sites because both CBRE and BofA are union-friendly companies and any union activity would give the impression that either company performs non-union work.  Moreover, any union activity at a BofA site causes distress to the relationship between CBRE and BofA, which – in turn – causes distress to the relationship between CBRE and BD.  Wilde Dep. 21:13-23, 21:24-22:8, 58:18-59:2.

### *Pressured by Local 79, CBRE and BofA Insist on BD Hiring a Laborer*

177.     BD was forced to put a Local 79 laborer on the job site to have Local 79 cease its union activity as a result of Local 79's union activity directed at BofA.  Wilde Dep. 35:25-36:12; Giovinazzi Dep. 31:21-35:11; Giovinazzi 2 (P10); Giovinazzi 3 (P6).

178.     Flavoni spoke to Zecca and asked him what it would take to get the rat out of there, and – as a result – arranged for BD to have Riteway provide a laborer at the BofA Job Site in exchange for Local 79 to cease its union activity at the BofA Job Site.  Flavoni Dep. 60:10-61:4.

179.    Riteway is a carting and demolition company.  They performed carting services at the BofA job site.  After BD acquiesced to Local 79's demands to put a laborer on, Riteway was used as a paymaster for a Local 79 laborer, who started working on Monday the following week. Lapidus Dep. 77:6-78:14; Piecora Dep. 8:13-9:14, 12:19-13:8, 13:9-15:19.

180.    A paymaster is a company which is signatory to Local 79 which agrees to accept payment from a non-Local 79 contractor in order to pay for a laborer provided by Local 79. Piecora Dep. 12:22-13:8.

181.    Riteway is part of a collective bargaining agreement with Local 79 as an employer that is part of the Interior Demolition Contractors Association.  Piecora Dep. 49:14-53:6; Rodopoulos 1 (L79:126-129).

182.    On April 26, 2013, at 11:15 AM, a representative of BD sent Piecora (the Secretary of Riteway) e-mail correspondence recounting how Local 79 agents arrived at the BofA Job Site and conducted various union activity such as setting up an inflated rat, distributing fliers, and picketing.  As a result of Local 79's conduct, BD agreed to put a laborer on the BofA job site with Riteway as a paymaster, in accordance with the agreement BD reached with Riteway, in order to have Local 79 cease its union activity.  On April 30, 2013 at 5:28 PM, Piecora responded to confirm the agreement between BD and Riteway.  Piecora understood that Riteway was being hired because Local 79 was picketing and protesting at the BofA job site and both BofA and CBRE wanted to avoid further activity by Local 79.  Piecora Dep. 6:25-7:24, 25:8-27:23; Riteway 1 (P48-P49).

### *Local 79's Threats and Conduct towards the CBRE and BofA Caused BD Harm*

183.    Every time Local 79 made a threat or conducted any union activity at BofA or CBRE, Flavoni and/or Deliteris spoke to Choi, Wilde, or Martin about it.  Flavoni Aff. ¶ 38.

184.     Choi, Wilde, Martin and other representatives of BofA and CBRE, respectively, referred all communications from Local 79 to Flavoni and/or Deliteris.  Flavoni Aff. ¶ 39.

185.     Choi, Wilde, Martin and other representatives of BofA and CBRE, respectively, wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity.  Flavoni Aff. ¶ 40.

186.     When Local 79 agents discussed the BofA Job Site or any threats or union activity directed at BofA and/or CBRE, Flavoni informed the Local 79 agents that he would relay their message to Choi, Wilde, Martin, and its representatives at BofA or CBRE, respectively.  Flavoni Aff. ¶ 41.

187.     Local 79's conduct jeopardized BD's status as an approved vendor of CBRE.  Wilde Dep. 59:3-8.

188.     As a result of Local 79's conduct, BofA became apprehensive about using BD on large high-profile projects and has recommended against using BD for particular projects.  Wilde Dep. 39:13-22, 60:9-61:4, 73:19-74:19, 82:14-18; CBRE3 (CBRE614-CBRE615).

189.     In fact, a BofA project in Brooklyn on Flatbush Avenue worth approximately two million dollars ($2,000,000.00), which was similar to the job performed by BD at the BofA Job Site, was considered to be a high profile job in which – though BD was the lowest bidder – a decision was made not to use BD at that job site due to concerns about Local 79's propensity for conducting union activity at BD's job sites.  Wilde Dep. 81:13-82:13, 82:19-83:4, 83:5-9.

190.     BD was also excluded from all bids by BofA and were not invited to bid on many other New York City projects worth over $500,000.00 due to BofA's recommendation and decision not to approve BD as a bidder for such jobs for nearly eighteen (18) months.  Wilde Dep. 83:10-23, 84:5-86:14, 88:2-5.

191.    BD was excluded from bids for this period time due to reputational risk to BofA and/or CBRE as a direct result of Local 79's conduct.  Wilde Dep. 88:13-23.

192.    Prior to Local 79's union activity at the BofA job site, BofA never requested that BD be removed from the approved list of general contractors.  Wilde Dep. 88:24-89:4.

193.    Local 79's conduct was coercive.  Wilde Dep. 72:9-16.

194.    Though Wilde knew that Local 79 demanded to put a laborer on the BofA job in order to cease its union activity, CBRE would not concern itself with the cost of a Local 79 laborer because it is BD's responsibility to keep union harmony under its agreement with CBRE. Wilde Dep. 30:12-31:25; Riteway 1 (P48-P49).

195.    The union activity conducted by Local 79 at the BofA Job Site could have led to the termination of BD from the project.  Wilde Dep. 59:3-8.

196.    BD incurred damages as a result of Local 79's conduct.  Flavoni 7.

**The Mount Sinai Job at One Gustave L. Levy Place, New York, NY**

***BD is Awarded the Emergency Room Observation Unit Job for Mt. Sinai***

197.    On June 21, 2012, BD and The Mount Sinai Hospital (hereinafter "Mt. Sinai") entered into an agreement for general contractor services to renovate a twenty (20) bed observation unit at Mt. Sinai.  Chang 18 (MS-954 – MS-999).

