UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BD DEVELOPMENT, LLC,

                   **Plaintiff,**

   -against-


LOCAL 79, LABORERS INTERNATIONAL
UNION OF NORTH AMERICA,

                   **Defendant.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Case No.: 2:14-cv-4876 (JS) (AKT)**

**<u>ORAL ARGUMENT REQUESTED</u>**


**PLAINTIFF'S MEMORANDUM OF LAW**
**<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**


                  **MILMAN LABUDA LAW GROUP PLLC**
                  Joseph M. Labuda, Esq.
                  Emanuel Kataev, Esq.
                  3000 Marcus Avenue, Suite 3W8
                  Lake Success, NY 11042-1073
                  (516) 328-8899 (office)
                  (516) 328-0082 (facsimile)
                  joe@mllaborlaw.com
                  emanuel@mllaborlaw.com

                  *Attorneys for Plaintiff*

## TABLE OF CONTENTS

**I.    PRELIMINARY STATEMENT** ........................................................................................1

**II.    STATEMENT OF FACTS**.............................................................................................3

    **A. The Parties**.........................................................................................................3

    **B. The Old Navy Project at Kings Plaza Shopping Mall in Brooklyn, NY** .......4

        **i.** BD became an approved vendor for the Gap and was awarded work.**..............**4

        **ii.** Local 79 threatened the Mall before BD commenced work.**............................**4

        **iii.** BD commenced construction on the Old Navy Project.**..................................**5

        **iv.** Local 79 enlisted the entire Building Trades' unions to threaten the Mall.**....**5

        **v.** Local 79 and the BCTC intimidated Macerich by storming Zito's office.**.......**5

        **vi.** Macerich was hyper-concerned about Local 79's threats.**.............................**6

        **vii.** Local 79 denied BD manpower to frustrate completion of the Old Navy job**..............**7

        **viii.** Local 79 started more fireworks before the Fourth of July weekend.**..........**8

        **ix.** Local 79 decided its deal was not good enough and threatens the Mall again.**............**10

        **x.** Local 79's conduct caused BD significant injury **.........................................**11

    **C. The Bank of America Project at 95 Wall Street, New York, NY** ................12

        i. Local 79 struck without warning. **..................................................................**12

        ii. Carpenters' Union employees walked off the BofA Project in solidarity. **....................**13

        iii. BD was forced to hire a laborer from Local 79.**...........................................**14

        iv. Local 79's conduct caused BD significant injury.**.........................................**14

    **D. The Brookdale Project at 1110 Pennsylvania Avenue, Brooklyn, NY** ........15

        i. BD was awarded work by Brookdale. **...........................................................**15

ii. Local 79 descended upon Brookdale. ...............................................................................15

iii. Local 79 continued to picket the Hospital when BD resumed work. ...........................19

iv. Local 79's conduct caused BD significant injury. ......................................................19

**E.  The Mount Sinai Project at One Gustave L. Levy Place, New York, NY** ..................20

i. Mt. Sinai awarded BD work and Local 79 descends upon them. ................................20

ii. Local 79's conduct caused BD significant injury. .....................................................21

**F.  BD Acted as the Secondary Employers' Liaison with Local 79** ..................................21

**G.  BD is Highly Regarded by its Clients** .........................................................................22

**III.    STANDARD** ....................................................................................................................23

**IV.    ARGUMENT** ..................................................................................................................23

**A.  THE UNDISPUTED FACTS SHOW THAT LOCAL 79 ENGAGED IN
UNLAWFUL SECONDARY ACTIVITY IN VIOLATION OF THE NLRA** ..........24

**i. <u>Legal Standard for Unlawful Secondary Boycott Activity</u>** .......................................24

**ii. <u>Local 79 picketed, threatened, and coerced the Secondary Employers</u>** .................27

*a. Local 79's unlawful actions and conduct.* ..........................................................28

*b. Local 79's unlawful threats.* ...............................................................................30

*c. Local 79's conduct is not protected by the First Amendment.* ...........................37

**iii. 79's motive was to force the Secondary Employers to cease using BD** .................40

**iv.  A clear causal connection exists between Local 79's violations and BD's
damages** ....................................................................................................................44

*a. Increased labor costs and lost profits.* ...............................................................44

*b. Increased administrative costs* ............................................................................45

*c. Loss of future work* ............................................................................................45

**V.    CONCLUSION** ................................................................................................................47

## TABLE OF AUTHORITIES

**Cases**

BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners,
90 F.3d 1318 (8th Cir. 1996) .................................................................. 27, 40

Brown & Root, Inc. v. La. State AFL-CIO,
10 F.3d 316, 322 (5th Cir. 1994) ..................................................................... 29

Burr v. N.L.R.B,
321 F.2d 612 (5th Cir. 1963) .......................................................................... 29

C&D Restoration, Inc. v. Laborers Local 79,
2004 U.S. Dist. LEXIS 5752, 2004 WL 736915 (S.D.N.Y. Apr. 5, 2004) ............... 26, 44

Capitol Awning Co. v. Local 137 Sheet Metal Workers Int'l Ass'n,
698 F. Supp. 2d 308 (E.D.N.Y. 2010) ................................................................ 24

Carrier Air Conditioning, Co. v. NLRB,
547 F.2d 1178 (2d Cir. 1976)..................................................................... 25, 40

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)........................................................................................ 23

Del Turco v. Speedwell Design,
623 F. Supp. 2d 319 (E.D.N.Y. 2009) ............................................................... 26

Donahue v. Artisan,
2002 U.S. Dist. LEXIS 5930, 00-8326, 2002 WL 523407 (S.D.N.Y April 8, 2002)....... 24

Douds v. Int'l Longshoremen's Ass'n,
242 F.2d 808 (2d Cir. 1957)............................................................................ 32

Fid. Interior Constr., Inc. v. Southeastern Carpenters Reg'l Counsel,
675 F.3d 1250 (11th Cir. 2012) ....................................... 32, 34, 38, 39, 41, 45

Florida Sugar Marketing and Terminal Association, Inc. v. Local No. 3,
668 F. Supp. 173 (S.D.N.Y. 1987) .............................................................. 40, 44

Goenaga v. March of Dimes Birth Defects Foundation,
51 F.3d 14 (2d Cir. 1995)................................................................................ 23

Gulf Oil Corp. v. Int'l Bhd. of Teamsters,
185 Misc. 409; 57 N.Y.S.2d 24 (Sup.Ct. Queens Cty. 1945) ......................................... 43

Int'l Longshoremen's Ass'n v. Allied Int'l,
456 U.S. 212 (1982)..................................................................................... 37

J.M. Haley Corp. v. Sheet Metal Workers Int'l Ass'n,
No. 15-CIV.-1227 (JS) (AYS), 2016 WL 915184 (E.D.N.Y. Mar. 7, 2016) ................... 24

Kaynard on behalf of NLRB v. Int'l Bhd. of Teamsters, etc.,
576 F.2d 471 (2d Cir. 1978)......................................................................... 37

Kaynard v. Independent Routemen's Ass'n,
479 F.2d 1070 (2d Cir. 1973)....................................................................... 30

Kentov v. Sheet Metal Workers Local 15,
418 F.3d 1259 (11th Cir. 2005) ................................................................... 38

Landstrom v. Chauffers, Teamsters, etc.,
476 F.2d 1189 (2d Cir. 1973)....................................................................... 30

Local Union No. 25, A/W Int'l Bhd. of Teamsters, etc. v. NLRB,
831 F.2d 1149 (1st Cir. 1987)....................................................................... 37

Nat'l Maritime Union v. NLRB,
342 F.2d 538 (2d Cir. 1965)......................................................................... 28

Nat'l Packing Company v. NLRB,
377 F.2d 800 (10th Cir. 1967) ..................................................................... 38

Nat'l Woodwork Mfrs. Ass'n v. NLRB,
386 U.S. 612 (1967).......................................................................... 35, 40, 42

NLRB v. Carpenters Dist. Council (Kaaz Woodwork Co.),
383 F.2d 89 (8th Cir. 1967) ......................................................................... 30

NLRB v. Carpenters Local 180,
462 F.2d 1321 (9th Cir. 1972) ................................................................. 34, 35

NLRB v. Denver Bldg. & Constr. Trades Council,
341 U.S. 675 (1951).............................................................................. 28, 40

NLRB v. Enterprise Ass'n of Steam Pipefitters, Local 686,
429 U.S. 507 (1977).................................................................................... 42

NLRB v. Fruit & Vegetable Packers Local 760,
377 U.S. 58 (1964)...................................................................................... 27

iv

NLRB v. Homer D. Bronson Co.,
    273 F. App'x 32 (2d Cir. 2008) .............................................................. 33

NLRB v. IBEW Local 453 (Delp Refrigeration Co.),
    432 F.2d 965 (8th Cir. 1970) ................................................................ 30

NLRB v. IBEW, Local 640,
    464 F.2d 545 (9th Cir. 1972) ................................................................ 27

NLRB v. Int'l Union of Operating Eng'rs,
    377 F.2d 528 (2d Cir. 1697) ................................................................ 30

N.L.R.B. v. Local 182, Int'l Bhd. of Teamsters,
    314 F.2d 53 (2d Cir. 1963) .................................................................. 38

NLRB v. Local 25, Int'l Bhd. of Elec. Workers, AFL-CIO,
    383 F.2d 449 (2d Cir. 1967) ........................................................... 27, 31

NLRB v. Local 25, IBEW,
    396 F.2d 591 (2d Cir. 1968) ................................................................ 32

NLRB v. Local 3, IBEW,
    471 F.3d 399 (2d Cir. 2006) ................................................................ 38

NLRB v. Local 3 Int'l Bhd. of Elec. Workers,
    730 F.2d 870 (2d Cir. 1984) ................................................................ 25

NLRB v. Local 445 (Edward L. Nezelek, Inc.)
    473 F.2d 249 (2nd Cir. 1973) .............................................................. 30

NLRB v. Local 825, Int'l Union of Operating Eng'rs,
    400 U.S. 297 (1971) ........................................................... 31, 35, 37, 38

NLRB v. Local Union 3, IBEW,
    467 F.2d 1158 (2d Cir. 1972) .............................................................. 31

NLRB v. Local Union 25, IBEW,
    491 F.2d 838 (2d. Cir. 1974) .............................................................. 31

NLRB v. Operating Engineers,
    317 F.2d 638 (8th Cir. 1963) .............................................................. 30

NLRB v. Plumbers Union of Nassau County, etc.,
    299 F.2d 497 (2d Cir. 1962) ................................................................ 27

NLRB v. Retail Store Employees Union,
    447 U.S. 607 (1980) .................................................................................... 37, 38

Ramey Constr. Co., Inc. v. Local Union No. 544, Painters, Decorators, & Paperhangers of Am.,
    472 F.2d 1127 (5th Cir. 1973) ........................................................................ 29

Sailors' Union of the Pacific, AFL and Moore Dry Dock Company,
    92 N.L.R.B. 547 (1950) ............................................................................ 40, 41

Soft Drink Workers Union Local 812,
    657 F.2d 1252, 1261 (D.C. Cir. 1980) ............................................................. 42

Texas Distributors, Inc. v. Local Union No. 100,
    598 F.2d 393 399 (5th Cir.1979) .................................................................... 41

Tru-Art Sign Co. v. Local 137, Sheet Metal Workers Int'l Ass'n,
    573 F. App'x 66 (2d Cir. 2014) ...................................................................... 34

Wells v. NLRB,
    361 F.2d 737 (6th Cir. 1966) ......................................................................... 35

Western World Ins. Co. v. Stack Oil, Inc.,
    922 F.2d 118 (2d Cir. 1990) ........................................................................... 23

Zenith Radio Corp. v. Hazeltine Research, Inc.,
    395 U.S. 100 (1969) ...................................................................................... 44

**Statutes**

29 U.S.C. § 158(b)(4), *et seq*... .................................... 2, 24, 25, 26, 27, 28, 32, 37, 39, 42, 44, 48

29 U.S.C. § 187 .............................................................................................. 24

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 23

## I.    **PRELIMINARY STATEMENT**

Defendant Local 79, Laborers International Union of North America (hereinafter "Defendant" or "Local 79") engaged in a campaign of illegal coercion and threats against BD Development LLC's (hereinafter "Plaintiff" or "BD") clients in an effort to preserve Local 79's so-called "market share" on construction jobs in New York City.