198.    Mt. Sinai is located at One Gustave L. Levy Place, New York, NY on Madison Avenue between 98th and 102nd Streets (hereinafter the "Mt. Sinai Job Site").  Id.; Chang Dep. 20:5-15.

199.    Edward Chang (hereinafter "Chang") served as the Director of Facilities, Design and Construction at Mt. Sinai from 2012 through 2015.  Chang Dep. 7:18-8:6.

### *Local 79 Descends Upon Mt. Sinai*

200.     There was a union issue at the Mt. Sinai Job Site.  In fact, he was contacted by Local 79 and informed that Mt. Sinai must use Local 79 to perform work under their jurisdiction. Chang Dep. 13:21-16:3.

201.     Indeed, threats were made by Local 79 to conduct union activity at Mt. Sinai directly to representatives of Mt. Sinai, which were relayed to the President of Mt. Sinai.  Local 79 made good on its threat by engaging in union activity while BD was performing work at the Mt. Sinai Job Site, and Chang witnessed the union activity.   Chang Dep. 17:6-20, 19:7-12, 22:18-23:11, 24:9-25:19.

202.     Chang spoke with representatives of BD and informed them that Mt. Sinai needs the issue with Local 79 resolved because having the rat out is not a good thing for Mt. Sinai. Chang Dep. 26:4-20.

203.     Giovinazzi similarly recalls that union activity was conducted by Local 79 at the Mt. Sinai Job Site.  Giovinazzi Dep. 42:9-45:5.

### *Local 79's Threats and Conduct towards Mt. Sinai Caused BD Harm*

204.     Every time Local 79 made a threat or conducted any union activity at Mt. Sinai, Flavoni and/or Deliteris spoke to Chang about it.  Flavoni Aff. ¶ 42.

205.     Chang and other representatives of Mt. Sinai referred all communications from Local 79 to Flavoni and/or Deliteris.  Flavoni Aff. ¶ 43.

206.     Chang and other representatives of Mt. Sinai wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity.  Flavoni Aff. ¶ 44.

207.     When Local 79 agents discussed the Mt. Sinai Job Site or any threats or union activity directed at Mt. Sinai, Flavoni informed the Local 79 agents that he would relay their message to Mt. Sinai and its representatives.  Flavoni Aff. ¶ 45.

208.     Local 79 threatened to picket the Mt. Sinai Job Site and – as a result – BD hired Linear Contracting to serve as a paymaster for Local 79 labor.  Flavoni Dep. 91:19-95:21.

209.     BD incurred damages as a result of Local 79's conduct.  Flavoni 7.

**The Brookdale Job at 1110 Pennsylvania Avenue, Brooklyn, NY**

***BD is Awarded the Brookdale Clinic Job***

210.     Brookdale is located at 1 Brookdale Plaza, Brooklyn, NY on Rockaway Parkway between Church Avenue and Avenue B.  Weigel Dep. 32:23-33:5; Weigel 5; Williamson Dep. 12:5-10.

211.     The Brookdale Job Site was located at 1110 Pennsylvania Avenue, between Cozine and Flatlands.  Weigel Dep. 15:3-7, 15:14-17; Weigel 5; Williamson Dep. 12:11-13; Capozza Dep. 13:21-23.

212.     Brookdale Hospital and the Brookdale Job Site are located about a mile-and-a-half away from each other.  Ferazzoli Dep. 17:13-18; Dugan Dep. 10:2-17.

213.     The scope of the work for the Brookdale Job Site was the building of a twelve (12) exam room clinic with a pharmacy, waiting areas, support space, registration, and reception. Fast Dep. 14:24-15:5.

214.     Gerard Connolly (hereinafter "Connolly") was the Senior Vice President of Facility Planning and Development, and has held that position at all relevant times.  Connolly Dep. 7:8-15.

215.     Jay Fast (hereinafter "Fast") was the Director of Planning, Design, and Transition at Brookdale Hospital, has held that position at all relevant times, and reports to Connolly.  <u>Fast Dep. 6:9-16, 8:23-24.</u>

216.     William Dugan (hereinafter "Dugan") was the Vice President of Security at all relevant times.  <u>Dugan Dep. 6:18-24.</u>

217.     Khari Edwards (hereinafter "Edwards") was the Vice President of External Affairs at Brookdale Hospital at all relevant times.  <u>Edwards Dep. 6:17-7:8.</u>

218.     Mark Toney (hereinafter "Toney") was the President and CEO of Brookdale Hospital at all relevant times.  <u>Fast Dep. 51:17-23; Edwards Dep. 7:12-20.</u>

219.     BD performed construction work at the Brookdale Job Site.  <u>Weigel Dep. 14:2-8.</u>

220.     Robert Weigel (hereinafter "Weigel") is an employee of BD who served as a superintendent at all relevant times, and became the superintendent for the Brookdale Job Site in the Spring of 2014, approximately a month before work started at the Brookdale Job Site.  <u>Weigel Dep. 15:23-16:4, 18:21-25.</u>

221.     Nicola Capozza (hereinafter "Capozza") served as the project manager for the Brookdale Job Site.  <u>Weigel Dep. 17:19-21.</u>

222.     Labate first learned of BD by finding the Brookdale Job Site.  <u>Labate Dep. 47:19-51:12.</u>

223.     A business agent from Local 79 once visited the Brookdale Job Site approximately a month after construction commenced.  <u>Weigel Dep. 21:15-22, 22:6-12.</u>

224.     Deliteris spoke with the business agent from Local 79 – who Weigel later understood to be Labate – and left after speaking to Deliteris.  <u>Weigel Dep. 23:12-14, 24:18-21, 26:16-24, 66:16-24, 66:25-67:24.</u>

225.     Business agents continued to appear at the Brookdale Job Site.   Weigel Dep. 24:25-25:4.

226.     Weigel kept a daily log of operations on job sites at the Brookdale Job Site. Weigel Dep. 118:5-119:23; Weigel 8 (P733).

### *Local 79 Descends Upon Brookdale Hospital*

227.     Weigel's log for April 24, 2014 states, in relevant part: "Rep from Local [79] came into our meeting.  Talked with Jimie re this job.  We told him we are with Local 621.  He said they don't recognize that union.  Him and Jimie walked out to parking lot and he left." Weigel Dep. 124:1-24; Weigel 8 (P608).