The specific acts that Local 79 engaged in included, but were not limited to: (i) storming the management offices of Macerich (the owners of the Kings Plaza shopping mall where BD was performing work on an Old Navy store for the Gap) uninvited and unannounced with fifteen (15) business agents, in mafia-like intimidation tactics; (ii) threatening to picket and shut down the power to the Kings Plaza mall if BD performed work at the mall; (iii) threatening to and actually picketing two (2) New York City hospitals (Brookdale and Mount Sinai where BD was performing work) at their front entrances and passing out flyers questioning the hospitals' ability to provide proper medical treatment; (iv) inciting sympathy strikes by having sister union members working on BD's projects drop their tools and leave the job sites; (v) engaging in slowdowns at BD's projects; blocking the entrances to job sites and a hospital; and (vi) preventing and intimidating construction workers from performing work on BD's projects.  Local 79's conduct was both appalling and unlawful.  Even more galling, BD is a union company (with a collective bargaining agreement with Local 621) and Local 79 still illegally attacked BD by picketing and threatening neutral third-party secondary employers with impunity because BD was not signatory to Local 79.

Local 79's conduct directed at the likes of Gap, Inc. (the "Gap"), Macerich Management Company ("Macerich"), Mount Sinai Health System, Inc. ("Mt. Sinai"), Bank of America ("BofA"), CB Richard Ellis ("CBRE"), and Brookdale Hospital ("Brookdale") (collectively the "Secondary Employers") forced them into a classic Hobbesian choice.

1

These Secondary Employers could either: (i) fire BD and work with a contractor who is signatory to Local 79 at substantially increased costs and face a potential breach of contract claim by BD; or (ii) keep BD on the project and risk Local 79 and its sister unions striking, picketing, and/or taking other illegal coercive measures which would invariably cause the Secondary Employers damages in the form of construction delays, lost opportunity costs, administrative hassle, and loss of good will. These Secondary Employers were caught in the cross-fire between Local 79 and BD, and thus were at Local 79's mercy. Due to Local 79's pressure and coercion, Local 79 won and BD lost. In the end, the Secondary Employers capitulated to Local 79's threats and coercive conduct in one form or another by forcing BD to use Local 79's laborers on their projects. The secondary pressure exerted by Local 79 upon the neutral third-party Secondary Employers on the various projects in the form of threats and coercion is precisely what is prohibited under the secondary boycott provisions of §§ 8(b)(4)(i)(B) and 8(b)(4)(ii)(B) of the National Labor Relations Act ("NLRA").

The injury suffered by BD (being forced to hire Local 79 laborers at increased labor costs, added administrative costs, and loss of future work from the Secondary Employers because of Local 79's unlawful conduct) is precisely the type of damages BD may recover under §§ 8(b)(4)(i)(B) and 8(b)(4)(ii)(B) of the NLRA. Indeed, BD went from a superstar to a pariah with these Secondary Employers in short order as a direct result of Local 79's illegal threats and intimidatory handiwork.

Accordingly, as fully articulated herein, BD will demonstrate that Local 79's conduct violated § 8(b)(4) to the severe detriment of BD. This Court should grant BD's motion for summary judgment on the issue of liability and order a hearing to determine the damages that BD should be awarded based on Local 79's unlawful conduct.

2

## II.   STATEMENT OF UNDISPUTED FACTS[1]

### A.  The Parties

BD is a general contractor which manages and performs work on construction projects in the New York City area.  See Plaintiff's Local Civil Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgement (hereinafter "SMF") ¶¶ 1, 141, 197, 240. Depending on their needs and available manpower, BD subcontracts work to various contractors, some of which are Local 79 contractors.  Id. at ¶¶ 101, 144, 240.

BD is signatory to a collective bargaining agreement (hereinafter "CBA") with the United Construction Trades and Industrial Employees ("UCTIE") Local 621 United Service Workers Union ("USWU"), International Union of Journeyman and Allied Trades ("IUJAT")  (hereinafter "Local 621" or "BD's Union") covering all of its construction workers since February 1, 2011 through the present.  Id. at ¶ 3.

Local 79 is a labor organization representing laborers in the New York City Area.  See Declaration of Emanuel Kataev, Esq. (hereinafter "Kataev Decl.") ¶ 24, Ex. V.[2]  There is exclusivity amongst the Building Trades unions that prevents other unions that perform the same work as the Building Trades local unions from joining the Building Trades.  See SMF ¶¶ 14-15.[3]

---

[1] This Court is respectfully referred to Plaintiff's Statement of Undisputed Material Facts for a complete list of the undisputed facts and support in the record.

[2] Local 79 is affiliated with the Building and Construction Trades Council of Greater New York (hereinafter "Building Trades" or "BCTC"), which is an umbrella group consisting of local trade unions.  See SMF ¶¶ 13-15.

[3] The New York City District Council of Carpenters (hereinafter "Carpenters" or "Carpenters' Union") and Local 3 are labor organizations which are affiliated with the Building Trades.  Id. at ¶¶ 16-17.

3

### B. The Old Navy Project at Kings Plaza Shopping Mall in Brooklyn, NY

#### i. BD became an approved vendor for the Gap and was awarded work.

BD was approved as a prequalified contractor for the Gap in early February 2014. Id. at ¶¶ 21, 23. BD subsequently bid on and was awarded its first job for the demolition and buildout of an Old Navy store (hereinafter the "Old Navy Project") located at the Kings Plaza shopping mall (the "Mall"). Id. The Mall is located at 5100 Kings Plaza, Brooklyn, NY, and is owned by Macerich Management Company. Id. at ¶¶ 24-25.

#### ii. Local 79 threatened the Mall before BD commenced work.

Mike Labate (hereinafter "Labate"), a Local 79 business agent, learned that the Gap was constructing an Old Navy store at the Mall even before BD commenced construction. Id. at ¶ 33.

Upon learning of the prospective Old Navy Project, Labate contacted Lucien Zito (hereinafter "Zito"), the Operations Manager for the Mall, to discuss the job and Labate discovered that BD would be performing the work there. Id. at ¶ 34. Labate told Zito that there were going to be "problems" if BD is performing the work. Id. Specifically, Labate told Zito that he had "problems" with BD in the past and that the Mall should anticipate that there were going to be "problems." Id.

Additionally, Anthony Williamson, another organizer for Local 79, met with representatives of Macerich twice to ask whether BD was performing work on the Old Navy Project and astoundingly proclaimed that the labor harmony clause between Macerich and the Gap is being violated because BD was working on the Old Navy Project. Id. at ¶¶ 39-40.

4

### iii. BD commences construction on the Old Navy Project.

In May 2014, BD commenced construction on the Old Navy Project. Id. at ¶ 35. On May 16, 2014, BD and All City Interior Contracting Inc (hereinafter "All City") signed an agreement for All City to perform demolition work at the Old Navy Project. Id. at ¶ 36.

All City is signatory to a collective bargaining agreement with Local 79. Id. at ¶ 37. All City was selected by BD because Local 79 told Macerich that there would be "problems" with BD performing work on the Old Navy Project. Id. BD hired All City in order to avoid any "problems" with Local 79. Id. Prior to hiring All City, BD had hired a different contractor at a much lower price. See Kataev Decl. ¶ 7, Ex. E; see also Declaration of Tamir W. Rosenblum ("Rosenblum Decl.") ¶ 10, Ex. 8 ("[BD] heard that there was going to be an issue with 79. So in an effort to mitigate that and maintain the harmony, we actually hired a demolition contractor who is Local 79. And in fact, they just finished the demolition now. And … they're not happy with that").

### iv. Local 79 enlisted the entire Building Trades' unions to threaten the Mall.

On May 16, 2014, Local 79 filed a "grievance" at the Building Trades against BD for being a "non-union" contractor. See SMF ¶ 67. Incredibly, the "grievance" notified and directed all Building Trades' local unions to meet at the Mall's management office (rather than BD's) on May 21, 2014 at 10:00 AM. Id. The grievance notice was sent to approximately sixty-nine (69) union representatives within the Building Trades even though this issue only involved Local 79. Id.

### v. Local 79 and the BCTC intimidated Macerich by storming Zito's office.

On May 21, 2014, fifteen (15) business agents of the Building Trades local unions, including Local 79, stormed into Zito's office uninvited and without prior warning to threaten, intimidate, and force Macerich to shut down the Old Navy Project on which BD was performing work. Id. at ¶¶ 41-44.

5

Specifically, Labate told Zito: (i) BD's Union was "not acceptable" to Local 79; (ii) Local 79 would picket the Mall if BD was to perform work on the Old Navy Project; (iii) to shut the job down; (iv) Local 79 would shut the job down if Zito failed to; and (v) there would be "problems" if BD continued performing work on the Old Navy Project.  Id. at ¶¶ 42-44.

With all fifteen (15) business agents present, Labate conveyed these statements to Zito in a loud, threatening manner.  Id. at ¶ 44.  In all four-and-one half (4.5) years Zito worked as an operations manager at the Mall, he had never been threatened and intimidated by a union this way before.  Id. at ¶ 46.  Zito viewed the unannounced visit as an intimidation tactic and a "show of force."  Id. at ¶¶ 47, 50.  Acknowledging the immoral and unlawful intimidation, various business agents of the Building Trades local unions told Zito as much.  Id.  In fact, almost every business agent apologized to Zito and stated that this type of harassment and intimidation was not appropriate, except Labate.  Id.

#### vi.   Macerich was hyper-concerned about Local 79's threats.

Macerich was intensely concerned and sensitive about any union activity occurring in public at the Mall that may affect shoppers or cause a mall shutdown.  Id. at ¶ 45.  Moreover, concerns over strikes at the Mall were real because all of the Mall's workers – including 32BJ members, security, operations, maintenance, and the power plant – are union members who may sympathize and honor any picket line set up by Local 79.  Id.

Finally, the risk of an electrical shutdown of power was also a major concern for Macerich, because Local 3 – another Building Trades local union – may be sympathetic to any grievance made by Local 79, especially because the Mall operated on a standalone generator "off the grid." Id.

6

Michael Jordan of Local 3 was one of fifteen (15) business agents who appeared at Zito's office in the "show of force," mafia-style meeting to intimidate Zito and highlighted the very real concern of a mall-wide electrical shutdown.  See Declaration of Joseph M. Labuda, Esq. (hereinafter "Labuda Decl.") ¶ 3, Ex. A at 20:4-23.

Macerich told BD that if this problem with Local 79 was not resolved, it would have no choice but to shut the job down.  See SMF ¶ 52.  When not immediately resolved, Macerich put the Old Navy Project on hold the same day.  Id. at ¶¶ 53-55.  Macerich knew there would be no risk of any union activity occurring if it shut the job down as demanded by Local 79.  Id.   After the Gap and BD urged Macerich that it could not impede the Gap's construction, Macerich began to cooperate and reopened the jobsite again on May 28, 2014.  See Kataev Decl. ¶ 14, Ex. L.

### vii.   Local 79 denied BD manpower to frustrate completion of the Old Navy job.

Local 79 had a hiring hall from which its 9,300 members were chosen for work according to seniority, qualifications, and preferences.  See SMF ¶ 85.  Local 79 contractors generally did not experience problems requesting men from Local 79's hiring hall.  Id. at ¶¶ 87-88.

All City was the Local 79 contractor hired by BD for the demolition phase of the Old Navy Project. Id. at ¶ 36.  Demolition work must be completed prior to moving on to the build-out.  See Kataev Decl. ¶ 3, Ex. A at 30:22-31:6.  However, during demolition and unlike Local 79 contractors, BD could not obtain manpower for the Old Navy Project to complete demolition, an apparent result of the labor issues between BD and Local 79.  See SMF ¶ 79.

BD had several conversations with All City regarding the need for more manpower.  Id. at ¶¶ 80-81.  In response, All City wrote BD and explained that it had requested "additional labor from union hall and they don't have available laborers" out of about ten thousand members and BD could not get any laborers.  Id. at ¶ 82; see also Kataev Decl. ¶ 11, Ex. I.

7

This effectively shut the Old Navy Project down again, despite the fact that there were literally a thousand members on the out-of-work list.  See SMF ¶ 84.  Indeed, Local 79 never runs out of men, Brooklyn construction sites never run out of available laborers, and any laborer working demolition usually works at night.  Id. at ¶ 89.

**viii.**    Local 79 started more fireworks before the Fourth of July weekend.

It was not enough for Local 79 that BD gave it the demolition work on the Old Navy Project.  Local 79 demanded more; namely, the "general conditions" work.  See Kataev Decl. ¶ 7, Ex. E at 78:4-79:9.  However, Local 79 would not work alongside BD's employees.  See Rosenblum Decl. ¶ 13, Ex. 11.