228.     Williamson is an organizer for Local 79.  Williamson Dep. 87:8-9.

229.     Williamson called representatives of Brookdale Hospital three (3) times claiming the work by stating that Local 79 has no representation on the Brookdale Job Site.   Williamson Dep. 14:17-15:20, 24:13-25:2.

230.     Every non-Local 79 contractor does not treat their employees with dignity and respect, while every Local 79 contractor does.  However, Williamson also did not do any research on BD as to whether BD's employees are treated the same as Local 79's members, basing his conclusions on "the past" and "historically speaking."   Williamson Dep. 19:14-25, 21:2-20.

231.     Williamson called Brookdale Hospital with the objective of having Brookdale Hospital use a Local 79 contractor and in order to have BD removed from the Brookdale Job Site.  Williamson Dep. 23:15-17, 28:9-19.

232.     Williamson concedes that when he was contacting representatives of Brookdale Hospital, he was not trying to inform the public about what Brookdale Hospital was doing. Williamson Dep.  26:13-21, 26:22-28:8.

233.     Williamson organized a picket line at Brookdale Hospital on six (6) different days: May 12, 13, 16, 19, 20, and 21, 2014.  Williamson Dep. 32:22-34:22, 68:21-70:24, 71:6-7; Williamson 5 (L79:117-122).

234.     On May 12, 2014, at 10:52 AM, Toney said to Connolly and others that he thought the dispute between BD and Local 79 was resolved already and understood that this dispute was one union against another.  On the same day at 11:17 AM, Connolly wrote to Fast stating "[t]hey have to rescue this now[,]" referring to BD, and meaning that BD has to resolve the issue.  Fast Dep. 38:20-39:21; Brookdale 1 (BROOK2).

235.     Fast understood that Local 79's dispute was with another union – Local 621, BD's union. Fast Dep. 39:22-40:10; Brookdale 1 (BROOK2).

236.     On May 12, 2014, at 11:17 AM, Connolly inquired of Deliteris whether the rat would still be placed at Brookdale Hospital the following morning because he was concerned about its continuing presence at the hospital.   Connolly Dep. 53:15-54:15; Brookdale 1 (BROOK7).

237.     Minutes later, at 11:21 AM, Connolly inquired of Flavoni and Deliteris again, stating that he needs a report "stat for what is the status and strategy" and that this is "for the CEO and [the] people at [the Department of Health, which provide Brookdale Hospital with funding]" Connolly Dep. 54:16-57:24; Brookdale 3 (BROOK9).

238.     On May 12, 2014 at 11:42 AM, Margaret Brubaker (hereinafter "Brubaker") – the Senior Vice President of Human Resources at Brookdale Hospital – e-mailed many Brookdale

representatives on behalf of Connolly to advise that Local 79 is conducting union activity at Brookdale Hospital and explained that there is a dispute because Local 79 wants the entire project at the Brookdale Job Site.  Brookdale provided explanations to representatives of various unions that deal with Brookdale about Local 79's conduct.  Fast's understood that Local 79 wanted all of the "laborers' work." Fast Dep. 40:11-41:22; Brookdale 1 (BROOK5).

239.    The following day, at 1:40 PM, Flavoni called Labate back to inquire on the status of taking the rat down.  Labate said that he had trouble reaching the organizing director, but he reached out to the organizer himself.  Describing this, Labate told Flavoni: "I said, you know, finish up early … the rat area.  And they're not going to put it up tomorrow[.]"  Flavoni and Labate then agreed to meet the following day.  5132014 14003 PM.m4a; Flavoni Aff. ¶¶ 22, 33.

240.    Brookdale Hospital representatives did not choose the subcontractors for the Brookdale Job Site; representatives of BD did, as the general contractor.  Fast. Dep. 18:11-14.

241.    BD was performing the work at the Brookdale job site using workers from Local 621.  Brookdale was contemplating using Local 79 laborers, even though it was going to cost more, in order to avoid any further union issues with Local 79.  Fast Dep. 56:16-17, 56:21-57:4.

242.    On May 12, 2014, BD signed an agreement with AMG Environmental Restoration LLC (hereinafter "AMG") to perform demolition work to appease Local 79.  Flavoni 4 (P844-P867).

243.    AMG is a demolition contractor which is signatory to Local 79.  Weigel Dep. 30:10-14.

244.    On the following day, May 13, 2014, at 8:02 AM, Connolly wrote to Flavoni and Deliteris to inform them that Local 79 came back with the rat again.  Connolly testified that: (i) both the rat and Local 79 agents were outside of the hospital standing around the rat and handing

out fliers; (ii) the purpose of his e-mail was to get BD to take action to remove the rat; (iii) that he believed Local 79 placed the rat up in order to coerce Brookdale into using Local 79 labor; (iv) if Local 79 did not conduct any union activity, there would be no need to have a conversation with BD about hiring Local 79 laborers at the Brookdale clinic job site; (v) Brookdale did not like having a rat outside the front entrance of the hospital, nor did Brookdale like having individuals passing out fliers in front of the hospital.  Connolly Dep. 62:18-65:23; Brookdale 5 (BROOK16).

245.    Connolly understood that Local 79 claimed the work at the Brookdale Job Site for themselves and that "they wanted whatever 'everything' meant."  Connolly Dep. 65:24-66:16.

246.    On May 13, 2014, at approximately 10:25 AM, Flavoni and Labate had a telephone conversation regarding Local 79's union activity.  Flavoni insisted to have the rat taken down the very same day, but Labate declined.  Flavoni inquired about what the problem was, and Labate answered: "I [would] like to claim [my] jurisdictional work;" "I'm trying to get some general conditions work, you know, that's what I'm trying to do."  During the call, Labate repeatedly intimated that he had spoken to Connolly.  Though Labate told Flavoni he does not control the rat, he later said: "Tell you what I'll do.  It's 11 o'clock.  Why don't I do this: Tomorrow there'll be no rats in front of the hospital 'til we have a conversation.  How about that? Fair enough?"  5132014 102550 AM.m4a; Flavoni Aff. ¶¶ 21, 33.