As a result of the Mall's sensitivity to any union activity or issues, and the Gap's interests to complete its project on time, tensions soared between the Gap and Macerich as they figured out how to appease Local 79 from acting on its threats.  See Labuda Decl. ¶ 16, Ex. N at 44:15-47:2, 48:2-66:6; see also Kataev Decl. ¶¶ 12-15, Exs. J, K, L, and M.

On June 13, 2014, BD sent the Gap the added cost of a Local 79 laborer.  See Labuda Decl. ¶ 16, Ex. N at 66:9-71:20; see also Kataev Decl. ¶ 16, Ex. N.  The change order, totaling over $33,000.00, was never approved by the Gap.  See Labuda Decl. ¶ 16, Ex. N at 66:9-71:20.

As a result of Local 79 never receiving a response to its demands, and because old habits die hard, on July 1, 2014, Local 79 threatened Macerich directly that it would set up a picket line on the Fourth of July if BD did not use its laborers.  See SMF ¶ 92.  That very day, Macerich and BD discussed Local 79's threats.  Id. at ¶ 93.

Zito explained that this issue has escalated to a level that requires Lindsey's (his superior) involvement.  Id.  Both Lindsey and Zito were pressured by Local 79 to require BD to use Local 79 labor in order to avoid picket lines, rats, and job shutdowns.  Id.

8

In utter and complete frustration, Zito complained to BD that it needs to stop Local 79 from coming to his office every two to three days and threatening to shut down and picket the mall.  Id. at ¶ 95.  At approximately 4:30 PM that day, BD, Gap, and Macerich spoke to discuss Local 79's latest threats.  Id. at ¶ 97; see also Rosenblum Decl. ¶ 10, Ex. 8.  Macerich made the following statements during the phone call:

> [T]he … unions are rattling their sabers, which they are wont to do, and the lease has a union harmony clause, …. Okay? … So **you guys need to resolve this**, … or were going to have a **picket line** and … **shut the job site down**. … They have not started picketing. They have made that very clear that if they don't have resolution by Friday at the latest, that -- and they did specifically say Friday, even though it's July 4th, that that will be the end date for them. … **We are -- we own a property. We don't want any problems at our property**. … So you guys just -- you need to reach out to them and try to come to a resolution. … Domenic, this is a blue collar mall. **You cannot affect the shopping class in our mall by having a picket line**. There [are] a 1,000 buses outside a day [driven by union employees]. We have Local 3 electricians in the power plants and Local 38 plant engineers. **There's too much at risk, too much at stake to have a picket line anywhere near our mall**. … Again, what [Zito] just said is really the bottom line. It is a blue collar mall, …**We have -- we're a public company. We have stockholders to answer to.** … We have agreements with local governments. We have all kinds of things that we have to contend with … Where you stand right now is if **a picket line is formed, or a rat is blown up, either one of them**, we will have to **shut down the job.** … We **shut it down** until you resolve the issue.

See Rosenblum Decl. ¶ 10, Ex. 8 (emphasis added).

On July 17, 2014, as a result of Local 79's pressure placed on Macerich, a compromise was reached with Local 79 to place a laborer on the Old Navy Project.  See SMF ¶¶ 98-102, 104; see also Labuda Decl. ¶ 16, Ex. N at 97:10-98:11; Kataev Decl. ¶ 17, Ex. O.  Meanwhile, the Gap continuously categorized the Old Navy Project – BD's first job for the Gap – as a "high risk" project, and had to engage in negotiations with Macerich to postpone its lease start date.  See SMF ¶¶ 103, 105; see also Kataev Decl. ¶¶ 18-19, Exs. P, Q.

9

**ix.** Local 79 decided its deal was not good enough & threatened the Mall again.

Smith replaced Labate as a business agent in Brooklyn. See Kataev Decl. ¶ 7, Ex. E at 79:23-80:14. After Smith took over in or about August 2014, he contacted Lindsey at Macerich on the phone and said that he had a problem with having a Local 79 laborer working for only one (1) day on the Old Navy Project. See SMF ¶ 96.

On August 13, 2014, at approximately 9:30 AM, Smith and Flavoni had a telephone conversation in which Smith requested that Flavoni pass on a message to the Gap:

> FLAVONI: Call me Domenic. And like I said, this was worked out and agreed to already. And Kings Plaza Mall, all the managers involved with the mall as well as the client, everybody was on conference calls and it was agreed and confirmed that Local 79 would accept one day a week. And that's what was worked out. And I'm sure that if we need to go back to the client and tell them that they're going to have to pick up the cost for another couple of days, there's going to be basically resistance on their end. SMITH: All right. So could you do me a favor, please, as me being the new area [business agent,] **[c]an you just ask … to see if we can get this guy there for two or three times a week** as the job picks up?

See Id. at ¶ 106; see also Rosenblum Decl. ¶ 18, Ex. 16 (emphasis added); Declaration of Joseph J. Vitale, Esq. (hereinafter "Vitale Decl.") ¶ 5, Ex. D.

Per Smith's request, Flavoni relayed Smith's message to the Gap the following day. See SMF ¶ 107. The Gap promptly declined to acquiesce to Local 79's demands. Id. On August 19, 2014, Smith and Flavoni spoke again. See Id. at ¶ 109; see also Rosenblum Decl. ¶ 20, Ex. 18. Smith threatened Flavoni that he was going to set up a picket line and orchestrate a walk-off from the job site. Id. Their conversation, in relevant part, was as follows:

> FLAVONI: Well, I already discussed [your demand] with the client after you and I last spoke. SMITH: Yes. FLAVONI: And the client basically said, "No, we're not going to agree to anything more than one day, like it's already been agreed." SMITH: Okay, Domenic. Because the reason why I'm saying this, **because I'm going to have to throw a line up over there, okay?**

10

> FLAVONI: What do you mean you're going to have to throw --
> SMITH: If Linear pulls out, **I'm going to have to throw a line up** there where I have the other bidders ... for carpenters and ... knockers coming out there. **And then we have a discussion in front of the job sites as far as moving the manpower off the job until they put labor on board.**

Id. (emphasis added).

At his deposition, Smith admitted to threatening Lindsey at Macerich about his threats to picket the Mall, to which Lindsey responded with words to the effect of **"oh, God.  Not again[,]"** expressed that he did not want to be dealing with this, and pleaded with Smith to avoid setting up a picket line.  Id. at ¶ 130 (emphasis added).  Smith admitted to this exact turn of events at his deposition.  In retaliation, later that day, Linear Contracting, Inc. (hereinafter "Linear") – the Local 79 signatory contractor which served as a "paymaster"[4] for the "general conditions" work – walked off the job "[i]n light of the circumstances surrounding between BD … and Local 79[.]" Id. at ¶ 108.    Per Smith's request, Flavoni informed the Gap and Macerich of Local 79's threats. Id. at ¶¶ 110-11, 127, 129.  The Gap felt bullied and terrorized as a result of Local 79's conduct.  Id. at ¶¶ 112, 136; see also Kataev Decl. ¶ 20, Ex. R ("They [Local 79] are like terrorists[.] And 'we don't negotiate with terrorists'").

                    **x.**   Local 79's conduct caused BD significant injury.

As a result of the BD's final refusal to acquiesce to Local 79's demands, in a final salvo, Local 79 began to picket the Gap at its corporate office on 55 Thomas Street, New York, NY and other Gap locations in August 2014.  Id. at ¶¶ 118, 79.  In fact, true to its *modus operandi*, Local 79 blocked the ingress and egress to Gap's corporate headquarters, requiring Local 79's removal therefrom.  Id.

---

[4] A paymaster is a company which is signatory to Local 79 which agrees to accept payment from a non-Local 79 contractor in order to pay for a laborer provided by Local 79.  See SMF ¶ 180.

11

BD's reputation was directly impacted by Local 79's union activity.  Id. at ¶ 120.  BD incurred significant damages as a result of Local 79's conduct, was never awarded another contract with the Gap, and was subsequently removed from the Gap's approved vendor list.  Id. at ¶ 139; Labuda Decl. ¶ 18, Ex. P at 66:24-67:2.  The doors at the Gap were now closed to BD.

### C.  The Bank of America Job at 95 Wall Street, New York, NY

#### i.  Local 79 struck without warning.

BD served as a general contractor on various projects for CBRE.  See SMF ¶ 140.  In or about April 27, 2012, CBRE awarded BD a contract to perform general contractor services for the build-out of a Bank of America branch located at 95 Wall Street, New York, NY (hereinafter the "BofA Project").  Id. at ¶ 141.

BD commenced work at the BofA Project on or about September 19, 2012.  Id. at ¶ 142.[5] On April 25, 2013, without any prior notice that it would do so, four or five business agents of Local 79 arrived at the entrance of the BofA Project and: (i) inflated a rat balloon; (ii) formed a picket line; (iii) blocked the entrance to the job site; and (iv) handed out leaflets slandering BofA. Id. at ¶¶ 149-50.

An employee of BD, arrived at 7:30 AM that day to find a rat blown up with Local 79 agents standing in front of the BofA Project entrance handing out flyers.  Id. at ¶¶ 146, 151-52. BD's employees were unable to walk into the BofA job site because Local 79 blocked the entrance and were intimidated by the five (5) Local 79 agents standing at the site.  Id. at ¶¶ 154-55.

---

[5] While BD used its own employees to perform laborers' work at the BofA Job Site, BD also hired a subcontractor called New York City Acoustics, Inc. (hereinafter "NYC Acoustics"), a signatory to the Carpenters' Union – to perform the carpentry work there.  See SMF ¶¶ 143-145.

**ii.** Carpenters' Union employees walked off the BofA Project in solidarity.

On April 25, 2013, the union carpenters working for NYC Acoustics engaged in a sympathy strike at the BofA Project based on Local 79's picketing and union activity.[6] NYC Acoustics was expected to be present at the BofA Project at 6:30 AM on the day Local 79 conducted its union activity. Id. at ¶ 160.

BD called NYC Acoustics to find out why it did not show, who explained that its carpenters had arrived and left because of Local 79. Id. Building Trades' union employees, including carpenters, understood that the rat symbolizes a labor dispute. Id. at ¶ 159. NYC Acoustics employees honored the picket line and protest activity that Local 79 conducted at the BofA Project by stopping all work and leaving the BofA Project. Id. at ¶ 163. The Carpenters have honored such picket lines and refused to work in the past. Id. at ¶ 164.

The protocol for a Building Trades local member arriving to work at a job site where a rat is present is to: (i) call their employer to inform them of the presence of the rat; (ii) go inside to work while the employer assesses the situation; (iii) meanwhile, the employer calls the union to inform them and a business agent is occasionally dispatched to the job site; (iv) the employer finds out whether to honor the picket line (simply by the presence of the rat) and informs the employee(s); and (v) if the employee is told to honor the picket line, the employee stops all work and leaves, but if the employee is told not to honor the picket line, the employee will continue working. Id. at ¶¶ 161-162. Indeed, when BD spoke to NYC Acoustics, it informed BD that it cannot show up to the job site to perform work due to the presence of Local 79 agents outside, and were specifically told not to "cross the line." Id. at ¶¶ 165-66.

---

[6] The Carpenters' Union is affiliated with the Building Trades, as is Local 79. Id. at ¶¶ 14-17. Sal DePetro (hereinafter "DePetro") works for NYC Acoustics and performed services as a carpenter foreman at the BofA Job Site, on which he was present every day throughout the project. Id. at ¶ 157.

The owner of NYC Acoustics also confirmed that his employees could not "cross the line." Id. at ¶¶ 167-168. Due to Local 79's labor dispute and work stoppages at its site, BofA contacted BD to discuss Local 79's illegal conduct. Specifically, BofA stated that it had been contacted by Local 79. Id. at ¶ 171. Meanwhile, CBRE also learned of Local 79's conduct.[7] Id. at ¶¶ 172-75.

Both CBRE and BofA had serious concerns about any union activity going on at their job sites because both companies are "union-friendly" and any union activity would give the wrong impression that either company performs non-union work. Id. at ¶ 176. Moreover, any union activity at a BofA site caused distress to the relationship between CBRE and BofA. This, in turn, caused distress to the relationship between CBRE and BD. Id.