247.    On May 13, 2014 at 10:39 AM, Connolly wrote to Flavoni (with copies to Deliteris and Fast) that Local 79's conduct is becoming problematic for Brookdale.  Fast knew that Local 79 was looking for all of the laborers' work, and that Local 79 was putting pressure on Brookdale Hospital to give Local 79 laborers' work by putting the rat out and by passing out fliers.  Fast Dep. 41:23-45:9; Brookdale 6 (BROOK18).

248.     On Tuesday, May 13, 2014, at 11:01 AM, in response to an e-mail from Connolly at 10:39 AM stating that "Labate needs to get this down" and that Local 79's union activity "is becoming problematic[,]" Flavoni responded to inform Connolly that Labate clearly stated what he is looking for, which was "all of the general conditions" (which is, generally, a laborer or laborers who clean up after the trades).  Connolly Dep. 67:22-71:13.

249.     Connolly asked Flavoni to find out what Local 79 wants at the direct request of Toney.  In effect, Connolly wanted BD to reach out to Local 79 at Brookdale's behest to find out what Local 79 wanted in order to end Local 79's union activity.  The rat and the fliers being handed out in front of Brookdale Hospital was a very difficult message for Brookdale to handle, which was why Connolly told Flavoni that "this is becoming problematic."   Connolly specifically said that Local 79's union activity had to go away.  Id.

250.     On May 14, 2014, at 11:14 AM, Flavoni called Labate to schedule a meeting as a result of Brookdale Hospital's urging.  They agreed to meet at the Brookdale Job Site at 1:00 PM.  5142014 111405 AM.m4a; Flavoni Aff. ¶¶ 23, 33.

251.     The same day, at 12:47 PM, Flavoni and Labate meet.  Labate told Flavoni that Local 79 is entitled to do the work at the Brookdale Job Site because it is a hospital.  Though Labate concedes that there is no contract between Brookdale and Local 79, Labate cited the union harmony clause.  Flavoni inquired about BD's desire to use its own men under Local 621 and Labate said that "it's going to be an issue, unless you want to sign with me …"  Labate explained that when he is not getting anywhere (in terms of having Local 79 laborers hired or signing up a contractor), he informs his boss and his boss instructs him to "put a line up."  Labate further explained that the rat was placed up because no one returned his call.  Flavoni asked and Labate confirmed that the only reason the rat is down now is because Flavoni has agreed to meet

and talk to Labate.  When Flavoni asked how he can avoid being targeted by Local 79 with the rat, Labate explained that since he cannot sign with Local 79, the "only way to suffice" for BD is to hire a laborer through a paymaster agreement, which Labate explained was a contract signed with the local that carries the payroll for a contractor.  Labate also explained that the Local 79 laborer cannot work alongside a non-Local 79 laborer.  When Flavoni asked what other options he has, Labate responded "You should have signed with me, not 621," and, referring to Local 79, said "Hey listen, it's a force."  Labate commiserated with Flavoni and said "if I was in your position, I don't know what I would do."  He reiterated: "you asked me what's the resolution. The resolution is either sign … or we figure out a paymaster situation …"  5142014 124711 PM.m4a; Flavoni Aff. ¶ 24, 33.

252.    On May 15, 2014, at 2:59 PM, Labate called Flavoni and spoke to him together with Deliteris on the phone.  When Flavoni informed Labate that they will not "bow down" to Local 79, Labate responded that he knows about the Old Navy job at Kings Plaza (hereinafter the "Old Navy Job" or "Old Navy") and that Local 79 and BD will – in effect – bump heads.  Labate declined to inform his boss that BD is a union shop under Local 621 and should be left alone; rather, Labate threatened that his organizing department "does those picket lines" and explained that it does not matter whether BD is union or non-union because he is "claiming the jurisdictional work."  5152014 25938 PM.m4a; Flavoni Aff. ¶¶ 25, 33.

253.    On Thursday, May 15, 2014, at 3:28 PM, Flavoni informed Connolly that BD and Local 79 could not come to terms.  Flavoni attempted to work something out with Local 79 upon Connolly's directive.  Connolly understood that Local 79 wanted its men on the job, and that if BD did not acquiesce to Local 79's demands, Local 79 would continue to conduct its union activity outside of Brookdale Hospital.  Connolly Dep. 72:22-75:4; Brookdale 9 (BROOK43).

43

254.     If Connolly he had to "step in" and "end this[,]" he would have instructed BD to hire the laborers Local 79 demanded to have on the Brookdale Job Site.  Connolly did not want to – nor could afford to – hire Local 79 laborers, but would find a way to do so to end Local 79's union activity.   Connolly Dep. 82:24-84:22; Brookdale 16 (BROOK69-BROOK70).

255.     On May 19, 2014, Weigel visited Brookdale Hospital and took video footage of Local 79's union activity as he walked towards the rat and inquired of the Local 79 agents what they were picketing.  The Local 79 agents did not deny that they were picketing the Hospital. The rat was across the street from the main entrance of Brookdale Hospital.  Approximately six (6) Local 79 agents were standing around the rat and handing out fliers.   Weigel Dep. 57:6-10, 41:16-19, 42:6-8, 32:35-36:4, 42:9-24, 41:20-42:2, 57:16-25, 49:22-50:4, 60:10-23, 58:2-11, 50:20-51:2; Video.MOV; Weigel 3 (P277-P278); Weigel Aff. ¶¶ 4-5, 9.

256.     In response to an e-mail from Flavoni to Connolly dated May 20, 2014 at 7:03 AM asking whether the rat has returned, Connolly responded at 7:20 AM the same day and stated "Yes It is becoming a challenge[.]"  When Flavoni replied at 7:22 AM to provide an update that BD expects to apprise Connolly of further developments at noon (only about four hours later), Connolly responded at 7:33 AM that he is "[n]ot sure [they] can hold off the chaos in the [executive] suite."  Additionally, Connolly forwarded the aforementioned correspondence to Fast stating that: "[Toney] was apoplectic yesterday.  He actually went to the demonstrators to tell them to leave ... I will not be able to hold [Toney] off. He wants to call a press conference and call [Local 79] out."  Toney was very angry and wanted the rat to go away, which put pressure on Connolly and Fast to resolve the issue.   Fast Dep. 50:13-55:23; Brookdale 12 (BROOK63-BROOK64).