### iii.    BD was forced to hire a laborer from Local 79.

BD spoke to Local 79 and asked what it would take to have Local 79 remove the rat and stop the union activity at the BofA Project. Id. at ¶ 178. Local 79 explained that the only way to get the rat down and stop all union activity was to hire a laborer from Local 79. Id. BD formalized an agreement with Riteway (a Building Trades contractor) in writing for BD to hire one (1) Local 79 laborer. Once Riteway confirmed the agreement, Local 79 ceased all union activity at the BofA Project. See Id. at ¶ 182; see also Kataev Decl. ¶ 21, Ex. S.

### iv.    Local 79's conduct caused BD significant injury.

Local 79's conduct negatively affected BD's approved vendor status for BofA. See SMF at ¶ 187. As a result of Local 79's conduct, BofA became apprehensive about and recommended against using BD on high-profile projects. Id. at ¶ 188. In fact, a $2M BofA project in Brooklyn similar to the BofA Project was not awarded to BD – though BD was the lowest bidder – due to concerns about Local 79's propensity for conducting union activity against BD. Id. at ¶ 189.

---

[7] Christine Wilde (hereinafter "Wilde") is the Director of Project Management at CBRE, and Howard Martin (hereinafter "Martin") was the Project Manager at CBRE for the BofA Job Site. See SMF ¶¶ 172-73.

14

Unfortunately, the damage did not end with the loss of the Flatbush Avenue job. BD was also excluded from all BofA bids and was not invited to bid on many other New York City projects worth over $500,000.00 due to BofA's directive against using BD for such jobs for nearly two (2) years due to Local 79's unlawful coercion and conduct. Id. at ¶¶ 190-91.

Prior to Local 79's union activity, BofA never requested that BD be removed from its approved list of general contractors. Id. at ¶ 192. BD incurred significant losses and damages as a result of Local 79's coercive conduct. Id. at ¶¶ 190-91, 193-96.

### D. The Brookdale Job at 1110 Pennsylvania Avenue, Brooklyn, NY

#### i. BD was awarded work by Brookdale.

Brookdale Hospital is located at 1 Brookdale Plaza, Brooklyn, NY on Rockaway Parkway between Church Avenue and Avenue B (hereinafter the "Hospital"). Id. at ¶ 210. BD was awarded work by Brookdale to build a twelve (12) exam room clinic with a pharmacy, waiting areas, support space, a registration room, and a reception room. See Id. at ¶ 213; see also Labuda Decl. ¶ 11, Ex. I at 18:12-20:15. The construction site was located at 1110 Pennsylvania Avenue between Cozine and Flatlands (hereinafter the "Brookdale Project"), about a mile-and-a-half away from the Hospital. See SMF ¶¶ 211-12.

#### ii. Local 79 descended upon Brookdale.

Local 79 learned about the Brookdale Project and Local 79 spoke with BD about the Brookdale job on April 24, 2014. Id. at ¶¶ 222, 227. BD informed Local 79 that it is signatory to Local 621, and Local 79 said that it did not recognize that union. Id.

Local 79 threatened to, and did in fact, "put a line up" if BD did not use Local 79's laborers. Id. at ¶ 233; see also Kataev Decl. ¶ 22, Ex. T. Meanwhile, Local 79 began a campaign of calling Brookdale to claim the work at the Brookdale Project. See SMF ¶ 229.

15

Local 79's objective in conducting this campaign was to have Brookdale use a Local 79 contractor instead of BD.  Id. at ¶ 231.  Finding no success in its telephone campaign, Local 79 took to the streets and picketed the Hospital on six (6) different days: May 12, 13, 16, 19, 20, and 21, 2014.  Id. at ¶ 233; see also Kataev Decl. ¶ 22, Ex. T.  In fact, Local 79's own attendance sheets indicate that they set up a "picket line."  Id.  This resulted in chaos in the executive suite and grave concerns at Brookdale, and pressured Brookdale to make the problem of Local 79's presence go away.  See SMF ¶¶ 234, 236-37, 256.

On May 12, 2014, the first day of picketing, Margaret Brubaker (hereinafter "Brubaker") – the Senior Vice President of Human Resources at the Hospital – e-mailed many Brookdale representatives on behalf of Connolly to advise that Local 79 was conducting union activity at the Hospital and explained that there was a dispute because Local 79 wanted to perform work on the entire project at the Brookdale Project to the exclusion of BD.  Id. at ¶ 238.  Indeed, Brubaker provided explanations to representatives of various unions present at Brookdale about Local 79's conduct out of concern those unions would stand in solidarity with Local 79.  Id.

Though Brookdale awarded BD the work because their bid met the Hospital's budget, Brookdale contemplated acquiescing to Local 79's demands to avoid any further union issues, even though it was going to cost more.  Id. at ¶ 241.  As a result of Local 79's conduct and pressure from Brookdale to appease Local 79, BD contracted with AMG Environmental Restoration LLC (hereinafter "AMG"), a Local 79 contractor, to perform demolition work at the Brookdale Project.  Id. at ¶¶ 242-43.  Brookdale understood that Local 79 claimed the work at the Brookdale Project for themselves and that Local 79 "wanted whatever 'everything' meant." Id. at ¶ 245.

The following day, on May 13, 2014, at approximately 10:25 AM, Flavoni and Labate had a telephone conversation regarding the picketing at the Hospital.  Id. at ¶ 246; see also Rosenblum Decl. ¶ 3, Ex. 1.  During that conversation, Labate said:

> Like I said, I like to **claim my jurisdictional … work**. … So my jurisdictional … work is pretty clear. It's in the building trades. It's in the green book. You know, 79 is in every friggin' borough you can think of and Long Island, with 66. So I'm trying to get some general conditions work, you know, that's what I'm trying to do. You know, clean-up behind the trades. …

Id. (emphasis added). BD called Local 79 to see what can be done to bring the rat down as a direct result of pressure from Brookdale, which found Local 79's conduct to be problematic.  See SMF ¶¶ 247-48.  Local 79 informed BD that it wanted to perform all of the general conditions work (which is, generally, a laborer or laborers who clean up after the trades).  Id. at ¶ 248.   At   the Hospital's urging, Flavoni, the President of BD, met with Local 79 at the Brookdale Project the following day on May 14, 2014.  Id. at ¶ 250.  During their meeting, Labate from Local 79 said:

> LABATE: if a job gets called in, I've got to act on it. … **if you sign with the local, great.** … FLAVONI: So now if I'm doing that with my own guys, what's the problem? LABATE: It's going to be an issue, **unless you want to sign with me** … LABATE: The only thing I can say is … if I can't resolve it [with] my normal procedure … My boss says to me, … "All right. **Then put a line up.**" … FLAVONI: So … what's it going to take for you not to put rats up …? LABATE: Well, it's tough **because you can't sign with the local**. … LABATE: We could have a guy … clean-up behind the trades. … Your guys can [do] the mechanical [work]. Anything else that pertains to clean-up, we can do, …. **That would be the only way to suffice**. … FLAVONI: So two union guys, a Local 79 guy, a Local 621 guy, cannot be doing the same thing, according to your rules.  LABATE: … They really can't. … FLAVONI: So what incentive would I have to say, "You know what? I can't have that." LABATE: **You should have signed with me, not 621.** [Laughter] No, I know. What can I tell you. **Hey listen, it's a force.**
> LABATE: you asked me what's the resolution. **The resolution is either sign, which you can't, or we figure out a paymaster** situation LABATE: …, **if I was in your position, I don't know what I would do**.

17

Id. at ¶ 251 (emphasis added); see also Rosenblum Decl. ¶ 6, Ex. 4.

BD informed Local 79 that it would not acquiesce to Local 79's demands.  See SMF ¶ 252; see also Rosenblum Decl. ¶ 7, Ex. 5.  In response, Local 79 threatened that its organizing department "does those picket lines" and explained that it does not matter whether BD is union or non-union because it was "claiming the jurisdictional work."  Id.

Local 79 immediately resumed picketing the Hospital.  See SMF ¶ 255; see also Kataev Decl. ¶ 22, Ex. T.  The Hospital's CEO was apoplectic over Local 79's conduct.  See SMF ¶ 256.  Brookdale was also upset about Local 79's conduct because patients and their family were being accosted by Local 79 walking in and out of the Hospital.  See Id. at ¶¶ 260-61, 272.  Moreover, Local 79 handed out flyers at the Hospital's front entrance intimating that Brookdale used unsafe medical practices, stating that:

> Shame on Brookdale Hospital Medical Center.  Brookdale Hospital Medical Center is allowing BD Development to exploit construction workers @ 1110 Pennsylvania Ave. in Brooklyn.  Brookdale's theory to hire exploitive contractors to cut cost may potentially result in workers being exposed to unsafe conditions that can lead to them becoming patients at Brookdale Hospital.  **We hope Brookdale doesn't have the same theory for their Medical Practices.**  We demand quality, safe construction!  Call Gerard Connolly @ (718) 240-[XXXX].  Tell Gerard all workers deserve to be treated with dignity and respect and not be exploited.  This leaflet is directed at the public and is not an inducement for anyone to stop working or making deliveries.

Id. at ¶¶ 259-60, 304; see also Kataev Decl. ¶ 25, Ex. W (emphasis added).  This was a bald-faced lie and was highly injurious to both the Hospital and BD.

Local 79's conduct went beyond mere speech, and arose to conduct prompting Brookdale to contact the police.  See SMF ¶ 262.  Eventually, as a result of Local 79's continued smear campaign of picketing, Brookdale pressured BD into hiring a laborer to appease Local 79.  Id. at ¶¶ 269-70.  The additional cost of the Local 79 laborer was borne by BD.  Id. at ¶ 278.

18

On May 27, 2014, BD signed an agreement with AMG to serve as paymaster for a Local 79 laborer.  Id. at ¶ 279.  The Brookdale Project was later shut down for a few months due to a structural slab issue.  Id. at ¶ 280.

### iii.    Local 79 continued to picket the Hospital when BD resumed work.

On or about October 8, 2014, when the project resumed, Local 79 began contacting Brookdale to demand that Local 79 laborers perform work on the construction project.  Id. at ¶ 283. BD contacted Local 79 per Brookdale's request and Local 79 demanded that its laborers perform the general conditions work at the Brookdale Project.  Id. at ¶ 284; see also Rosenblum Decl. ¶ 25, Ex. 23.  During that conversation, Local 79 informed BD that he was "trying to make sure we don't have a problem here."  Id.

Local 79 continued to contact Brookdale directly.  See SMF ¶ 286.  On October 15, 2014, at 10:19 AM, Local 79 called BD to follow up on its demands.  Id. at ¶ 287; see also Rosenblum Decl. ¶ 29, Ex. 27.  During that conversation, when BD informed Local 79 that BD would not acquiesce to its demands, Local 79 stated: **"this is where we have the right to organize, you understand?"** and **"if you're going to be in the city, in the five boroughs, you're going to come across this again."**  Id. (emphasis added).  BD offered Local 79 a portion of the work, but Local 79 rejected BD's offer, stating that it was "unacceptable" and that Local 79 will fight "tooth and nail" for all the work.  See SMF ¶¶ 287-88; see also Rosenblum Decl. ¶ 30, Ex. 28.

Beginning on October 21, and continuing throughout the rest of October and most of November, Local 79 picketed the Hospital a total of nineteen (19) times, nearly every working day that month.  See SMF ¶ 296; see also Kataev Decl. ¶ 23, Ex. U.

19

iv.   Local 79's conduct caused BD significant injury.

The CEO of Brookdale was extremely upset about Local 79's conduct because it was problematic and harmed both the Hospital's brand and standing within the community.  See SMF ¶ 303.  Fast had concerns about the fact that Local 79's union activity would cause issues with other unions involved with Brookdale Hospital.  Id. at ¶ 304.

Brookdale also had concerns about Local 79's union activity because of union Local 1199's large presence at the Hospital and the risk that it could become sympathetic to Local 79's union activity and supporting Local 79 to Brookdale Hospital's detriment.  Id. at ¶ 314.  Brookdale Hospital was so concerned about Local 79's conduct that it hired an outside public relations firm to prepare a statement addressing the union activity.  Id. at ¶ 313.  Because of the chaos in the executive suite, the Hospital was under pressure to get the rat down and stop Local 79's unlawful union activity by any means possible.  Id. at ¶ 315.

BD ultimately hired Local 79 laborers as a result of Local 79's coercive and unlawful conduct, resulting in an increase in BD's cost for the Brookdale Project.  Id. at ¶ 323.  BD incurred damages as a result of Local 79's conduct.  Id. at ¶ 325.  Additionally, BD was not considered for at least one (1) other project and Brookdale considered the fact that Local 79 may interfere with BD's as a negative factor in deciding whether to award BD any future work.  Id.