257.     When Connolly wrote that "[i]t is becoming a challenge[,]" Connolly was referring to the fact that it was a challenge to make the rat go away (as well as the fliers), and that Brookdale wanted to eliminate all Local 79 union activity at Brookdale.   Fast Dep. 57:5-17; Brookdale 12 (BROOK63-BROOK64).

258.     On May 20, 2014, at 8:16 AM, Connolly wrote to Toney to advise him that he believes Brookdale should wait before acting, and that failing other efforts to have Local 79 cease and desist from its conduct, Connolly would step in late this afternoon and "end this[.]"  At 8:35 AM, Toney e-mailed Connolly to ask whether the rat was on site.  In response, Connolly forwarded Deliteris' update on the status of a proceeding instituted against Local 79 before the National Labor Relations Board (hereinafter "NLRB") (stating that there should be a decision by noon that day) to Toney and stated that he believes that they should wait for the decision and that he would end this issue if there is no decision by noon.  Connolly further remarked in a forwarded e-mail at 8:50 AM to Fast, Flavoni, and Deliteris that he is afraid this will be a difficult day.  Connolly said this because the rat was up again and Toney was very angry about it. Fast  Dep.  60:9-63:10,  90:492:9;  Brookdale  18  (BROOK76-BROOK80),  Brookdale  20 (BROOK89).

259.     Connolly forwarded the e-mail to Flavoni and Deliteris because Local 79 resumed its union activity at Brookdale after it previously ceased its union activity, and wanted to inform them about it so that they can resume discussions about how to resolve this problem.  The flier damaged the reputation of Brookdale, and thought that the leaflet implied that Brookdale's medical practices are unsafe.  Connolly testified that he believed handing out this flier would create the perception that Brookdale was not providing quality health care.  Connolly Dep. 90:4-92:9; Brookdale 20 (BROOK89).

260.     While Connolly was unsure whether the flier would persuade individuals not to utilize Brookdale in seeking medical attention, Connolly was adamant that the flier could and would create anxiety amongst patrons of Brookdale because the flier and Local 79's dispute with BD and Local 621 "is the last thing they need to be dealing with." Connolly Dep. 92:10-93:8.

261.     Dugan was notified that the rat was placed in close proximity to Brookdale Hospital.  Dugan Dep. 33:22-34:16.

262.     Dugan contacted the police to notify them of Local 79's conduct because he had safety concerns regarding the rat's placement.  Dugan Dep. 24:17-26:21, 27:14-21, 31:12-22.

263.     Williamson admits that he knew that BD is represented by Local 621. Williamson Dep. 37:11-23.

264.     Williamson's goal of conducting his campaign was to get Brookdale to sit down with a business agent of Local 79. [cite] ("my job is to get [Brookdale] to meet with [Local 79] … That's my objective.  My objective is to bring Brookdale … to the table to resolve the situation").  Williamson Dep. 38:9-23, 41:19-42:6.

265.     Even if BD offered its employees exactly what Local 79 offered to its members, Williamson would still be out there conducting union activity against Brookdale Hospital for using a non-Local 79 contractor.  Williamson Dep. 42:15-43:14.

266.     Local 79's jurisdiction covers the five (5) boroughs of New York City, and that his department's goal is to increase Local 79's market share.  Williamson Dep. 48:3-5, 49:20-50:5.

267.     Every job action Williamson takes is to further the goal of the Local 79's Market Development Department.  Williamson Dep. 52:25-53:6.

268.     If someone asked him what to do when they see a rat, Williamson testified that: (i) he would ask them to acknowledge the problem and stay in solidarity with whatever the issue was; (ii) good members know what to do; and (iii) standing in solidarity could mean all sorts of things. Williamson Dep. 73:18-79:2.

269.     On May 21, 2014, at 7:43 AM, Connolly wrote to Flavoni and Deliteris that he believes it is in everyone's best interest to resolve this quickly, and mentioned that the rat is at Brookdale today. At 9:07 AM, Connolly followed up and wrote that there is a new flier with Toney's name on it, which Toney would not look at kindly. He ended his correspondence by stating that he cannot stress how important resolution is today. Fast Dep. 57:18-60:3; Brookdale 14 (BROOK58).

270.     On May 21, 2014, Weigel noted in his log that a Local 79 laborer will be at the Brookdale Job Site after demolition is over. Weigel Dep. 136:19-139:25; Weigel 10 (P610).

271.     Connolly saw the flier. Connolly Dep. 33:3-36:11; Brookdale 2 (BROOK4).

272.     Connolly was less upset about the fact that his name was on the flier than the fact that Local 79 decided to engage another union in a public debate outside the front door of a hospital regarding a job that is a mile-and-a-half away, and the many people that walk in through the front door of the hospital are not having a good day as it is, and that being accosted by Local 79 - even with a smile - without being told what the real problem is (that Local 79 wants the work that another union obtained) was problematic for Connolly. Connolly Dep. 36:12-37:21.

273.     Connolly understood that Local 79 wanted its members to perform the work, and did not want a different union's members performing the work. Local 79 engaged in this union activity in order to get representation on the Brookdale clinic job. Connolly Dep. 37:23-38:21.

274.     When Connolly discussed Local 79's union activity with representatives of BD, the conversation would be about how to get Local 79 to cease conducting union activity. Connolly wanted and insisted that BD acquiesce to Local 79's demands in order to get Local 79 to cease conducting its union activity at Brookdale Hospital.  This is despite the fact that Connolly learned that adding a Local 79 laborer on is a complicated process with paymasters. Connolly Dep. 38:22-40:15.

275.     Connolly was as upset about the rat Local 79 placed at the hospital as Toney was, especially about the fact that the Brookdale clinic job site was a mile-and-a-half away. Personally, Connolly was more upset about fliers being handed out to people visiting the hospital.  Connolly Dep. 44:2-45:3.

276.     Local 79's union activity caused Brookdale to put pressure on BD to resolve the dispute by doing whatever needs to be done, because Local 79's union activity placed pressure on Brookdale.  Connolly Dep. 45:4-48:25.