### E.  The Mount Sinai Job at One Gustave L. Levy Place, New York, NY

i.   Mt. Sinai awarded BD work and Local 79 descended upon BD.

On June 21, 2012, BD and Mt. Sinai entered into an agreement for general contractor services to renovate a twenty (20) bed observation unit at Mt. Sinai (hereinafter the "Mt. Sinai Project").  Id. at ¶ 197.  Mt. Sinai was contacted by Local 79 who issued threats of picketing and other union activity regarding BD's performance of work there.  Id. at ¶¶ 200-01.

20

As a result of Local 79's threats, Mt. Sinai pressured BD to resolve the issue because Mt. Sinai did not want to have any union activity at its hospital. Id. at ¶ 202. Local 79 conducted union activity at Mt. Sinai. Id. at ¶ 203. Indeed, Local 79 threatened to picket Mt. Sinai, forcing BD to hire Linear to serve as a paymaster for a Local 79 laborer. Id. at ¶ 208.

### ii.   Local 79's conduct caused BD significant injury.

BD was injured by increased labor and administrative costs as a result of Local 79's conduct. Id. at ¶ 209. Additionally, Mt. Sinai never awarded BD any additional work. Id.

### F.   BD Acted as the Secondary Employers' Liaison with Local 79

On every project, at their request, BD informed the Secondary Employers about Local 79's statements, demands, and threats in order to allow its clients to understand and navigate the difficult landscape created by Local 79. Moreover, BD informed the Secondary Employers about Local 79's demands because BD intended to pass on any added cost due to Local 79's demands to its clients.

On the Old Navy Project, every time Local 79 made a threat or conducted any union activity at the Mall, BD spoke to the Gap and Macerich about it. Id. at ¶ 114. In turn, the Gap and Macerich referred their communications from Local 79 to BD. Id. at ¶ 115. The Gap and Macerich wanted to be informed of everything Local 79 told BD with respect to their threats and union activity. Id. at ¶ 116. When Local 79 agents discussed the Old Navy Project or any threats or union activity directed at the Mall or the Gap, Flavoni informed the Local 79 agents that he would relay their message to the Gap and Macerich. Id. at ¶ 117.

On the BofA Project, every time Local 79 made a threat or conducted any union activity at BofA or CBRE, BD spoke to CBRE and BofA about it. Id. at ¶ 183. CBRE and BofA referred all communications from Local 79 to BD. Id. at ¶ 184.

21

CBRE and BofA wanted to be informed of everything Local 79 told BD with respect to their threats and union activity.  Id. at ¶ 185.  When Local 79 discussed the BofA Project or any threats or union activity directed at BofA and/or CBRE, BD informed Local 79 that it would relay the message to CBRE and BofA.  Id. at ¶ 186.

On the Brookdale Project, every time Local 79 made a threat or conducted any union activity at Brookdale, BD spoke to Brookdale about it.  Id. at ¶ 319.  Brookdale referred all communications from Local 79 to BD.  Id. at ¶ 320.  Brookdale wanted to be informed of everything Local 79 told BD with respect to their threats and union activity.  Id. at ¶ 321.  When Local 79 discussed the Brookdale Project or any threats or union activity directed at Brookdale, BD informed Local 79 that it would relay the message to Brookdale Hospital.  Id. at ¶ 322.

On the Mt. Sinai Project, every time Local 79 made a threat or conducted any union activity at Mt. Sinai, BD spoke to Mt. Sinai about it.  Id. at ¶ 204.  Mt. Sinai referred all communications from Local 79 to BD.  Id. at ¶ 205.  Mt. Sinai wanted to be informed of everything Local 79 told BD with respect to their threats and union activity.  Id. at ¶ 206.  When Local 79 discussed the Mt. Sinai project or any threats or union activity directed at Mt. Sinai, BD informed Local 79 that he would relay their message to Mt. Sinai.  Id. at ¶ 207.

Local 79 did not have a contract with any of the Secondary Employers.  Id. at ¶¶ 326-31.

### G.  BD was Highly Regarded by its Clients

On BofA jobs, CBRE rated BD as excellent as a contractor, and regarded BD so highly that, after BofA removed BD from its approved vendors list, CBRE petitioned and was able to convince BofA to place them back on the list.  Id. at ¶¶ 332-33.  BD has completed over 200 projects for BofA over the last five (5) years, and completed various projects with perfect scores of 100 by BofA's score design team.  Id. at ¶ 334.

22

Indeed, Wilde remarked that BD's work quality is exceptional.  Id.  At Brookdale, Connolly described BD's performance as "the best."  Id. at ¶ 335.  Brookdale credits BD with saving the Brookdale Project and getting it to completion.  Id. at ¶ 336.  BD also performed outstanding work on other projects Fast had overseen.  Id. at ¶ 337.  On BD's one job for the Gap, which was marred by Local 79's conduct, the Gap thought BD was a good contractor, and Mt. Sinai believed that BD performed quality and satisfactory work.  Id. at ¶ 338-39.

## III.   STANDARD

Summary judgment shall be granted pursuant to Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact; this burden is satisfied if the moving party can point to the absence of evidence necessary to support an essential element of the non-moving party's claim. See Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995).

A party resisting summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See Fed. R. Civ. P. 56(e); see also Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Id.

Case 2:14-cv-04876-JS-AKT   Document 85   Filed 02/02/17   Page 31 of 56 PageID #: 3544

Thus, the party resisting summary judgment must "come forward with specific facts to show there is a factual question that must be resolved at trial." Donahue v. Artisan, 2002 U.S. Dist. LEXIS 5930, 00-8326, 2002 WL 523407, at *1 (S.D.N.Y April 8, 2002).

Here, the undisputed facts will demonstrate that Local 79 unlawfully exerted pressure and threatened the neutral third-party Secondary Employers with the object of having BD removed the Projects in direct violation of the secondary boycott provisions of the NLRA. Accordingly, this Court should grant summary judgment in BD's favor.

## IV.   ARGUMENT

### A. THE UNDISPUTED FACTS SHOW THAT LOCAL 79 ENGAGED IN UNLAWFUL SECONDARY ACTIVITY IN VIOLATION OF THE NLRA

#### i.   Legal Standard for Unlawful Secondary Boycott Activity

Section 303 of the LMRA makes it unlawful for "any labor organization to engage in any activity or conduct defined as an unfair labor practice ...." See 29 U.S.C. § 187(a). A union engages in primary activity when it "targets an employer with whom it has a dispute." See Capitol Awning Co. v. Local 137 Sheet Metal Workers Int'l Ass'n, 698 F. Supp. 2d 308, 322 (E.D.N.Y. 2010). A union engages in secondary activity when it targets an employer or third-party that it does not have a dispute with to gain leverage over the employer it does have a dispute with. Id.

"By placing enough pressure, [the] union might coerce a secondary employer to change its own business relationship with a primary employer, in such a way that is detrimental to the primary employer." See J.M. Haley Corp. v. Sheet Metal Workers Int'l Ass'n, No. 15-CIV.-1227 (JS) (AYS), 2016 WL 915184, at *3 (E.D.N.Y. Mar. 7, 2016) (Seybert, J.). Section 158(b)(4) broadly prohibits secondary activitity, making it illegal for a union to "engag[e] in or induc[e] or encourage[e] strikes and picketing against an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer."

24

Id.  More specifically, the statute makes it an unfair labor practice to "threaten, coerce, or restrain any person" for the purpose of: (1) "forcing ... any employer or self-employed person to join any labor or employer organization"; (2) "forcing ... any person to cease ... doing business with any other person"; (3) "forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees"; or (4) "forcing or requiring any employer to assign particular work to employees in a particular labor organization ...." Id. (citing 29 U.S.C. § 158(4)(A-D)).

The NLRA proscribes certain types of unfair labor practices by labor organizations.  See NLRA §§ 8(b)(4)(i)(B) and  8(b)(4)(ii)(B).  The statute provides, in pertinent part:

> **(b)** Unfair labor practices by labor organization
> It shall be an unfair labor practice for a labor organization or its agents-- (4)(i) to **engage in, or to induce or encourage** any individual employed by any person engaged in commerce or in an industry affecting commerce to **engage in, a strike or a refusal** in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods… or to perform any services; or (ii) **to threaten, coerce, or restrain any person** engaged in commerce or in an industry affecting commerce, where in either case **an object** thereof is … (B) **forcing or requiring any person to cease using**, selling, handling, transporting, or otherwise dealing in the products of any other producer …, **or to cease doing business with any other person**, or forcing or requiring any other employer to recognize or bargain with a labor organization; …

See 29 U.S.C. § 158(b)(4) (emphasis added).  Section 8(b)(4)(b) of the NLRA is "often described as a 'secondary boycott' section of the Act[.]" See Carrier Air Conditioning, Co. v. NLRB, 547 F.2d 1178, 1188 (2d Cir. 1976) (internal quotation and citation omitted).  The secondary boycott section "prohibits a union from engaging in or inducing or encouraging strikes and picketing against an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer." See NLRB v. Local 3 Int'l Bhd. of Elec. Workers, 730 F.2d 870, 875-76 (2d Cir. 1984) (citing Carrier Air, 547 F.2d at 1188-89).

25

A labor union engages in unfair labor practices with respect to a secondary employer in violation of § 8(b)(4)(ii)(B) when it: (i) threatens, coerces or restrains a neutral party, (ii) with the object coercing that party to cease doing business with the plaintiff, and (iii) there is a causal connection between the violation and the harm plaintiff suffered. See Del Turco v. Speedwell Design, 623 F. Supp. 2d 319, 348 (E.D.N.Y. 2009).

Unlawful secondary activity is recognized as "both effective and unlawful precisely because it disrupts the business relations of two parties" and constitutes "an interference by one party with the contractual relations of two others." See C&D Restoration, 2004 U.S. Dist. LEXIS 5752, 2004 WL 736915, at *3 (internal quotation and citations omitted). This is precisely what happened here. In the present case, all three (3) elements are clearly and convincingly established by undisputed facts. Local 79 threatened and coerced the Secondary Employers (i.e., Gap, Macerich, CBRE, BofA, Mt. Sinai, and Brookdale) with picketing, threats of picketing, shutdowns, and other "problems," if they continued to use BD on the Projects. Local 79's unlawful conduct was wildly successful since it caused the Secondary Employers to demand BD use Local 79 to avoid any problems with Local 79 and then caused the Secondary Employers to stop using BD on future projects in order to avoid further unlawful harassment from Local 79.

Local 79 pressured Macerich to shut the Old Navy Project down due to threats of picketing and shutting down the entire Mall's power. Similarly, at Brookdale Hospital, Local 79 picketed and passed out flyers to patients targeting Brookdale as an "unsafe" hospital. At Bank of America, Local 79 blocked the entrance to the job site and had sister local union members drop their tools and walk off the job. Finally, Local 79 picketed Mt. Sinai Hospital which forced BD to incur over $200,000.00 in additional labor costs because Mt. Sinai, in turn, forced BD to hire Local 79's laborers.

26

BD was severely injured by Local 79's unlawful conduct due to increased labor costs, increased administrative costs in managing the various Projects, and lost opportunities for future work with these platinum-level clients.  Local 79 irrevocably and permanently damaged BD's reputation with these clients and must be held accountable for its illegal conduct.

### ii.   Local 79 picketed, threatened, & coerced the Secondary Employers.

The first criterion requires a determination regarding "the *nature* of the union's conduct: whether the union or its agents . . . threatened . . . or restrained any person." Id. at 1189 (emphasis in original).  The touchstone for unlawful activity under Section 8(b)(4)(ii) is its coercive nature, whether the activity is secondary picketing, boycotting, or other acts. See NLRB v. Fruit & Vegetable Packers Local 760, 377 U.S. 58, 68 (1964) ("[T]he prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise").

The Second Circuit acknowledged "Congress's intention to outlaw a fairly broad range of economic pressure tactics." Id. at 1191. Courts have recognized that "in cases involving ambiguous statements, the line between lawful persuasion and unlawful threats is not easily drawn." See, e.g., BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners, 90 F.3d 1318, 1331 (8th Cir. 1996); see also NLRB v. Local 25, IBEW, 383 F.2d 449 (2d Cir. 1967) (threat of "trouble" and "work stoppages" unlawful); NLRB v. Plumbers Union of Nassau County, 299 F.2d 497, 501 (2d Cir. 1962) (threats to stop the job to pull other trades off the job unless demands were met unlawful); NLRB v. IBEW, Local 640, 464 F.2d 545 (9th Cir. 1972) (affirming that subtle and indirect threats can constitute unlawful secondary boycott activity).