277.     Connolly explained to Toney that Local 79's union activity arises out of a dispute between Local 79 and Local 621 where Local 79 did not approve of Local 621.  Connolly Dep. 49:2-15.

278.     Any additional costs incurred on the project would have to be assumed by BD because Brookdale did not permit BD to spend whatever money they wanted on the Brookdale clinic job site.  Costs not specifically approved by Brookdale – especially those costs which would cause Brookdale to go over its budget – were not going to be paid by Brookdale. Connolly Dep. 49:16-53:14.

279.     On May 27, 2014, BD signed an agreement with AMG for AMG to serve as paymaster for a Local 79 laborer.  Flavoni 5 (P832-P843).

48

280.     The Brookdale Job Site was later shut down for a few months due to a structural slab issue.  Capozza Dep. 48:8-50:2.

281.     On August 13, 2014, Smith and Flavoni spoke on the phone where Smith stated that he is the area business agent for Local 79, he just inherited Brooklyn, and that Labate was the area business agent for Brooklyn but he left for Manhattan.   8132014 93846 AM.m4a; Flavoni Aff. ¶ 28, 33.

282.     Smith found the Brookdale Job Site by canvassing the area when he took over the Brooklyn area and that he did not speak to Labate about the Brookdale Job Site beforehand. Smith Dep. 50:25-51:9, 54:25-55:6, 62:21-64:4.

283.     On October 8, 2014, Smith contacted Connolly and left a message with a secretary for him.  Smith's message was that Local 79 has no representation at the Brookdale Job Site.  Smith Dep. 57:10-15, 58:10-59:16; Smith 2 (P569).

284.     On the same day, Flavoni contacted Smith as a result of Smith's contacting Connolly.  Smith asked Flavoni whether AMG will continue to serve as the paymaster for general conditions work now that demolition work is completed.  Flavoni responded that he was not planning on it.  Smith said that AMG is obligated to stay on the job for the general conditions work.  When Flavoni informed Smith that he is not interested in doing that, Smith said "All right, Domenico, I'm trying to make sure we don't have a problem here …"  Flavoni asked Smith about what happens to his employees covered under a CBA with Local 621.  Smith responded that they are not connected with the Building Trades and that Local 621 men are irrelevant because they are not signatory with Local 79.  1082014 32430 PM.m4a; Flavoni Aff. ¶¶ 29, 33.

285.     In a follow up conference the same day at 3:38 PM, Smith called Flavoni back to inquire about whether there is a chance that BD's union – Local 621 – has a reciprocal with

Local 79.  Smith reiterated that BD should be signed with Local 79, which Flavoni declined because he already has a contract with Local 621.  When Smith asked whether he can have Local 79 laborers at the Brookdale Job Site, Flavoni declined.  Smith said he will call him back.  1082014 33829 PM.m4a; Flavoni Aff. ¶¶ 30, 33.

286.     The next time Smith called Brookdale Hospital directly, he spoke to Connolly, introduced himself, and inquired about the Brookdale Job Site, to which Connolly responded that he thought this issue was resolved already.  Smith Dep. 60:2-13, 66:18-68:4.

287.     On October 15, 2014, at 10:19 AM, Smith called Flavoni and demanded again to have Local 79 laborers at the Brookdale Job Site.  When Flavoni declined, Smith responded that he spoke with Connolly.  Flavoni explained that if he brings Local 79 laborers on, he will have a problem with Local 621.  Smith responded that the problem is Local 621 has no reciprocal and that this is basically a "spit in our face" because Local 621 is doing Local 79's "jurisdictional work."  When Flavoni asked for an explanation, Smith responded that the union BD's employees are covered by is not a Building Trades local.  Flavoni explained that there is no law requiring him to use Local 79 laborers.  In response, Smith stated that "this is where we have the right to organize, you understand?"  Flavoni continued to ask for how he is supposed to deal with Local 621, and Smith responded that BD can sign with Local 79.  Smith also said, grimly, that "if you're going to be in the city, in the five boroughs, you're going to come across this again."  Smith further explained that though Local 621 is signatory to BD, they are not recognized.  Flavoni offered Smith a portion of the work and Smith requested whether he can get back to Flavoni with an answer.  10152014 101905 AM.m4a; Flavoni Aff. ¶¶ 31, 33.

288.     On October 17, 2014, at 11:36 AM, Smith called Flavoni to confirm that Flavoni received a message Smith left for Flavoni the other day.  Flavoni confirmed receipt of the

message and recounted that the message left was along the lines of "[the] deal is off the table, not acceptable" or something along those lines.  Smith confirmed this and stated that if Local 79 has to fight "tooth and nail," they will, meaning Local 79 will go as far as they have to – generally speaking – but would still like to resolve it and offered BD to become signatory to Local 79 again, which Flavoni promptly rejected.  Flavoni expressed his disdain for Local 79 because of the way they threaten and work against BD, but stated that he would speak to his client about a potential resolution.  Smith responded that he had been in contact with Connolly and remains in contact with him.  Smith Dep. 246:23-251:9; Smith 3 (10172014 113652 AM.m4a; Flavoni Aff. ¶¶ 32-33).

289.    On October 21, 2014, at 8:17 AM, Brubaker told various Brookdale representatives that the rat is back and provided a summary of what the leaflet Local 79 is handing out states.  Connolly forwarded this e-mail to Fast, Flavoni, and Deliteris at 8:50 AM the same day.  Fast Dep. 63:11-25; Brookdale 20 (BROOK89).

290.    On October 21, 2014 at 12:34 PM, Deliteris sent Connolly an e-mail outlining the history of what transpired with respect to the Brookdale clinic job site and Local 79's activity. Local 79's conduct prior to the structural issue at the job site resulted in two (2) Local 79 laborers being brought on to perform work at the Brookdale Job Site.  After work resumed there, Local 79 pushed for more work and – despite being offered a portion of the work – Local 79 rejected this and said that they would fight BD "tooth and nail."  Fast Dep. 69:8-72:21; Brookdale 22 (BROOK92).