To determine whether statements are unlawful "threats, coercion, or restraints" under the law, courts consider the objective circumstances surrounding the statements rather than the subjective interpretation of the listener. See, e.g., BE & K Constr. Co., 90 F.3d at 1331

27

("To determine whether particular statements constitute a prohibited threat, the specific language and the surrounding facts and circumstances are examined, not the subjective interpretation of the listener"). Thus, where inconsistent or conflicting evidence exists about what message was intended, there may be a fact question to be decided by a jury. Id.

The undisputed facts show the unlawful nature of Local 79's conduct was sufficient to force the Secondary Employers to stop using BD and its labor force and, instead, required BD to use Local 79's labor force at a much higher cost. Local 79 engaged in both unlawful conduct and unlawful threats against the neutral Secondary Employers.

    a.   Local 79's unlawful actions and conduct.

The "most compelling reason for prohibiting such secondary activities was that the damage and disruption to the normal flow of commerce, which was an inevitable consequence, far outweighed the needs of the unions for such a weapon in effective collective bargaining." See Nat'l Maritime Union v. NLRB, 342 F.2d 538, 544 (2d Cir. 1965) (citations omitted). It was the "clear purpose and intention of Congress to confine the warfare [between the union and the primary employer] to an area which includes direct action against the principal antagonist whether it be a primary employer or a rival union and which would exclude the use of economic pressure by a union against neutral employers as an indirect means of exerting force against the union's principal target. Id. at 544.

Picketing is unlawful where the object is to exert pressure on a secondary employer. See NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675 (1951) (§ 8(b)(4) prohibits peaceful picketing, as well as other peaceful means of inducement and encouragement, [to further a proscribed] objective …").

28

Fact-finders may examine the entire course of conduct of a union to determine whether its actions were coercive.  See, e.g., Ramey Constr. Co., Inc. v. Local Union No. 544, Painters, Decorators, & Paperhangers of Am., 472 F.2d 1127, 1135 (5th Cir. 1973);  see also Brown & Root, Inc. v. La. State AFL-CIO, 10 F.3d 316, 322 (5th Cir. 1994).

Local 79 engaged in various forms of unlawful coercive conduct that achieved its desired effect of causing the Secondary Employers to cease using BD and use Local 79.  On the Old Navy project, in a scene reminiscent of the "Godfather," Local 79 stormed Macerich's management offices with fifteen (15) business agents and forced Macerich to shut the job down, resulting in damage and delay.

After BD capitulated to Local 79's demands, Local 79 intentionally denied manpower to pressure BD, the Gap, and Macerich into getting all of the laborers' work, compounding delay upon delay on BD's first job for the Gap.  On the BofA Project, Local 79 picketed and blocked the entrance to the BofA Project. This intimidated and prevented BD's employees from working.  It inflated a rat, which in turn incited sister union carpenter to engage in a sympathy strike by dropping all tools, stopping all work, and leaving the job site until "the problem is resolved." Local 79 also unlawfully leafletted flyers slandering BofA to coerce BofA to stop using BD.

Similarly, at Brookdale and Mount Sinai, Local 79 picketed and passed out defamatory flyers badmouthing the hospital rather than BD.  In fact, an organizer for Local 79 testified that the target of Local 79's unlawful conduct was Brookdale.

Moreover, at Brookdale, Local 79's own internal attendance sheets establish that Local 79 conducted picket lines.   Picketing is a *per se* violation of the LMRA and is not constitutionally protected.  See Burr v. NLRB 321 F.2d 612 (5th Cir. 1963).

29

*b. Local 79's unlawful threats.*

Courts have long held and recognized that threats of strikes alone by a union made to a neutral third-party amounted to illegal coercive conduct. See Landstrom v. Chauffers, Teamsters, etc., 476 F.2d 1189, 1193 (2d Cir. 1973) (upholding verdict against union upon finding that threat of picket was unlawful); Kaynard v. Independent Routemen's Ass'n, 479 F.2d 1070, 1073 (2d Cir. 1973) (general threats of picketing unlawful); NLRB v. Int'l Union of Operating Eng'rs, 377 F.2d 528, 530 (2d Cir. 1697) (threats of picketing and threats of work stoppages unlawful). In NLRB v. Local 445 (Edward L. Nezelek, Inc.), the Second Circuit held that a union's threat to picket accompanied by the words, "not a wheel will turn period, nothing will move" constituted a threat under the NLRA. See 473 F.2d 249 (2nd Cir. 1973); see also NLRB v. IBEW Local 453 (Delp Refrigeration Co.), 432 F.2d 965 (8th Cir. 1970) (specific threats to picket made to neutral third-parties constituted unlawful secondary activity); NLRB v. Carpenters Dist. Council (Kaaz Woodwork Co.), 383 F.2d 89 (8th Cir. 1967) (same).

In other analogous cases, courts have held that even veiled threats by unions to neutral third-parties could be deemed unlawful secondary activity when accompanied by circumstances which resolve any ambiguity as to motive. For example, in NLRB v. Operating Engineers, a union representative stated that "if you don't have Layne-Western shut down, I am going to have to shut you down." See 317 F.2d 638, 641 (8th Cir. 1963). The "ambiguity" cited by the Court was that the union also said it was not going to strike, but added that there would be "trouble" if Layne was used in the future. Id.

The undisputed facts in this case evince Local 79's hell-bent approach of applying pressure on the Secondary Employers to squeeze BD into hiring its laborers to preserve its "market share."

30

The record is rife with instances of Local 79 pressuring and coercing the Secondary Employers, with threats of picketing, shutdowns, and "problems" if they continued using BD.

On the Old Navy Project, Local 79 repeatedly threatened Zito at Macerich that the mall was going to be picketed. Zito was threatened at the mob-style "grievance" meeting which he, himself, called a "show of force." Before the job even started, Labate of Local 79 issued unlawful general unqualified threats of "problems" that may arise if BD is to perform work on the Old Navy Project. Based on Local 79's threats, Zito was acutely concerned about a mall shutdown and a picket line. All of these threats were illegal. See NLRB v. Local 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 304 (1971); see also NLRB v. Local 25, IBEW, 383 F.2d 449, 452 (2d Cir. 1967) (threat of "work stoppages" unlawful). Local 79 conveyed these threats to both the Secondary Employers and BD. On the Old Navy Project, Smith also asked BD to convey his threats of picketing to the Gap and Macerich. When Smith began to issue the third set of threats in August 2014 (following those in May and July), Smith himself testified at his deposition that Lindsey from Macerich groaned and said "Oh God, no, not again!" in response to Smith's direct threats. This abominable conduct by Local 79 was unlawful because it pressured the Gap and Macerich to, in turn, pressure BD to acquiesce to Local 79's demands. See Declaration of Brett W. Joseph (hereinafter "Joseph Decl.") ¶ 14, Ex. 12 (July 17, 2014 4:58 PM correspondence). This is classic textbook unlawful secondary boycott activity and it worked.

Further supporting the coercive nature of these threats is the fact that BD paid Local 79 contractors for laborers it did not need, and which inherently delayed the Old Navy Project, in exchange for added costs and a poor first impression with the Gap. This was not a good deal for either BD or the Secondary Employers. Local 79's unlawful conduct and threats resulted in BD's lightning quick removal from the Gap's nascent approved vendors list.

31

The fact that the Gap removed BD from its approved vendor list as soon as BD was put on the list demonstrates the nature and effectiveness of Local 79's improper and unlawful conduct. On the BofA, Mt. Sinai, and Brookdale projects, Local 79 engaged in similar conduct. Local 79 again engaged in unlawful conduct and issued threats, both directly and indirectly, to the Secondary Employers. Moreover, on every Project, Local 79 "claimed" the work for itself. The record is replete with testimony and audio recordings of Local 79 claiming its "jurisdictional work" on all of the Projects. Courts have consistently held that where a union tells a neutral that it "claims work" in a particular "jurisdiction" for itself, the First Amendment provides no quarter from § 8(b)(4) violations. See NLRB v. Local Union 25, IBEW, 491 F.2d 838, 840-1 (2d. Cir. 1974); NLRB v. Local Union 3, IBEW, 467 F.2d 1158, 1160 (2d Cir. 1972); NLRB v. Local 25, IBEW, 396 F.2d 591, 593 (2d Cir. 1968); Douds v. Int'l Longshoremen's Ass'n, 242 F.2d 808 (2d Cir. 1957). Although the First Amendment protects picketing in other contexts, the First Amendment offers no refuge to unfair labor practices, which include secondary boycotts marked by coercive picketing with unlawful intent. See Fid. Interior Constr., Inc. v. Southeastern Carpenters Reg'l Counsel, 675 F.3d 1250 (11th Cir. 2012).

The Secondary Employers all understood that Local 79 would act on its threats (and, in fact, Local 79 did so) of picketing and other unlawful coercive conduct if their demands were not met.[8] Local 79's interference and work stoppages would have caused (and did cause) significant problems for the Secondary Employers which they were desperate to avoid.[9]

For instance, the same day he was threatened, Zito from Macerich sent BD and the Gap an e-mail concerning the Old Navy Project dated May 21, 2014 stating, *inter alia*:

---

[8] See SMF ¶¶ 98, 110-11, 238, 245, 253, 273, 291, 303, and 318.

[9] Id. at ¶¶ 45, 48-49, 93, 97, 111, 176, 189, 236, 262, 291, 305-09, 313-14.

> I was just unexpectedly greeted with about 15 [business agents] that all had issues with the subs on your job. Most notably, Local 3 - electricians as well as carpenters, carting, laborers and painters. This mall is a stand-alone power generator. If a picket line was established you bare [sic] the [responsibility] of having our plant potentially shut down. **We cannot have union issues here.** From talking to the crowd I get the impression BD development [sic] is going to have a hard time satisfying their requirements, but I leave that to you to decide. These issues need to go away now. …
> Based on the severity and depth of this union grievance, through this e-mail I suggest the job be put on hold until the issues are resolved.

See SMF ¶ 41 (emphasis in original). The lockout resulted in BD falling three (3) days behind schedule. See Kataev Decl. ¶ 10, Ex. H. Similarly, in July, 2014, when again threatened with a picket line by Local 79, Macerich demanded that BD resolve the union issue immediately. See Rosenblum Decl. ¶ 10, Ex. 8. Indeed, Local 79's statements were universally perceived as threats by every single Secondary Employer.[10] See NLRB v. Homer D. Bronson Co., 273 F. App'x 32 (2d Cir. 2008) (recipient's interpretation of threats considered to conclude speech constituted unlawful threat).

The Secondary Employers understood Local 79's statements to mean: (i) Local 79 and BD employees could not work together; (ii) Local 79 wanted all of the work to be performed for itself; (iii) Local 79 does not want BD to perform any of the work; and (iv) there was going to be picketing, shutdowns, and other "problems" if Local 79's demands were not met.[11] The Secondary Employers did not want to deal with the problems presented by Local 79's presence and demanded that BD take care of it.

---

[10] See Labuda Decl. ¶ 13, Ex. K at 29:21-30:16, 58:10-20, 73:2-77:9, 85:6-88:5; Labuda Decl. ¶ 15, Ex. M at 17:6-20, 19:7-12; Kataev Decl. ¶ 8, Ex. F at 91:19-95:2; Kataev Decl. ¶ 9, Ex. G at 100:10-23.

[11] See SMF ¶¶ 98, 295; 245; 34, 39, 42, 49, 55, 64, 165, 200-01, 273, 297-98, 306, 311; 44, 50-51, 174, 247-49, 272, 284, 301.

33

However, the only way for BD to take care of it was either to sign a contract with Local 79 (which it could not do because BD was already signatory to a CBA with Local 621) or hire a paymaster at substantially higher cost using Local 79 laborers. Moreover, the shut downs, slowdowns, and delays resulting from Local 79's conduct impacted project schedules on each of these jobs. This, in turn, delayed all subsequent work and invariably made BD look bad. If Local 79 had not engaged in its unlawful conduct, BD would have timely completed its work – as it has consistently done so on other projects – and would have maintained a good relationship with its valuable clientele.

Local 79 plunged its sharpest knife into BD and ruined its chance to make a good first impression with the Gap. Indeed, BD made substantial efforts to become an approved general contractor and hoped to establish an excellent working relationship with the Gap by providing the outstanding services BD is known to provide. Sadly, BD had only one (1) chance to make a good first impression, and Local 79 took it away.