291.    In response to the e-mail from Deliteris, Connolly responded to say – among other things – "just keep pushing[.]"  Connolly asked Deliteris that BD work on getting the job done because, if there is no more construction, there can no longer be any dispute.  Connolly recalls

conversations with Flavoni and Deliteris about BD giving Local 79 the work they wanted and coming to some sort of compromise at Brookdale's behest because Connolly wanted to resolve the issue.  In Deliteris' summary, he relayed Smith's message that Local 79 was going to fight BD "tooth and nail" unless BD puts Local 79 laborers on the job site.  Connolly testified that he understood the "tooth and nail" comment as a broader fight across Brooklyn and other jobs going on, i.e., a "full-out turf war, they were not going to give an inch."  Commenting on Connolly's response to that e-mail at 12:57 PM later that day, Connolly was concerned and wanted to finish the project.  Connolly was concerned because he thought Local 79 would resume its union activity with the rat and the fliers, and - in addition - that Local 79 would picket Brookdale Hospital.  Connolly Dep. 93:11-105:10; Brookdale 22 (BROOK92).

292.     Weigel visited Brookdale Hospital a second time on October 21, 2014.  This time, he drove by and took videos of the rat and Local 79 agents picketing around the rat.  The rat was across the street from the main entrance of the hospital.  Weigel Dep. 59:12-24, 34:14-17, 35:2-4, 36:24-37:2,   35:25-36:4,   37:3-17,   39:2-40:15,   42:25-43:9,   57:11-15;   IMG_0758.mov; IMG_0759.mov; IMG_0760.mov;[2] Weigel 4 (L79:9-10); Weigel Aff. ¶¶ 7-9.

293.     Connolly reiterated twice on November 11, 2014 that Brookdale wants to complete work at the Brookdale Job Site as soon as possible to end Local 79's union activities there.  Connolly Dep. 108:25-110:4; Brookdale 32 (BROOK124).

294.     On November 11, 2014, at 12:20 PM, Connolly forwarded Flavoni, Deliteris, and Fast correspondence from Edwards in which Edwards stated that he was at a political conference and Brookdale was the topic of some conversation.  Additionally, Edwards characterized Local

---

[2] The reference to a file ending with ".mov" refers to a video.

79's union activity as a "public relations nightmare," which Connolly agreed with Edwards' assessment.  Connolly Dep. 110:5-112:13; Brookdale 33 (BROOK126-127).

295.    On November 14, 2014, at 5:15 PM, Flavoni sent Connolly a list of options for dealing with both the Carpenters' and Local 79's union activity.  The options included: (i) continue as-is and endure the union activity; (ii) direct BD to hire the Building Trades locals members in addition to the current work force; (iii) direct BD to replace its workforce with Building Trades locals' members; or (iv) replace BD all together.  Connolly inquired about having BD and the Building Trades locals work together in an effort to cease all union activity at Brookdale.  One way or another, Connolly's objective was to avoid any union activity at the hospital and remain within budget for the project, two priorities that Connolly must balance.  Connolly would be willing to pay money within their budget to avoid union activity at Brookdale.  Connolly Dep. 118:3-121:4; Brookdale 37 (BROOK165-BROOK168).

296.    Local 79 picketed Brookdale Hospital on October 21, 27, 28, 29, 30, 31 and November 3, 4, 5, 6, 10, 11, 12, 13, 14, 18, 19, 20, 21.  L79:155-179.

297.    During his deposition, Smith conceded that if Local 79 laborers are to perform work at the Brookdale Job Site, Local 621 members would necessarily not be performing that work.  Smith Dep. 191:19-192:2.

298.    Smith's job with a contractor like BD is to try and get BD to use Local 79 men if BD is performing covered work under Local 79's CBA.  Smith Dep. 18:19-24.

299.    According to Smith, the work being done was Local 79 work, and that Smith was claiming this work for Local 79.  Smith Dep. 194:22-195:9.

300.    Ferazzoli recalls that Local 79 agents issued leaflets to people as they picketed Brookdale Hospital.  Ferazzoli Dep. 60:9-13.

301.     Toney was extremely upset by the presence of the rat and was angry because it was becoming a problem for the hospital.  Toney did not want the embarrassment of the rat in front of Brookdale Hospital.  Edwards Dep. 28:18-29:19, 52:10-53:11.

302.     Toney was bothered by the rat because it was harming Brookdale Hospital's brand and standing within the community.  Edwards Dep. 54:16-55:18.

303.     Fast understood that Local 79 conducted its union activities because Brookdale was not using Local 79 laborers, and Local 79 was trying to put pressure on Brookdale to change contractors.  Fast Dep. 26:19-27:6, 27:8-11.

304.     In Fast's view, Local 79 was attempting to harass and upset Brookdale by issuing leaflets in which it stated that Brookdale was allowing BD to exploit construction workers at the clinic job site, may result workers being exposed to unsafe work conditions which can lead to the workers becoming patients at Brookdale, and that Local 79 hopes Brookdale does not have the same theory for their medical practices because the statements made within the flier were not true.  Fast Dep. 64:22-65:10; Brookdale 20  (BROOK89); Brookdale 2 (BROOK4).

305.     Fast had concerns about the fact that Local 79's union activity would cause issues with other unions involved with Brookdale Hospital.   Fast Dep. 65:11-66:10; Brookdale 1 (BROOK5).

306.     Fast expected Local 79 to cease their union activity if they hired Local 79 laborers to perform work at the Brookdale Job Site.  Fast Dep. 72:2-21; Brookdale 22 (BROOK92).

307.     Local 79's placement of the rat outside of Brookdale Hospital caused Fast concern in that it gave the impression that Brookdale was doing something wrong and because Brookdale has union contractions with 1199 and another union.  Fast Dep. 27:12-28:18.

308.     Fast informed Connolly when he observed the rat and the Local 79 agents picketing outside, and they discussed their concerns regarding same.  Fast Dep. 28:19-29:2.

309.     Fast also had concerns with respect to delays that the Brookdale Job Site might incur as a result of Local 79's union activities, as Brookdale Hospital had certain deadlines they wanted to meet, and labor disagreements would hold up the project.  Fast Dep. 30:10-18, 31:17-23.