In order to determine the coercive nature of the conduct, the fact-finder must look at the totality of the circumstances. See Tru-Art Sign Co. v. Local 137 Sheet Metal Workers Int'l Ass'n, 573 F. App'x 66, 67 (2d Cir. 2014); see also, e.g., Fid. Interior Constr., Inc., 675 F.3d 1250 ("Often the content of handbills, banners, and warning letters, "when evaluated in light of . . . [the] entire campaign strategy and conduct [of a union] offer[s] telling evidence of secondary intent").

Many courts have found coercive conduct on lesser facts then those present here. In NLRB v. Carpenters Local 180, the Court held the union's conduct was coercive when it made three (3) different threats on separate occasions to three (3) different contractors, including statements that things would get "kind of rough" and threats to shut down the project if a non-union subcontractor was used. See 462 F.2d 1321 (9th Cir. 1972).

34

Similarly, in Wells v. NLRB, the Sixth Circuit made a finding of unlawful coercive secondary activity for a seemingly innocuous remark by a union to a general contractor that they should not "act like a school kid. You know what I'm talking about" when subsequently demanding that a subcontractor leave the job site. See 361 F.2d 737 (6th Cir. 1966). The totality of the circumstances removed any ambiguity concerning whether the union representative's statement were intended as a threat. Id. Local 79's conduct and threats were much more egregious than those made in Carpenters Local 180 and Wells, *supra*. Local 79 consistently relied on picketing, slowdowns, threats of picketing and slowdowns, and unqualified threats of "problems" to institute an *in terrorem* campaign against the Secondary Employers. Every time Local 79 wanted something, it made both specific threats of picketing and shutdowns as well as general unqualified threats of "problems" and "issues." See Local 825, Int'l Union of Operating Eng'rs and Local 25, IBEW, *supra*.

As discussed in detail *supra*, the record is replete with instance after instance of these unlawful coercive threats.[12] Indeed, Labate from Local 79 considers it normal to threaten picket lines just to shake the Secondary Employers up because "[m]aybe they don't want an issue either." See Vitale Decl. ¶ 7, Ex. F at 304:15-309:14. Labate even admitted telling neutral Secondary Employers "hey, you got to get this thing resolved or these guys are going to do a picket line here." Id. Similarly, Smith asked BD to relay his threats of picketing to BD's clients, and Williamson openly supported engaging in sympathy strikes, as did Lee. Local 79's conduct and threats sewed fear with the Secondary Employers and proactively forced them to stop using BD.

---

[12] See Vitale Decl. ¶ 5, Ex. D at 152:18-154:20; see also Rosenblum Decl. ¶ 20, Ex. 18; Labuda Decl. ¶ 13, Ex. K at 28:24-30:16, 36:13-48:16, 85:6-88:5, 109:19-110:22; Labuda Decl. ¶ 17, Ex. O at 74:6-83:8; Labuda Decl. ¶ 18, Ex. P at 37:14-42:25, 43:9-22, 95:12-96:15; Kataev Decl. ¶ 8, Ex. F at 91:19-95:21.

35

Based on this well-documented history of threats, it is no surprise that Local 79 was also prone to making violent threats. Indeed, during Labate's deposition, he testified (referring to Flavoni of BD: "The guy is the biggest weasel I ever met … he is a rat. … This guy, if he was ever in this room, I would throw a chair at him. You can put that down." See Vitale Decl. ¶ 7, Ex. F at 287:23-288:21. Local 79's illegal threatening approach was effective and worked according to plan. Labate's statements (as well as those of the other Local 79 agents) were direct threats (to the Secondary Employers) that if BD did not acquiesce to its demands, Local 79 would orchestrate picket lines, shutdowns, and various job actions which would hurt the Secondary Employers. Further evidence of Local 79's improper object is its agreement to stop picketing, leafletting, rats, and various threats if its laborers performed all the work on the Projects.

In fact, the Secondary Employers were so concerned about Local 79's threats that they: (i) contacted BD to determine how to "make this go away;" (ii) notified their superiors and others to prevent further problems from arising; (iii) preemptively shut down and locked BD out of job sites; (iv) demanded that BD appease Local 79; and (v) made arrangements to account for the costly delays resulting from Local 79's threats.

Moreover, due to Local 79's conduct, BD ceased to be used by the Secondary Employers for future jobs, whether permanently or temporarily, as a direct result of Local 79's illegal conduct despite the fact that BD was highly regarded as a qualified and desired general contractor by the Secondary Employers. Specifically, the Gap removed BD from its approved vendors list as soon as the Old Navy Project was completed, and CBRE removed BD from its approved vendors list pursuant to instruction from Bank of America. Meanwhile, both Brookdale and Mt. Sinai have not awarded BD any additional work whatsoever despite testimony from representatives of both hospitals that BD is a great contractor.

36

Thus, the deliberate motive of Local 79's threats (which it achieved, albeit by illegal means) was to force, coerce, and require the neutral Secondary Employers to terminate their relationship with BD. This is precisely the type of secondary pressure prohibited by § 8(b)(4)(ii) of the Act. See Local 825, Int'l Union of Operating Engineers, 400 U.S. at 303; see also Local Union No. 25, A/W Int'l Bhd. of Teamsters, etc. v. NLRB, 831 F.2d 1149 (1st Cir. 1987); Kaynard on behalf of NLRB v. Int'l Bhd. of Teamsters, etc., 576 F.2d 471 (2d Cir. 1978).

It is important to note that despite the fact that BD did not appreciate Local 79's conduct, BD attempted to mollify Local 79 by offering, from time to time, portions of the work BD was awarded in order to stop Local 79 from illegally acting against and threatening its clients. However, these attempts were simply not enough for Local 79. Local 79's greed and animus towards BD would not even allow BD the smallest piece of the overall pie. Local 79 wanted it all.

In turn, though the Secondary Employers certainly did not want to either damage their relationship with BD or face the ire of Local 79, the Secondary Employers had no choice but to require BD to use Local 79 and not use BD for future jobs in order to placate Local 79 and ensure no further harassment.

    *c. Local 79's conduct is not protected by the First Amendment.*

Local 79 will undoubtedly wave the First Amendment flag in defense of its conduct. However, the Supreme Court has "consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment." See Int'l Longshoremen's Ass'n v. Allied Int'l, 456 U.S. 212, 227 (1982) (citing, e.g., NLRB v. Retail Store Employees Union, 447 U.S. 607, 616 (1980). It is even "clearer that conduct designed not to communicate but coerce merits still less consideration under the First Amendment." Int'l Longshoremen's Ass'n v. Allied Int'l, 456 U.S. at 227.

37

The labor laws reflect a careful balancing of interests. Id. (citing NLRB v. Retail Store Employees Union, 447 U.S. at 617). Conduct directed at a neutral employer receives no First Amendment protection. See Local 825, Int'l Union of Operating Eng'rs, 400 U.S. at 304. Although some forms of conduct like peaceful handbilling are not coercive within the meaning of the Act, the fact-finder may consider the content of handbills, warning letters, banners, and threats to picket to determine whether the union intended to enmesh neutral employers in its dispute with the primary employer. See Fid. Interior Constr., Inc., 675 F.3d at 1261.

Local 79 will also likely argue that all it did was inflate a rat, which is well within their constitutional right. However, many Courts have held that the use of the "rat" is illegal. Local 79's "rat" argument myopically fails to account for the various other coercive conduct accompanying its menacing, inflatable rat. The use of an inflatable rat in addition to conduct violates the NLRA. See NLRB v. Local 3, IBEW, 471 F.3d 399, 402 (2d Cir. 2006) (using a rat while conducting a "shop-in" violative of the NLRA); see also Kentov v. Sheet Metal Workers Local 15, 418 F.3d 1259, 1265 (11th Cir. 2005) (placement of rat at mock funeral procession deemed violative of the NLRA).

Further, Local 79's picketing was not "informational" in nature, as Local 79 had no idea what BD was paying its employees and failed to launch an inquiry into same to determine area standards. It is well-established that courts have deemed such picketing as not "informational" in nature, but rather as unlawful recognitional picketing. See NLRB v. Local 182, Int'l Bhd. of Teamsters, 314 F.2d 53, 58-59 (2d Cir. 1963) (holding that if one of the Union's purposes of informational picketing is recognition, then that picketing is unlawful); Nat'l Packing Company v. NLRB, 377 F.2d 800, 803 (10th Cir. 1967) (same).

38

Here, the rat at Brookdale was accompanied by several Local 79 agents marching, walking, and distributing flyers to patients and visitors who had a lot more to be concerned about than Local 79's greedy pursuit of additional work. Egregiously, Local 79 accosted people who were already preoccupied with greater concerns with flyers intended to make them concerned about the medical care they and their loved ones were receiving at the Hospital. See Kataev Decl. ¶ 25, Ex. W.

Moreover, Local 79 was not peacefully protesting. The police were called and Hospital security kept a close eye on Local 79. It is no wonder Brookdale no longer awarded any work to BD. Indeed, Local 79 concedes it picketed Brookdale, as its own records establish that they were conducting a "picket line" at Brookdale Hospital (even though the Brookdale Project was a mile and a half away). See Kataev Decl. ¶¶ 22-23, Exs. T and U. The target was clearly Brookdale, since BD was nowhere in sight working miles away. The record establishes, furthermore, that the rat had to be moved because it was placed very close to an entrance. Similarly, accompanying the rat and leafletting at Bank of America were several Local 79 agents who intimidated a BD employee and physically prevented him from coming into the BofA job site by blocking the entrance.

Local 79 engaged in a smear campaign against the Secondary Employers. At BofA and Brookdale, Local 79 passed out flyers to patients and customers attacking them instead of BD, the primary employer with whom Local 79 had its dispute. When viewed in the totality of the circumstances of all the other illegal conduct, Local 79's leafletting campaign must not be afforded any First Amendment protection since it was part of the union's "entire campaign strategy." See Fid. Interior Constr., Inc., 675 F.3d at 1261. Based on the above, it is clear that the undisputed facts establish the coercive nature of Local 79's conduct required to prove a violation of § 8(b)(4).

39

### iii.   **Local 79's motive was to force the Secondary Employers to cease using BD.**

The second criterion involves a determination related to the "*purpose* of the Union's conduct: whether an object was to force [the neutral party] to cease handling the products of, or doing business with, [the plaintiff]." See Carrier Air, 547 F.2d at 1189 (emphasis in original).

A union's true objective can only be determined from a totality of the circumstances. See Denver Bldg. and Constr. Trades Council, 341 U.S. at 685-692; see also, e.g., BE & K Constr. Co., 90 F.3d at 1331 ("To determine whether particular statements constitute a prohibited threat, the specific language and the surrounding facts and circumstances are examined, not the subjective interpretation of the listener."); Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 644 (1967) (Courts must determine whether "under all the surrounding circumstances, the Union's objective was preservation of work for [the boycotted or picketed employer's] employees . . ."). Since the neutral employers and the picketed employer often share a common work site, the Court must examine the evidence in light of the standard set out by the NLRB. See Florida Sugar Marketing and Terminal Association, Inc. v. Local No. 3, 668 F. Supp. 173, 179 (S.D.N.Y. 1987) (applying Sailors' Union of the Pacific, AFL and Moore Dry Dock Company, 92 NLRB 547, 549 (1950) (hereinafter "Moore Dry Dock"). The Moore Dry Dock indicia of an improper motive includes:

> (1) the picketing union beforehand makes known to other unions its intent to picket; (2) the picketing union knows that it is the policy of other unions to honor all pickets on the jobsite and not to cross such picket lines; (3) an understanding between a secondary employer and the picketing union that work interruptions will cease if and when a picket is removed; (4) threats, veiled or otherwise, by picketing union that a secondary employer was not using good business judgment in doing business with the primary employer; (5) picketing only at jobsites where other unions are working and not at jobsites where only non-union workers are employed, and where picketing is never done at the primary employer's home office; and (6) the failure of a picketer to answer inquiries of others as to the purpose of the picketing.

40

Id. (citing Texas Distributors, Inc. v. Local Union No. 100, 598 F.2d 393 399 (5th Cir.1979)).

Here, virtually all of the Moore Dry Dock indicia of an improper motive are present. Local 79 informed every union within the Building Trades of its intent to picket by issuing a Building Trades "grievance" knowing full well that its sister unions will join Local 79's cause. Local 79 knew that the Carpenters' Union would drop their tools and leave the BofA Project if picketing occurred since both unions have the same policy and are affiliated with the Building Trades.