310.     Though Fast did not  have any conversations with any member of Local 79, business agents and organizers of Local 79 communicated with Fast and other representatives of Brookdale through Flavoni and Deliteris.  Additionally, Local 79 agents reached out directly to Connolly.  Fast Dep. 110:18-111:14; Brookdale 28 (BROOK106).

311.     In Fast's view, the motive behind Local 79's actions was to have Local 79 workers perform some or all of the labor work on the Brookdale Job Site.  Fast Dep. 32:21-34:8.

312.     If Local 79 did not conduct any union activity, Brookdale Hospital would not have requested that BD hire a Local 79 laborer.  Fast Dep. 75:13-76:2.

313.     Brookdale Hospital was so concerned about Local 79's conduct (for which it recognized it could not do anything about), that it hired an outside public relations firm to prepare a statement addressing the union activity.  Edwards Dep. 75:20-78:7.

314.     Edwards had concerns about Local 79's union activity because of 1199's heavy presence at Brookdale Hospital and the risk that 1199 could become sympathetic to Local 79's union activity and supporting Local 79 to Brookdale Hospital's detriment.  Edwards Dep. 84:12-85:5.

315.     Edwards was under pressure to get the rat down by any means possible.  Edwards Dep. 26:13-27:9.

316.     To Connolly's knowledge, Brookdale has no contract with Local 79.  Connolly Dep. 150:21-151:2.

317.     Connolly does not recall any conversation with Smith and that Local 79 wanted its members to perform the work at Brookdale to the exclusion of everyone else.  Connolly Dep. 141:6-143:22.

318.     Connolly confirmed that – based on Connolly's conversation with Smith – he understood that the rat and the fliers would go away if Local 79 members were placed on the job. Connolly Dep. 177:9-17.

### *Local 79's Threats and Conduct towards Brookdale Hospital Caused BD Harm*

319.     Every time Local 79 made a threat or conducted any union activity at Brookdale Hospital, Flavoni and/or Deliteris spoke to Connolly and/or Fast about it.  Flavoni Aff. ¶ 46.

320.     Connolly, Fast, and other representatives of Brookdale referred all communications from Local 79 to Flavoni and/or Deliteris.  Connolly Dep. 160:3-16.

321.     Connolly, Fast, and other representatives of Brookdale wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity. Flavoni Aff. ¶ 48; Brookdale 3 (BROOK9).

322.     When Local 79 agents discussed the Brookdale Job Site or any threats or union activity directed at Brookdale Hospital, Flavoni informed the Local 79 agents that he would relay their message to Brookdale Hospital.  Flavoni Aff. ¶ 49.

323.     BD ultimately hired Local 79 laborers as a result of Local 79's conduct, and this resulted in an increase to the cost of the Brookdale Job Site.  Fast Dep. 35:24-36:5.

324.     As a result of the Brookdale Hospital union activity conducted by Local 79, which pressured Brookdale Hospital, BD acquiesced to Local 79's demands by hiring a Local 79

laborer in exchange for Local 79's cessation of union activity at the Brookdale Job Site. Williamson Dep. 56:4-57:19.

325.     BD incurred damages as a result of Local 79's conduct.  Additionally, BD was not considered for at least one (1) other project and Brookdale considers the fact that Local 79 may interfere with BD's performance on a project as a negative factor in deciding whether to award BD any future work.  Fast Dep. 89:21-97:23, 114:24-115:11; Flavoni 7; Brookdale 22 (BROOK92).

### *Local 79 Does Not Have A Contract With Any of the Secondary Neutral Employers*

326.     BofA is not signatory to any contract with Local 79.  Lee Dep. 84:21-85:23.

327.     CBRE is not signatory to any contract with Local 79.  Lee Dep. 84:21-85:23.

328.     Mount Sinai is not signatory to any union in the construction industry.   Chang Dep. 10:5-9; Lee Dep. 84:21-85:23.

329.     Brookdale is not signatory to any contract with Local 79.  Lee Dep. 84:21-85:23.

330.     The Gap is not signatory to any union contracts with Local 79.  Ciuzio Dep. 20:6-9.

331.     Macerich is not signatory to any union contracts with Local 79.  Lee Dep. 84:21-85:23.

### *BD is Highly Regarded by its Clients*

332.     Wilde from CBRE rates BD as excellent as a contractor.  Wilde Dep. 57:3-5.

333.     Wilde regards BD so highly as a contractor that, after BofA removed them from the approved vendors list, Wilde was able to have BofA reconsider and put them back on the list. Wilde Dep. 82:3-84:18.

334.     Dan Richardson (hereinafter "Richardson") is the Vice President and Senior Construction Discipline Manager at Bank of America.  On October 2, 2014, Richardson provided Wilde and others notes regarding BD and noted that BD has completed over 200 projects for BD over the last five (5) years, and completed various projects with perfect scores of 100 by Bank of America's score design team.   Wilde remarked that BD's work quality is exceptional. Richardson noted that Bank of America does not see any issues with unions on this project. Wilde Dep. 40:4-44:20; CBRE4 (CBRE618-CBRE619).

335.     Connolly described BD's performance at previous jobs as "the best" and "very competent." Connolly Dep. 11:10-12, 12:9-19.

336.     Connolly credits BD with saving the Brookdale Job Site and getting it to completion. Connolly Dep. 25:14-27:5.

337.     BD was an outstanding performance with respect to previous projects Fast had awarded to BD. Fast Dep. 15:14-16.

338.     Ciuzio said that BD is a good contractor. Ciuzio Dep. 147:3-9.

339.     Chang said that BD performed quality and satisfactory work. Chang Dep. 27:9-20, 67:10-18.

Dated: Lake Success, New York
         October 5, 2016                    **MILMAN LABUDA LAW GROUP, PLLC.**

                                   _____/s_____
                                     Joseph M. Labuda, Esq.
                                     Emanuel Kataev, Esq.
                                     3000 Marcus Avenue, Suite 3W8
                                     Lake Success, NY 11042-1073
                                     (516) 328-8899 (office)
                                     (516) 328-0082 (facsimile)
                                     joe@mllaborlaw.com
                                     emanuel@mllaborlaw.com

cc: Joseph J. Vitale, Esq. (via e-mail, on consent)

58