Every single Secondary Employer knew that Local 79's conduct would stop as soon as BD acquiesces to its demands to hire its laborers. Local 79 issued flyers defaming and castigating the Secondary Employers for choosing BD. Additionally, when Local 79 picketed Brookdale Hospital, the president and CEO of Brookdale came outside and demanded to know why Local 79 was picketing the Hospital; Local 79 never answered his questions, nor that of another Brookdale representative. Importantly, Local 79 never took any action at BD's offices – it was always conduct taken at the sites of the Secondary Employers. Accordingly, the evidence overwhelmingly establishes that Local 79's true objective was improper and unlawful.

In order to be lawful under Moore Dry Dock, "the picketing union [must] make sure that people are not led to believe that the picket line is directed against anyone other than the primary employer." Fid. Interior Constr., Inc., 675 F.3d at 1262 (citations omitted). "If the normal effect of the picket line causes confusion in the minds of the viewer as to its purpose . . . the burden is . . . on the picketing union to make known . . . that it is directed only against the primary employer and no other employer or neutral person." Id. (citation omitted). "The union shoulders a 'heavy burden' and must "convince the trier of fact that the picketing was conducted in a manner least likely to encourage secondary effects." Id. (citation omitted). Local 79 does not come close to meeting this burden.

41

Instead, the evidence against Local 79 is overwhelming. Local 79 engaged in conduct and threats with a purpose of forcing the Secondary Employers to stop doing business with BD. See 29 U.S.C § 8(b)(4)(ii)(B); see also Soft Drink Workers Union Local 812, 657 F.2d 1252, 1261 (D.C. Cir. 1980); NLRB v. Enterprise Ass'n of Steam Pipefitters, Local 686, 429 U.S. 507, 510 (1977); see also Nat'l Woodwork, 386 U.S. 612 (1967). On their face, Local 79's ultimatums to the Secondary Employers demonstrate that an object of Local 79's conduct was to force the Secondary Employers to cease doing business with BD. Indeed, the Secondary Employers understood the ultimatums to mean that Local 79 is to perform all of the laborers' work on the Projects and BD is to perform none. In developing this inquiry, this court should examine all the surrounding circumstances, including the remoteness of the threat, the history of relations between the union and the employer, and the "economic personality" of the industry. See Nat'l Woodwork, 386 U.S. at 644 n. 38.

It is clear that Local 79's conduct and threats to the Secondary Employers had an unlawful motive. Local 79 wanted to force the Secondary Employers to pressure BD to use Local 79 laborers and to stop doing business with BD now and in the future.

Local 79's agents openly admitted and representatives of the Secondary Employers understood that Local 79 wanted BD off the project so that Local 79 could claim the work for itself. In addition, Local 79's animus towards BD shows a troubled and belligerent history, starting since in or about 2012 with the Mt. Sinai job. Over the years, Local 79 has actively targeted BD in an effort to have remove BD from jobs before BD is even awarded the jobs. Specifically, Labate told Macerich that he had "problems" with BD in the past and that the Mall should anticipate that there were going to be "problems." See SMF ¶ 34. Labate attempted to persuade Macerich to exclude BD from the Old Navy Project. Id.

42

Also, recently, Local 79 conducted additional union activity against BD at a different BofA job in Queens, New York.  See Docket Entry  52.  Local 79 routinely insisted that if BD signed a collective bargaining agreement with Local 79, then BD could perform work without interference from Local 79.  Alternatively, if BD placed Local 79 laborers on the various construction projects, Local 79 would cease its unlawful union activity at that construction site.  However, it bears repeating that BD could not sign a collective bargaining agreement with Local 79 because it was already signatory to a collective bargaining agreement with Local 621, and signing with Local 79 would constitute an unfair labor practice.  See SMF ¶¶ 3-4; see also, e.g., Gulf Oil Corp. v. Int'l Bhd. of Teamsters, 185 Misc. 409; 57 N.Y.S.2d 24 (Sup.Ct. Queens Cty. 1945) (holding that a union's conduct is unlawful because the employer already had a certified union and it interfered with an existing union contract).

If Local 79 desired to replace Local 621 as the representative for BD's employees by legal means, it could have engaged in primary organizing activities of BD's employees from the bottom up, such as campaigning for their support during a time when a contract bar was not in effect.

Despite the fact that Local 79 never recognized BD's Union and incorrectly claimed that BD was "non-union," it never attempted to properly organized BD.  Instead, it pursued its end through improper and illegal means.

The overwhelming undisputed evidence in the record establishes that Local 79 was "putting the screws" to BD on the Old Navy Project by denying BD manpower.[13]  Yet, instead of dealing directly with BD, Local 79 consistently coerced the Secondary Employers through its conduct of picketing, slowdowns, shutdowns, walk-offs, and intimidation, as well as threatening to picket, engage in work stoppages, and other unlawful union activity.

---

[13] See Kataev Decl. ¶ 4, Ex. B at 66:17-67:15.

43

Local 79 indisputably brought economic pressure to bear upon the Secondary Employers for the express purposes of (1) pressuring BD to recognize Local 79 or, in the alternative, (2) forcing BD to hire Local 79 laborers.  Accordingly, the evidence establishes the second element of a violation of Section 8(b)(4)(ii).

**iv.  A clear causal connection exists between Local 79's violations and BD's damages.**

With respect to the third criterion – causation – a plaintiff must demonstrate that the unlawful activity was a "substantial factor or material cause" of the plaintiff's injury.  See C&D Restoration, 2004 U.S. Dist. LEXIS 5752, 2004 WL 736915, at *4.  As a direct result of Local 79's conduct and threats, BD was damaged by incurring increased labor costs, administrative costs, and lost opportunities for future work with the Secondary Employers.

A causal connection exists when "the injury alleged was precisely the type of loss that the claimed violations would be likely to cause."  See Florida Sugar Mktg. & Terminal Assn. Inc. v. Local No. 3, Int'l Longshoremen's Ass'n, 668 F. Supp. 173, 182 (S.D.N.Y. 1987) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125(1969)).

In Florida Sugar, the union's disruption of work directly led to a direct negative financial impact on the plaintiff there.  It was obvious that the negative financial impact never would have resulted absent the unlawful union activity.  Id.  The same reasoning in Florida Sugar applies here.

*a.  Increased labor costs and lost profits.*

At each of the Projects, Local 79's coercive conduct applied enough pressure on the Secondary Employers to force BD to hire its laborers in order to keep its clients happy.  The cost of the laborers was exorbitant for several reasons.

First, each laborer was paid $106.44 per hour without including the premium paid to paymasters, who are required in order to place a laborer on one of the Projects.

44

Second, BD did not send its own workforce home.  Rather, BD kept its own employees working elsewhere.  Finally, BD did not profit from the Projects as it would have absent Local 79's conduct and threats.

b.  *Increased administrative costs.*

Every time Local 79 issued a threat, BD, through its principals and staff, had numerous conferences with its clients, meetings and conferences with Local 79, exchanged countless e-mails, and took time away from focusing on its work – the completion of the Projects – to focus on the problems created by Local 79.

c.  *Loss of future work.*

Further, BD's lost future work is also recoverable.  See Fid. Interior Constr., Inc., 675 F.3d at 1261, 1265 ("A [bar] against recovery for damages based on lost opportunities to bid would eviscerate the secondary boycott law. If primary employers cannot recover damages for lost opportunities to bid, unions will have every incentive to engage in secondary boycotts because the unions ordinarily will suffer, at most, minimal financial liability, no matter how strong the proof of greater injury").

The Court in Fid. Interior Constr., Inc., further held: "This . . . go[es] beyond the Union's alleged desire to . . . 'level the playing field'; this is the blatant elimination of competition. Id. Such was Local 79's aim here.  With the Gap, BD was not awarded a single other job after the Old Navy Project and was removed from the approved vendors list in short order.  With CBRE, BD was placed on the bench for two (2) years at the direction of BofA after conducting two hundred (200) projects for BofA and consistently obtaining perfect quality scores.[14]  There is no other reason for this other than Local 79's illegal coercive conduct.

---

[14] See Kataev Decl. ¶ 26, Ex. X.

45

In the case at bar, the Gap acknowledged that the union issues BD faced at the Old Navy Project was a substantial factor in their decision to remove BD from the approved contractors list. Specifically, two (2) representatives of the Gap testified that the union issues were the major factor in determining whether to remove BD from the approved vendors list. Moreover, prior to its removal, BD was not awarded a Banana Republic job on Fifth Avenue because it was "high profile" despite the fact that BD was the lowest bidder. Similarly, BofA forced CBRE to remove BD from its approved contractors list for a period of two (2) years as a direct result of Local 79's activities at the BofA Project.

The aftermath of Local 79's coercive conduct was truly devastating to BD. Further, BD has not been awarded any additional work by Mt. Sinai nor Brookdale despite the fact that both Mt. Sinai and Brookdale regarded BD as a quality contractor. Indeed, many times, the primary subject of conversations between BD and the Secondary Employers revolved around keeping BD on the project in light of Local 79's militant position or figuring out who will pay for the cost of Local 79's laborers.

All parties believed and understood that BD's continued involvement would subject their respective project to strikes, slowdowns, and "problems" by Local 79. This was a risk that the Secondary Employers did not want to face on future projects. As a result, BD was no longer awarded work. BD went from being a superstar on to an outcast as a direct result of Local 79's unlawful secondary pressure activity.

Further evidence of causal connection can be easily gleaned from Zito's email, which effectively spawned the beginning of the end of BD's budding relationship with the Gap. It could not have been clearer as to the cause of BD's removal:

46

> **We cannot have union issues here.**  From talking to the crowd I get the impression BD [D]evelopment  is going to have a hard time satisfying their requirements, but I leave that to you to decide.  These issues need to go away now.  Based on the severity and depth of this union grievance, through this e-mail **I suggest the job be put on hold until the issues are resolved.**

See SMF ¶ 41 (emphasis added).

Zito from Macerich had never been visited by fifteen (15) business agents in such a manner in the course of his tenure as operations manager despite working on much more difficult jobs than the Old Navy Project.  Moreover, Zito previously dealt with a different business agent from Local 79 and that business agent never made any threats to Zito.  Indeed, in assessing the differences between that business agent and Labate, Zito found that the previous business agent was a gentleman who was very diplomatic, political, and professional, while Labate was much more pushy, aggressive, intimidatory, and constantly arrived unannounced.

Accordingly, the undisputed facts establish the final element of causality.

## V.      CONCLUSION

Local 79 created disaster and caused chaos on BD's Projects.  Local 79 pressured the Secondary Employers with picketing, slowdowns, threats, and other unlawful conduct in order for the Secondary Employers to stop using BD and use Local 79 laborers at increased costs to BD.

As a result, and adding insult to injury, BD quickly went from being placed on approved vendor lists and hand-picked to be awarded various construction projects to an outcast removed from the approved vendor lists it was just placed on and no longer being invited to bid on future projects.  Such a swift and decisive fall from grace can be attributed to one reason - and one reason only - Local 79's threats, coercion and unlawful secondary activity against the Secondary Employers.

The undisputed facts show that Local 79 had the power and ability to threaten, coerce, and attack neutral third-party secondary employers to force them to require that BD use Local 79's laborers, cause these Secondary Employers to avoid future headaches with Local 79, and to cease doing business with BD face picketing, slowdowns, and other union activity by Local 79.  Indeed, Local 79 displayed an aggressive stance towards BD the likes of which some, like Macerich, had never seen.

BD has established violations of NLRA §§ 8(b)(4).  First, Local 79 threatened and coerced the Secondary Employers that if they continued using BD, Local 79 would engage in picketing, shut downs, walk-offs, and other union activity.  Second, the clear purpose of the threat was to force BD to use Local 79 laborers and force the Secondary Employers to stop doing business with BD.  Finally, the evidence shows BD incurred increased costs on the Projects and was subsequently removed from consideration for future jobs due to Local 79's conduct and threats of slowdowns and work stoppages.

For the reasons set forth above, BD respectfully requests that its motion for summary judgment on the issue of liability be granted and that this Court order a hearing to determine the damages that BD should be awarded.

Dated: Lake Success, New York
February 1, 2017

**MILMAN LABUDA LAW GROUP PLLC**

__/s Emanuel Kataev, Esq._____
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com
joe@mllaborlaw.com
*Attorneys for Defendants*

48

To:    Cohen Weiss & Simon LLP
        Attn: Joseph J. Vitale, Esq.
        330 West 42nd Street, 25th Floor
        New York, NY 10036-6979
        Tel:  212.356.0238
        Fax: 646.473.8238
        Cell: 917.514.9478
        jvitale@cwsny.com