UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BD DEVELOPMENT, LLC.,

                    **Plaintiff,**

     **-against-**

LOCAL 79, LABORERS INTERNATIONAL
UNION OF NORTH AMERICA,

                    **Defendant.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.: 2:14-cv-4876 (JS) (AKT)

PLAINTIFF'S RESPONSE TO
DEFENDANT'S STATEMENT OF
UNDISPUTED MATERIAL FACTS
AND PLAINTIFF'S COUNTER-
STATEMENT OF FACTS
PURSUANT TO LOCAL RULE 56.1
IN SUPPORT OF ITS MOTION
<u>FOR SUMMARY JUDGMENT</u>

       Plaintiff, BD Development LLC (hereinafter "Plaintiff" or "BD"), by its attorneys, Milman Labuda Law Group, PLLC, pursuant to Rule 56.1(b) of the Local Rules for the Eastern District of New York, hereby respectfully submits this response (and counterstatement of facts) to the Defendant Local 79, Laborers International Union of North America's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of its Motion for Summary Judgment (hereinafter "SOUMF" or "Statement").  Following its response to Defendant's Statement, Plaintiff also sets forth those facts as to which it contends there are genuine issues to be tried consistent with the requirements of Rule 56.1.

<u>RESPONSES TO DEFENDANT'S STATEMENT</u>

**I.**     <u>AS TO "LOCAL 79"</u>

**1.**    Local 79 is a labor organization representing general laborers who perform  construction work in connection with general conditions, demolition, the erection of scaffolding,  fireproofing, and mortar mixing in the five boroughs of New York City.  (Lee Dep. at 23;  Rynkiewycz Dep. at 17; Williamson Dep. at 48; Labate Dep. at 43, 67).

**Response: Admit,** but note that Local 66, together with Local 79, are two (2) of five (5) locals comprised of the Mason Tenders District Council, and that Local 66 is the "Long Island equivalent" of Local 79.  <u>Rynkiewicz Dep. 17:2-18:8.</u>

2.      General conditions work includes cleaning, keeping walkways open,  keeping things safe, and the movement of material.  (Lee Dep. at 24).

**Response: Admit,** but note that general conditions work also includes throwing things in the dumpster, and anything to do with the flowing of the job.  Ferazzoli Dep. 26:22-27:24; Lee Dep. 23:23-24:4.

3.      98-99% of all construction in the five boroughs involving banks, hospitals  and schools is done using laborers represented by Local 79.  (Zecca Dep. at 20).

**Response: Deny.**  Many banks, hospitals, and schools in the five (5) boroughs of New York City whose construction is performed by laborers who are not represented by Local 79.  Flavoni Aff. ¶¶ 1, 51.

4.      Local 79 has approximately 6,800 active members.  (Zecca Dep. at 43).

**Response: Deny.**  Local 79 has 9,300 members, of which approximately four hundred (400) are currently out of work.  Lee Dep. 68:8-15.

5.      Local 79 has relationships with over one thousand construction employers  who are signatories to a collective bargaining agreement with the Union.  (Labate Dep. at 65).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial.  Flavoni Aff. ¶ 67.

6.      Local 79 is a member of the Building Construction Trades Council of  Greater New York and Vicinity ("BCTC"), a group of affiliated unions representing employees  in the construction industry.  (Zecca Dep. at 34-36).

**Response: Admit,** but note that: (i) there is an exclusivity amongst the BCTC that prevents other unions that perform the same work as the BCTC local unions from joining the BCTC; (ii) The New York City District Council of Carpenters (hereinafter "Carpenters" or "Carpenters' Union") is a labor organization which is affiliated with the BCTC; and          (iii) Local Union No. 3, International Brotherhood of Electrical Workers (hereinafter "Local 3") is a labor organization which is affiliated with the BCTC.  Zecca Dep.  34:19-40:25; Flavoni Dep.  21:22-22:11;

Rynkiewicz Dep. 129:19-131:21; Jordan Dep. 13:3-8.

**7.**     Local 79 is the only union in the BCTC that represents general laborers.  (Zecca Dep. at 40).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 52.

**8.**     Local 79 employs approximately twelve Business Agents who monitor  construction sites within their geographic area, visit contractors which are signatories to a  collective bargaining agreement with Local 79, handle certain staffing requests and grievances, and look for other locations where work within the Local's jurisdiction is being performed.  (Zecca Dep. at 15-16; Labate Dep. at 22-23, 35).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 53.

**9.**     Local 79 has a Market Development Department whose function is to  increase Local 79's market share by encouraging developers to use union contractors, helping  non-union workers understand the benefits of unionized labor, encouraging developers and other  construction firms to treat workers with respect, promoting the Union's Apprenticeship  program, organizing non-union workers, working with the community, working on zoning issues  and political legislation, and by conducting informational rallies. (Williamson Dep. at 50-51;  Lee Dep. at 61-61; Rynkiewycz Dep. at 13-14, 32-33, 98-99).

**Response: Deny.**  The purpose and function of the Market Development Department is to "get some 79 guys on the job site" by threatening and coercing others who are not employed by BD and to get others to stop using BD to perform services.   Flavoni Aff. ¶ 54; Ferazzoli Dep. 37:6-16; Weigel Dep. 77:3-79:4; Ferazzoli Dep. 45:7-47:11; Capozza Dep. 33:20-34:7; Ross Dep. 131:20-133:4; Smith Dep. 121:19-122:7; Smith Dep. 152:18-154:20, 196:5-22 ("**Q:** … when you spoke with Brian [Lindsey] over at Kings Plaza [Shopping Center], did you ever mention setting up a picket line? **A:** I mentioned it to Brian, yes, I did. **Q:** And do you remember the context and what he said to you? **A:** "Oh, [G-d]. Not again." **Q:** That's what he said? **A:** Yeah. "Oh, [G-d], please you know, like … he didn't want to have to go through dealing with this …"); Lapidus Dep. 30:16-31:7 (The Local 79 agents blocked the entrance to the BofA job site).

**10.**     Rynkiewycz has at all relevant times served as the Director of the Market  Development Department.  (Rynkiewycz Dep. at 12-13).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 55.

**11.**     Dennis Lee, Anthony Williamson, Lenny Anselmo, Steve Andujar and  Juan Carlos work as field organizers in the Market Development Department.  (Lee Dep. at 55).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 56.

**12.**     When the Market Development Department distributes handbills, it  usually also has some sort of prop such as an inflated rat, pig, or cat.  (Rynkiewycz Dep. at 66;  Williamson Dep. at 72).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but adds that Flavoni only recalls a rat being inflated at the Bank of America job site located at 95 Wall Street, New York, NY (hereinafter "BofA"), at Brookdale University Hospital and Medical Center (hereinafter "Brookdale Hospital"), and The Mount Sinai Hospital (hereinafter "Mt. Sinai.") Flavoni Aff. ¶ 57; Chang Dep. 17:6-20, 19:7-12; Giovinazzi Dep. 20:7-24:17; Giovinazzi 1 (P9); Edwards Dep. 23:20-24:14; Weigel 42:6-8, 32:35-36:4; Lapidus Dep. 27:25-28:5.

**13.**     The Market Development Department distributes handbills to inform the  public of an issue, and uses the inflated rat as an "attention grabber" to increase publicity.  (Rynkiewycz Dep. at 67).

**Response: Deny.**  A rat is inflated any time there is picketing, is used a prop to signal that there is a problem, and is mandatorily used any time there is a labor problem. Lee Dep. 110:8-15; Williamson Dep. 73:4-17.  Members of other local unions within the BCTC acknowledge the rat as a signal of a labor problem, stand in solidarity with members of other local unions within the BCTC, engage in work stoppages upon seeing a rat at a job site, and refuse to return to work until the rat is taken down.  Williamson Dep. 73:18-79:2; DePetro Dep. 28:11-29:23; Wilde Dep. 22:16-25:16.  Members of other unions affiliated with the BCTC recognize the rat as a signal of

a labor problem and engage in work stoppages.  Lapidus Dep. 67:21-68:13, 71:1-4; Rynkiewicz Dep. 129:19-131:21; DePetro Dep. 27:6-11.   Secondary employers such as Macerich Management Company (hereinafter "Macerich"), the landlord for the Kings Plaza Shopping Center (hereinafter the "Mall"), view the rat as a signal of a labor dispute and will shut a job down if a rat is blown up.  712014 43334 PM.m4a;[1]  Flavoni Aff. ¶¶ 26, 33.  The inflation of the rat caused serious security concerns for secondary employers such as Brookdale.  Dugan Dep. 33:22-34:16, 37:24-39:3, 39:18-40:12, 41:15-18; Brookdale 23 (BROOK94); Brookdale 30 (BROOK122); Fast Dep. 28:19-29:2.  Lee was once arrested at a "rally" where a rat was inflated. Lee Dep. 15:4-6.  The purpose of inflating the rat is to exert pressure on secondary employers such as BofA, Brookdale, the Mall, the Gap, and Mt. Sinai – some of which were under pressure to get the rat down by any means possible – to force BD to sign a contract with Local 79 or, in the alternative, hire Local 79 laborers to perform work on BD's jobs, an act which is both coercive and menacing, because the rat would not come down until BD agreed to have Local 79 laborers perform work on its jobs.  Wilde Dep. 53:5-11, 72:9-16; Edwards Dep. 23:20-25:4, 26:13-27:9, 35:21-37:24, 61:19-25; Connolly Dep. 166:22-167:25, 177:9-17; Zito Dep. 29:21-30:16, 34:7-36:12; 58:10-20.  Finally, Local 79's handbills contain defamatory and inherently false statements which fail to "inform the public" of anything.  Lee 1 (L79:8) ("BD Development is allowing the exploitation of construction workers at their … project …"); Williamson 2 (L79:9) ("Brookdale … is allowing BD … to exploit construction workers"); Brookdale 2 (BROOK4) ("Brookdale's theory to hire exploitive [sic] contractors to cut cost [sic] may potentially result in workers being exposed to unsafe work conditions that can lead to them becoming patients at Brookdale Hospital.  We hope Brookdale doesn't have the same theory for their Medical Practices [sic];" Connolly Dep. 33:3-36:11.

---

[1] The reference to a file ending with ".m4a" refers to an audio recording.

**14.**   The Market Development Department uses the rat as a symbol of someone being exploited, of something wrong.  (Lee Dep. at 101-110; Williamson Dep. at 73).

**Response: Deny.**  A rat is inflated any time there is picketing, is used a prop to signal that there is a problem, and is mandatorily used any time there is a labor problem. Lee Dep. 110:8-15; Williamson Dep. 73:4-17.  Members of other local unions within the BCTC acknowledge the rat as a signal of a labor problem, stand in solidarity with members of other local unions within the BCTC, engage in work stoppages upon seeing a rat at a job site, and refuse to return to work until the rat is taken down.  Williamson Dep. 73:18-79:2; DePetro Dep. 28:11-29:23; Wilde Dep. 22:16-25:16.  Members of other unions affiliated with the BCTC recognize the rat as a signal of a labor problem and engage in work stoppages.  Lapidus Dep. 67:21-68:13, 71:1-4; Rynkiewicz Dep. 129:19-131:21; DePetro Dep. 27:6-11.   Secondary employers such as Macerich Management Company (hereinafter "Macerich"), the landlord for the Kings Plaza Shopping Center (hereinafter the "Mall"), view the rat as a signal of a labor dispute and will shut a job down if a rat is blown up.  712014 43334 PM.m4a; Flavoni Aff. ¶¶ 26, 33.

**15.**   When a worker sees an inflated rat at his or her jobsite, it is the worker's decision whether to work.  (Zecca Dep. at 50; Labate Dep. at 239-40).

**Response: Deny.**  Members of all BCTC local unions acknowledge the rat as a signal of a labor problem, stand in solidarity with BCTC local union members, engage in work stoppages upon seeing a rat at a job site, and refuse to return to work until the rat is taken down.  Williamson Dep. 73:18-79:2; DePetro Dep. 28:11-29:23; Wilde Dep. 22:16-25:16.  Local 79 agents expect that all BCTC local unions performing work on a job site with a non-Local 79 contractor would come out in solidarity if Local 79 holds a job action on such a job site.  Williamson Dep. 95:25-96:23.  Furthermore, Local 79 agents would reach out to other BCTC local union members working on a job site and ask that those members stand in "solidarity" with them by refusing to –

among other things – enter the building, picket, and engage in work stoppages.  Williamson Dep.

95:24-96:23; Flavoni Aff. ¶ 68.

**16.**     Local 79 has never told a worker to not go to work where there was another union with a campaign; Local 79 tells the worker to do whatever he or she wants and if he or she wants to work, to work.  (Rynkiewycz Dep. at 130-132; Williamson Dep. at 75-79).

**Response: Deny.**    AMG Environmental Restoration LLC (hereinafter "AMG"), a Local 79

contractor, worked on the Brookdale job site from 4:00 PM to midnight to avoid having its

members refusing to cross the picket line when the Carpenters were picketing; therefore, Local 79

contractors honor the picket lines of and stand in solidarity with the Carpenters.  Weigel Dep.

129:12-132:24; Weigel 9 (P609).  Salvatore DePetro (hereinafter "DePetro"), a foreman for New

York City Acoustics, Inc. (hereinafter "NYC Acoustics"), which is a member of the Carpenters,

has previously been told by business agents to honor another BCTC local union's picket line

whereby he would drop all of his tools and go outside of the job site to stand with the BCTC

members until the dispute was resolved.  DePetro Dep. 10:7-20, 11:6-22, 15:18-20, 30:15-31:24.

DePetro does not deny that he engaged in a work stoppage as a result of union activity which

occurred at the BofA job site.  DePetro Dep. 32:10-36:14.  Finally, Local 79 effectively told Local

79 workers not to work when they refused to send laborers requested by All City at the Old Navy

job.  Ross Dep. 57:13-62:13; Ross 2 (P270).

**17.**     A member of a union within the BCTC is not obligated, by agreement or otherwise, to honor a protest by another local within the BCTC. (Zecca Dep. at 48; Labate Dep. at 238-39.

**Response: Deny.**  BCTC local union business agents told its members to honor other BCTC local

union's picket lines, drop all tools, and go outside of the job site to stand with the BCTC

members until the dispute is resolved, effectively engaging in a job shutdown.  DePetro Dep.

10:7-20, 11:6-22, 15:18-20, 30:15-31:24.

**18.**     Local 79 rarely pickets.  (Rynkiewycz Dep. at 144-145).

**Response: Deny**.  Local 79 picketed at BofA, Brookdale, and Mt. Sinai.  <u>Flavoni Aff. ¶ 58.</u>

19.     Local 79 has a non-exclusive Hiring Hall, which maintains a list of laborers seeking work, and the type of work they can and want to do.  (Lee Dep. at 67).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  <u>Flavoni Aff. ¶</u>

<u>59; Flavoni Dep. 118:14-20.</u>

20.     The Local 79 collective bargaining agreement with All City Interior  Contracting Inc. (the "All City CBA") sets forth the ratio of laborers that All City may select  directly and those referred by the Union. (Rodopoulos Dep. at 33-34, Rodopoulos Dep. Exs. 1,  3).

**Response: Admit,** but objects to this statement as immaterial, and only to the extent that the

documents speak for themselves.

21.     The All City CBA provides in relevant part in Article III, Section 2 that:

Whenever an Employer requires employees to perform work  covered by this Agreement on any job, the Employer shall provide  to the Hiring Hall written notification (on a form to be supplied by  the Union to all signatory Employers in writing), stating the job  location, the date the work is to commence, the shift start time, the  estimated duration of the shift and of the job, the number and type  of employees required, the name of the person at the job site to  whom the employees are to report, and the name of the general  contractor.

(Rodopoulos Dep. Exs. 1, 3).

**Response: Admit,** but objects to this statement as immaterial, and only to the extent that the

documents speak for themselves.  Furthermore, All City requested but was denied manpower

from Local 79.  <u>Ross 2 (P270).</u>

22.     Under the All City CBA, All City selects the first laborer who serves as  foreman, the second laborer is selected by the Union and serves as shop steward. The third  through ninth laborers are selected by All City.  (Rodopoulos Dep. at 35; Rodopoulos Dep. Exs.  1, 3).

**Response: Admit,** but objects to this statement as immaterial, and only to the extent that the

documents speak for themselves.

23.     There are not always individuals on Local 79's hiring hall list who are  ready, willing and able to go to actual job.  (Rynkiewycz Dep. at 91).

**Response: Deny.**   Luann Piecora (hereinafter "Piecora"), the Secretary of Rite Way Internal

Removal Incorporated (hereinafter "Riteway"), generally did not experience problems requesting

men from Local 79's hiring hall.   Piecora Dep. 18:21-19:18, 25:8-27:23.   Labate, a Local 79

agent for nearly twenty (20) years, said that: (i) you would never run out of guys; (ii) Brooklyn

never runs out of available laborers in the hiring hall; and (iii) demolition is done predominantly

at night.   Labate Dep. 70:18-77:10, 13:9-14:14, 22:3-7.   There were four hundred (400) Local 79

members out of work.   Lee Dep. 68:8-15.

24.     If the Hiring Hall does not have a match for a contractor seeking a laborer,  the contractor
can employ any worker it wants through whatever means.  (Rynkiewycz Dep. at  91-92).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.   Flavoni Aff. ¶

60; Furthermore, All City requested but was denied manpower from Local 79.   Ross 2 (P270).

25.     The All City CBA provides in relevant part in Article III, Section 2 that:

The Employer may employ individuals from any available source  other than the Hiring Hall . . .
where a written request for  employees is made by the Employer . . .  and the Hiring Hall has  not
given written notice of dispatched employees to the Employer . . . at least four (4) hours before
the job is scheduled to begin.

**Response: Admit,** but objects to this statement as immaterial, and only to the extent that the

documents speak for themselves.

26.     The All City CBA provides in relevant part in Article IV, Section 4 and  Schedule D that:

An Employer shall be considered a paymaster whenever it  contracts with a company not a
signatory with the Union to  perform general conditions work on a job . . . and shall assure that
all on site work within the scope of Article IV of the CBA is  performed by MTDC-signatory
contractors…

**Response: Admit,** but objects to this statement as immaterial, and only to the extent that the

documents speak for themselves.

27.     All Local 79 collective bargaining agreements covering general conditions  work have a
paymaster provision.  (Labate Dep. at 244).

9

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 61.

28.     When serving as a paymaster on a job, the Local 79 signatory is responsible for the job five days a week.  (Rodopoulos Dep. at 64-65, 84-85; Labate Dep. at 242;  Rodopoulos Dep. Exs. 1, 3).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 62.  Plaintiff adds that a Local 79 member working under a paymaster provision at the Mall worked for only one (1) to three (3) days a week.  Ferazzoli Dep. 55:6-22; see also Defendant's SOUMF ¶ 97, *infra* ("Zecca explained that BD did not need to use a laborer represented by Local 79 every day since the 95 Wall job was small.")

29.     Because the paymaster has assumed responsibility for laborers work on  the job, a contractor utilizing the services of a Local 79-signatory paymaster cannot have its own  laborers doing work under their regular (non-Local 79) terms and conditions of employment.  (Labate Dep. at 88-90).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but adds that Flavoni is aware – from conversations with Labate – that Local 79 would not work alongside any non-BCTC members.  Flavoni Aff. ¶ 63.

30.     Laborers represented by Local 79 earn approximately $37 or $38 per hour  in wages and benefits of about $23 or $30 per hour, for an hourly package of about $60 or $68.  (Zecca Dep. at 41-42; Labate Dep. at 44, 229).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 64.

## II.     AS TO "BD/LOCAL 621"

31.     BD Development LLC ("BD") is general contractor in the construction  industry.  (Jordan Dep. Ex. 2).

**Response: Admit.**

32.     Domenico Flavoni is BD's President.  (Flavoni Dep. at 24).

**Response: Admit.**

**33.**     Jimie Deliteris is Vice President of BD.  (Deliteris Dep. at 7).

**Response: Admit.**

**34.**     Deliteris and Flavoni are the only officers and only owners of BD.  (Deliteris Dep. at 8).

**Response: Admit.**

**35.**     Since 2011, United Construction Trades & Industrial Employees Local  621 ("Local 621") has represented certain employees of BD.  (Local 621 Dep. Ex 2; Weigel Dep  Ex. 2).

**Response: Admit.**

**36.**     Andrew Talamo has served as Local 621's President since 2006 and since  2011 has had principal responsibility for representing the Local 621 members at BD.  He has  negotiated and administered both collective bargaining agreements with BD.  (Talamo Dep. 9,  13-15).

**Response: Admit** as to all the foregoing facts, except that Plaintiff **lacks sufficient information**

to admit or deny that Andrew Talamo has served as Local 621's President since 2006.  Flavoni

Aff. ¶ 65.

**37.**     BD and Local 621's first CBA became effective February 1, 2011 and was  set to expire on January 31, 2014.  (Local 621 Dep. Ex. 2; Flavoni Dep. Ex. 1 at 1-2; Flavoni  Dep. at 25-26).

**Response: Admit,** but objects to this statement as immaterial.

**38.**     The 2011-2014 Local 621-BD CBA was extended month-to-month until a  successor agreement was reached in May 2014.  (Flavoni Dep. Ex. 1 at 1-2).

**Response: Admit,** but objects to this statement as immaterial.

**39.**     The current Local 621-BD CBA has an effective date of February 1, 2014  and is set to expire on January 31, 2017.  (Weigel Dep. Ex. 2).

**Response: Admit,** but objects to this statement as immaterial.

**40.**     Flavoni and Deliteris have responsibility for negotiating with Local 621  and for addressing issues that arise under BD's CBA with Local 621.  (Flavoni Dep. at 24-25).

**Response: Admit,** but objects to this statement as immaterial.

**41.** The current Local 621-BD CBA provides that:

The Employer hereby recognizes and acknowledges that the Union is the exclusive representative for all Full-time & Part-time Mechanics, Carpenters, Helpers, Journeymen, Laborers, Lathers, Painters, Superintendent, Assistant Superintendent, and others excluding all guards, project managers, office and clerical employees for the purpose of collective bargaining, as provided by the Labor Management Relations Act of 1947.

(Weigel Dep. Ex. 2).

**Response: Admit,** but objects to this statement as immaterial, and the document speaks for itself.

**42.** The office employees are members of Local 621. (Giovinazzi Dep. at 54-55).

**Response: Deny.** No office employees are members of Local 621. Flavoni Dep. 44:23-45:5; Weigel 2 (P551-P552) ("… excluding all … office and clerical employees …")

**43.** At all relevant times Robert Weigel served as a Superintendent for BD and is covered by the Local 621-BD CBA with Local 621. (Weigel Dep. at 11, 15-16).

**Response: Admit.**

**44.** At all relevant times Kenneth Ross served as a project manager for BD and was a member of Local 621, covered by the Local 621-BD CBA. (Ross Dep. at 10-12).

**Response: Deny.** Project managers are not included in the recognition clause of BD's collective bargaining agreement, and Ross is not a member of Local 621. Flavoni Dep. 30:5-16; Weigel 2 (P551-P552) ("… excluding all … project managers …"). Plaintiff **admits** that Ross served as a project manager for BD. Additionally, Plaintiff objects to this statement as immaterial.

**45.** Nicola Capozza has been a project manager with BD since approximately January 2014 and is member of Local 621 covered by the Local 621-BD CBA. (Capozza Dep. at 8-9).

**Response: Deny.** Project managers are not included in the recognition clause of BD's collective bargaining agreement, and Ross is not a member of Local 621. Flavoni Dep. 30:5-16; Weigel 2 (P551-P552) ("… excluding all … project managers …"). Plaintiff **admits** that Capozza served as a project manager for BD. Additionally, Plaintiff objects to this statement as immaterial.

**46.**     Deliteris's wife Ivy works for BD as a secretary and is a member of Local 621.  (Deliteris Dep. at 9).

**Response: Deny.**  No office employees are members of Local 621.  Flavoni Dep. 44:23-45:5; Weigel 2 (P551-P552) ("… excluding all … office and clerical employees …").  **Plaintiff** admits that Ivy served as a secretary for BD.  Additionally, Plaintiff objects to this statement as immaterial.

**47.**     Deliteris gets health insurance from the Local 621 affiliated plan through his wife. (Deliteris Dep. at 9).

**Response: Admit,** but objects to this statement as immaterial.

**48.**     Flavoni's wife Angela provides administrative services for BD as an office or clerical employee.  (Flavoni Dep. at 43-44).

**Response: Admit,** but objects to this statement as immaterial.

**49.**     Flavoni receives health insurance under the Local 621-BD CBA through his wife. (Flavoni Dep. at 42).

**Response: Admit,** but objects to this statement as immaterial.

**50.**     Laborers work under Local 621-BD CBA includes sweeping floors, cleaning up garbage, maintaining a clean environment.  (Flavoni Dep. at 56).

**Response: Admit,** but objects to this statement as immaterial, and that laborers work under the Local 621-BD CBA also includes all general conditions work, among other things.  Flavoni Aff. ¶ 66.

**51.**     Deliteris is not aware of any CBA limitation on BD using subcontractors to perform carpentry or laborers work.  (Deliteris Dep. at 49-51).

**Response: Admit,** but objects to this statement as immaterial.

**52.**     The current Local 621-BD CBA provides in Article XX:

Effective February 1st, 2014, all employees covered by the terms of this Agreement shall receive a 3% per hour wage increase.

As to any economic changes to be effective January 1, 2015, the Agreement may be reopened by either party on or after October 1, 2014. As to any economic changes to be effective January 1, 2016, the Agreement may be reopened by either party on or after October 1, 2015.

(Weigel Dep. Ex. 2).

**Response: Admit,** but objects to this statement as immaterial.

53.    Talamo does not know the wage rate of any BD employee. (Talamo Dep. at 59).

**Response: Admit,** but objects to this statement as immaterial.

54.    Flavoni told Labate that BD's laborers are not paid as much as Local 79 signatories pay their laborers or as much as the area standard. (Labate Dep. at 92-93, 149).

**Response: Deny.** Flavoni does not know whether BD's laborers are or are not paid as much as Local 79 signatories pay their laborers or as much as the "area standard." Flavoni Dep. 74:16-75:10.

55.    The current Local 621-BD CBA does not prevent BD from using a subcontractor, rather than BD's own employees, to perform carpentry or laborer work. (Talamo Dep. at 73-74; Weigel Dep. Ex. 2; Flavoni Dep. at 149-50).

**Response: Admit,** but objects to this statement as immaterial, and the document speaks for itself.

56.    The current Local 621-BD CBA provides in Article XVIII, Section 5:

A Safety Committee of one. (1) employee is hereby agreed upon for the purpose of calling the Company's attention to unsafe, unsanitary or otherwise unhealthy conditions which may exist.

(Weigel Dep. Ex. 2).

**Response: Admit,** but objects to this statement as immaterial, and the document speaks for itself.

57.    Talamo does not know if a Safety Committee exists. (Talamo Dep. at 97).

**Response: Admit,** but objects to this statement as immaterial.

58.    Neither BD nor Local 621 has an apprenticeship program for laborers. (Giovinazzi Dep. at 52-53; Talamo Dep. at 83; Flavoni Dep. at 52-53).

**Response: Admit,** but objects to this statement as immaterial.

**59.**     The current Local 621-BD CBA provides that "The Company recognizes the right of the Union to designate a Shop Steward who shall be recognized as the representative of the Union for all matters arising under this Agreement to the extent permitted herein. (Weigel Dep. Ex. 2).

**Response: Admit,** but objects to this statement as immaterial.

**60.**     On July 31, 2015, Emilio Ferazzoli and Robert Weigel each testified that BD has no Shop Steward. (Weigel Dep. at 12; Ferazzoli Dep. at 14).

**Response: Admit,** but objects to this statement as immaterial.

**61.**     On June 2, 2016, Local 621's President testified that Ferazzoli has been the shop steward at BD since at least June 2014. (Talamo Dep. at 20-21).

**Response: Admit,** but objects to this statement as immaterial.

**62.**     Flavoni has not had any discussions with Ferazzoli in his capacity as shop steward. (Flavoni Dep. at 27).

**Response: Admit,** but objects to this statement as immaterial.

**63.**     Ferazzoli does not know who is President of Local 621. (Flavoni Dep. at 14).

**Response: Admit,** but objects to this statement as immaterial.

**64.**     Talamo does not know what classification Ferazzoli works or his hourly rate of pay. (Talamo Dep. at 43, 45).

**Response: Admit,** but objects to this statement as immaterial.

**65.**     Local 621 has filed no grievances under the Local 621-BD CBAs. (Deliteris Dep. at 52).

**Response: Admit,** but objects to this statement as immaterial.

**66.**     Local 621 is not associated with the BCTC. (Labate Dep. at 91).

**Response: Admit.**

**67.**     BD is not considered a minority-owned or woman-owned business. (Deliteris Dep. at 35).

**Response: Admit,** but Plaintiff objects to this statement as immaterial.

**III.     AS TO "95 WALL STREET"**

**68.**     In or about early 2013, the Bank of America ("BOA") was using CBRE as project manager for building a new branch at 95 Wall Street ("95 Wall"). (Wilde Dep. at 10-11).

**Response: Admit.**

**69.** Christine Wilde is the Director of Project Management for CBRE with responsibility for Bank of America's construction in New York. (Wilde Dep. at 6, 8).

**Response: Admit.**

**70.** CBRE hired BD as general contractor for 95 Wall, requiring BD to show that it is a "union shop." (Wilde Dep. at 8-9; Flavoni Dep. at 55).

**Response: Admit.**

**71.** BOA's lease with its landlord at 95 Wall Street had a union harmony clause imposed by the landlord:

Union labor shall be used by all contractors and subcontractors performing any and all Alterations within the Building. All contractors and subcontractors shall perform all work in a professional manner, and shall work in close harmony with one another as well as with the Building management and maintenance personnel.

(Wilde Dep. at 67-68; CBRE Dep. Ex. 1 at ¶ 25).

**Response: Admit.**

**72.** Union harmony clauses in leases are industry standard. (Wilde Dep. at 33).

**Response: Admit.**

**73.** A "union harmony" clause is in the contract between CBRE and BD. (Wilde Dep. at 57; Flavoni Dep. at 53).

**Response: Admit.**

**74.** A "union harmony" clause would exclude CBRE from hiring even the highest quality non-union contractor. (Wilde Dep. at 75).

**Response: Admit,** but note that BD is a union contractor. Flavoni Dep. 24:13-25:25; Williamson Dep. 37:11-23; Edwards Dep. 79:19-24; Zecca Dep. 56:4-58:13, 58:22-59:3.

**75.** CBRE and BOA are "very union-friendly companies" and do not want publicity suggesting otherwise. (Wilde Dep. at 21, 60).

**Response: Admit,** but note that CBRE and BofA also do not want any union activity – such as picketing, work stoppages, or other labor disputes – going on at its job sites, and any such activity affects CBRE's relationship with BofA.  Wilde Dep. 21:13-23.

**76.**   BD hired NYC Acoustics to perform carpentry work at 95 Wall in the assembly of walls, ceilings, material acoustics.  (DePetro Dep. at 10-11; Lapidus Dep. at 50-51,  68; Flavoni Dep. at 55).

**Response: Admit.**

**77.**   NYC Acoustics has a collective bargaining agreement with the New York  City & Vicinity District Council of Carpenters (the "Carpenters' Union"). (DePetro Dep. at 11;  Flavoni Dep. at 55).

**Response: Admit,** but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**78.**   At all relevant times, George Zecca served as a Business Agent for Local 79.  (Zecca Dep. at 14).

**Response: Admit.**

**79.**   Sometime prior to April 25, 2013, Zecca learned about BD's BOA job at  95 Wall by walking around his geographic area and seeing a work permit in the window.  (Zecca  Dep. at 70-71).

**Response: Admit.**

**80.**   Zecca called Local 79's office and learned BD was not a signatory to a  collective bargaining agreement with Local 79.  (Zecca Dep. at 71).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 69.

**81.**   Sometime prior to April 25, 2013, Zecca came to the 95 Wall jobsite and  asked who the contractors working there were; Lapidus, an employee of BD, said he was not  authorized to tell Zecca anything; Zecca asked Lapidus who cleans up the jobsite and Lapidus  said he did. (Lapidus Dep. at 17-20; Zecca Dep. at 72-73).

**Response: Admit.**

**82.**     Sometime prior to April 25, 2013, Zecca called Rynkiewycz about 95  Wall, which was the first Rynkiewycz heard of BD.  (Rynkiewycz Dep. at 28-29, 41).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 70.

**83.**     Rynkiewycz looked into BD and saw it did not have state certified  apprenticeship program, which to Rynkiewycz means the employees of BD were exploited by  dangerous work conditions since he considers safety to be a major component of any worker's  conditions of employment.  (Rynkiewycz Dep. at 101-105, 133; Labate Dep. at 224-25).

**Response: Deny.**   BD considers safety the highest of priorities and has dedicated employees who work with employees of BD to ensure a safe job environment for everyone.   BD also created a safety video and issued toolbox talks prior to starting a job every day to remind BD's employees to keep safety in mind.  Finally, the record is devoid of any safety incidents on any of BD's jobs.   Lapidus Dep. 38:10-20; Giovinazzi Dep. 46:6-54:17.   Plaintiff **lacks sufficient information** to admit or deny whether Rynkiewycz looked into BD and saw it did not have state certified  apprenticeship program, or what any such inquiry meant to Rynkiewicz.  Flavoni Aff. ¶ 71.

**84.**     Rynkiewycz concluded that BD's workers were being exploited at 95 Wall  and that the public needed to be notified.  (Rynkiewycz Dep. at 60).

**Response: Deny.**   Rynkiewicz's investigation of BD was wholly incomplete.  He never learned how much Local 621 members earned, and claims that he asked a "researcher" – without identifying who – to find out whether BD or Local 621 had an apprenticeship program.  Rynkiewicz Dep. 100:22-105:9.  Plaintiff objects to this statement as immaterial.

**85.**     Even if workers have a union, Rynkiewycz believes they can still be  exploited. (Rynkiewycz Dep. at 100).

**Response: Admit,** only to the extent that this is Rynkiewycz' opinion, which Plaintiff objects to this statement as immaterial.

**86.**     Rynkiewycz assigned Dennis Lee to distribute informational hand bills at 95 Wall. (Rynkiewycz Dep. at 34).

**Response: Deny.** Lee, Zecca, and other agents inflated a giant rat, blocked the entrance to the BofA job site, handed out fliers, picketed the BofA job site, and induced a work stoppage by other BCTC local union members.   Lapidus Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep. 31:25-32:9; Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816); Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).    Furthermore, Local 79 called Jeannie Choi (hereinafter "Choi") from BofA, which could not be construed as informing the public. Giovinazzi Dep. 25:18-28:18.

**87.**     Local 79's activity at BOA was not aimed at having BD recognize Local 79 as representative.  (Rynkiewycz Dep. at 82, 99).

**Response: Deny.**  Local 79's activity was aimed at having BD recognize Local 79's claim to the work BD was performing by pressuring and coercing BofA and CBRE into forcing BD to hire Local 79 laborers in order to have Local 79 cease its union activity.   Wilde Dep. 35:25-36:12; Giovinazzi Dep. 31:21-35:11; Giovinazzi 2 (P10); Giovinazzi 3 (P6); Flavoni Dep. 60:10-61:4.

**88.**     On April 25, 2013, Lapidus was scheduled to report to work at 95 Wall at 6:30 a.m. but he arrived approximately an hour late.  (Lapidus Dep. at 27, 53).

**Response: Admit.**

**89.**     NYMEC and More Air Mechanical, two subcontractors retained by BD, were  waiting outside of the jobsite for Lapidus to arrive and open the site.  (Lapidus Dep. at 48).

**Response: Admit,** but note that More Mechanical is actually named "More Air Mechanical."

Lapidus Dep. 47:12-49:1.

90.     When Lapidus arrived on April 25, 2013, he saw approximately five Local 79 men, including Lee, standing by a pickup truck and at the corner in front of the Water Street entrance with an inflated rat in the truck and the men handing out leaflets. (Lapidus Dep. at 28- 29; Lee Dep. at 86-87; Lee Dep. Ex. 1; Lapidus Exs. 3-14).

**Response: Deny.** Lee, Zecca, and other agents inflated a giant rat, blocked the entrance to the BofA job site, handed out fliers, picketed the BofA job site, and induced a work stoppage by other BCTC local union members.   Lapidus Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep. 31:25-32:9; Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816); Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).    Furthermore, Local 79 called Jeannie Choi (hereinafter "Choi") from BofA, which could not be construed as informing the public. Giovinazzi Dep. 25:18-28:18.

91.     The Local 79 leaflets were entitled "Shame on You BD Development, No Workers Deserves to be Exploited!!!" and included the statement that "BD Development is allowing the exploitation of construction workers at their Bank of America project at 95 Wall St." (NYC Acoustics Dep. Ex. 4).

**Response: Admit,** but note that the document speaks for itself.

92.     Local 79 did not engage in picketing.  (Zecca Dep. at 64, 109).

**Response: Deny.**  Lee, Zecca, and other agents inflated a giant rat, blocked the entrance to the BofA job site, handed out fliers, picketed the BofA job site, and induced a work stoppage by other BCTC local union members.   Lapidus Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep. 31:25-32:9; Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-

69:23; Giovinazzi 9 (P815-P816); Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

**93.**     Local 79 had informational action at 95 Wall.  (Lee Dep. at 17).

**Response: Deny.**  Lee, Zecca, and other agents inflated a giant rat, blocked the entrance to the BofA job site, handed out fliers, picketed the BofA job site, and induced a work stoppage by other BCTC local union members.  Lapidus Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep. 31:25-32:9; Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816); Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

**94.**     Lapidus claims it took him two to three minutes from when he first arrived  at 95 Wall by bus until he entered the job site.  (Lapidus Dep. at 31).

**Response:  Deny.**  Lapidus testified that it took him two to three minutes to get to the job site from the bus stop, not that it took him two to three minutes to inside, as he was asked how much time it took for him to get to the entrance of the job site to try to enter it from the bus stop. Lapidus Dep. 31:13-19.

**95.**     Lapidus claims that he approached the Water Street entrance and Local 79  representatives were handing out leaflets by the doors, that as he approached the entrance he said  "Excuse me.  I need to get into the job site" to the men, that "they just stood there;" that a minute  later Lapidus repeated "Excuse me.  I need to get into the job site" and they parted and he  entered.  (Lapidus Dep. at 30-31).

**Response: Admit**, but note that the job site entrance was blocked and there were repeated requests by Lapidus to enter the job site.  Lapidus Dep. 30:14-31:7.  Moreover, other BCTC local union members engaged in work stoppages as a result of the blocked entrance.  Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816); Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

**96.**     Shortly after arriving at the job site, Lapidus spoke to Flavoni by phone to tell him that Local 79 had set up a rat.  (Flavoni Dep. at 47; Lapidus Dep. at 33-34).

**Response: Admit,** but note that Lapidus spoke to Deliteris, as well, and that inflated a giant rat,

blocked the entrance to the BofA job site, handed out fliers, picketed the BofA job site, and

induced a work stoppage by other BCTC local union members.  Lapidus Dep. 33:3-25; Lapidus

Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep. 49:1-51:14;

Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep. 31:25-32:9;

Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816); Lapidus Dep.

54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

**97.**     Flavoni then spoke to Zecca to resolve the issue at BOA.  Zecca explained that BD could use a signatory to a collective bargaining agreement with Local 79 to provide a  laborer.  Flavoni explained that Riteway Internal Removal Inc., a signatory to a collective  bargaining agreement with Local 79, had done demolition work at the site.  Zecca explained that  BD did not need to use a laborer represented by Local 79 every day since the 95 Wall job was small.  (Zecca Dep. at 63).

**Response: Admit,** but note that Flavoni told Zecca that BD is a union contractor and Zecca

informed Flavoni that Local 79 does not recognize that union, and that BD was forced to hire a

Local 79 laborer because Local 79 agents engaged in intimidating BD, BofA, and CBRE and

inducing workers not to perform work for BD.   Flavoni Aff. ¶ 73; Lapidus Dep. 33:3-25;

Lapidus Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep.

49:1-51:14; Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep.

31:25-32:9; Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816);

Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-

P107).

**98.**     Flavoni's conversation with Zecca was his first contact with a Local 79  representative. (Flavoni Dep. at 20-21).

**Response: Admit.**

**99.**     Prior to 2013, Flavoni had known for years that Local 79 represented laborers in New York City, and BD had used subcontractors that were signatories to a collective bargaining agreement with Local 79 on jobs prior to 95 Wall. (Flavoni Dep. at 20-21).

**Response: Admit,** but objects to this statement as immaterial.

**100.**     Once Riteway confirmed that it would provide BD a laborer, Local 79 took down the rat. (Zecca Dep. at 97).

**Response: Deny.**  Once Riteway confirmed with Local 79 that it would provide BD a laborer, Local 79 ceased all of its union activity, including the inflation of a giant rat, blocking the entrance to the BofA job site, handing out fliers, picketing the BofA job site, and inducing a work stoppage by other BCTC local union members.  Flavoni Aff. ¶ 74; Lapidus Dep. 33:3-25; Lapidus Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep. 31:25-32:9; Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816); Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

**101.**     The rat was down on April 25 by 8:30 a.m.  (Lapidus Dep. 53; Flavoni Dep. at 63; CBRE Dep. Ex. 2).

**Response: Admit.**

**102.**     Neither CBRE nor BOA was involved in the resolution.  (Wilde Dep. at 25-26; Flavoni Dep. at 61-62).

**Response: Admit.**

**103.**     BD decided to hire a laborer through Riteway without first speaking to CBRE or BOA. (Wilde Dep. at 36).

**Response: Admit.**

**104.**     At 8:21 a.m. on April 25, 2014, Flavoni emailed a CBRE representative stating that Local 79 had erected a rat against BD at 95 Wall, that BD resolved the issue "within 30 minutes." (CBRE Dep. Ex. 2).

**Response: Admit.**

**105.**    No one from Local 79 ever spoke to CBRE, BOA, NYC Acoustics, other trades or any contractors regarding 95 Wall.  (Lee Dep. at 80-82, 90; Zecca Dep. at 66, 75).

**Response: Deny.**   Local 79 called Jeannie Choi (hereinafter "Choi") from BofA.  Giovinazzi

Dep. 25:18-28:18.

**106.**    Wilde considers Local 79 a "very dirty union" because it "coerced people into hiring their laborers with the rat up in front of buildings." (Wilde Dep. at 22, 46-47, 53).

**Response: Admit.**

**107.**    While at 95 Wall, one worker who was maybe from BD told Lee that the worker was "paid like crap".  (Lee Dep. at 73-74, 81).

**Response:** Plaintiff **lacks sufficient information** to admit or deny whether any BD employee

ever told Lee he or she was "paid like crap," but notes that Lapidus was the only BD employee at

the BofA job site, and did not testify to any such conversation, despite being questioned about all

of his conversations with Local 79.  Flavoni Aff. ¶ 71; see also, generally, Lapidus Dep.  Plaintiff

further objects to this statement as immaterial and inadmissible on the grounds that it constitutes

hearsay.

**108.**    From April 26, 2014 until July 17, 2014, Riteway provided a laborer three days per week. (Riteway Dep. Exs. 2, 3, 4).

**Response: Admit,** but note that BD was coerced into hiring a Local 79 laborer.  Lapidus Dep.

15:7-23; Wilde Dep. 20:24-21:10, 35:25-36:12.

**109.**    The laborer provided by Riteway did general clean up with Lapidus who supervised the laborer and had other duties.  (Lapidus Dep. at 82-83).

**Response: Admit.**

**110.**    The 95 Wall job site ran six days a week most weeks.  (Giovinazzi Dep. at 16, 36).

**Response: Admit.**

**111.**    Local 621 did not file any grievances over BD's use of Riteway to perform general conditions work.  (Flavoni Dep. at 101-02).

**Response: Admit,** but objects to this statement as immaterial.

**112.**    Local 621 did not file grievance over BD's use of NYC Acoustics to perform carpentry. (Deliteris Dep. at 51).

**Response: Admit,** but objects to this statement as immaterial.

**113.**    For the period of approximately April 2013 until approximately April 2015, BOA recommended against CBRE using BD on large, high profile BOA jobs, *i.e.*, jobs over $500,000 in the five boroughs.  (Wilde Dep. at 74, 81-84).

**Response: Admit.**

**114.**    The job at 95 Wall was BD's first large, high profile job for BOA.  (Wilde Dep. at 90).

**Response: Admit.**

**115.**    Wilde does not know why BOA recommended that CBRE not use BD on large high profile jobs but thinks BOA was concerned about the risk to its reputation posed by Local 79's protest activity.  (Wilde Dep. at 88).

**Response: Deny.**  Both BofA and CBRE have a problem with any union activity going on at its

job sites, and such activity detrimentally affects CBRE's relationship with BofA, which

detrimentally affects BD's relationship with CBRE and could have led to the termination of BD.

Wilde Dep. 21:13-22:8, 59:3-8.  Furthermore, BofA only became apprehensive about CBRE's

use of BD on large high-profile projects as a result of and directly after Local 79 conducted its

unlawful union activity.  Wilde Dep. 39:13-22.

**116.**    For the period of approximately April 2013 until approximately April 2015, BOA had approximately five or six large, high profile jobs in the five boroughs.  (Wilde Dep. at 84-85).

**Response: Admit.**

**117.**    Since approximately April 2015, BOA has permitted CBRE to use BD on large, high profile BOA jobs.  (Wilde Dep. at 74, 81-84).

**Response: Admit.**

**118.**    BD had five successful bids for BOA in 2014-2015.  (Ross Dep. at 152-153).

**Response: Admit.**

**119.**    Angela Parisi was the married name of Angela Giovinazzi, now divorced.  (Ross Dep. at 156).

**Response: Admit.**

**120.**    Michael Ceciliani is President of NYC Acoustics.  (DePetro Dep. at 6).

**Response: Admit.**

**121.**    Salvatore DePetro served as foreman of NYC Acoustics at 95 Wall Street.  (DePetro Dep. at 13).

**Response: Admit.**

**122.**    DePetro goes to work when he sees a union's inflated  rat and works until  told to stop by his office.  (DePetro Dep. at 28-29).

**Response: Deny.**  DePetro does not go into work immediately upon seeing a union's inflated rat, which is a signal of a labor dispute, and honors picket lines of other BCTC local unions. Furthermore, DePetro does not recall any of the events that occurred at the BofA job site. Finally, Plaintiff notes that what DePetro generally does when he sees a union's inflated rat is not material for purposes of Defendant's motion for summary judgment.  DePetro Dep. 30:15-36:14; Zecca 30:8-20.

**123.**    DePetro does not recall seeing an inflated rat at 95 Wall or any type of  work stoppage. (DePetro Dep. at 32).

**Response: Admit,** but note that DePetro did not recall much of anything related to Local 79's conduct.  DePetro Dep. 47:22-48:3.

**124.**    DePetro never spoke to Zecca or anyone else from Local 79 regarding 95 Wall.  (DePetro Dep. at 34, 48).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 76.

26

**125.**    Lapidus claims that NYC Acoustics was scheduled to be on site on April 25 at 6:30 a.m. (Lapidus Dep. at 49).

**Response: Admit,** but note that Lapidus' sworn testimony does not constitute a "claim."

**126.**    NYC Acoustics arrived sometime around 10:30 a.m. and stayed 15 minutes.  (Lapidus Ex. 15, Lapidus Dep. at 68, 71-72).

**Response: Deny.**  DePetro informed Lapidus that they were not allowed to cross the line and have been asked not to cross the line.  DePetro indicated that they would come to the job site after everything was resolved and had done so, and DePetro's boss – Michael Ceciliani – informed Giovinazzi that employees could not cross the line.   Lapidus Dep. 52:6-54:12; Giovinazzi Dep. 63:17-69:23.

**127.**    Lapidus claims that he called DePetro shortly after Lapidus got to 95 Wall to ask when DePetro would arrive, that DePetro said he "We cannot show up to the job until everything is squared off outside…We have been asked not to cross the line" and that DePetro did not identify who had made that request.  (Lapidus Dep. at 49-52).

**Response: Admit,** but note that: (i) Lapidus' sworn testimony does not constitute a "claim;" (ii) DePetro has no recollection of what happened, while Lapidus does; and (iii) DePetro testified that he has been told by BCTC local union members not to cross the line where there is picketing, drop all tools, and stand outside in solidarity with other BCTC local union members. DePetro Dep. 47:22-48:3; see Lapidus Dep., generally; Lapidus Dep. 33:3-25; Lapidus Dep. 27:25-28:5, 29:3-13; Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12; Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107); DePetro Dep. 29:24-30:14, 30:15-31:24; DePetro Dep. 31:25-32:9; Lapidus Dep. 51:8-52:5; Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816); Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45); Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

**128.**    DePetro does not recall any conversation with Lapidus about being asked to not work. (DePetro Dep. at 40-41).

**Response: Admit,** but note that DePetro does not recall anything that happened at the BofA job

site.  DePetro Dep. 47:22-48:3.

## IV.    AS TO "BROOKDALE"

**129.**    Mark Toney is President and CEO of Brookdale Hospital Medical Center  ("Brookdale). (Fast Dep. at 51).

**Response: Admit.**

**130.**    Gerard Connolly is Senior Vice President for facility planning and  development and oversees the construction department of Brookdale.  (Connolly Dep. at 7-8).

**Response: Admit.**

**131.**    Jay Fast is the Director of Planning, Design and Transition for Brookdale  and oversees construction projects.  (Fast Dep. at 6).

**Response: Admit.**

**132.**    Duggan is Vice President of Security for Brookdale.  (Duggan Dep. at 6).

**Response: Admit.**

**133.**    Dalton Alfred is Director of Security for Brookdale.  (Duggan Dep. at 13).

**Response: Admit.**

**134.**    Khari Edwards is Vice President of External Affairs for Brookdale, with  responsibility to oversee public relations, government relations and other business development  issues.  (Edwards Dep. at 6-7).

**Response: Admit.**

**135.**    Brookdale  has  collective  bargaining  agreements  with  Local  1199,  the   Security Brotherhood, and CIR.  (Fast Dep. at 28, 41; Connolly Dep. at 150-51).

**Response: Admit.**

**136.**    Brookdale generally requires its construction projects to be done using  union labor.  (Fast Dep. at 14).

**Response: Admit.**

28

**137.**     Brookdale looks for local minority/women-owned businesses and to spread state money into the community, without preference to the unions involved. (Connolly Dep. at 89).

**Response: Admit,** but objects to this statement as immaterial.

**138.**     Brookdale receives state funds and must have 30 percent of its construction work perform by minority/women-owned business enterprises ("MWBE"). (Edwards Dep. at 46).

**Response: Admit,** but objects to this statement as immaterial.

**139.**     Brookdale's receipt of state funds obligates Brookdale to have workers paid at least prevailing wages. (Edwards Dep. at 69).

**Response: Deny.**    Representatives of Brookdale view the term "prevailing wages" as an

acceptable wage bargained for in a union contract.  Connolly Dep. 171:13-172:24.

**140.**     Brookdale runs a deficit, so cost is an important factor, but Brookdale balances reducing cost against the prospect of a public relations nightmare. (Connolly Dep. at 116-17).

**Response: Admit,** but objects to this statement as immaterial.

**141.**     Brookdale would not look to save costs by having workers paid below prevailing wage. (Connolly Dep. at 164).

**Response: Admit,** but objects to this statement as immaterial, and representatives of Brookdale

view the term "prevailing wages" as an acceptable wage bargained for in a union contract.

Connolly Dep. 171:13-172:24.

**142.**     Brookdale's model is to use construction managers. (Connolly Dep. at 19).

**Response: Admit,** but objects to this statement as immaterial.

**143.**     Fast is part of a team, including Connolly and the purchasing department, that reviews proposals from potential construction managers. (Fast Dep. at 7-9).

**Response: Admit.**

**144.**     Fast puts together requests for proposals ("RFP") and reviews the proposals once they come back. (Fast Dep. at 7).

**Response: Admit.**

**145.**     Fast discusses all contracts with his superior Connolly. (Fast Dep. at 9).

Response: Admit.

**146.** In 2014, Brookdale began a clinic construction project (the "clinic" or the "clinic project") that involved expanding a family care clinic at 1110 Pennsylvania Avenue in Brooklyn with twelve exam rooms, a pharmacy, waiting areas, support space, registration and reception. (Fast Dep. at 15, 30; Connolly Dep. at 24; Capozza Dep. at 13).

Response: Admit.

**147.** Brookdale used BD as Construction Manager for the clinic project. (Connolly Dep. at 108).

Response: **Admit,** but note that BD was the general contractor for the clinic project. <u>Flavoni Aff. ¶ 77.</u>

**148.** BD passed the costs of construction on to Brookdale; the Hospital was paying for the clinic job. (Fast Dep. at 36).

Response: **Admit,** but note that the Hospital paid for the clinic job solely pursuant to its agreement with BD and any approved change orders; nothing more. <u>Flavoni Aff. ¶ 78.</u>

**149.** Brookdale required BD to use union labor on the clinic. (Fast Dep. at 13).

Response: Admit.

**150.** Brookdale understood that BD was using its own workers to perform laborers work at the clinic and that it would be more expensive for Brookdale to use laborers represented by Local 79. (Fast Dep. at 56).

Response: **Admit,** but note that this is because paymasters for Local 79 charge a premium for having a Local 79 laborer on above and beyond the actual cost of the laborer. <u>Labate Dep. 82:7-83:13.</u>

**151.** From Brookdale's perspective, hiring laborers represented by Local 79 to work on the clinic was "not going to break the bank" and if four or five laborers represented by Local 79 were hired, Brookdale would adjust the clinic project's cost and take money from somewhere else in the budget. (Connolly Dep. at 49-50, 84, 117).

Response: **Admit,** but note that another way Brookdale would adjust the clinic project's cost is by paying BD less. <u>Flavoni Aff. ¶ 79.</u>

**152.**   New York State's Department of Health funded the clinic project with $3.2 million. (Connolly Dep. at 55-56).

**Response: Admit,** but objects to this statement as immaterial.

**153.**   Construction on the clinic project started approximately mid-April 2014  and ended approximately February 2015.  (Capozza Dep. at 13-14; Weigel Dep. at 14, 18-20).

**Response: Admit.**

**154.**   BD used a demolition contractor to do demolition rather than using its  own labor force because BD did not have sufficient manpower.  (Fast Dep. at 74; Capozza Dep.  at 29, 46).

**Response: Deny.**  BD intended to perform demolition with its own work force for the Brookdale

job site.  Deliteris Dep. 34:16-36:25.

**155.**   BD selected AMG Environmental Restoration LLC ("AMG") to do  demolition because Brookdale had instructed BD to use woman-owned businesses to the extent  possible, AMG's owner is a woman, and AMG's bid had a good price.  (Flavoni Dep. at 77;  Capozza Dep. at 34-35; Deliteris Dep. at 35-36).

**Response: Admit,** but note that AMG was selected only after Local 79 commenced its campaign

of threatening to conduct union activity and the project started in April 2014. Capozza Dep.

13:24-14:6; Connolly Dep. 53:15-54:15 (Local 79 commenced union activity against Brookdale

on the morning of May 12, 2014); Flavoni 4 (P844) (BD and AMG entered into a subcontract

agreement later that day).

**156.**   AMG has a collective bargaining agreement with Local 79.  (Labate Dep. at 98).

**Response: Admit.**

**157.**   Fast does not recall any discussion about BD paying itself the additional  cost for using laborers represented by Local 79 to perform demolition work.  (Fast Dep. at 38).

**Response: Admit,** but note that BD paid for the additional cost.  Connolly Dep. 49:16-53:14.

**158.**   BD entered an agreement on May 12, 2014 with AMG for AMG to  perform demolition work at the clinic.  (Flavoni Dep. at 74; Flavoni Ex. 4).

Response: **Admit**, but note that the Brookdale clinic job began in April.  Capozza Dep. 13:24-

14:6.

**159.**    The contract with AMG regarding demolition work at the clinic included a  requirement
that "all labor shall be of standing and affiliation that will permit the project to be  carried on
harmoniously." (Flavoni Dep. Ex. 5).

**Response: Admit,** but note that the document speaks for itself.

**160.**    With the exception of about three or four years between 2005 and 2008 or  2009, Mike
Labate has since 1997 served as a Business Agent for Local 79. (Labate Dep. at 13-  15).

**Response: Admit.**

**161.**    On or about April 24, 2014, Labate came to the clinic jobsite when BD  was putting up
protective construction fence.  (Capozza Dep. at 26-28).

**Response: Admit.**

**162.**    On or about April 24, Labate came into a project meeting being held at the  clinic,
introduced himself and Deliteris escorted Labate out of the meeting. (Capozza Dep. at 26-28).

**Response: Admit.**

**163.**    Once outside, Labate asked if any laborers represented by Local 79 would  be performing
the laborers work at the clinic as the clinic was within Local 79's jurisdiction.  (Labate Dep. Ex.
1; Labate Dep. at 154).

**Response: Admit.**

**164.**    Between his conversation on April 24 with Labate and Flavoni's  conversation with
Labate on May 13, Deliteris did not speak to Labate.  (Deliteris Dep. at 18-19;  transcript of
recording of call on May 13, 2014).

**Response: Admit.**

**165.**    The Carpenters' Union had a demonstration with an inflated rat at the  clinic for several
weeks during the project, including on May 12, 2014. (Ferazzoli Dep. at 92-93;  Weigel Dep. at
99, 101, 131-33; Video.mov; 6230.Mov; Picket line.Mov; Weigel Dep. Ex. 9).

**Response: Deny.** The Carpenters' Union picketed the Brookdale job site – not Brookdale

Hospital, like Local 79 did – for a few days, sporadically.  Weigel Dep. 143:1-3; Flavoni Aff. ¶

80; Defendant's SOUMF ¶ 97, *infra* ("The Carpenters' Union picketed … at the clinic during the

clinic project, including on November 14, 18, 19").

**166.**   On May 12, 2014 Weigel spoke to a representative of AMG regarding  AMG's request to perform demolition work from 4:00 pm until midnight because starting earlier  in the day would involve AMG workers having to cross a picket line set up by the Carpenters'  Union.  (Weigel Dep. Ex. 9; Weigel Dep. at 133).

**Response: Admit,** but note that AMG was concerned that her Local 79 member-employees would honor the Carpenters' picket, and that AMG took steps to avoid that.  Weigel 9 (P609).

**167.**   Rynkiewycz assigned Williamson to distribute informational hand bills at  Brookdale and did so because he thought workers were being exploited at Brookdale.  (Rynkiewycz Dep. at 36).

**Response: Deny.** Williamson called Brookdale with the objective of having Brookdale use a Local 79 contractor, and concedes that he was not informing the public when he called Brookdale directly.  Williamson Dep. 23:15-17, 26:22-28:8.  Williamson called Brookdale in order to have BD removed from the job. Williamson Dep. 28:9-19. Williamson's goal of conducting his campaign was to get Brookdale to sit down with a business agent of Local 79. Williamson Dep. 38:9-23, 41:19-42:6 ("my job is to get [Brookdale] to meet with [Local 79] … That's my objective.  My objective is to bring Brookdale … to the table to resolve the situation"). Williamson's goal in attempting to shame Brookdale was to pressure Brookdale to hire Local 79 laborers.  Williamson Dep. 63:16-25.

**168.**   Local 79's activity at Brookdale was not aimed to have BD recognize Local 79 as representative of BD's laborers.  (Rynkiewycz Dep. at 82, 99; Williamson Dep. at  26-28, 63).

**Response: Deny.**  Local 79's activity at Brookdale was aimed to claim the work BD was awarded to themselves.  Connolly Dep. 65:24-66:16.  Williamson called Brookdale with the objective of having Brookdale use a Local 79 contractor.   Williamson Dep. 23:15-17. Williamson's goal of conducting his campaign was to get Brookdale to sit down with a business agent of Local 79. Williamson Dep. 38:9-23, 41:19-42:6 ("my job is to get [Brookdale] to meet with [Local 79] … That's my objective.  My objective is to bring Brookdale … to the table to

resolve the situation"). Williamson's goal in attempting to shame Brookdale was to pressure

Brookdale to hire Local 79 laborers. Williamson Dep. 63:16-25.

**169.** On May 12 and 13, 2014, Local 79 erected a large inflated rat on the opposite side of the street from Brookdale's main entrance and on the same side of the street as the Brookdale urgent care center. (Duggan Dep. at 19-21; Williamson Dep. at 33-35; Williamson Dep. Exs. 2, 5).

**Response: Deny.** Local 79 set up a picket line at Brookdale Hospital on May 12, 13, 16, 19, 20,

and 21. Williamson Dep. 68:21-70:24; Williamson 5 (L79:117-122) ("Event Picket Line"). The

rat was in close proximity to the entrance of Brookdale urgent care center across the street from

the Hospital, and the police became involved as a result of Local 79's union activity and safety

concerns regarding same. Dugan Dep. 22:12-14, 27:14-21, 31:12-22, 33:22-34:16.

**170.** The rat was close to the street, approximately fifteen to twenty feet to the south of the urgent care center, and did not block anyone's entrance. (Edwards Dep. at 27; Duggan Dep. at 21-22; Brookdale Dep. Ex. 44; Fast Dep. at 20-21).

**Response: Deny.** At some point in time, the rat was in close proximity to the entrance of

Brookdale urgent care center across the street from the Hospital, and the police became involved

as a result of Local 79's union activity and safety concerns regarding same. Dugan Dep. 22:12-

14, 27:14-21, 31:12-22, 33:22-34:16.

**171.** Two to five persons handed out leaflets near the rat. (Duggan Dep. at 15, 30-31; Fast Dep. at 21, 29; Williamson Dep. at 33-35; Weigel Dep. at 42, 53).

**Response: Admit,** but note that Local 79's activities were not limited to leafletting and

specifically included picketing. Weigel Dep. 60:10-23; Lee Dep. 110:8-15 (The rat is inflated

any time there is picketing); Williamson 5 (L79:117-122).

**172.** Another leafletter stood in the street to hand out leaflets to cars. (Edwards Dep. at 31).

**Response: Admit,** but note that Local 79's activities were not limited to leafletting and

specifically included picketing, and Local 79 agents walking around. Weigel Dep. 60:10-23; Lee

Dep. 110:8-15 (The rat is inflated any time there is picketing); Williamson 5 (L79:117-122);

Edwards Dep. 49:13-22; Deliteris Dep. 95:11-17.

**173.**   The leaflet was entitled "Shame on Brookdale Hospital Medical Center." (Williamson Dep. Ex. 2).

**Response: Admit,** but note that Local 79's activities were not limited to leafletting and specifically included picketing.   Weigel Dep. 60:10-23; Lee Dep. 110:8-15 (The rat is inflated any time there is picketing); Williamson 5 (L79:117-122).

**174.**   The leaflet included the statement that "Brookdale Hospital Medical  Center is allowing BD Development to exploit construction workers @ 1110 Pennsylvania Ave.  in Brooklyn." (Williamson Dep. Ex. 2).

**Response: Admit,** but note that the document speaks for itself.

**175.**   Local 79 wanted publicity to put pressure on Brookdale to address how it  was doing business and to hire credible contractors who treated workers with respect.  (Williamson Dep. at 26-28, 63).

**Response: Deny.** Local 79's activity at Brookdale was aimed to claim the work BD was awarded to themselves and to put pressure Brookdale on Brookdale to stop doing business with BD.   Connolly Dep. 65:24-66:16; Fast Dep. 27:8-11.   Williamson called Brookdale with the objective of having Brookdale use a Local 79 contractor.   Williamson Dep. 23:15-17. Williamson's goal of conducting his campaign was to get Brookdale to sit down with a business agent of Local 79. Williamson Dep. 38:9-23, 41:19-42:6 ("my job is to get [Brookdale] to meet with [Local 79] … That's my objective.  My objective is to bring Brookdale … to the table to resolve the situation"). Williamson's goal in attempting to shame Brookdale was to pressure Brookdale to hire Local 79 laborers.   Williamson Dep. 63:16-25.  Local 79 picketed Brookdale Hospital.   Weigel Dep. 60:10-23; Lee Dep. 110:8-15 (The rat is inflated any time there is picketing); Williamson 5 (L79:117-122).

**176.**   BD had issued a contract to AMG to do the demolition work at the clinic  before Local 79 installed the rat inflated rat at Brookdale on May 12. (Deliteris Dep. at 25-26,  37; Weigel Dep. at 134-35).

**Response: Deny.** AMG was selected only after Local 79 commenced its campaign of threatening to conduct union activity and the project started in April 2014. <u>Capozza Dep. 13:24-14:6; Connolly Dep. 53:15-54:15 (Local 79 commenced union activity against Brookdale on the morning of May 12, 2014); Flavoni 4 (P844) (BD and AMG entered into a subcontract agreement later that day).</u>

177.   On May 13, 2014, Labate explained to Flavoni that because the issue he raised with Deliteris on April 24 had not been resolved, the Market Development Department erected the inflated rat at Brookdale. (Labate Dep. at 161-62; transcript of recording of call on May 13, 2014).

**Response: Deny.** Local 79 set up a picket line at Brookdale Hospital on May 12, 13, 16, 19, 20, and 21. <u>Williamson Dep. 68:21-70:24; Williamson 5 (L79:117-122) ("Event Picket Line").</u>

178.   On May 14, 2014, Local 79 did not erect the inflated rat at Brookdale so that Flavoni and Labate could meet to discuss the issue. (Transcript of recording of May 14, 2014, at 7).

**Response: Admit,** but note that this contradicts Defendant's assertion that there is a separation between the Market Development Department and business agents.

179.   On May 14, Labate and Flavoni spoke about BD using a laborer represented by Local 79 to do general conditions work after the demolition work was completed. (Labate Dep. at 101-03; transcript of recording of May 14, 2014, at 7).

**Response: Deny.** Labate threatened Flavoni with union disharmony and said that he would speak to representatives of Brookdale Hospital if BD did not hire Local 79 laborers or recognize Local 79 as the representative for BD's employees. <u>5142014 124711 PM.m4a; Flavoni Aff. ¶¶ 24, 33</u> ("I mean, the people in the hospital are all union. They don't want us to have union issues[;]" "It's going to be an issue, unless you want to sign with me …[;]" "You should have signed with me, not 621. [Laughter] No, I know. What can I tell you. Hey listen, it's a force"). Flavoni acted as a liaison between Local 79 agents and representatives of Brookdale. <u>Flavoni Aff. ¶¶ 46-49.</u>

**180.**    In approximately May 2014, Flavoni began using his phone to record some, but not all, of his conversations with Labate and did so without telling Labate. (Flavoni Dep. at 15-17).

**Response: Admit.**

**181.**    On May 14, 2014, BD filed unfair labor practice charges with the National Labor Relations Board challenging what BD considered the Union's "illegal activities." (Brookdale Dep. Ex. 9).

**Response: Admit,** but objects to this statement as immaterial.

**182.**    On May 15, 2014 Flavoni told Labate that BD would not use a laborer employed by a Local 79 signatory to perform general conditions work at Brookdale. (Transcript of recording of call May 15, 2014).

**Response: Admit.**

**183.**    Labate responded that Local 79 would have an issue with BD if BD similarly performed general conditions work at the King Plaza Mall without using a laborer represented by Local 79. (Transcript of recording of call May 15, 2014).

**Response: Admit,** but note that Local 79 never picketed BD's offices. Flavoni Aff. ¶ 81.

**184.**    On May 16, 2014, Local 79 resumed its use of an inflated rat and distributed leaflets at Brookdale. (Williamson Dep. Ex. 5; Williamson Dep. at 34).

**Response: Deny.** Local 79 set up a picket line at Brookdale Hospital on May 12, 13, 16, 19, 20,

and 21. Williamson Dep. 68:21-70:24; Williamson 5 (L79:117-122) ("Event Picket Line").

**185.**    On May 19 through 21, 2014, Local 79 used an inflated rat and distributed leaflets at Brookdale. (Williamson Dep. Ex. 5; Williamson Dep. at 34).

**Response: Deny.** Local 79 set up a picket line at Brookdale Hospital on May 12, 13, 16, 19, 20,

and 21. Williamson Dep. 68:21-70:24; Williamson 5 (L79:117-122) ("Event Picket Line").

**186.**    Local 79 never blocked the entrance to the urgent care center in any fashion. (Duggan Dep. at 37; Fast Dep. at 29; Weigel Dep. at 42, 53).

**Response:**  At some point in time, the rat was in close proximity to the entrance of Brookdale

urgent care center across the street from the Hospital, and the police became involved as a result

of Local 79's union activity and safety concerns regarding same. Dugan Dep. 22:12-14, 27:14-

21, 31:12-22, 33:22-34:16.

**187.** At no time did Local 79 engage in any picketing or any activity other than the inflated rat and leaflets. (Duggan Dep. at 45-46; Fast Dep. at 30; Connolly Dep. at 31-32; Edwards Dep. at 50; Williamson Dep. at 79-80; Weigel Dep. at 37, 48).

**Response: Deny.** Local 79 set up a picket line at Brookdale Hospital on May 12, 13, 16, 19, 20, and 21. Williamson Dep. 68:21-70:24; Williamson 5 (L79:117-122) ("Event Picket Line").

**188.** Brookdale considered Local 79's rat and leaflets to be an eye sore, an embarrassment and a public relations nightmare that could negatively affect the hospital's community relations. (Connolly Dep. at 65, 112; Edwards Dep. at 21, 27, 52, 55; Fast Dep. at 27-28).

**Response: Deny.** Margaret Brubaker (hereinafter "Brubaker"), Brookdale's Senior Vice President of Human Resources, considered Local 79's union activity a credible threat to Brookdale's operations, prompting immediate action and notification to the various unions who represent the employees of Brookdale. In fact, on May 12, 2014 at 11:42 AM – the morning of Local 79's first day of union activities – Brubaker e-mailed many Brookdale representatives on behalf of Connolly to advise that Local 79 is conducting union activity and explained that there is a dispute because Local 79 wants the entire project. In the e-mail, there is specific reference to various explanations provided to representatives of various unions that deal with Brookdale. Fast Dep. 40:11-41:22; Brookdale 1 (BROOK5) ("HR Response Explanation provided to Michele Hart and Clare Thompson – 1199 Nursing Explanation provided to Karen Masters C1R Messages left to call me back – Cora Mahr, Brenda Ofori and Doreen Farword – 1199 Guild Message left with Jasper McCormick (Security Brotherhood) to call me back"). Additionally, Brookdale hired a public relations firm due to inquiries from 1199. Connolly Dep. 118:3-121:4; Brookdale 38 (BROOK178-180).

**189.** Brookdale was not concerned that Local 79's protest would lead to any work stoppage by Brookdale's own employees. (Edwards Dep. at 86; Fast Dep. at 65-66).

**Response: Deny.** Fast had concerns with respect to delays the Brookdale clinic job site might

incur as a result of Local 79's union activity, as Brookdale had certain deadlines they wanted to

meet, and labor disagreements would hold up the project.  Fast Dep. 30:10-18, 31:17-23.

**190.**     Local 79's actions did not delay the clinic project at all.  (Fast Dep. at 104).

**Response: Deny.** The delays caused by Local 79's union activity - coupled with other, normal

construction delays - were causing Brookdale problems.     Connolly Dep. 121:5-124:24;

Brookdale 42 (BROOK191).

**191.**     Williamson was present each day of protest activity at Brookdale and completed
attendance sheets listing those Local 79 members also in attendance. (Williamson  Dep. at 69-70;
Williamson Dep. Ex. 5).

**Response: Admit.**

**192.**     The attendance sheet is used by Local 79 to track Local 79 members' participation.
(Rynkiewycz Dep. at 110).

**Response: Admit,** but note that the attendance sheet is to track members' participation in

picketing.  Williamson Dep. 68:21-70:24; Williamson 5 (L79:117-122) ("Event Picket Line").

**193.**     The attendance sheets are handed in to Local 79's secretarial staff and are  not reviewed
by Rynkiewycz.  (Rynkiewycz Dep. at 112-113).

**Response: Plaintiff lacks sufficient information** to admit or deny this statement, but objects to

this statement as immaterial.  Flavoni Aff. ¶ 82.

**194.**     On the attendance sheet there is a line for the "Event" being conducted,  and for the
Brookdale activity Williamson wrote "picket line."  (Williamson Dep. Ex. 5).

**Response: Admit,** but note that Williamson wrote "picket line" numerous times.  In fact,

Williamson wrote "picket line" every time, including on May 12, 13, 16, 19, 20, and 21.

Williamson Dep. 68:21-70:24; Williamson 5 (L79:117-122) ("Event Picket Line").   The

Complaint in this case was filed on August 15, 2014, and served on Defendant on August 21,

2014.  See Docket Entries 1, 6.  Anthony Williamson wrote "picket line" when he picketed

Brookdale Hospital again on October 21, 27, 28, 29, 30, 31, and November 3, 4, 5, 6, 10, 11, 12, 13, 14, 18, 19, 20, 21.  L79:155-L79:179.  In total, Williamson picketed – and wrote down that he conducted a picket line at – Brookdale Hospital twenty-five (25) times.  Id.

**195.**   According to Rynkiewycz, there are only three events a field organizer  should have put on the attendance form as that form existed in 2014:  member action line,  lunchtime rally or full-day rally.  (Rynkiewycz Dep. at 108).

**Response: Deny.**  Williamson knows what picketing is, and confirmed that he wrote picket line on each and every single attendance sheet without fail.  Williamson Dep. 70:22-71:22.

**196.**   A member action event is almost always for informational purposes.  (Rynkiewycz Dep. at 119).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial.  Flavoni Aff. ¶ 83.

**197.**   When asked about his Brookdale attendance forms at his deposition,  Williamson stated that he was sloppy and should have listed the "Event" as "informational" or  "job action." (Williamson Dep. at 70-71).

**Response: Admit,** but note that Williamson wrote "picket line" numerous times.  In fact, Williamson wrote "picket line" every time, including on May 12, 13, 16, 19, 20, and 21.  Williamson Dep.  68:21-70:24; Williamson 5 (L79:117-122) ("Event  Picket Line").  The Complaint in this case was filed on August 15, 2014, and served on Defendant on August 21, 2014.  See Docket Entries 1, 6.  Anthony Williamson wrote "picket line" when he picketed Brookdale Hospital again on October 21, 27, 28, 29, 30, 31, and November 3, 4, 5, 6, 10, 11, 12, 13, 14, 18, 19, 20, 21.  L79:155-L79:179.  In total, Williamson picketed – and wrote down that he conducted a picket line at – Brookdale Hospital twenty-five (25) times.  Id.

**198.**   Williamson did not complete attendance sheets properly.  (Rynkiewycz Dep. at 140-141).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial.  Flavoni Aff. ¶ 84.

**199.**   On May 21, 2014, Region 29 of the National Labor Relations Board dismissed the unfair labor practice charge filed by BD, explaining that "The evidence presented by [BD] did not establish that Union representatives engaged in any unlawful picketing conduct. Rather the Union engaged in lawful protest activity—installation of a rat and non-obstructive leafleting—that the Board has found not to be coercive and unlawful" and "the evidence failed to establish that the Union unlawfully threatened to picket as alleged by [BD]." (P262-264).

**Response: Admit,** but objects to this statement as immaterial and on the grounds that it is irrelevant and constitutes inadmissible evidence.

**200.**   On May 21, 2014, BD arranged with AMG to hire a laborer from Local 79 to perform general conditions work. (Brookdale Dep. Ex. 14; Weigel Dep. Ex. 10; Weigel Dep. at 138-39).

**Response: Deny.**   Representatives of Brookdale were threatened by Local 79 agents and, as a result, pressured BD into being forced to hire a Local 79 laborer due to Local 79's picketing and walking around an inflated rat. Fast Dep. 60:9-63:10 (On May 20, 2014, at 8:16 AM, Connolly advised Toney that, failing other efforts to have Local 79 cease and desist from its conduct, he would step in late this afternoon and "end this[.]" Connolly further remarked that he is afraid this will be a difficult day. Connolly said this because Local 79 was conducting union activity again and Toney was very angry about it.); Fast Dep. 60:9-63:10 (On May 21, 2014, at 7:43 AM, Connolly told Flavoni and Deliteris that he believes it is in everyone's best interest to resolve this quickly, and mentioned that Local 79 is conducting union activity at Brookdale today. At 9:07 AM the same day, Connolly followed up and said that there is a new flyer with Toney's name on it, which Toney would not look at kindly. He ended his correspondence by stating that he cannot stress how important resolution is today); Weigel Dep. 136:19-139:25 (On May 21, 2014, Weigel noted in his log that a Local 79 laborer will be on the job site after demolition); Edwards Dep. 49:13-22; Deliteris Dep. 95:11-17..

**201.**   BD entered an agreement on May 27, 2014 with AMG for AMG to perform general conditions cleaning at the clinic. (Flavoni Dep. at 74; Flavoni Dep. Ex. 5).

**Response: Admit.**

**202.** The contract with AMG regarding general conditions work at the clinic included a requirement that "all labor shall be of standing and affiliation that will permit the project to be carried on harmoniously." (Flavoni Dep. Ex. 5).

**Response: Admit,** but note that these are boiler plate provisions. Flavoni Dep. 115:5-11.

**203.** Local 621 did not file grievance over BD using AMG to do general conditions clean-up at the clinic. (Flavoni Dep. at 100).

**Response: Admit,** but objects to this statement as immaterial.

**204.** BD had planned to use its own employees, represented by Local 621 to do general conditions clean-up at the clinic. (Flavoni Dep. at 100).

**Response: Admit.**

**205.** BD kept its own laborers busy on miscellaneous items. (Flavoni Dep. at 101).

**Response: Admit,** but note that BD strived – at great cost – to ensure that none of its employees

lose work as a result of Local 79's conduct. Flavoni Aff. ¶ 85.

**206.** Brookdale's project at the clinic had structural issue that put work on hold from approximately June 2014 until November 2014. (P744-745; Connolly Dep. at 96; Capozza Dep. at 48-50; Fast Dep. at 31).

**Response: Admit.**

**207.** BD did not have AMG provide a laborer represented by Local 79 to do general condition cleaning after the structural issue was resolved and work at the clinic resumed. (Deliteris Dep. at 97-98).

**Response: Admit.**

**208.** On September 26, 2014, Ruben Colon of the Carpenters' Union sent an email to BD and Brookdale Hospital objecting to BD "self-performing the interior carpentry portion of the work" at the clinic and stating that "if we are unable to reach an agreement with BD Development we will have no other recourse but to enter into a **Full Scale Labor Dispute** … which threatens to draw all parties involved with the project, including Brookdale Hospital." (Brookdale Dep. Ex. 25; Fast Dep. at 85).

**Response: Admit,** but note that the Carpenters' Union and Local 79 are part of the BCTC and

honor each other's picket lines and other union activity. Williamson Dep. 32:9-16; Smith Dep.

109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15;

Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**209.**   On October 10, 2014, representatives of Brookdale and BD met with Ruth Harvey of Ametis Industries Inc., a minority/woman-owned business enterprise, to discuss Ametis performing some work and the issue raised by the Carpenters' Union. (Edwards Dep. at 44-46).

**Response: Admit,** but note that Brookdale arranged the meeting to resolve the issues raised by both the Carpenters' Union and Local 79. Connolly Dep. 120:8-121:4.

**210.**   Edwards had received calls about the clinic project not meeting the 30% MWBE requirement and he was concerned Brookdale was at risk of losing state funding in the future. (Edwards Dep. at 48).

**Response: Admit,** but note that Brookdale had long ago met the thirty percent (30%) MWBE requirement and Flavoni believes that Local 79 agents raised such a concern to Khari Edwards, who is not involved in construction but in external affairs, did so to exert further pressure on Brookdale to remove BD from the job. Flavoni Aff. ¶ 86.

**211.**   Edwards believed that if BD hired Ametis it would have satisfied Brookdale's MWBE requirements and probably solve issues with the Carpenters' Union and Local 79. (Edwards Dep. at 70).

**Response: Admit,** but note that Edwards was under pressure to have Local 79 cease its union activity by any means possible and received instructions from Toney to have Local 79 cease its union activity in any way, shape, or form. Edwards Dep. 26:13-27:9, 61:19-25.

**212.**   Ametis was never used to perform work on the clinic project. (Fast Dep. at 71; Weigel Dep. at 110).

**Response: Admit,** but note that neither BD nor Brookdale could afford to absorb Ametis' proposed cost. Connolly Dep. 105:11-106:24; Brookdale 25 (BROOK96-97) (The delta of the cost of using Ametis in order to appease both the Carpenters and Local 79 was prohibitive, and Connolly was not willing to absorb such a cost, nor did he expect BD to).

**213.**   On November 5, 2014, Ed McWilliams of the Carpenters' Union sent an email to Brookdale Hospital objecting to work being performed by workers paid less than the area standard wages and benefits, asking Brookdale to use its "managerial discretion to not allow these non-area standard contractors to perform any work on any of [its] projects" and informing Brookdale of a "new and aggressive public information campaign against BD" that will "impact all parties associated with the projects where they are employed." (Brookdale Dep. Ex. 26; Edwards Dep. at 66; Fast Dep. at 86).

**Response: Admit**, but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**214.**   The Carpenters' Union had a leaflet entitled "Shame on Brookdale Hospital Medical Center." (Brookdale Dep. Ex. 47).

**Response: Admit**, but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**215.**   The leaflet included the statement that "Brookdale Hospital Medical Center is allowing BD Development to exploit construction workers at 1110 Pennsylvania Ave. in Brooklyn." (Brookdale Dep. Ex. 47).

**Response: Admit**, but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**216.**   The Carpenters' Union picketed and distributed leaflets at the clinic during the clinic project, including on November 14, 18, 19. (P746, 747, 749; Edwards Dep. at 49; Weigel Dep. at 44-47; Ferazzoli Dep. at 92-93; Weigel Dep. at 99, 101, 131-33; Video.mov; 6230.Mov; Picket line.Mov).

**Response: Admit**, but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**217.**   From approximately November 2013 until May 2015, Barry Smith served  as a Business Agent for Local 79.  (Smith Dep. at 14).

**Response: Admit.**

**218.**   In  approximately  August 2014, Smith  was  assigned to serve as Business  Agent for Brooklyn.  (Smith Dep. at 16).

**Response: Admit.**

**219.**   Connolly and Smith spoke just once, in October 2014, when work on the  clinic was suspended but set to resume.  Smith wanted a laborer represented by Local 79 to  perform the general conditions work, and Connolly responded that the issue had been resolved  already, with AMG to perform general conditions work.  (Connolly Dep. at 149, 160-161, 176-  77; Smith Dep. at 56-60, 67-68, 180).

**Response:   Deny.**   Smith spoke with Connolly four times, of which three were initiated by Smith.  Smith Dep. 56:13-57:9, 60:2-13, 66:18-68:4.  Additionally, Williamson called Connolly several times with the object of having Local 79 laborers perform work at the Brookdale job site, and to remove BD from the project.  Williamson Dep. 14:17-15:20, 24:13-25:2, 25:3-5, 23:15-17, 23:22-24:7, 28:9-19, 28:20-29:2, 29:24-30:19 (Williamson called Brookdale Hospital three (3) times in 2014; Williamson learned from the first call that his point of contact for the Brookdale job site is Connolly; Williamson called Brookdale with the objective of having Brookdale use a Local 79 contractor; During Williamson's second call to Brookdale).

**220.**   Smith did not threaten Connolly with a rat or flyers or anything like that. (Connolly Dep. at 161; Smith Dep. at 241-42).

**Response: Deny.**  Brookdale was being threatened and pressured by Local 79.  Ferazzoli Dep. 47:12-48:2.  Smith admitted that he has the authority to threaten a picket line.  Smith Dep. 121:19-122:7.  Also, when Flavoni ultimately informed Smith that Brookdale did not agree to hiring a Local 79 laborer, Smith responded by threatening to put a picket line up.  Smith specifically asked Flavoni to call his client and let them know what Smith said.  Smith Dep. 139:20-146:2; Smith 3 (8192014 113406 AM.m4a); Flavoni Aff. ¶¶ 87, 33.

221.   On October 15, 2014, Smith asked Flavoni to have AMG use a laborer represented by Local 79 for general conditions work at the clinic; Flavoni rejected the request but offered to resolve the issue by doing masonry and stucco work with laborers represented by Local 79. (Transcript of recording of October 15 call, at 10).

**Response: Admit,** but note that Smith informed Flavoni that he was speaking to Connolly and threatened that BD is going to have "this problem" again.

222.   On October 17, 2014, Smith informed Flavoni that Local 79 rejected BD's offer of stucco work and said with respect to BD's refusal to use a laborer represented by Local 79 for general conditions at the clinic that if Local 79 has "to fight it tooth and nail," the Union will. (Transcript of recording of October 7 call).

**Response: Admit,** but note that Smith continued to inform Flavoni that he was speaking to Connolly, and Flavoni explained to Smith that whatever Smith tells Flavoni is passed on to Brookdale.

223.   On October 21, 2014, Local 79 erected an inflated rat and distributed leaflets at Brookdale and continued to do so each week day the week of October 27, November 3 through 6, each week day the week of November 10, November 18 through 21. (L79-155 to 179; Brookdale Dep. Exs. 20, 30, 41; Deliteris Dep. at 98).

**Response: Admit,** but note that Anthony Williamson wrote "picket line" when he picketed Brookdale Hospital again on October 21, 27, 28, 29, 30, 31, and November 3, 4, 5, 6, 10, 11, 12, 13, 14, 18, 19, 20, 21.  L79:155-L79:179.  In total, Williamson picketed – and wrote down that he conducted a picket line at – Brookdale Hospital nineteen (19) times in October and November.  Id.

**224.**   Nothing Local 79 said or did led BD to use a laborer represented by Local 79 to perform general conditions work at the clinic after the structural issues were resolved and work resumed. (Deliteris Dep. at 98-99).

**Response: Deny.**   Local 79's actions caused Connolly concern because he thought Local 79 would picket Brookdale Hospital.  Connolly Dep. 93:11-105:10; Brookdale 22 (BROOK92).

**225.**   Fast never spoke to anyone from Local 79 regarding the protest activity. (Fast Dep. at 110-11).

**Response: Admit,** but note that all of Local 79's communications with Flavoni were passed on to Fast, that Local 79 agents were told this and knew of it, and that Local 79 agents requested that Flavoni pass on messages from Local 79.  Fast Dep. 31:24-32:19, 69:8-72:21; Brookdale 22 (BROOK92); Flavoni Aff. ¶¶ 46-49.

**226.**   Fast never spoke with Flavoni about Local 79 setting up or threatening to set up a picket line. (Fast Dep. at 48-49).

**Response: Deny.**   All of Local 79's communications with Flavoni were passed on to Fast, Local 79 agents were told this and knew of it, and Local 79 agents requested that Flavoni pass on messages from Local 79.   Fast Dep. 31:24-32:19, 69:8-72:21; Brookdale 22 (BROOK92); Flavoni Aff. ¶¶ 46-49.

**227.**   Within three or four weeks of work starting at the clinic, Labate called Connolly, who forwarded to BD without returning call. (Connolly Dep. at 20-21; Labate Dep. at 78, 99, 111, 269); Connolly never spoke to Labate. (Labate Dep. at 155,157).

**Response: Admit,** but note that all of Local 79's communications with Flavoni were passed on to Fast, that Local 79 agents were told this and knew of it, and that Local 79 agents requested that Flavoni pass on messages from Local 79. Fast Dep. 31:24-32:19, 69:8-72:21; Brookdale 22 (BROOK92); Flavoni Aff. ¶¶ 46-49.

**228.**   Labate never reached out to any Brookdale representative other than Connolly. (Labate Dep. at 118).

**Response: Admit,** but note that Smith reached out to Brookdale representatives several times. Smith Dep. 56:13-57:9, 60:2-13, 66:18-68:4. Additionally, Williamson called Connolly several times with the object of having Local 79 laborers perform work at the Brookdale job site, and to remove BD from the project. Williamson Dep. 14:17-15:20, 24:13-25:2, 25:3-5, 23:15-17, 23:22-24:7, 28:9-19, 28:20-29:2, 29:24-30:19 (Williamson called Brookdale Hospital three (3) times in 2014; Williamson learned from the first call that his point of contact for the Brookdale job site is Connolly; Williamson called Brookdale with the objective of having Brookdale use a Local 79 contractor; During Williamson's second call to Brookdale).

**229.**   Brookdale never considered removing BD from the job.  (Fast Dep. at 95).

**Response: Admit,** but note that Brookdale representatives were aware that Local 79's objective was to remove BD from the job.  Williamson Dep. 28:9-19.

**230.**   Since the clinic project, Brookdale has issued one RFP, for work on the  Intensive Care Units ("ICU"), and included BD among recipients of the RFP.  (Fast Dep. at 95- 96, 98-99; Connolly Dep. at 122).

**Response:  Deny.**  BD has placed bids on other projects for Brookdale since the completion of the clinic job, and has not been awarded any work thus far.  Flavoni Aff. ¶ 88.

**231.**   Brookdale did not select BD for the ICU project because BD was not the  lowest bidder. (Fast Dep. at 96; Connolly Dep. at 123).

**Response: Deny.**  Brookdale has not awarded BD any work since Local 79's union activity and has not done so as a result of Local 79's union activity.  Flavoni Aff. ¶ 89.

**232.**   Brookdale went with lowest bidder on the ICU project.  (Connolly Dep. at 123).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶ 90.

**233.**   Brookdale sent BD the ICU RFP after BD's disputes with Local 79 and  the Carpenters' Union.  (Fast Dep. at 114).

**Response: Deny.**   Plaintiff is not certain whether the ICU RFP was sent to BD by Brookdale after BD's dispute with Local 79.   Flavoni Aff. ¶ 91.

234.    BD seeks in excess of $1.9 million in alleged damages in connection with  the ICU project at Brookdale.  (Flavoni Dep. Ex. 7).

**Response: Admit.**

235.    Brookdale would "absolutely" use BD again and has "absolutely" no  concerns about using BD on future projects as a result of Local 79's protest activity.  (Connolly  Dep. at 28, 82; Fast Dep. at 114).

**Response: Deny.**  Brookdale has not awarded BD any work since the completion of the clinic job.  Flavoni Aff. ¶¶ 88-89.

236.    Brookdale's only concern about using BD on future projects is whether  BD is capable of performing the work and is competitive.  (Connolly Dep. at 124).

**Response: Deny.**   Brookdale had numerous concerns about Local 79's conduct and has an important interest in preventing any such conduct from happening in the future.   Fast Dep. 40:11-41:22; Brookdale 1 (BROOK5) ("HR Response Explanation provided to Michele Hart and Clare Thompson – 1199 Nursing Explanation provided to Karen Masters C1R Messages left to call me back – Cora Mahr, Brenda Ofori and Doreen Farword – 1199 Guild Message left with Jasper McCormick (Security Brotherhood) to call me back"); Connolly Dep. 118:3-121:4; Brookdale 38 (BROOK178-180).

237.    Connolly has not been directed, and has not directed anyone, not to use  BD on future jobs because of the clinic experience.  (Connolly Dep. at 124).

**Response:  Deny.**  Brookdale has not awarded BD any work since the completion of the clinic job, and had regularly been awarded work prior to Local 79's conduct.  Flavoni Aff. ¶¶ 88-89.

238.    On March 3, 2016, BD commenced an action against the Carpenters' Union.  (Complaint dated March 3, 2016, Civil Action No. 2:16-cv-1073 ("Complaint against  Carpenters' Union")).

**Response: Admit,** but objects to this statement as immaterial.

**239.**    In its complaint against the Carpenters' Union, BD alleged that "In or  about early May 2014, upon information and belief, the Carpenters contacted Brookdale and issued unqualified, general threats to picket Brookdale directly if BD was permitted to perform  the work on the Clinic without the Carpenters' members." (Complaint against Carpenters'  Union ¶ 23).

**Response: Admit,** but objects to this statement as immaterial.

**240.**    In its complaint against the Carpenters' Union, BD alleged that "Representatives of Brookdale have since then informed BD that the Carpenters' conduct plays a  substantial role when determining whether BD will be awarded future jobs.  To date, BD has not  been awarded any additional role by Brookdale." (Complaint against Carpenters' Union ¶ 27).

**Response: Admit,** but objects to this statement as immaterial.

## V.    <u>AS TO "KINGS PLAZA"</u>

**241.**    Macerich Co. is the owner and landlord of the Kings Plaza Mall (the  "Mall").  (Zito Dep. at 49).

**Response: Admit.**

**242.**    In 2014, the Gap had an Old Navy Store that it was relocating within the  Mall.  (Ciuzio Dep. at 119).

**Response: Admit.**

**243.**    At all relevant times, Brian Lindsey was Macerich's senior manager/tenant  coordinator. (Zito Dep. at 50, 96).

**Response: Admit.**

**244.**    At all relevant times, Stephen DeClara was Macerich's senior  manager/property management.  (Zito dep. at 96-97).

**Response: Admit.**

**245.**    At all relevant times, Lucien Zito was operations manager for Macerich  and oversaw constructions jobs in the Mall by the landlord and by tenants.  (Zito Dep. at 9-12).

**Response: Admit.**

**246.**    Lindsey and DeClara were Zito's superiors; Zito reported to Lindsey and  DeClara.  (Zito Dep. at 76, 96-97).

**Response: Admit.**

**247.**     As operations manager, Zito represented the Mall's interests and made  sure its rules and regulations were adhered to with respect to construction, including the  "requirement that work taking place on site must be done so with union harmony."  (Zito Dep. at  9-12).

**Response: Admit.**

**248.**     Zito would facilitate communications and resolution between the tenant,  sometimes the general contractor, and the business agents of the unions.  (Zito Dep. at 13-14).

**Response: Admit.**

**249.**     All construction jobs at the Mall have a pre-construction meeting with  general contractors where Zito gives direction as to what is required.  (Zito Dep. at 21-23).

**Response: Admit.**

**250.**     Zito does not recall the pre-construction meeting with BD but he always  tells general contractors they have to provide union harmony.  (Zito Dep. at 23-24).

**Response: Admit.**

**251.**     The Mall operates in a working class environment and Macerich considers  it to be a "blue collar working class mall" with working class patrons.  (Zito Dep. at 30, 35).

**Response: Admit.**

**252.**     The Mall always had "an intense concern and sensitivity to any type of  public union action at the mall." (Zito Dep. at 34, 77, 122).

**Response: Admit,** but note that the Mall had "an intense concern and sensitivity to any type of public union *activity* at the mall."  Zito Dep. 34:7-36:12 (emphasis added).

**253.**     The Mall is "very sensitive to" the "threat of a rat being blown up." (Zito  Dep. at 30, 35, 77).

**Response: Admit,** but note that the Mall was also sensitive to and deeply concerned about any picket lines being formed at the Mall.  Zito Dep. 58:10-20, 139:20-140:14, 180:6-181:11.  The concerns raised by any public union activity at the mall were the reduction of shoppers, a total mall shut down, or an electrical shut down of power at the Mall.  Zito Dep. 34:7-36:12; Zito 1 (MACERICH9); Ross 7 (P206).

**254.**    The Mall was concerned that an inflated as rat at the Mall would decrease  its customers' willingness to shop in the Mall.  (Zito Dep. at 35, 117-18).

**Response: Admit,** but note that the Mall was also sensitive to and deeply concerned about any picket lines being formed at the Mall.   Zito Dep. 58:10-20, 139:20-140:14, 180:6-181:11. The concerns raised by any public union activity at the mall – including picketing – were the reduction of shoppers, a total mall shut down, or an electrical shut down of power at the Mall. Zito Dep. 34:7-36:12; Zito 1 (MACERICH9); Ross 7 (P206).

**255.**    The Gap's lease at the Mall required the Gap to maintain union harmony.  (Ciuzio Dep. at 40; Kruse Dep. at 134).

**Response: Admit.**

**256.**    Most malls have harmony clauses in the leases requiring tenants to use  credible union contractors that pay living wages to their workers and treat them with respect.  (Williamson Dep. at 83).

**Response: Admit,** but Plaintiff objects to this statement as immaterial.

**257.**    It was the Gap's standard practice for years prior to 2014 to ask landlords  whether or not construction needed to be done using union labor.  (Kruse Dep. at 133-34).

**Response: Admit,** but Plaintiff objects to this statement as immaterial.

**258.**    There is typically language in the Gap's leases with some sort of harmony  clause that the Gap cannot do anything that affects the landlord's business.  (Kruse Dep. at 42).

**Response: Admit.**

**259.**    Lauren Kruse was the Gap's Director of Construction for the Northeast for  five years from approximately 2011 until January 2016.  (Kruse Dep. at 8-9).

**Response: Admit.**

**260.**    John Ciuzio is the Gap's Senior Project Manager, managing construction  for new stores or refurbishing existing stores and in that capacity he is involved in bidding  projects.  (Ciuzio Dep. at 6-8).

**Response: Admit.**

**261.**     Bidders must be union for specific projects such as when the Gap's lease  with the landlord requires unions.  (Ciuzio Dep. at 20-21, 199).

**Response: Admit.**

**262.**     Bidders must do their due diligence to see what is required and review the  Gap's lease to see if a particular union is required.  (Ciuzio Dep. at 21).

**Response: Admit,** to the extent that the Gap provided BD with a copy of its lease or any related documents, and to note further that I personally spoke with Mr. Zito to determine BD's requirements to perform work at the Mall and was told that as long as BD is union, there are no problems.  Flavoni Aff. ¶ 92.

**263.**     The Gap's master service agreement with general contractors require the  general contractors to maintain union harmony.  (Kruse Dep. at 138).

**Response: Admit,** but note that the document speaks for itself.

**264.**     The Gap calculates the cost of a non-union labor to be generally 25-30%  less than for union labor.  (Ciuzio Dep. at 94-95, 199).

**Response: Admit,** but objects to this statement as immaterial.

**265.**     Ken Ross was the Project Manager for BD's job in the Mall.  (Ross Dep.  at 13-14; Giovinazzi Dep. at 70).

**Response: Admit.**

**266.**     Angela Giovinazzi was Assistant Project Manager for BD's job in the  Mall.  (Ross Dep. at 28-29; Giovinazzi Dep. at 70).

**Response: Admit.**

**267.**     Michael Deliteris was field superintendent for BD at the Mall.  (Capozza Dep. at 39-40; Ross Dep. at 30, 49).

**Response: Admit,** but note that Michael Deliteris was a superintendent for BD at the Mall.

Flavoni Aff. ¶ 93.

**268.**     Michael Deliteris is the nephew of Jimie Deliteris.  (Weigel Dep. at 75-88;  Flavoni Dep. at 54).

**Response: Admit,** but objects to this statement as immaterial.

**269.**    BD was the lowest qualified bidder for the Old Navy Store project.  (Kruse Dep. at 22).

**Response: Admit.**

**270.**    BD's bid was still $500,000 to $600,000 above the Gap's estimated costs  for the Old Navy Store project.  (Kruse Dep. at 50).
**Response: Admit,** but note that Local 79's threats issued to the Mall and the Gap in order  to

place a laborer on the Mall job site caused further strain on an already over-budget project.

Flavoni Aff. ¶ 94.

**271.**    The project in the Mall was BD's first job for the Gap.  (Flavoni Dep. at 106;  Ross Dep. at 24).

**Response: Admit,** but note that BD's first job for the Gap was an important opportunity to make

an excellent first impression, which Local 79 utterly destroyed by engaging in its threatening

conduct and union activity.  Flavoni Aff. ¶ 95.

**272.**    The project in the Mall was to be a union project.  (Kruse Dep. at 35).

**Response: Admit.**

**273.**    The Gap's contract with BD required BD to maintain union harmony.  (Ciuzio Dep. at 195).

**Response: Admit.**

**274.**    BD selected EG Electric Inc. to perform electrical work at the Mall.  (Jackson Dep. at 29; Ross Dep. Ex. 8).

**Response: Admit.**

**275.**    EG Electric Inc. is not a signatory to a collective bargaining agreement  with Local 3. (Jackson Dep. at 29).

**Response: Admit,** but note that Local 3 is a member of the BCTC, just like Local 79 and the

Carpenters.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca

Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz

Dep. 129:19-131:21; Jordan Dep. 13:3-8.

**276.**   The Mall has a stand-alone generation plant that generates the Mall's electricity. (Jackson Dep. at 33; Zito Dep. at 20).

**Response: Admit,** but note that Labate threatened to have the mall's power shut down.

Giovinazzi Dep. 74:6-83:8; Zito Dep. 30:22-34:7.

**277.**   Members of the electricians' union, Local 3, maintain the generation plant.  (Jackson Dep. at 33; Zito Dep. at 19-20).

**Response: Admit.**

**278.**   BD needed Local 3's cooperation throughout project at the Mall.  (Ross  Dep. at 97-98).

**Response: Admit.**

**279.**   Local 3 does not honor, and does not refuse to cross, picket lines set up by  other unions. (Jackson Dep. at 57).

**Response: Deny.**   Local 3 is a member of the BCTC, just like Local 79 and the Carpenters, and honors the picket lines set up by other BCTC local unions.   Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21; Jordan Dep. 13:3-8; Williamson Dep. 73:18-79:2; DePetro Dep. 28:11-29:23; Wilde Dep. 22:16-25:16; Williamson Dep. 95:25-96:23; Williamson Dep. 95:24-96:23; Flavoni Aff. ¶ 68.

**280.**   On May 15, 2014, Flavoni told Labate that BD would not use a Local 79  laborer to perform general conditions work at Brookdale.  (Transcript of recording of May 15).

**Response: Admit.**

**281.**   Labate responded by indicating that Local 79 would also have an issue  with BD if BD similarly performed general conditions work at King Plaza Mall without using a  Local 79 laborer.  (Transcript of recording of May 15).

**Response: Admit,** but note that Labate did not only threaten Flavoni, but also threatened the Mall directly (and the Gap indirectly, through Flavoni) with picketing, shut downs of the entire mall, a total electrical power shut down, and other union activity.   Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.

**282.**   On May 16, 2014, BD subcontracted to All City Interior Contracting Inc.  ("All City") the performance of demotion work at the Mall. (Ross Dep. Ex. 4; Giovinazzi Dep.  at 106-07; Flavoni Dep. at 112-13, 168).
**Response: Deny.**  Representatives of the Mall and the Gap were given general warnings by Local 79 agents about using BD for the Mall job and, as a result, BD hired a Local 79 laborer against its will to forego any issues to make a good first impression.  Labate Dep. 127:10-130:5, 176:4-8; Flavoni Aff. ¶ 97.

**283.**   BD prepared the contract with All City and included a requirement that  "all labor shall be of standing and affiliation that will permit the project to be carried on  harmoniously." (Rodopoulos Dep. at 71-72; Ross Dep. at 4).

**Response: Admit,** but note that the document speaks for itself.

**284.**   Section 20 of All City contract is standard language in BD's contracts with subcontractors.  (Giovinazzi Dep. at 109-110; Flavoni Dep. at 115).

**Response: Admit.**

**285.**   The Gap did not have any discussions with BD about the subcontracting of  demolition work.  (Kruse Dep. at 155).

**Response: Admit,** but note that BD hired All City in an effort to placate Local 79 and make a good first impression with the Gap. Flavoni Aff. ¶ 97; 712014 43334 PM.m4a (Flavoni: "we heard that there was going to be an issue with 79. So in an effort to mitigate that and maintain the harmony, we actually hired a demolition contractor who is Local 79. And in fact, they just finished the demolition now. And it appears that they're not happy with that. Now, we absorbed an additional $40,000 cost in doing that"); Flavoni Aff. ¶¶ 26, 33.

**286.**   Construction at the Mall project commenced on May 20, 2014.  (Ciuzio  Dep. at 184; Ciuzio Dep. Ex. 1).

**Response: Admit.**

**287.**   Demolition work at the Mall project was being performed on May 21,  2014.  (Ciuzio Dep. at 15-86).

**Response:  Admit.**

**288.**   On or about May 16, 2014, Local 79 filed a grievance regarding BD with  the BCTC. (Jordan Dep. Ex. 2).

**Response:  Admit,** but notes that the purpose of a Building Trades grievance is to have other

business agents from the Building Trades locals show support for the grieving local union and to

help try to resolve the grievance (Smith Dep. 109:22-110:18), a Building Trades grievance is

usually filed when a contractor refuses to put a laborer on (Smith Dep. 117:23-118:10).

**289.**   A business agent of a union affiliated with the BCTC files a BCTC  grievance when he has an issue at a job to see if other trades also have an issue; the grievance is  just to inform the other trades what is going on and to see if the other trades have an issue.  (Labate Dep. at 179-80, 191).

**Response:  Deny.**  The purpose of the grievance meeting here is to conduct a "show of force"

and to intimidate Zito into kicking BD off the Mall job.   Zito Dep. 36:13-48:16; Zito  1

(MACERICH9); Ross 7 (P206).  Nearly all the union representatives of other BCTC local unions

later apologized to Zito and explained that this was Local 79's "show of force."  Id.

**290.**   Once a BCTC union files a grievance and the other trades are notified, the  union can later take a job action which is considered sanctioned.  (Labate Dep. at 191-92).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to

this statement as immaterial.  Flavoni Aff. ¶ 98.

**291.**   A sanctioned job action does not require other trades to stop work.  (Labate Dep. at 193).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement.  Flavoni Aff. ¶

99.

**292.**    If Local 79 took some action at the Mall—rat, picketing leaflets—the  other trades' members would not have to honor; the other trades' members can go to work.  (Labate Dep. at 237-38).

**Response: Deny.**  AMG Environmental Restoration LLC (hereinafter "AMG"), a Local 79 contractor, worked on the Brookdale job site from 4:00 PM to midnight to avoid having its members refusing to cross the picket line when the Carpenters were picketing; therefore, Local 79 contractors honor the picket lines of and stand in solidarity with the Carpenters.  Weigel Dep. 129:12-135:12; Weigel 9 (P609).  Salvatore DePetro (hereinafter "DePetro"), a foreman for New York City Acoustics, Inc. (hereinafter "NYC Acoustics"), which is a member of the Carpenters, has previously been told by business agents to honor another BCTC local union's picket line whereby he would drop all of his tools and go outside of the job site to stand with the BCTC members until the dispute was resolved.  DePetro Dep. 10:7-20, 11:6-22, 15:18-20, 30:15-31:24, 41:9-24; Zecca Dep. 47:19-50:23.  DePetro does not deny that he engaged in a work stoppage as a result of union activity which occurred at the BofA job site.  DePetro Dep. 32:10-36:14. Finally, Local 79 effectively told Local 79 workers not to work when they refused to send laborers requested by All City at the Old Navy job.  Ross Dep. 57:13-62:13; Ross 2 (P270);

**293.**    On May 21 business agents from several unions—including one from the  Carpenters' Union; one from the Tile workers' union, one from Local 3, one from the  Steamfitters' union, one from the Painters' union, one from the Tin Knockers' union, probably one  from the Plumbers' union, and Labate from Local 79—met with Zito.  (Zito Dep. at 100-03;  Labate Dep. at 206).

**Response: Admit,** but note that various business agents of the BCTC local unions, led by Labate, stormed Zito's office in a show of force to intimidate Zito into kicking BD off the Mall job.  Zito Dep. 36:13-48:16; Zito 1 (MACERICH9); Ross 7 (P206).  Furthermore, Local 3 is a member of the BCTC, just like Local 79 and the Carpenters, and honors the picket lines set up by other BCTC local unions.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep.

29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21; Jordan Dep. 13:3-8; Williamson Dep. 73:18-79:2; DePetro Dep. 28:11-29:23; Wilde Dep. 22:16-25:16; Williamson Dep. 95:25-96:23; Williamson Dep. 95:24-96:23; Flavoni Aff. ¶ 68.

**294.**   It is common to have several business agents attend a BCTC grievance meeting.  (Labate Dep. at 215).

**Response: Admit.**

**295.**   Labate met at the Mall for his BCTC grievance because that is where the job was, and he met at the Mall's management office because it was a convenient location  known to all BCTC unions.  (Labate Dep. at 195, 198, 215).

**Response: Deny.**  The purpose of conducting the grievance meeting at the Mall's management was to conduct a "show of force" and to intimidate Zito into kicking BD off the Mall job.  Zito Dep. 36:13-48:16; Zito 1 (MACERICH9); Ross 7 (P206).

**296.**   The representatives of the various unions met outside Zito's office, talked  about the job, then went into conference room to tell Zito what the issues were.  (Labate Dep. at  205, 210).

**Response: Admit,** but objects to this statement as immaterial.

**297.**   Zito asked what the issue was, Labate told him BD is not going to use laborers represented by Local 79.  (Labate Dep. at 207).

**Response: Deny.**  Labate threatened Zito with picketing, mall shut downs, electrical shutdowns, and other union activity in order to intimidate Zito into kicking BD off the Mall job.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37; Zito Dep. 36:13-48:16; Zito 1 (MACERICH9); Ross 7 (P206).

**298.**   Other union representatives had issues with BD during the meeting.  (Zito Dep. at 106).

**Response: Admit,** but objects to this statement as immaterial.

**299.** Five or six different union representatives expressed concerns during the meeting. (Zito Dep. at 47).

**Response: Admit,** but objects to this statement as immaterial.

**300.** The Carpenters' Union business agent told Zito he had an issue with BD using non-union carpenters. (Labate Dep. at 235-36, 256-57; Zito Dep. at 106-07).

**Response: Deny.** BD is a union contractor. Flavoni Dep. 24:13-25:25; Williamson Dep. 37:11-23; Edwards Dep. 79:19-24; Zecca Dep. 56:4-58:13, 58:22-59:3. It should be noted, further, that Plaintiff objects to this statement as immaterial.

**301.** The Painters union told Zito it had an issue with BD. (Zito Dep. at 106-07).

**Response: Admit,** but objects to this statement as immaterial.

**302.** Local 3's representative at meeting said there could potentially be an issue with BD's use of EG Electric to perform electrical work. (Zito Dep. at 66-67).

**Response: Admit,** but objects to this statement as immaterial, and note – further – that Jordan is not a credible witness, as he was the only Local 3 business agent and denied saying anything to Zito. Jordan Dep. 22:8-23:7, 62:15-63:20, 22:8-23:7.

**303.** Zito does not specifically recall any reference to a "picket line" during the meeting. (Zito Dep. at 40-41, 46).

**Response: Deny.** Zito was threatened by Labate with picketing, a shutdown of the Mall, and an electrical shutdown. Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.

**304.** Labate never mentioned picket line, against the Mall or otherwise, to Zito. (Labate Dep. at 211-12).

**Response: Deny.** Zito was threatened by Labate with picketing, a shutdown of the Mall, and an electrical shutdown. Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni

Aff. ¶¶ 96, 33-37.

**305.**     Labate told Zito there were going to be issues, not problems, with BD.  (Labate Dep. at 213-14, 218).

**Response: Deny.**  Zito was threatened by Labate with picketing, a shutdown of the Mall, and an electrical shutdown.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.

**306.**     During the meeting with Zito on May 21, there was no reference, direct or indirect, to a shutdown.  (Labate Dep. at 217; Zito Dep. at 41-42).

**Response: Deny.**  Zito was threatened by Labate with picketing, a shutdown of the Mall, and an electrical shutdown.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.

**307.**     Labate did not mention the Market Development Department or rats or leaflets.  (Labate Dep. at 218-19).

**Response: Deny.**  Zito was threatened by Labate with all sorts of union activity, including picketing, a shutdown of the Mall, and an electrical shutdown.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.

**308.**     DeClara, who had joined the meeting with Zito, invited Labate into his office; Labate explained BD was going to perform general conditions work without using laborers represented by Local 79, that Local 79 had issues with BD on other sites, DeClara said he would look into it and get back to Labate in a few days.  (Labate Dep. at 207-10, 219-20).

**Response: Admit,** but note that Labate threatened all sorts of union activity, including picketing, a shutdown of the Mall, and an electrical shutdown.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14;

732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.

**309.** On May 21, 2014, Zito sent an email to Ciuzio and Ross, stating "we have some big union issues with your build out. I was just unexpectedly greeted with about 15 BA's that all had issues with the subs on your job. Most notably, Local 3–electricians as well as carpenters, carting, laborers and painters." (Ross Dep. Ex. 7).

**Response: Admit.**

**310.** After the meeting with Zito on May 21, "Local 3 essentially threatened to lock [BD] out by locking electrical panels". (Flavoni Dep. at 165-66).

**Response: Admit,** but note that Local 3 is a member of the BCTC, just like Local 79 and the

Carpenters, and honors the picket lines set up by other BCTC local unions, and that Local 79 was

the main grievant who called Local 3 and other BCTC unions. Williamson Dep. 32:9-16; Smith

Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-

19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21; Jordan Dep. 13:3-8;

Williamson Dep. 73:18-79:2; DePetro Dep. 28:11-29:23; Wilde Dep. 22:16-25:16; Williamson

Dep. 95:25-96:23; Williamson Dep. 95:24-96:23; Flavoni Aff. ¶ 68.

**311.** Initially the Mall locked the Gap out of an electrical room that BD needed to get into. (Kruse Dep. at 13).

**Response: Admit,** but note that the Mall did so as a direct result of Local 79's threats to Zito.

Ross 7 (P206); Giovinazzi Dep. 74:6-83:8.

**312.** The job was shut down for labor issues from May 21 until May 27 and restarted on May 29. (Ciuzio Dep. at 215-16; Kruse Dep. at 46).

**Response: Admit,** but note that the Mall did so as a direct result of Local 79's threats to Zito.

Ross 7 (P206); Giovinazzi Dep. 74:6-83:8.

**313.** The initial issue involved the electricians' union threatening to shut down the power generation station. (Ciuzio Dep. at 33).

**Response: Deny.** The initial issue was that Labate threatened all sorts of union activity,

including picketing, a shutdown of the Mall, and an electrical shutdown. Ross 7 (P206);

Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.  This is supported by the fact that Labate discussed the Mall job with Zito in the Winter of 2013, well before the job started in May 2014, and Local 79 initiated the grievance.  Zito Dep. 118:25-120:22; Jordan 2.

**314.**  Macerich shut BD out of the job site as a result of Local 3's threat. (Ciuzio Dep. at 35).

**Response:  Deny.**  Macerich shut BD out of the Old Navy job site because of Labate's threats of union activity, including picketing, a shutdown of the Mall, and an electrical shutdown.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.    This is supported by the fact that Labate discussed the Mall job with Zito in the Winter of 2013, well before the job started in May 2014, and Local 79 initiated the grievance which resulted in a show of force to intimidate Zito.  Zito Dep. 118:25-120:22; Jordan 2; Zito Dep. 36:13-48:16; Zito 1 (MACERICH9); Ross 7 (P206).

**315.**  Kruse understood the May lock out was because of an electrical union issue; she never saw Local 79's BCTC grievance.  (Kruse Dep. at 13, 52-53).

**Response:  Deny.**  The May lock out was because of Labate's threats of all sorts of union activity, including picketing, a shutdown of the Mall, and an electrical shutdown.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.  This is supported by the fact that Labate discussed the Mall job with Zito in the Winter of 2013, well before the job started in May 2014, and Local 79 initiated the grievance.  Zito Dep. 118:25-120:22; Jordan 2.  Furthermore, Kruse never visited the Mall job site.  Kruse Dep. 10:13-19.

**316.**   Kruse understood that the May 21 meeting with Zito meeting was "specific to electrical subs" and that BD was using a union different than the one that maintains the Mall's stand-alone generator.  (Kruse Dep. at 40).

**Response: Deny.**   The May 21 meeting with Zito was specific to Local 79's desire to remove BD from the Old Navy job and claim the work for themselves.  Ross 7 (P206); Giovinazzi Dep. 74:6-83:8; Ciuzio Dep. 30:22-34:7, 54:24-66:6, 71:21-77:22, Labate Dep. 283:2-284:19, 304:15-309:14; 732014 104541 AM.m4a; Flavoni Aff. ¶¶ 96, 33-37.   This is supported by the fact that Labate discussed the Mall job with Zito in the Winter of 2013, well before the job started in May 2014, and Local 79 initiated the grievance.  Zito Dep. 118:25-120:22; Jordan 2.   Furthermore, Kruse never visited the Mall job site.  Kruse Dep. 10:13-19.

**317.**   On July 1, 2014, representatives of the Gap, BD and Macerich had conference call in which Lindsey stated "The unions are stating that their calls are not being returned. And we need to correct it."  (Transcript of recording of July 1, at 2).

**Response: Admit,** but note that Lindsey also stated "So you guys need to resolve this, and you need to return the unions' calls or were going to have a picket line and we're going to have to shut the job site down."  712014 43334 PM.m4a (Flavoni: "we heard that there was going to be an issue with 79. So in an effort to mitigate that and maintain the harmony, we actually hired a demolition contractor who is Local 79. And in fact, they just finished the demolition now. And it appears that they're not happy with that. Now, we absorbed an additional $40,000 cost in doing that;" Lindsey: "we own a property. We don't want any problems at our property … if a picket line is formed, or a rat is blown up, either one of them, we will have to shut down the job. If that occurs on Friday or it occurs a month from now, that's just a requirement. We shut it down until you resolve the issue … And I certainly am not going to tolerate any unions or any contractor coming in and trying to extort more out of these jobs"); Flavoni Aff. ¶¶ 26, 33.

**318.**   Local 79 and the Carpenters' Union had voiced concern about BD not returning calls. (Zito Dep. at 125).

**Response: Deny.** Flavoni denies ignoring Local 79's calls. <u>Flavoni Aff. ¶ 100.</u>

319.    On the July 1 conference call, Flavoni stated "And if they want to put up the rat, put up the rat. Because the rat really, you know, it's a picket line by anybody's definition." (Transcript of recording of July 1, at 8-9).

**Response: Admit.**

320.    On the July 1 conference call, Lindsey stated, "I think there's a threat— I'm not sure that would be the right word—but they propose taking action in whatever form they choose to take it. But let's be clear about a couple of things. Number one, what they're doing is not illegal." (Transcript of recording of July 1, at 10).

**Response: Admit,** but note that Lindsey is not an attorney. <u>Flavoni Aff. ¶ 101.</u> Plaintiff

furthermore objects to this statement on the grounds that it constitutes inadmissible opinion

testimony regarding illegality.

321.    On the July 1 conference call, Flavoni asked, "Right now we have a situation based on our understanding that if we don't agree to their demands by Friday, that we will be shut out of the job and they are threatening a picket line. Is that where we stand right now?" (Transcript of recording of July 1, at 11). On the July 1 conference call, Lindsey answered, "No. Where you stand right now is if a picket line is formed, or a rat is blown up, either one of them, we will have to shut down the job. If that occurs on Friday or it occurs a month from now, that's just a requirement. We shut it down until you resolve the issue. That's all. That's why we're reaching out to you now. And again, you know, I think you guys can reasonably say that this is not the first time we've reached out and raised the issue with you. Lucien's been pretty vocal with you. I know Steve has. Like I said, I've had discussions with Gap already." (Transcript of recording of July 1, at 11).

**Response: Admit,** but note that Flavoni has kept open lines of communication with Local 79.

<u>Flavoni Aff. ¶ 100.</u>  Furthermore, based on Local 79's threats of picket lines and other illegal

conduct, the Mall said it would shut down the project to prevent BD from working on the Old

Navy project. <u>712014 43334 PM.m4a; Flavoni Aff. ¶¶ 26, 33.</u>

322.    On July 2, Gap representatives and BD representatives had a conference call during which Flavoni stated that BD "moved our carpentry crew to the night shift to try to avoid—be out-of-sight, out-of-mind kind of thing." (Transcript of recording of July 2, at 8).

**Response: Admit.**

**323.**   Flavoni sent an email to Kruse on July 7, 2014 stating that BD was trying to work evenings at the Mall to avoid issues with the Carpenters' Union.  (Ross Dep. Ex. 12,  Ross Dep. at 140-142).

**Response: Admit,** but note that e-mail also discussed how Local 79's threats and demands would be conveyed to the Gap.

**324.**   BD intended to use own employees to do clean-up at the Mall.  (Flavoni Dep. at 103).

**Response: Admit.**

**325.**   On July 3, 2014, Flavoni called Labate to discuss the Mall, and Labate  suggested that BD use a paymaster to provide a laborer represented by Local 79 to perform  general conditions work at the Mall, just as BD had done at Brookdale.  (Transcript of recording  of July 3, at 2-3).

**Response: Admit,** but note that Flavoni served as a liaison between the Gap, the Mall, and Labate, who communicated his threats and demands to Flavoni to pass on to the Gap and the Mall.  Flavoni Aff. ¶¶ 34-37.

**326.**   During his call on July 3 with Labate, Flavoni asked "what the full scope  is and what the total cost is going to be" of Labate's paymaster suggestion; Labate responded "I  would say three days a week is sufficient unless you need him more.  (Transcript of recording of  July 3, at 6-7).

**Response: Admit.**

**327.**   On July 8, 2014 representatives of Macerich, BD, and the Gap had a call  in which Zito stated "And I know Macerich is very, very highly against anything that has to do  with a picket or a rat, that they want to be—have the public image of always being, you know,  having union harmony."  (Transcript of recording of July 8, at 6).

**Response: Admit.**

**328.**   On the July 8 call, DeClara stated "The problem is we don't control what a  union does. And if they choose to put up a picket line, what we have to do is designate an  entrance to the shopping center, have it designated as the labor entrance.  And then they are perfectly, as long as they have the proper permits from the city, they are perfectly capable of  putting up a picket line. We cannot stop them from doing that. Macerich made clear does not  want rat, wants public image of having union harmony."  (Transcript of recording of July 8, at  6).

**Response: Admit.**

**329.**   The Mall was opposed to an inflated rat being at the Mall.  (Kruse Dep. at 135).

**Response: Admit,** but note that the Mall was opposed to any union activity at the Mall, including picketing.  Zito Dep. 58:10-20, 139:20-140:14, 180:6-181:11.

**330.**     Lindsey informed Kruse that the Mall considered either the erection of an  inflated rat or the presence of a picket to be bad from the Mall's perspective.  (Kruse Dep. at  136).

**Response: Admit,** but note that the Mall was opposed to any illegal union activity at the Mall, including picketing.  Zito Dep. 58:10-20, 139:20-140:14, 180:6-181:11.

**331.**     The Gap was concerned that any union disputes would put the Gap in  violation of the Union harmony clause in its lease.  (Kruse Dep. at 42).

**Response: Admit,** but note that the Gap's concerns translated into pressure exerted by the Gap onto BD to resolve Local 79's demands.  Ciuzio Dep. 71:21-77:22; Ciuzio 8 (GAP194).

**332.**     The Mall did not pressure the Gap to act.  (Kruse Dep. at 164, 166).

**Response: Deny.**  The Gap felt pressure from the Mall to attempt to resolve Local 79's demands.

Zito Dep. 58:10-20, 73:2-77:9; Ciuzio Dep. 71:21-77:22.

**333.**     On July 16, 2014, the Gap authorized BD to use a laborer represented by  Local 79 for one day per week at the Mall for a cost not to exceed $4,500, which the Gap would pay.  (Ciuzio Dep. at 93; Ciuzio Dep. Ex. 14; Kruse Dep. at 76).

**Response: Admit,** but note that the Gap was forced to due to pressure from the Mall, which it exerted, in turn, on BD.  Zito Dep. 58:10-20, 73:2-77:9; Ciuzio Dep. 71:21-77:22.

**334.**     Linear submitted three invoices in connection with providing a laborer at  the Mall in July and August 2014, which combined totaled $1,975.60.  (Flavoni Dep. Ex. 17).

**Response: Admit.**

**335.**     On July 17, 2014, Flavoni sent an email to Lindsey informing him that the  Gap had authorized BD to use a laborer represented by Local 79 for one day per week and  Flavoni expected this arrangement to satisfy Local 79 for the remainder of the project.  (Ciuzio  Dep. Ex. 15-A).

**Response: Admit.**

**336.**   On July 17, 2014, Lindsey responded that Flavoni's arrangement was "an excellent gesture and we will certainly support you with the discussion if you would like."  (Ciuzio Dep. Ex. 15-A).

**Response: Admit.**

**337.**   On July 21, 2014, Flavoni called Ken Bluhm of the Carpenters' Union and  confirmed that BD was using its own carpenters, represented by Local 621, to perform carpentry  at the Mall. (Transcript of July 21, at 1).

**Response: Admit,** but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.  Plaintiff furthermore objects to this statement as inadmissible on the grounds of relevance.

**338.**   During the call on July 21, Flavoni informed Bluhm, "Well, the mall  management sent us an email asking us to call you because they said that you're threatening to  put up a picket line. So that's why I'm calling you, to see what it is you're really looking for, and  what it is that you need to work this thing out."  (Transcript of July 21, at 4).

**Response: Admit,** but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**339.**   Flavoni further stated to Bluhm, "Now, we understand that you went to  Lucien Zito and told him that if we don't take you on, or one of your contractors on that are  affiliated with the carpenters, that you're going to put up a picket line."  (Transcript of July 21, at  6).

**Response: Admit,** but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**340.** On July 21, 2014, Zito sent Lindsey an email that Zito had spoken to a representative of the Carpenters' Union that same date who was about to have a meeting about erecting a rat at the Mall's main entrance because BD was not using members of the Carpenters' Union to perform work at the Mall. (Ciuzio Dep. Ex. 18).

**Response: Admit,** but note that the Carpenters' Union and Local 79 are part of the BCTC and honor each other's picket lines and other union activity. Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**341.** On July 21, Kruse responded to Zito by email that included the statement "Let them put up the rat." (Ciuzio Dep. Ex. 18).
**Response: Admit.**

**342.** On July 21, Lindsey responded to Kruse's email of that same date stating that "putting up the rat does not resolve the issue and puts us in a very bad position." (Ciuzio Dep. Ex. 18).

**Response: Admit,** but notes that this is an example of how the Mall exerts pressure on the Gap, and – in turn – on BD.

**343.** Linear provided a laborer represented by Local 79 to do general conditions work at the Mall. (Flavoni Dep. at 152-53; Deliteris Dep. at 123).

**Response: Admit.**

**344.** Local 621 did not file any grievance over use of Local 79 to do clean-up. (Flavoni Dep. at 103).

**Response: Admit,** but objects to this statement as immaterial.

**345.** BD found other work for its employees to perform. (Flavoni Dep. at 103-04).

**Response: Admit,** but note that BD strived – at great cost – to ensure that none of its employees lose work as a result of Local 79's conduct. Flavoni Aff. ¶ 85.

**346.** On August 13, Smith spoke to Flavoni and stated, "Because the job has picked up since Mike Labate had been there, and we have a laborer which is hard to get coming in one time a week. So was talking to my office, and they told me to reach out to you and see if we can resolve this. Can we have this guy at least coming in like three times a week, Monday, Wednesday, or Friday or something? But the one day a week is crazy, like it's unheard of for the duration of the whole job for us to have labor there for one day a week." (Transcript of call

August 13, at 2).

**Response: Admit,** but note that Smith conveyed threats of picketing to Flavoni which he asked Flavoni to convey to the Gap and the Mall.   <u>Smith Dep. 152:18-154:20, 156:13-157:4, 157:16-20; 158:13-159:6.</u>

**347.**     On August 13, Flavoni declined Smith's request.  (Transcript of call  August 13, at 2).

**Response: Admit.**

**348.**     On August 14, Parisi sent an email to BD representatives asking for  confirmation that "Local 79 laborer on site:  Thursday August 7, 2014 2 hours and Wednesday  August 13, 2014- 8 Hours-total of 10 hours for the week…"  (Smith Dep. Ex. 1).
**Response: Admit.**

**349.**     On August 14, Ross responded and sent an email to Christie Johnson of  Linear that "We have no intention of paying 2 hrs for show up time for laborer that decided to  show up a day late.  Please change to 8 hrs and I will approve."  (Smith Dep. Ex. 1).

**Response: Admit.**

**350.**      On August 14, Johnson responded that "We understand that a laborer did  not show up Wednesday August 6th however the agreement between Local 79 and BD was to provide a union laborer one day a week.  With that being said, we need to pay this laborer 2  hours show up time for Thursday August 7th."  (Smith Dep. Ex. 1).

**Response: Admit.**

**351.**     On August 19, 2014, Johnson sent Ross an email, forwarding her email of  August 14, and stating "As of today I still have not received a response in regards to my email below.  In light of the circumstances surrounding between BD Development and Local 79,  effective immediately Linear Contracting will no longer be providing the Local 79 Laborer for  the Old Navy Kings Plaza project.  We ask that you please process payment for all outstanding  invoices."  (Smith Dep. Ex. 1).

**Response: Admit.**

**352.**     On August 19, Kruse forwarded to Lindsey an email of that same date from  BD concerning Local 79's request that BD use a laborer represented by Local 79 three days per  week rather than one day a week.  (Kruse Dep. Ex. 3).

**Response: Admit.**

**353.**   On August 19, Kruse sent an email to Lindsey informing him that the Gap would not agree to Local 79's request that BD use a laborer represented by Local 79 three days per week rather than one day a week.  (Kruse Dep. Ex. 3).

**Response: Admit.**

**354.**   On August 20, 2014, Lindsey sent an email to Kruse responding to her email of August 19 and informed her that he would contact Local 79, that in his view the Gap had "met [Local 79's] agreement [to use a laborer one day a week] and they needed to live with it.  Don't worry about any further action." (Kruse Dep. Ex. 3).

**Response: Admit.**

**355.**   On August 26, 2014, Flavoni called Linear to discuss Linear's email of August 19 that announced that Linear would no longer provide a laborer at the Mall.  (transcript of August 26, at 1).

**Response: Admit,** but note that Johnson constantly dodged answering Flavoni's questions

regarding Johnson's true motivation for withdrawing from the job.

**356.**   On August 26, 2014, Linear explained its August 19 email was "in regards to the two hours that I never received a response to for my email, was the reason why I stopped services… I never received my response.  For week I never ever received a response from your office in regards to my email."  (Transcript of August 26, at 1).

**Response: Admit,** but note that Linear is not credible.  Flavoni Aff. ¶ 102.

**357.**   Kruse did not speak to anyone from Local 79 regarding the Mall.  (Kruse Dep. at 12, 27-28).

**Response: Admit,** but note that Local 79 had a lot more leverage to exert pressure against the

Mall.  Flavoni Aff. ¶ 103, 34-37.

**358.**   Sal Troia oversaw the Mall job for All City.  (Rodopoulos Dep. at 21).

**Response: Admit,** but objects to this statement as immaterial.

**359.**   At all relevant times, John Rodopoulos has been All City's sole owner and its president. (Rodopoulos Dep. at 60-61).

**Response: Admit.**

**360.**   If Troia wants more men on a job, he tells Rodopoulos who faxes a sheet to Local 79. (Rodopoulos Dep. at 10, 14, 25-26).

**Response: Admit.**

**361.** All City had two jobs in the Mall, one for BD and one for another general contractor Corcon. (Rodopoulos Dep. at 16-17).

**Response: Admit,** but objects to this statement as immaterial.

**362.** All City's contract with BD was for $113,000 but there "were a lot of extras". (Rodopoulos Dep. at 17).

**Response: Admit.**

**363.** BD "kept saying [All City] need[ed] more men, more men." (Rodopoulos Dep. at 15-16).

**Response: Admit.**

**364.** Rodopoulos believed he "didn't need more men" for BD's job at the Mall. (Rodopoulos Dep. at 15-16).

**Response: Admit,** but note that BD requested more men and was behind schedule as a result of the lack of additional men.  Weigel Dep. 79:5-14, 86:3-18, Ferazzoli Dep. 66:2-16, 66:17-67:15; Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24, 62:3-13; Ross 2 (P270).

**365.** On June 2, All City wrote a letter to BD stating that "As per your request, we are requesting additional labor from union hall and they don't have available laborers."  (Ross Dep. Ex. 2; Giovinazzi Dep. at 118).

**Response: Admit,** but note that Local 79's failure to provide manpower was, in effect, a shutdown and/or slowdown of BD's job at Old Navy.  Furthermore, the letter says nothing about only asking for additional laborers for one (1) night.

**366.** The request Rodopoulos referenced in his June 2 letter was for a single night and for one or two laborers. (Rodopoulos Dep. at 44, 49, 75).

**Response: Deny.**  The request for additional manpower was an ongoing request which was repeatedly denied.  Weigel Dep. 79:5-14, 86:3-18, Ferazzoli Dep. 66:2-16, 66:17-67:15; Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24, 62:3-13; Ross 2 (P270).

**367.** The Hiring Hall's failure to provide the workers All City alleges it asked for did not cause any delay.  (Rodopoulos Dep. at 75-76).

**Response: Deny.** Local 79's failure to provide manpower All City requested caused BD to fall behind schedule for the entire Old Navy project. <u>Weigel Dep. 79:5-14, 86:3-18, Ferazzoli Dep. 66:2-16, 66:17-67:15; Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24, 62:3-13; Ross 2 (P270).</u>

**368.** Rodopoulos claims he called the Hiring Hall because BD "kept asking for more men. [He] tried to put them at peace," and made the call believing he "didn't need" more men. (Rodopoulos Dep. at 46, 76).

**Response: Admits** to the extent that BD "kept asking for more men," but Plaintiff **lacks sufficient information** to admit or deny the remaining portions of this statement, but notes that BD repeatedly requested additional manpower. <u>Flavoni Aff. ¶ 104; Weigel Dep. 79:5-14, 86:3-18, Ferazzoli Dep. 66:2-16, 66:17-67:15; Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24, 62:3-13; Ross 2 (P270).</u>

**369.** Even if the Hiring Hall had satisfied All City's alleged request, All City was going to split the laborers between two jobs it had at the Mall. (Rodopoulos Dep. at 76-77).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial. <u>Flavoni Aff. ¶ 105.</u>

**370.** All City had used the same laborers on the same shift at both stores. (Rodopoulos Dep. at 77).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial. <u>Flavoni Aff. ¶ 106.</u>

**371.** On June 5, Local 79's shop steward at the Old Navy job got a replacement for a laborer who failed to report to work. (Ross Dep. Ex. 3; Rodopoulos Dep. at 53).

**Response: Admit,** but objects to this statement as immaterial.

**372.** Rodopoulos believes that "Doubling the men doesn't double the work" performed. (Rodopoulos Dep. at 22).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial.  Flavoni Aff. ¶ 107.

373.    All City worked 19 days and ended on June 18.  (Giovinazzi Dep. at 100-101).

**Response: Admit,** but note that this was the primary reason the entire Old Navy job was behind schedule. Ciuzio Dep. 108:9-112:8; Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4.

374.    Rodopoulos has had the experience where workers All City has selected  for work "don't show up".  (Rodopoulos Dep. at 38).

**Response: Admit,** but objects to this statement as immaterial.

375.    All City's work for BD at the Mall occurred at night, requiring workers to  be willing to travel to Brooklyn in the middle of the night.  (Rodopoulos Dep. at 45).

**Response: Deny.**   Luann Piecora (hereinafter "Piecora"), the Secretary of Rite Way Internal Removal Incorporated (hereinafter "Riteway"), generally did not experience problems requesting men from Local 79's hiring hall.  Piecora Dep. 18:21-19:18, 25:8-27:23.  Labate, a Local 79 agent for nearly twenty (20) years, said that: (i) you would never run out of guys; (ii) Brooklyn never runs out of available laborers in the hiring hall; and (iii) demolition is done predominantly at night.  Labate Dep. 70:18-77:10, 13:9-14:14, 22:3-7.  There were four hundred (400) Local 79 members out of work.  Lee Dep. 68:8-15.

376.    There was more demolition work required at the Mall than was originally  planned.  (Kruse Dep. at 86).

**Response: Admit,** but note that this only supports BD's request for additional manpower in order to maintain their schedule.  Weigel Dep. 79:5-14, 86:3-18, Ferazzoli Dep. 66:2-16, 66:17-67:15; Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24, 62:3-13; Ross 2 (P270).

377.    In All City's view, both stores were manned correctly; All City  collectively had about 15 to 20 workers at the Mall each night.  (Rodopoulos Dep. at 78).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but notes that All City completed demolition behind schedule, delaying the entire project significantly due to a lack of requested manpower.  <u>Weigel Dep. 79:5-14, 86:3-18, Ferazzoli Dep. 66:2-16, 66:17-67:15; Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24, 62:3-13; Ross 2 (P270).</u>  Plaintiff furthermore objects to this statement as inadmissible on the grounds that it constitutes opinion testimony.

**378.**   Rodopoulos wrote the June 2 letter because Giovinazzi "asked me for the letter". (Rodopoulos Dep. at 47).

**Response: Admit.**

**379.**   Delays on a job are common but no other contractor has ever requested a letter like Giovinazzi requested.  (Rodopoulos Dep. at 89).

**Response: Admit.**

**380.**   Troia never complained to Rodopoulos about manning or any slowdown by Local 79. (Rodopoulos Dep. at 59).

**Response: Admit,** but objects to this statement as immaterial.

**381.**   Troia did complain to Rodopoulos that BD had "seven different supers on the job. One didn't know what the other one was doing".  (Rodopoulos Dep. at 59-60).

**Response: Admit,** but objects to this statement as immaterial.

**382.**   BD did not tell All City that it was awarding All City the demolition work because the Gap or the Mall said to.  (Rodopoulos Dep. at 86).

**Response: Admit,** but objects to this statement as immaterial.

**383.**   BD never invoked the clause in All City's contract to serve notice that BD considered All City to have failed to perform work according to schedule.  (Rodopoulos Dep. at 88-89).

**Response:  Admit,** but objects to this statement as immaterial.

**384.**   There was a five-day delay in BD getting permits at the beginning of the job at the Mall. (Giovinazzi Dep. at 130-31; Ciuzio Dep. Ex. 36).

**Response: Admit,** but objects to this statement as immaterial.

**385.** There was a two-day delay at the Mall related to asbestos investigation at the Mall. (Giovinazzi Dep. at 131-32; Ciuzio Dep. Ex. 36).

**Response: Admit,** but objects to this statement as immaterial.

**386.** There was a delay related to sprinkler shutdown and the Mall not cooperating. (Giovinazzi Dep. at 141-43; Ciuzio Dep. Ex. 36).

**Response: Admit,** but objects to this statement as immaterial.

**387.** There was a ten-day delay in getting fire alarm information from the Mall. (Giovinazzi Dep. at 146-47; Ciuzio Dep. Ex. 36).

**Response: Admit,** but objects to this statement as immaterial.

**388.** There was a two-day delay at the Mall caused by unforeseen HVAC work. (Giovinazzi Dep. at 148; Ciuzio Dep. Ex. 36).

**Response: Admit,** but objects to this statement as immaterial.

**389.** There was a four-day delay at the Mall due to a floor installation system that would not come off the concrete and had to be ground off. (Giovinazzi Dep. at 150; Ciuzio Dep. Ex. 36).

**Response: Admit,** but objects to this statement as immaterial.

**390.** There was a five-day delay at the Mall related to installation of breaker needed to run flooring machines. (Giovinazzi Dep. at 150-51; Ciuzio Dep. Ex. 36).

**Response: Admit,** but objects to this statement as immaterial.

**391.** There was a delay at the Mall when a flooring machine broke. (Giovinazzi Dep. at 152-53).

**Response: Admit,** but objects to this statement as immaterial.

**392.** Local 79's conduct did not contribute to the delays caused by permit issues, asbestos issues, sprinkler issues, floor removal issues, HVAC issues, fire alarm issues, mastic/grind issues, or sample flooring issues. (Ciuzio Dep. at 219-23, 230).

**Response: Deny.** Local 79's conduct (threatening to picket, failing to provide manpower, threatening a shutdown of the job, threatening an electrical shutdown of the mall, etc.) contributed to the overall general delay and falling behind schedule on the Old Navy project.

<u>Flavoni Aff. ¶ 108.</u>

**393.** "Construction Period" is the period between delivery of the space and the commencement of rent for the space. (Ciuzio Dep. at 78-79).

**Response: Admit.**

**394.** If construction is not complete by the commencement of rent, the tenant is paying "dead rent". (Ciuzio Dep. at 79).

**Response: Admit.**

**395.** The Gap negotiated additional time with the Mall before having to pay rent, so the Gap did not incur any dead rent. (Ciuzio Dep. at 79-80).

**Response: Admit,** but note that the negotiation of additional time came at an expense. Flavoni Aff. ¶ 109.

**396.** In the Gap's view, Union issues were not the predominant reason for the delays at the Mall. (Kruse Dep. at 164).
**Response: Deny.** Even considering all the other normal delays of a construction project, Ciuzio testified that delays as a result of Local 79's union activity was the biggest contributor to the delays faced by the Gap and BD on the ONKP project. Ciuzio Dep. 225:19-226:17.

**397.** In the Gap's view, some of the delays in the Mall project were attributable to BD's conduct. (Kruse Dep. at 133).

**Response: Deny.** Even considering all the other normal delays of a construction project, Ciuzio testified that delays as a result of Local 79's union activity was the biggest contributor to the delays faced by the Gap and BD on the ONKP project. Ciuzio Dep. 225:19-226:17.

**398.** Lauren Kruse decided to no longer include BD on the approved vendor bid list. (Ciuzio Dep. at 170-71; Kruse Dep. at 67).

**Response: Admit,** but note that but for Local 79's interference on the Old Navy job, Kruse would not have removed BD from the approved vendor list and BD would have continued to be awarded work from the Gap. Flavoni Aff. ¶ 110.

**399.** Kruse was "not happy" with "quite a few things" that led to BD's removal from the Gap's approved vendor bid list. (Kruse Dep. at 70).

**Response: Admit,** but note that Local 79's conduct contributed to BD's removal from the Gap's approved vendor bid list.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Flavoni Aff. ¶ 111.

**400.**   "The reason behind [the Gap's removal of BD] was more about how [BD]  handled the situation with [Local 79] as opposed to the union issue."  (Kruse Dep. at 67, 153,  157).

**Response: Deny.**   Local 79's conduct contributed to BD's removal from the Gap's approved vendor bid list.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Flavoni Aff. ¶ 111. Moreover, BD's handling of the issue cannot be separated from the issue, itself, as Kruse was frustrated by the entire ordeal presented by Local 79, and Kruse's proposed solution was for BD to pay for Local 79's laborers.  Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200).

**401.**   The Gap hires general contractors and it is the general contractor's  responsibility to comply with all requirements.  (Kruse Dep. at 68-69).

**Response: Admit.**

**402.**   The Gap has had other general contractors in situations similar to the one  involving BD and Local 79 at the Mall.  (Kruse Dep. at 68).

**Response: Admit,** but note that Local 79 – and, in particular, Labate – had a personal vendetta against BD, as prior to the Mall job beginning, Zito was contacted by Labate, and Zito recalled one particular conversation he had with Labate outside of the mall prior to the commencement of construction of the Old Navy store.  Namely, when Zito informed Labate that BD was going to be performing work at the Mall, Labate told Zito that there would be problems with the job if BD is performing the work.  Specifically, Labate told Zito that he had problems with BD in the past and that the Mall should anticipate that there were going to be problems.  Zito recalls that Labate attempted to persuade Zito to exclude BD from the job. Zito Dep. 24:5-27:14.  Plaintiff objects, further, that whether Gap has had other general contractors in situations similar to the one involved BD and Local 79 at the Mall is immaterial.

**403.**   When the Gap learns there is an issue regarding unions, the Gap calls the general contractor and tells it to resolve the issue, and the general contractor resolves it. (Kruse Dep. at 68).

**Response: Admit,** but note that Local 79, and – in particular – Labate, had a personal vendetta against BD.  Zito Dep. 24:5-27:14, 161:13-163:6.

**404.**   Other general contractors do not involve the Gap in "days and days of phone calls and emails." (Kruse Dep. at 68).
**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial.  Flavoni Aff. ¶ 112.

**405.**   Kruse cannot recall any other instance in which union issues lasted three months. (Kruse Dep. at 90).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but notes that Local 79 and Labate had a personal vendetta against BD and persistently reneged on agreements BD entered into with Local 79 in good faith to resolve Local 79's claims to BD's work.  Zito Dep. 24:5-27:14, 161:13-163:6; Ciuzio Dep. 71:21-77:22; Ciuzio 8 (GAP194); Ciuzio Dep. 124:4-126:14; Kruse Dep. 95:12-96:15; Flavoni Aff. ¶ 112.

**406.**   Kruse considered it extraordinary that after three months BD had not yet resolved Local 79's issues and was frustrated with BD. (Kruse Dep. at 90).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but notes that Local 79 and Labate had a personal vendetta against BD and persistently reneged on agreements BD entered into with Local 79 in good faith to resolve Local 79's claims to BD's work.  Zito Dep. 24:5-27:14, 161:13-163:6; Ciuzio Dep. 71:21-77:22; Ciuzio 8 (GAP194); Ciuzio Dep. 124:4-126:14; Kruse Dep. 95:12-96:15; Flavoni Aff. ¶ 112.

**407.**   BD, unlike other general contractors, deferred a lot of the decisions to the Gap, Kruse felt BD wanted her to handle the situation and the Gap to incur the costs. (Kruse Dep. at 68).

**Response: Admit,** but note that both the Gap and BD were already over their respective budgets for this project and that, alone, contributed to a great deal of issues as a result of Local 79's conduct.  Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200); Ross Dep. 140:18-141:19; Ross 12 (P257-P258); Ciuzio Dep. 84:3-87:25; Ciuzio 11 (GAP220-222); Ciuzio Dep. 92:12-97:9; Ciuzio 14 (GAP189-GAP191); Ciuzio 15 (GAP208-GAP209).

**408.**   When a general contractor has an issue with a union and resolves it, the Gap does not typically see change orders.  (Kruse Dep. at 68-69).

**Response: Plaintiff lacks sufficient information** to admit or deny this statement, but notes that Local 79 and Labate had a personal vendetta against BD and persistently reneged on agreements BD entered into with Local 79 in good faith to resolve Local 79's claims to BD's work.  Zito Dep. 24:5-27:14, 161:13-163:6; Ciuzio Dep. 71:21-77:22; Ciuzio 8 (GAP194); Ciuzio Dep. 124:4-126:14; Kruse Dep. 95:12-96:15; Flavoni Aff. ¶ 112.

**409.**   In June, BD submitted a change order to the Gap regarding the additional cost of $33,717.84 to use laborers represented by Local 79 for demolition.  (Ciuzio Dep. Ex. 7; Ciuzio Dep. at 252).

**Response: Admit.**

**410.**   Kruse could not recall another situation in which a general contractor submitted a change order expecting the Gap to pay for resolving a union issue.  (Kruse Dep. at 69).

**Response: Plaintiff lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial.  Flavoni Aff. ¶ 112.

**411.**   Kruse was surprised by, and unhappy with, BD's change order seeking $33,000.  (Kruse Dep. at 50, 69-70).

**Response: Plaintiff lacks sufficient information** to admit or deny this statement, but objects to this statement as immaterial.  Flavoni Aff. ¶ 112.

**412.**   Kruse questioned why BD submitted the change order and why BD felt the Gap needed to pay it.  (Kruse Dep. at 54-55).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but notes that what Kruse really questioned is what gives Local 79 the right to claim work that it is not otherwise entitled to.   Kruse Dep. 51:19-55:4; Ross 10 (P52-P54).

**413.**   The fact that BD submitted the $33,000 change order, rather than BD  simply absorbing the cost, was one reason Kruse removed BD from the approved vendor list.  (Kruse Dep. at 70-71).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but notes that both the Gap and BD were already over their respective budgets for this project and that, alone, contributed to a great deal of issues as a result of Local 79's conduct.   Flavoni Aff. ¶ 112; Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200); Ross Dep. 140:18-141:19; Ross 12 (P257-P258); Ciuzio Dep. 84:3-87:25; Ciuzio 11 (GAP220-222); Ciuzio Dep. 92:12-97:9; Ciuzio 14 (GAP189-GAP191); Ciuzio 15 (GAP208-GAP209).   Furthermore, Local 79 and Labate had a personal vendetta against BD and persistently reneged on agreements BD entered into with Local 79 in good faith to resolve Local 79's claims to BD's work.   Zito Dep. 24:5-27:14, 161:13-163:6; Ciuzio Dep. 71:21-77:22; Ciuzio 8 (GAP194); Ciuzio Dep. 124:4-126:14; Kruse Dep. 95:12-96:15; Flavoni Aff. ¶ 112.

**414.**   The fact that BD was not winning bids was another reason why Kruse  removed BD from the approved vendor bid list.  (Kruse Dep. at 70, 153, 155-57).

**Response: Admit,** but note that Local 79's conduct contributed to BD's removal from the Gap's approved vendor bid list.   Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.   Furthermore, Plaintiff objects to this statement as immaterial.

**415.**   "There were other issues completely unrelated to the union" why Kruse  removed BD from the approved vendor list.  (Kruse Dep. at 67).

**Response: Admit,** but note that Local 79's conduct contributed to BD's removal from the Gap's approved vendor bid list.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.  Furthermore, Plaintiff objects to this statement as immaterial.

416.    Before BD was removed by Kruse from the approved vendor list, BD bid  on seven projects and lost all but the Old Navy store bid at the Mall. (Ciuzio Dep. Ex. 41;  Ciuzio Dep. at 243-46; Kruse Dep. 156-57).

**Response: Admit,** but note that Local 79's conduct contributed to the Gap's decision not to award BD work.  Flavoni Aff. ¶ 111.

417.    BD was not the lowest bidder on any of the projects that it bid on and that  the Gap awarded to another general contractor. (Ciuzio Dep. Ex. 41; Ciuzio Dep. at 169, 245).

**Response: Deny.**  BD was the lowest bidder on the Banana Republic job at 105 Fifth Avenue, but was not awarded this work.  Ciuzio Dep. 133:13-145:13; Ciuzio 27 (GAP127-128); Ciuzio 27A (GAP132-GAP136).

418.    Flavoni has no evidence that BD was lowest bid for any of the bids it lost. (Flavoni Dep. at 125-57; Ciuzio Dep. Ex. 41).

**Response: Admit,** but note that BD was the lowest bidder on the Banana Republic job at 105 Fifth Avenue, but was not awarded this work.  Ciuzio Dep. 133:13-145:13; Ciuzio 27 (GAP127-128); Ciuzio 27A (GAP132-GAP136).

419.    The Gap's decision to award all projects that BD bid on (other than the Old  Navy store at the Mall) to other general contractors was not based on what happened at the Mall.  (Kruse Dep. at 156-57).

**Response: Deny.**  The Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.

420.    Union issues like the ones that arose at the Mall are not considered by the  Gap when awarding jobs.  (Ciuzio Dep. at 134-35).

**Response: Deny.** The Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct. Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.

**421.** Neither Flavoni nor Deliteris know what factors the Gap considered for any of the bids BD did not win, Flavoni "can only speculate." (Flavoni Dep. at 128, 133; Deliteris Dep. at 138).

**Response: Admit,** but note that every new relationship – including BD's relationship with the Gap – has growing pains, but in BD's experience, BD always worked through them and developed substantial successful relationships with its new clients and have continued to serve such clients for many years despite the bumps in the road at the beginning of the relationship. Unfortunately, where Local 79 got involved, the new relationship with the Gap was unable to weather their conduct on top of normal growing pains, and contributed to BD not being awarded future work. Flavoni Aff. ¶ 111.

**422.** Many of BD's clients do not award bids to the lowest bidder. (Flavoni Dep. at 127).
**Response: Admit.**

**423.** BD's clients sometimes spread work among bidders. (Flavoni Dep. at 128).

**Response: Admit.**

**424.** In October 2014, an issue arose regarding BD's refusal to reimburse the Mall for a $5000 invoice regarding a fire alarm, and the Gap told BD to "grow up, act like professionals, and pay the five grand." (Flavoni Dep. at 157-59; Kruse Dep. Ex. 4).

**Response: Admit,** but note that both BD and the Gap were over their respective budgets for this project and the Mall failed to schedule a site visit despite numerous requests from BD for one. Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200); Ross Dep. 140:18-141:19; Ross 12 (P257-P258); Ciuzio Dep. 84:3-87:25; Ciuzio 11 (GAP220-222); Ciuzio Dep. 92:12-97:9; Ciuzio 14 (GAP189-GAP191); Ciuzio 15 (GAP208-GAP209); Flavoni Aff. ¶ 113. Furthermore, Plaintiff objects to this statement as immaterial.

**425.**   Kruse considered BD's resistance to reimbursing the Mall for a $5000  invoice regarding a fire alarm to be "ridiculous "and was another reason why Kruse removed BD  from the approved vendor list.  (Kruse Dep. at 131-32, 155-57; Kruse Dep. Ex. 4).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but notes that both BD and the Gap were over their respective budgets for this project and the Mall failed to schedule a site visit despite numerous requests from BD for one.   Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200); Ross Dep. 140:18-141:19; Ross 12 (P257-P258); Ciuzio Dep. 84:3-87:25; Ciuzio 11 (GAP220-222); Ciuzio Dep. 92:12-97:9; Ciuzio 14 (GAP189-GAP191); Ciuzio 15 (GAP208-GAP209); Flavoni Aff. ¶¶ 112-113.   Furthermore, Local 79's conduct contributed to BD's removal from the Gap's approved vendor bid list.   Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.   Plaintiff objects to this statement as immaterial.

**426.**   Kruse considered BD's communications poor and that was another reason  why Kruse removed BD from the approved vendor bid list.  (Kruse Dep. at 155-57).
**Response: Deny.**  BD's communication skills were outstanding.  Ciuzio Dep. 147:10-148:15.

Furthermore, the problems stemmed from Local 79's conduct, which Kruse blames BD for by failing to pay Local 79 to go away.  Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200).

**427.**   Kruse was frustrated by the level of communication from BD.  (Ciuzio  Dep. at 214; Ciuzio Dep. Ex. 35).

**Response: Deny.**   BD's communication skills were outstanding.  Ciuzio Dep. 147:10-148:15.

Furthermore, the problems stemmed from Local 79's conduct, which Kruse blames BD for by failing to pay Local 79 to go away.  Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200).

**428.**   Kruse considered BD to be "a disaster" in its failure to communicate with  the Gap in a timely manner, which was one of the factors for BD's removal from list.  (Kruse  Dep. at 120, 126-27; Ciuzio Dep. Exs. 37, 38).

**Response: Deny.** BD's communication skills were outstanding. <u>Ciuzio Dep. 147:10-148:15.</u>

Furthermore, Local 79's conduct contributed to BD's removal from the Gap's approved vendor

bid list. <u>Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15;</u>

<u>Flavoni Aff. ¶ 111.</u> Finally, the problems stemmed from Local 79's conduct, which Kruse

blames BD for by failing to pay Local 79 to go away. <u>Kruse Dep. 49:15-51:18; Ciuzio 7</u>

<u>(GAP200).</u>

**429.** The Gap considered all of BD's communications poor; it was not just communication about union issues, it was communications on construction issues as well. (Kruse Dep. at 168).

**Response: Deny.** BD's communication skills were outstanding. <u>Ciuzio Dep. 147:10-148:15.</u>

Furthermore, the problems stemmed from Local 79's conduct, which Kruse blames BD for by

failing to pay Local 79 to go away. <u>Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200).</u>

**430.** "Communication is a really big piece for our business, and a team that communicated as poorly as [BD] did at Kings Plaza Mall could be enough to remove them" from the approved vendor list. (Kruse Dep. at 157-58).

**Response: Deny.** BD's communication skills were outstanding. <u>Ciuzio Dep. 147:10-148:15.</u>

Furthermore, Local 79's conduct contributed to BD's removal from the Gap's approved vendor

bid list. <u>Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15;</u>

<u>Flavoni Aff. ¶ 111.</u> BD served as a liaison between the Gap (and the Mall) by keeping them

informed of all developments on the job, including Local 79's communications to the Gap and to

the Mall as to what will happen if Local 79 laborers are not hired. <u>Flavoni Aff. ¶¶ 34-37.</u>

**431.** Gap would not use "a newer contractor" like BD on "a Gap or a full-line Banana Republic because those are higher level of execution." (Ciuzio Dep. at 170).

**Response:  Deny.** BD was invited to bid on the project, and the Gap considered BD as a

potential contractor for a job such as the Banana Republic store on 105 Fifth Avenue, but

rejected BD because of its union issues with Local 79. <u>Flavoni Aff. ¶ 114.</u>

**432.** Ciuzio expressed to Kruse his concerns about using BD again because of the change order management, the scheduling challenges and potential quality issues. (Ciuzio Dep. at 173).

**Response: Deny.** Local 79's conduct caused the Gap the most concern.  Kruse Dep. 37:19-42:25,  43:9-22,  77:7-80:8,  88:5-89:9,  83:4-88:4,  89:10-91:7;  Ciuzio  Dep.  145:18-151:15; Flavoni Aff. ¶ 111.

**433.** The Gap did not consider BD's work "top notch … it had some room for improvement with the quality." (Ciuzio Dep. at 177).

**Response: Deny.**  The Gap considered BD's work good and better than average.  Ciuzio Dep. 147:3-9.

**434.** The Gap considered BD's work to be "B+" but the Gap expects "A" work. (Ciuzio Dep. at 238-39).

**Response: Deny.**  The Gap considered BD's work good and better than average.  Ciuzio Dep. 147:3-9.

**435.** BD was not strong following the Gap's protocols and procedures.  (Ciuzio Dep. at 147).

**Response: Deny.**  BD and the Gap just entered into their business relationship and there were necessarily growing pains.  Flavoni Aff. ¶ 111.

**436.** BD "definitely needed improvement" in the area of cost control measure. (Ciuzio Dep. at 148).

**Response: Deny.**  BD and the Gap just entered into their business relationship and there were necessarily growing pains.  Flavoni Aff. ¶ 111.  Furthermore, both BD and the Gap were over their respective budgets – especially as it relates to labor costs – for this project and the Mall failed to schedule a site visit despite numerous requests from BD for one.  Kruse Dep. 49:15-51:18; Ciuzio 7 (GAP200); Ross Dep. 140:18-141:19; Ross 12 (P257-P258); Ciuzio Dep. 84:3-87:25; Ciuzio 11 (GAP220-222); Ciuzio Dep. 92:12-97:9; Ciuzio 14 (GAP189-GAP191); Ciuzio 15 (GAP208-GAP209); Flavoni Aff. ¶¶ 112-113.  Finally, Plaintiff objects to this statement as

immaterial.

**437.**　　The Gap had union issues at construction jobs prior to BD and the Mall.  (Ciuzio Dep. at 24).

**Response: Admit,** but objects to this statement as immaterial.

**438.**　　The Gap has had unions inflate rats, rats are commonplace and ignored.  (Ciuzio Dep. at 24).

**Response: Deny.**　At the Old Navy job, the Mall was sensitive to and deeply concerned about any picket lines being formed at the Mall.  <u>Zito Dep. 58:10-20, 139:20-140:14, 180:6-181:11.</u> The concerns raised by any public union activity at the mall were the reduction of shoppers, a total mall shut down, or an electrical shut down of power at the Mall.  <u>Zito Dep. 34:7-36:12; Zito 1 (MACERICH9); Ross 7 (P206).</u>  In turn, the Mall's concerns created concerns for the Gap vis-à-vis its relationship with the Mall.  <u>Ciuzio Dep. 36:14-37:23, 44:15-47:2, 48:2-54:23, 71:21-77:22; Kruse Dep. 37:19-42:25, 43:9-22, 55:7-58:16.</u>

**439.**　　The Gap had a construction project at the Gap Outlet store in Flatbush.  (Ciuzio Dep. at 131).

**Response: Admit.**

**440.**　　The Gap bid its Flatbush job "open shop," *i.e.*, as a non-union project, because the landlord did not have union requirements.  (Ciuzio Dep. at 131).

**Response: Admit,** but objects to this statement as immaterial.

**441.**　　BD's bid on the Flatbush project but was not lowest bid.  (Ciuzio Dep. at 133).

**Response: Admit,** but objects to this statement as immaterial.

**442.**　　The Gap awarded the Flatbush project to All-Rite Construction as general  contractor. (Ciuzio Dep. at 158).

**Response: Admit.**

**443.**　　The Gap's decision to award the Flatbush project to All-Rite was not  influenced by BD's experience at the Mall.  (Kruse Dep. at 156).

**Response: Deny.** The Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.

**444.**   All-Rite is a non-union general contractor.  (Kruse Dep. at 145-46).

**Response: Admit,** but objects to this statement as immaterial.

**445.**   On August 5 and 6, 2014, Local 79 erected an inflated rat and distributed  leaflets at the Gap Outlet store on Fulton Street regarding the fact that the Gap was using All- Rite for the Flatbush project. (Ciuzio Dep. Ex. 33).

**Response: Admit,** but objects to this statement as immaterial.

**446.**   On August 12, 13 and 18, 2014, Local 79 erected an inflated rat and  distributed leaflets at the Gap store in Lincoln Square regarding the fact that the Gap was using  All-Rite for the Flatbush project. (Kruse Dep. at 145-46; Ciuzio Dep. Exs. 30, 34).

**Response: Admit,** but objects to this statement as immaterial.

**447.**   All-Rite is still on the Gap's list of approved vendors list and is eligible to  bid on projects. (Kruse Dep. at 170).
**Response: Admit,** but objects to this statement as immaterial.

**448.**   Kruse removed BD from the list of approved vendors because she was not  sure BD had the staff needed to work on Gap projects. (Kruse Dep. at 153).

**Response: Deny.** The Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.

**449.**   The Banana Republic job was a "flagship project on Fifth Avenue . . . a  very high-profile location" so Gap went with Schimenti Construction Company ("Schimenti"),  which had "an all-inclusive number and the right team to do the work." (Kruse Dep. at 104, 106- 07).

**Response: Deny.** BD was the lowest bidder on the Banana Republic job at 105 Fifth Avenue.

Ciuzio Dep. 133:13-145:13; Ciuzio 27 (GAP127-128); Ciuzio 27A (GAP132-GAP136).

**450.**   BD's union issues did not play a role in the Gap's decision regarding the  Banana Republic job. (Kruse Dep. at 107).

**Response: Deny.**  The Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct.   Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.   Furthermore, the Banana Republic job was considered a high profile job.  Kruse Dep. 106:23-107:1 ("This is a flagship project on Fifth Avenue.  So it is a very high-profile location").

**451.**   At its interview for the Banana Republic project, the Gap told BD it was  looking for bidder who had longevity and experience with the brand.  (Flavoni Dep. at 132-33).

**Response:  Admit,** but note that BD was nonetheless invited to bid on the project, and the Gap considered BD as a potential contractor for a job such as the Banana Republic store on 105 Fifth Avenue, but rejected BD because of its union issues with Local 79.  Flavoni Aff. ¶ 114.

**452.**   At time of interview, BD had been with the Gap for less than a year and  Schimenti had been with the Gap about ten years.  (Flavoni Dep. at 133).

**Response: Admit,** but note that BD was nonetheless invited to bid on the project, and the Gap considered BD as a potential contractor for a job such as the Banana Republic store on 105 Fifth Avenue, but rejected BD because of its union issues with Local 79.  Flavoni Aff. ¶ 114.

**453.**   Gap would not use "a newer contractor" like BD on "a Gap or a full-line  Banana Republic because those are higher level of execution."  (Ciuzio Dep. at 170).

**Response: Deny.**   BD was invited to bid on the project, and the Gap  considered BD as a potential contractor for a job such as the Banana Republic store on 105 Fifth Avenue, but rejected BD because of its union issues with Local 79.  Flavoni Aff. ¶ 114.

**454.**   Kruse created a report entitled "Flatiron 105 5th Avenue, NYC NY: Project Overview and General Contracting Strategy" and dated June 1, 2014 to show Banana  Republic the reason why Gap decided to award the job to Schimenti.  (Kruse Dep. at 113; Ciuzio  Dep. Ex. 28).

**Response: Admit.**

**455.**   BD's ratings reflected in the Banana Republic report were not at all  influenced by what happened at the Mall, the ratings were specific to the Flatiron project.  (Kruse  Dep. at 114-15).

**Response: Deny.**  The Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.  Furthermore, the Banana Republic job was considered a high profile job.  Kruse Dep. 106:23-107:1 ("This is a flagship project on Fifth Avenue.  So it is a very high-profile location").

**456.**  BD did not give Kruse confidence that BD had thought about schedule strategy or cost controls regarding the Flatiron project; BD's team did not have many "proactive suggestions," Kruse was not convinced BD had much experience with projects like the Flatiron project. (Kruse Dep. at 114-15).

**Response: Deny.**  The Gap's assessment of BD as a general contractor was directly and negatively impacted by Local 79's conduct as a result of the union issues created by Local 79.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.  Furthermore, the Banana Republic job was considered a high profile job.  Kruse Dep. 106:23-107:1 ("This is a flagship project on Fifth Avenue.  So it is a very high-profile location").  Finally, BD has previously handled projects much larger than the Banana Republic job.  Flavoni Aff. ¶ 115.

**457.**  Kruse did not have confidence in the team presented by BD.  (Kruse Dep. at 104).

**Response: Deny.**  The Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct.  Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.  Furthermore, the Banana Republic job was considered a high profile job.  Kruse Dep. 106:23-107:1 ("This is a flagship project on Fifth Avenue.  So it is a very high-profile location").

**458.**  The Gap had decided by June 2, 2014 to not use BD for the Flatiron project.  (Kruse Dep. at 142, 150; Ciuzio Dep. Ex. 42).

**Response: Admit,** but note that Local 79 issued threats to the Mall which were relayed to the Gap and caused delays at the outset of the Old Navy job which affected the Gap's assessment of BD as a general contractor in May 2014.   Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.

**459.**   The Gap wanted the same general contractor to do both the demolition and build-out at the Flatiron project.  (Kruse Dep. at 106).

**Response: Admit.**

**460.**   BD seeks in excess of $225,000 in alleged damages in connection with its Banana Republic bid.  (Flavoni Dep. Ex. 7).

**Response: Admit.**

**461.**   Schimenti has had situations similar to BD's at the Mall where "unions have kind of reared their ugly heads but they usually solve it without [Kruse's] knowledge or involvement." (Kruse Dep. at 107).

**Response:**  Plaintiff **lacks sufficient information** to admit or deny this statement, but notes that it defies logic that Kruse supposedly knows about something she admittedly has no knowledge of.  Flavoni Aff. ¶ 116.

**462.**   In deciding the lowest bidder, the Gap does not look to the penny; the Gap would not focus on a $30,000 difference in $6.7 million bids and the Gap would instead consider both bids equal.  (Kruse Dep. at 148-49).

**Response: Admit,** but note that the Gap's assessment of BD as a general contractor was directly impacted by Local 79's conduct.   Kruse Dep. 77:7-80:8, 88:5-89:9, 83:4-88:4, 89:10-91:7; Ciuzio Dep. 145:18-151:15; Flavoni Aff. ¶ 111.   Furthermore, the Banana Republic job was considered a high profile job, which played a role because of the Gap's assessment of risk of union activity occurring there based on the contractor the Gap chose.  Kruse Dep. 106:23-107:1 ("This is a flagship project on Fifth Avenue.  So it is a very high-profile location").

**463.**    During a break in his deposition, Zito spoke to Plaintiff's counsel to seek  legal advice on an unrelated union issue on property his current company was considering  purchasing. (Zito Dep. at 166-67).

**Response: Admit,** but objects to this statement as immaterial and inadmissible on the grounds of

relevance.

**464.**    In its complaint against the Carpenters' Union, BD alleged that "The  Carpenters issued unqualified, general threats to Gap and Macerich, including but not limited to: 1) shut down the Old Navy job; and 2) put up a picket line at the Kings Plaza mall." (Complaint  against Carpenters' Union ¶ 40).

**Response: Admit,** but objects to this statement as immaterial.

**465.**    In its complaint against the Carpenters' Union, BD alleged that "True to  his distressed email, Macerich in fact shut down the work on the jobsite because of the  Carpenters' unqualified, general threats to picket Kings Plaza, inflate a giant rat, and Local 3's  threat to shut down the power to the entire Kings Plaza mail property." (Complaint against  Carpenters' Union ¶ 49).
**Response: Admit,** but objects to this statement as immaterial.

**466.**    In its complaint against the Carpenters' Union, BD alleged that "The  Carpenters' actions adversely affected BD's ability to be awarded work on future bids from the  Gap." (Complaint against Carpenters' Union ¶ 57).

**Response: Admit,** but objects to this statement as immaterial.

**467.**    In its complaint against the Carpenters' Union, BD alleged that "In fact, to  date, BD has not been awarded any additional work and stopped receiving invitations to bid from  the Gap as a direct result of the Carpenters's unlawful actions." (Complaint against Carpenters'  Union ¶ 58).

**Response: Admit,** but objects to this statement as immaterial.

## VI.    AS TO "MOUNT SINAI"

**468.**    Edward Chang was Director in charge of Design Construction for Mount  Sinai from 2012 to 2015.  (Chang Dep. at 7-8).

**Response: Admit.**

**469.**    In 2013, BD performed work for Mount Sinai in connection with  renovation of 20-bed Emergency Room observation unit (the "ER job").  (Chang Dep. at 10-11;  Flavoni Dep. at 84).

**Response: Admit.**

**470.**    At first, Jeremiah Lauerano was Mount Sinai's project manager for the  job, but Michael Cain took over as project manager because Chang needed someone with greater  level of sophistication to deal with BD.  (Chang Dep. at 56-57, 63).

**Response: Deny.**  Mt. Sinai's project manager was replaced because Chang needed someone

with a greater level of sophistication to handle the project.  Chang Dep. 56:19-57:8.

**471.**    A union that Chang could not recall called him to say Mount Sinai had to  use its members; Chang responded that he does not get involved and the union would have to  call the general contractor.  (Chang Dep. at 14-15).

**Response: Admit,** but note that Local 79 was the union who contacted Chang.  Flavoni Aff. ¶

117.

**472.**    The union that called Chang did not mention picketing or any other  problems that might occur.  (Chang Dep. at 17, 25-27).

**Response: Admit,** but note that Local 79 eventually threatened to picket Mt. Sinai.  Chang Dep.

17:10-23.

**473.**    Flavoni spoke to Ken Bluhm of the Carpenters' Union who said BD  should not do the carpentry with its own employees at the ER job.  (Flavoni Dep. at 85).

**Response: Admit,** but note that the Carpenters' Union and Local 79 are part of the BCTC and

honor each other's picket lines and other union activity.  Williamson Dep. 32:9-16; Smith Dep.

109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22; Rynkiewicz Dep. 18:17-19:15;

Zecca Dep. 21:16-22:9; Jordan 2; Rynkiewicz Dep. 129:19-131:21.

**474.**    Mount Sinai's contract with BD required BD to "use all reasonable efforts  to maintain good relations with labor unions . . . to maintain peaceful laborer relations and a  trouble-free job site."  (Chang Dep. Ex. 18; Chang Dep. at 48-50).

**Response: Admit.**

**475.**    The language about labor relations is boilerplate in all Mount Sinai  contracts with general contractors.  (Chang Dep. at 52-53).

**Response: Admit.**

**476.**    Mount Sinai makes sure to use only union contractors.  (Chang Dep. at 16).

**Response: Admit.**

**477.**    Chang confirmed BD was union before it started.  (Chang Dep. at 16).

**Response: Admit.**

**478.**    At some point, a union erected a rat at Mount Sinai.  (Chang Dep. at 17-18).

**Response: Admit,** but note that the union was Local 79, and that Local 79's activity included

picketing.  Chang Dep. 17:10-23; Flavoni Aff. ¶¶ 117-118.

**479.**    The erection of inflated rats at Mount Sinai happens so often that Chang  does not pay
much attention to it.  (Chang Dep. at 18).

**Response: Admit,** but note that Mt. Sinai was concerned about the erection of inflated rats and

any union activity at Mt. Sinai.   Flavoni Aff. ¶ 119.   Furthermore, Plaintiff objects to this

statement as immaterial.

**480.**    The erection of inflated rats at Mount Sinai do not matter to Chang  because unions have
"every right to do it".  (Chang Dep. at 18-19).

**Response:** Plaintiff **lacks sufficient information** to admit or deny this statement, but note that

Mt. Sinai was concerned about the erection of inflated rats and any union activity at Mt. Sinai.

Flavoni Aff. ¶¶ 119-120.  Furthermore, Plaintiff objects to this statement as immaterial.

**481.**    An inflated rat was up while BD did work at Mount Sinai.  (Chang Dep. at 19).

**Response: Admit,** but note that the union was Local 79, and that Local 79's activity included

picketing.  Chang Dep. 17:10-23; Flavoni Aff. ¶¶ 117-118.

**482.**    Chang had no concern that Mount Sinai's unionized health care workers  would not go to
work because of the rat.  (Chang Dep. at 30).

**Response: Admit,** note that Mt. Sinai was concerned about the erection of inflated rats and any

union activity at Mt. Sinai.  Flavoni Aff. ¶¶ 119-120.   Furthermore, Plaintiff objects to this

statement as immaterial.

**483.**    BD used Linear to provide a laborer on the ER job.  (Chang Dep. Exs. 12, 16, 17).

**Response: Admit,** but note that BD was forced to hire Local 79 laborers as a result of Local 79's

threat of union activity, picketing, and inflation of a rat at Mt. Sinai.   Chang Dep. 17:10-23;

Flavoni Aff. ¶¶ 117-118.

**484.**    During the course of BD's work, Chang grew concerned about the  frequency with which
BD submitted change orders seeking additional compensation for work  BD claimed was beyond
the scope of its contract.  (Chang Dep. at 61).

**Response: Admit,** but objects to this statement as immaterial.

**485.**    Chang was concerned BD was "playing games with change orders."  (Chang Dep. at 62).

**Response: Deny.**  All change orders submitted were outside the scope of BD's contract with Mt.

Sinai.  Flavoni Aff. ¶ 121.

**486.**    BD told Mount Sinai in October 2013, before the ER job was complete, that it did not
want to build a relationship with Mount Sinai, BD just wanted to finish and be  gone.  (Chang
Dep. at 74; Chang Dep. Ex. 7).

**Response: Admit,** but objects to this statement as immaterial.

**487.**    Chang was concerned that BD slowed its work because Mount Sinai had  not approved
and paid change orders.  (Chang Dep. at 75).

**Response: Deny.**  BD did not slow down any work on the Mt. Sinai job, but BD was concerned

about Mt. Sinai's delaying of approval for change orders which BD had substantially performed.

Flavoni Aff. ¶ 122.

**488.**    Mount Sinai considered terminating BD mid-job because BD was refusing  to continue to
work unless Mount Sinai paid outstanding change orders totaling approximately $70,000.
(Flavoni Dep. at 168-69).

**Response: Admit,** but note that BD completed the job to Mt. Sinai's satisfaction and Chang

never sent BD the termination letter. Chang Dep. 27:9-20, 117:5-9.

**489.**    Chang decided mid-job he was not going to invite BD to submit any bids  on future work.
(Chang Dep. at 95).

**Response:  Admit,** but note that Local 79's conduct affected Mt. Sinai's decision to no longer award any future work.  Flavoni Aff. ¶ 123.

**490.**    Chang's decision to no longer use BD had nothing to do with the rat or union issues; it was based purely on Chang's experience with BD.  (Chang Dep. at 96-97; 118-  19).

**Response: Deny.**  Local 79's conduct affected Mt. Sinai's decision to no longer award any future work.  Flavoni Aff. ¶ 123.

**491.**    BD seeks in excess of $2 million in alleged damages in connection with Mount Sinai.

**Response: Admit.**

**492.**    BD seeks in excess of $30 million in alleged damages in this lawsuit. (Flavoni Dep. Ex. 7).

**Response: Admit.**

## PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS ("CSF")

**BD Development LLC**

1.    BD Development LLC is a foreign limited liability company formed under the laws of the State of Delaware and is authorized to do business in the State of New York.  Flavoni 1; P64.

2.    BD's principals are Domenico Flavoni (hereinafter "Flavoni") and Jimie Deliteris (hereinafter "Deliteris"), who are the President and Vice President of BD, respectively.  Flavoni Dep. 24:16-18; Weigel Dep. 18:17-18; Flavoni Aff. ¶¶ 1-2.

3.    BD is signatory to a collective bargaining agreement (hereinafter "CBA") with the United Construction Trades and Industrial Employees ("UCTIE") Local 621 United Service Workers Union ("USWU"), International Union of Journeyman and Allied Trades ("IUJAT") (hereinafter "Local 621" or "BD's Union") since February 1, 2011 through the present.  Flavoni 1; Flavoni Dep. 24:13-25:25, 25:19-26:11, 26:12-24.

4.      The CBA's recognitional clause is comprised of a bargaining unit covering BD's employees engaged in the job classifications of apprentices, journeymen, superintendents, and assistant superintendents performing trade work including, but not limited to, general labor work, demolition, carpentry work, painting, and cement work.  Weigel 2 (P551-P568); Local 621-2.

**Local 79, Laborers International Union of North America**

5.      Local 79, Laborers International Union of North America (hereinafter "Local 79" or "Defendant") is a labor organization with its principal place of operation located at 520 Eighth Avenue, Suite 679, New York, NY 10018.  Labate Dep. 293:6-17.

6.      George Zecca (hereinafter "Zecca") was a business agent for Local 79 at all relevant times. Rynkiewicz Dep. 29:18-32:16; Zecca Dep. 13:6-14:16.

7.      Mike Labate (hereinafter "Labate") was a business agent for Local 79 at all relevant times. Williamson Dep. 94:3-8; Rynkiewicz Dep. 29:18-32:16.

8.      Barry Smith (hereinafter "Smith") was a business agent for Local 79 at all relevant times. Rynkiewicz Dep. 29:18-32:16; Smith Dep. 12:2-8, 14:4-15, 50:3-7.

9.      Dennis Lee (hereinafter "Lee") was an organizer in Local 79's Market Development Department at all relevant times.  Lee Dep. 15:24-16:8; 60:9-61:18.

10.     Lee was previously arrested and charged with unlawful assembly as a result of union activities against a different contractor who is not a signatory to Local 79.  Lee also alluded to the fact that he was arrested numerous times.  Lee 8:10-11:20.

11.     Anthony Williamson (hereinafter "Williamson") is an organizer in Local 79's Market Development Department and has served as one for thirteen (13) years.  Williamson Dep. 87:8-9, 49:20-50:5.

12.     Chaz Rynkiewicz (hereinafter "Rynkiewicz") is the Director of the Market Development Department or Organizing Department.  Rynkiewicz was arrested twice previously for civil disobedience relating to his duties as a Local 79 member; once for protesting an immigration issue, and another for rallying against the New York City School Construction Authority. Rynkiewicz Dep. 12:8-19, 44:18-46:21; 95:2-96:17.

13.     The Building and Construction Trades Council of Greater New York (hereinafter "Building Trades" or "BCTC") is an umbrella group consisting of local affiliates of various national and international unions.  Williamson Dep. 32:9-16; Smith Dep. 109:12-21; DePetro Dep. 29:24-30:14; Zecca Dep. 34:12-37:22.

14.     There is exclusivity amongst the Building Trades that prevents other unions that perform the same work as the Building Trades local unions from joining the Building Trades.  Zecca Dep. 34:19-40:25; Flavoni Dep. 21:22-22:11.

15.     Local 79 is affiliated with the Building Trades.  Rynkiewicz Dep. 18:17-19:15; Zecca Dep. 21:16-22:9; Jordan 2.

16.     The New York City District Council of Carpenters (hereinafter "Carpenters" or "Carpenters' Union") is a labor organization with its principal place of operation located at 395 Hudson Street, New York, NY, and is affiliated with the Building Trades.  Rynkiewicz Dep. 129:19-131:21.

17.     Local Union No. 3, International Brotherhood of Electrical Workers (hereinafter "Local 3") is a labor organization with its principal place of operation located at 15811 Jewel Avenue, 4th Floor, Flushing, NY 11365 and is affiliated with the Building Trades.  Jordan Dep. 13:3-8.

**The Old Navy Kings Plaza Job at 5100 Kings Plaza, Brooklyn, NY**

***BD is Approved as a General Contractor for the Gap and is Awarded Work***

18.     Tenny Vujicic (hereinafter "Vujicic") was a project manager at Gap, Inc. (hereinafter the "Gap") at all relevant times.  Ross Dep. 143:21-144:20.

19.     Old Navy is owned by the Gap.  Zito Dep. 16:20-25.

20.     The Gap has a process by which they preapprove contractors.  The Gap maintains a list of approved contractors, and the list has contractors added to and removed from it on a quarterly basis.  Kruse Dep. 16:19-20:1.

21.     Vujicic worked with Lauren Kruse (hereinafter "Kruse"), the Director of Construction for the Northeast at the Gap at all relevant times.  Vujicic worked closely with BD on jobs for Bank of America.  Kruse had conversations with Vujicic about BD and learned that Vujicic liked working with BD and that they had a close relationship. On November 21, 2013, Vujicic introduced BD to the Gap.  The same day, Kruse forwarded a request to Joseph James, a Gap employee, requesting that James begin the approval process for BD.  Kruse met with BD sometime afterwards.  On December 4, 2013, James contacted BD to begin the process, which involved financial disclosures and the execution of various documents.  On January 27, 2014, BD followed up and James responded to inform Flavoni that they are waiting for internal approval signatures.  BD was ultimately approved as a prequalified contractor.  Kruse Dep. 8:9-9:16, 28:4-32:10; Kruse 1 (P83-P85).

22.     Gap's online system for bids confirmed that BD had placed a bid on the Old Navy job on February 27, 2014 at 5:34 PM, which was submitted by Flavoni.  Ross Dep. 16:25-19:25; Ross 13 (P467).

23.     BD was awarded the Old Navy job.  Kruse Dep. 22:9-16.

### *The Mall*

24.     The Old Navy is located within the Kings Plaza Shopping Mall (hereinafter the "Mall"), which is located in Brooklyn, NY.  Zito Dep. 9:17-25.

25.     Macerich Management Company (hereinafter "Macerich") owns the Mall.  Lucien Zito (hereinafter "Zito") is a representative of Macerich, while Dawn DeGarbo (hereinafter "DeGarbo") is his assistant, and Brian Lindsey (hereinafter "Lindsey") and Steve DeClara (hereinafter "DeClara") are Zito's superiors.  Ross Dep. 39:2-24.

26.     Zito worked at Macerich as operations manager, and – in that capacity – managed the Mall until September 2014.  The Mall was previously owned by "Vornado," and Zito worked for Vornado for three (3) years in the same position managing Kings Plaza, until Macerich purchased the Mall from Vornado. In both positions, Zito worked on-site at the mall. Altogether, Zito worked in this capacity for approximately four-and-a-half years.  Zito Dep. 8:5-9:10, 10:2-11:7.

27.     In his capacity as operations manager for both Macerich and Vornado, Zito has overseen more than fifty (50) construction projects at the Mall.  Zito Dep. 11:8-15.

28.     Zito's primary role with respect to construction project was to represent the landlord's interests, and ensure that rules and regulations were adhered to.  Zito Dep. 11:16-12:15.

29.     Prior to Local 79's union activity at the Mall, business agents of various unions would communicate with Zito about a problem they had and Zito would facilitate communication between the business agent, the tenant, and – at times – the general contractor.  Some unions who Zito had previously dealt with included the Carpenters, Local 79, the electrical union, and the concrete, painters, and steamfitters unions.  Zito Dep. 14:20-15:14.

30.     Focusing specifically on Local 79, Zito previously dealt with a business agent named Carl Cully (hereinafter "Cully") who would complain to Zito on numerous occasions that there was no laborer on site or that Local 79 was not being used from time to time on various jobs. Zito Dep. 14:20-15:14.

31.     Zito typically facilitated communication between business agents of Local 79 and those involved in the project to the point where Local 79 was satisfied, as he would with any union's business agent.  Zito Dep. 15:15-16:2.

32.     Zito never initiated contact with Local 79 because it was not his business to look for problems. Zito Dep. 16:3-14.

### *Local 79 Descends Upon the Mall and the Gap*

33.     Labate learned about the Old Navy job by seeing the barricades and visiting mall management to obtain information about what store and which contractor will be working on it from the mall manager.  Labate Dep. 174:19-176:3.

34.     Prior to the Old Navy job beginning, Zito was contacted by Labate.  Zito recalls one particular conversation outside of the mall prior to the commencement of construction at Old Navy in which Labate would typically request information about the job.  When Zito informed Labate that BD was performing the work, Labate told Zito that there would be problems with the job if BD is performing the work.  Specifically, Labate told Zito that he had problems with BD in the past and that the Mall should anticipate that there were going to be problems.  Zito recalls that Labate attempted to persuade Zito to exclude BD from the job.  Zito Dep. 24:5-27:14.

35.     BD commenced construction of an Old Navy store at the Mall, and Kenneth Ross (hereinafter "Ross") was the project manager at BD for the Old Navy job.    Zito Dep. 10:25-11:10, 16:15-19.

36.     On May 16, 2014, BD and All City Interior Contracting Inc (hereinafter "All City") signed an agreement for All City to perform demolition work at the Old Navy Job Site.  Ross 4 (P502-P523).

37.     Ross recommended – and Flavoni and Deliteris accepted – All City solely due to the issues raised by Local 79.  Ross Dep. 45:9-15.

38.     John Rodopoulos (hereinafter "Rodopoulos") is the owner of All City.  Ross Dep. 59:6-60:17.

39.     Williamson went to the Old Navy Job Site twice.  The first time he went there, he visited the Mall's management office.  When Williamson met with a Mall management representative, he identified himself, who he represented, and asked whether BD was performing work there.  When the Mall representative answered in the affirmative, Williamson said that he is here to remind the representative that there is a labor harmony clause that exists that Williamson asserted is being violated, and which he would like to resolve.  Williamson Dep. 81:15-82:23.

40.     Williamson met with the same Mall representative a second time, repeating what he said the first time.  Williamson Dep. 91:15-92:16.

### *In a Show of Force, Local 79 and the Building Trades Locals Storm Zito's Office*

41.     On May 21, 2014, at 11:51 AM, Lucien Zito sent Ross and John Ciuzio an e-mail stating:

"Apparently we have some big union issues with your build out.  I was just unexpectedly greeted with about 15 [business agents] that all had issues with the subs on your job.  Most notably, Local 3 - electricians as well as carpenters, carting, laborers and painters.  This mall is a stand-alone power generator.  If a picket line was established you bare [sic] the [responsibility] of having our plant potentially shut down.  **We cannot have union issues here.**  From talking to the crowd I get the impression BD development [sic] is going to have a hard time satisfying their requirements, but I leave that to you to decide.  These issues need to go away now.

Based on the severity and depth of this union grievance, through this e-mail I suggest the job be put on hold until the issues are resolved."

Ross Dep. 46:4-24; Ross 7 (P206) (emphasis in original).

102

42.     In Zito's office.  Labate asserted that BD's Union was not acceptable to Local 79.  Labate threatened Zito that Local 79 would picket the Mall if BD was to perform work at the Old Navy job site.  There were times that Labate directly threatened a picket line and a rat being blown up, which the Macerich would be very sensitive to as a blue-collar mall.  Zito Dep. 27:22-28:23, 28:24-29:20, 29:21-30:16.

43.     The threats of picketing were directly related to whether BD would cooperate in using Local 79 laborers on the job site.  Zito Dep. 30:17-31:2.

44.     Labate also discussed shutting the job down with Zito and, in fact, requested that Zito shut the job down.  Labate told Zito that if you allow BD to keep working without putting on Local 79 laborers, "there was essentially going to be a problem, or a picket line[.]"  Labate did so in a loud, threatening manner.  Zito Dep. 31:23-34:6.

45.     There was an intense concern and sensitivity by Macerich representatives to any public union activity at the Mall.  One concern was that it would reduce shoppers.  Another concern was a total mall shutdown, because all of the Mall's workers – including 32BJ members, security, operations, maintenance, and the power plant – are union members who may sympathize and honor any picket line set up by Local 79.  Finally, the risk of an electrical shutdown of power was a major concern for Macerich.  Zito Dep. 34:7-36:12.

46.     On May 21, 2014, Zito was visited by about fifteen business agents from various Building Trades' local unions in the morning at the Mall's management office where Zito worked.  The business agents arrived unannounced, which was odd to Zito because he had a very good working relationship with all of the business agents.  In the course of Zito's tenure as operations manager, he had never been visited in such a manner despite working on much more

difficult jobs than the Old Navy job.  Zito Dep. 36:13-48:16; Zito 1 (MACERICH9); Ross 7 (P206).

47.    Zito viewed the unannounced visit as an intimidation tactic, and that various business agents had told him as much and apologized for it afterwards.  In fact, almost every business agent apologized to Zito and stated it was not the appropriate move to make, except Labate.  At the meeting, Labate threatened to picket the Mall.  Id.

48.    As a result, Zito was concerned that the potential picket line could result in a potential shut down of power to the Mall.  Id.

49.    Zito had other concerns about Local 79's threatened union activity, such as the disappearance of materials, problems with building systems, lines being cut, potential sabotage, and other consequences.  At the unannounced meeting, Zito was told that problems would occur if BD was allowed to perform work at the Old Navy job site, and Zito relayed his concerns to Ciuzio.  Id.

50.    To Zito, this meeting was a "show of force."  Zito considered Local 79's threats a major issue and a major problem because fifteen business agents had never shown up in his office before, despite the fact that Zito previously dealt with more severe union issues with bigger contractors and bigger projects than the Old Navy project.  Id.

51.    Zito got the impression that BD will have a hard time satisfying Local 79's requirements because of its show of force and the tone they set forth, i.e., "this needs to stop now, this is the end of the world[,]" with five to seven of the fifteen business agents communicating this to Zito.  The business agents communicated that they wanted BD to hire Local 79 laborers for the Old Navy job, and that – if BD would not do so – the Mall would be subject to problems, picket lines, rats, shutdowns, and/or other union activity by the Building Trades locals.  The business

agents also relayed that if BD did not hire Local 79 laborers, BD should not be doing the work at the Mall.  Id.

52.     During a telephone conversation between Angela Giovinazzi (formerly known as Angela Parisi) (hereinafter "Giovinazzi") and Zito, Zito informed Giovinazzi that he was surprised by an unannounced visit by twelve to fifteen business agents at his office, and that he did not appreciate this.  Zito informed Ross first.  Because Ross was on the road, Ross asked Giovinazzi to call Zito and get the particulars.  Giovinazzi called Zito and discussed what happened in detail. Zito remarked that if BD did not resolve this, the Mall would have no choice but to shut the Old Navy job site down.  Zito also told Giovinazzi that Local 79 threatened to go to Local 3 and have the Mall's power shut down if this was not resolved.  Giovinazzi Dep. 74:6-83:8.

53.     Zito put the job was on hold as a direct result of the issues between Local 79 and BD. Zito Dep. 54:20-55:20; Zito 1 (MACERICH9); Ross 7 (P206).

54.     Zito confirmed that he had shut the job down on the same day he was visited by fifteen business agents.  Zito Dep. 59:8-62:3.

55.     Zito knew that there would be no risk of union activity if he shut the job down both because BD would not be performing work and because Labate told Zito he wanted Zito to shut the job down.  Zito Dep. 58:21-59:7.

56.     In a letter dated May 21, 2014, counsel for BD wrote to Zito and stated, among other things, that the mall has improperly locked BD out of the construction site that it was working on for Old Navy based on the claim that BD is performing work with nonunion labor, and Ross confirmed that the job was shut down as a result of the union activity.  Ross Dep. 92:11-95:9; Ross 6 (P524-P525).

## *The Mall is a Stand-Alone Power Plant*

57.     Macerich employed Local 3 electrical workers directly to staff the Mall's power plant, as the Mall is a stand-alone entity and does not have a "co-generation plant."  In fact, the Mall is "an island completely independent of the grid" and its power is generated on-site and solely provided to and by itself.  Zito Dep. 19:18-21:3; Jordan Dep. 32:18-33:13.

58.     The provision of power to the Mall is very important to the mall.  Jordan Dep. 33:14-34:5.

59.     The Mall is maintained by two Local 3 members who work for "Penguin." Jordan Dep. 49:25-51:2.

60.     If the Mall's power got shut down, there were no backups for energy and the entire mall and all its stores would be forced to close. Zito Dep. 21:4-14.

## *Building Trades Grievance*

61.     Local 79 and other Building Trades' unions communicate with one another regarding campaigns they take against contractors and have a meeting place at the Building Trades where they meet face-to-face to discuss such matters.  The unions within the Building Trades also communicate with one another via telephone calls, e-mails, and meetings at a particular restaurant where they have a back room.  Rynkiewicz Dep. 83:22-85:14.

62.     According to Smith, there are thirty-one (31) Building Trades locals.  Smith Dep. 109:12-21.

63.     A Building Trades grievance may be called by a Building Trades local union for all the business agents from all of the Building Trades locals to meet on a job site at a particular date and time.  Notification of a Building Trades grievance is typically circulated amongst all the Building Trades locals.  Notification goes out to all of the Building Trades locals within the

Building Trades to let them know that one of the Building Trades locals is having some issue on a particular job site.  Zecca Dep. 50:24-56:3.

64.     A Building Trades grievance, according to Labate, is called to notify all the other Building Trades local unions about a job so that they could meet to determine whether they want to raise an issue with the job.  Labate calls one by contacting the Building Trades, providing information, and waiting to be notified.  As for why he cited that the grievance with BD at the Old Navy job was "nonunion," Labate said it was because "621 is maybe a union, but not to [Labate] ..."  Labate controls which Building Trades locals the grievance goes out to. It appears from the grievance form and Labate's testimony that the e-mail was sent to the business managers of each local who then send it down.  The primary purpose for filing a Building Trades grievance is to notify all the various trades that there may be some type of issue with respect to a non-trades contractor performing work, and the secondary purpose is to follow the proper protocol so that a job action, protest activity, etc. is sanctioned by the Building Trades.  Labate Dep. 179:25-194:22; Jordan 2.

65.     Michael Jordan (hereinafter "Jordan") has been a business agent of the Carpenters' Union at all relevant times.  Jordan Dep.  37:23-25, 38:3-8.

66.     Smith explained that in order to file a grievance with the Building Trades, you call the Building Trades directly and make the grievance by identifying yourself and stating that you would like to have a Building Trades grievance, provide the area, the lot, the address, and what is going on.  Smith Dep. 104:21-23.

67.     On May 16, 2014, a grievance was announced by Lizmary Rodriguez (hereinafter "Rodriguez") of the Building Trades against BD for being a "non-union" contractor.  The grievance was filed by Labate from Local 79, and all notified were directed to meet at the Mall's

management office on Wednesday, May 21, 2014 at 10:00 AM.  The grievance notice was sent to approximately sixty-nine people from all sorts of unions within the Building Trades.  The specific trades to be notified were the Carpenters, Painters, Sheetmetal Workers, Electrical Workers, Plumbers, and Tile Marble Terrazzo unions.  Jordan Dep. 12:9-13:2.

68.     Smith said that you can have a grievance as "nonunion" or you can have it where someone else is covering Local 79's jurisdictional work.  Smith Dep. 104:13-20.

69.     When a Building Trades grievance is filed, it gets disseminated to the business agents at all the other Building Trades.  Smith Dep. 107:9-13.

70.     Whenever a Building Trades grievance is filed and other Building Trades local's business agents are notified of it, they must attend the grievance.  Smith Dep. 108:4-23.

71.     The purpose of a Building Trades grievance is to have other business agents from the Building Trades locals show support for the grieving local union and to help try to resolve the grievance.  Smith Dep. 109:22-110:18.

72.     Smith said that a Building Trades grievance is usually filed when a contractor refuses to put a laborer on.  Smith Dep. 117:23-118:10.

73.     Williamson expects that other Building Trades unions performing work on a job site with a non-Local 79 contractor would come out in solidarity with Local 79 if Local 79 holds a job action on such a job site.  Williamson Dep. 95:25-96:23.

74.     If a non-Local 79 contractor was performing work together with other Building Trades contractors, Williamson would reach out to the other Building Trades unions and he would ask the Building Trades to be in solidarity with Williamson, which could mean not entering the building, passing out leaflets, and making telephone calls.  Williamson Dep. 95:24-96:23.

75.     Jordan attended the May 21, 2014 grievance.  Jordan Dep. 20:4-23.

76. Though a third party, such as Brookdale University Hospital and Medical Center (hereinafter "Brookdale"), has nothing to do with the Building Trades grievance, a Building Trades grievance would be held at Brookdale, and Brookdale would be notified about the grievance occurring "out of respect." Smith Dep. 274:15-20.

77. Similarly, if a Building Trades grievance is to be held at the Mall, Smith would let Mall management or the landlord know about the Building Trades grievance, but the issue would be resolved directly with the contract, and the mall or the landlord would have nothing to do with it. Smith Dep. 276:3-20.

78. Despite this, on May 21, 2014, a Building Trades grievance was held at the Mall's management office directly with Zito and BD was not present at, nor was BD notified of, any such Building Trades grievance. Smith Dep. 276:21-278:6; Ross 7 (P206); Jordan 2.

### *Lack of Manpower*

79. During the demolition phase, Ross had trouble obtaining manpower for the Old Navy Job from All City to complete the demolition work, an apparent result of the labor issues between BD and Local 79. Ross Dep. 57:13-58:7.

80. Ross had several conversations with representatives of All City regarding the need for more manpower. Ross Dep. 58:8-20, 59:6-60:17, 60:18-61:11, 61:15-24.

81. Four people from BD - Ross, Mike Deliteris, Giovinazzi, and Deliteris - admonished All City for falling behind schedule. Ross Dep. 110:15-112:12.

82. Ross and/or Giovinazzi requested a letter from All City concerning the lack of manpower from the hiring hall. Ross Dep. 62:3-13; Ross 2 (P270).

83. At the time Smith placed himself on the out-of-work list in 2015, there were two hundred (200) members on the list. Smith Dep. 33:13-34:2.

84.     There were under a thousand employees on the out-of-work list at Local 79 in 2014, when the Old Navy job was underway.  Smith Dep. 34:3-12.

### *Hiring Hall*

85.     Local 79 has a hiring hall.  Members are chosen from the hiring hall according to seniority, qualifications, and preferences.  Local 79 has 9,300 members and approximately 400 are currently out of work.  Lee Dep. 66:9-12, 66:15-68:7, 68:8-15.

86.     According to Rynkiewicz, Local 79's hiring hall works pretty good and that Local 79 is one of the very few locals in the city that actually has a hiring hall that requires contractors to take members.  Rynkiewicz Dep. 88:5-90:25.

87.     Luann Piecora (hereinafter "Piecora"), the Secretary of Rite Way Internal Removal Incorporated (hereinafter "Riteway"), generally did not experience problems requesting men from Local 79's hiring hall, but did experience a problem a couple of times.  Piecora Dep. 18:21-19:18.

88.     Piecora generally sent Local 79 requests for manpower the day before and did not have issues getting men.  Piecora Dep. 25:8-27:23.

89.     Labate said that: (i) you would never run out of guys; (ii) Brooklyn never runs out of available laborers in the hiring hall; and (iii) demolition is done predominantly at night.  Labate Dep. 70:18-77:10.

90.     Rodopoulos requested men from the hiring hall for the Old Navy job site but none were available.  Rodopoulos Dep. 44:13-18.

91.     Though Rodopoulos disagreed with BD's demands for additional manpower, to appease them, Rodopoulos requested additional manpower from the union hiring hall.  Rodopoulos was told no men were available.  At the request of Giovinazzi, Rodopoulos submitted a letter

explaining that he requested men from the hiring hall and none were available.  Rodopoulos Dep. 46:6-50:12; Ross 2 (P270).

### *Local 79's Campaign Against BD at the Old Navy Job Site*

92.   On July 1, 2014, Local 79 agents issued another threat directly to Zito at the Mall that they would set up a picket line on Friday, July 4, 2014, if BD did not meet Local 79's demands. Ross Dep. 128:24-130:5; Ross 10 (P54).

93.   On July 1, 2014, at 10:33 AM, Flavoni told Zito about Local 79's latest threat towards Zito of picketing the Mall if BD did not meet Labate's demands by Friday, July 4, 2014.  In response, at 10:47 AM, Zito stated that the issue has now escalated to a level that requires Lindsey's involvement.  As a result of the pressure Local 79 placed on Macerich, Zito wanted to discuss with BD how the dispute can be resolved because Macerich had to meet with the Gap and BD to assist in a resolution, which Zito was trying to facilitate.  Zito reported to Lindsey and requested that Lindsey be involved in trying to resolve the issue between Local 79 and BD. Lindsey had the same concerns Zito had regarding picket lines, rats, and job shutdowns.  Zito Dep. 73:2-77:9; Zito 5 (MACERICH31-MACERICH 33).

94.   Zito received threats from Local 79 to picket the Mall regarding BD and spoke to Lindsey regarding Local 79's threats.  Zito relayed any threats he received to Lindsey.  Zito Dep. 81:15-85:3; Zito 7 (MACERICH62-MACERICH64).

95.   Ross had several conversations with Zito on the phone and in person concerning threats Local 79 made to Zito.  Zito asked Ross what he is going to do about this problem and stated that he needs to stop Labate from coming to his office every two to three days and threatening to shut down and picket the mall.  Ross Dep. 131:20-133:4.

96.     Smith spoke to Lindsey at Macerich on the phone sometime in August 2014 for approximately ten (10) to fifteen (15) minutes.  Smith explained his problem with a laborer only working one (1) day a week at the Old Navy job site to Lindsey.  Smith Dep. 125:11-127:7.

97.     Evelyn Jew (hereinafter "Jew") is an in-house attorney for the Gap.  Jew was party to a telephone conference between representatives of the Gap, Macerich, and BD.  The subject of the conference was Macerich's concern that Local 79 would picket the Mall   After Flavoni outlined his efforts at achieving union harmony, Macerich demanded that the Gap reach out to Local 79, that Local 621 and Local 79 representatives meet, or for someone to ask Local 79 to put what they want in writing.  Macerich demanded that the Gap make a good faith effort to resolve the dispute.  Macerich also pointed out the union harmony clause in Gap's lease and stated unequivocally that the job site will be shut down in the event of any picketing by Local 79.  Lindsey explained that, under the labor harmony clause, the tenant has to immediately take action to reasonably eliminate such a dispute including by (1) removing all disputants from the job site until the dispute no longer exists; (2) seek a judgment for a breach of contract between Tenant and Tenant's contractor; and (3) file appropriate unfair labor practice charges in the event of a union jurisdictional dispute.  Because Lindsey informed Kruse that the Gap had to try and create labor harmony with any unions and make a fair attempt at trying to maintain labor harmony, Gap considered using Local 79 labor on the project in order to do so.  The only concerns the Gap had on the Old Navy job were possible shut downs, subsequent delays, and its relationship with Macerich.  Kruse Dep. 55:7-58:16; Ross 11 (P235-P237); 712014 43334 PM.m4a;[2] Flavoni Aff. ¶¶ 26, 33.

98.     On July 7, 2014, at 7:48 AM, Flavoni e-mailed Ciuzio and Kruse regarding Labate's demands and relayed that it would be a problem to have a Local 79 laborer work alongside BD's

---

[2] The reference to a file ending with ".m4a" refers to an audio recording.

labor force.  Ciuzio understood that to mean that Local 79 wanted all the work for itself and that, barring such an agreement, Local 79 would continue to take action to interfere with the Old Navy project.  Ciuzio Dep. 81:15-84:2; Ciuzio 10 (GAP160-161).

99.     During a telephone conversation between representatives of Gap, Macerich, and BD the following day, Flavoni explained the inherent bad faith displayed by Local 79 in reneging on their previous deals and taking acts to sabotage the Old Navy Job as manpower was not provided.  Zito 11 (782014 91322 AM.m4a; Flavoni Aff. ¶¶ 27, 33).

100.    On July 10, 2014, at 4:11 PM, DeClara sent Flavoni correspondence regarding a potential compromise proposed by DeClara to resolve the union issues.  The following morning, Flavoni forwarded the correspondence to Kruse and Ciuzio, to which Kruse responded that she is willing to learn about the cost – but is not committing to do it – solely to find out how much it will cost to make Local 79 go away.  The Gap had no desire or need for any Local 79 laborer.  Ciuzio Dep. 89:16-92:11.

101.    On July 11, 2014, at 10:03 PM, Flavoni sent representatives of Gap a list of all subcontractors and their union affiliations to exhibit the union harmony displayed by BD in hiring various locals, including various Building Trade locals.  Two of the subcontractors listed were signatories to Local 79.  Ciuzio Dep. 88:2-89:15; Ciuzio 12 (GAP148- GAP 149).

102.    On July 16, 2014, Ciuzio ultimately rejected the change order for $40,000.00 in costs for a Local 79 laborer, but approved a separate change order for $4,500.00 in costs for a Local 79 laborer resulting from Local 79's second set of threats in July.  Prior to receiving the numbers for the new compromise, Ciuzio told Lindsey that he believes they have a plan in place based on his understanding of the numbers.  Ciuzio Dep. 92:12-97:9; Ciuzio 14 (GAP189-191); Ciuzio 15 (GAP208- GAP 209).

103.    The Gap viewed the Old Navy job as a high risk job due to Local 79's conduct.  <u>Ciuzio</u>

<u>Dep. 98:12-100:22, 105:21-108:8; Ciuzio 16 (GAP70-71), Ciuzio 19 (GAP72-73), Ciuzio 19A</u>

<u>(GAP74-GAP75).</u>

104.    On July 17, 2014, Flavoni corresponded with Lindsey to inform him that a compromise

had been reached.  Lindsey responded with approval and stated that he would support BD.

<u>Ciuzio Dep. 97:10-98:11; Ciuzio 15A (GAP210-GAP211).</u>

105.    On July 23, 2014, Ciuzio moved the Store Effective Date to September 24, 2014

primarily due to "labor actions (work stoppages)[.]"    <u>Ciuzio Dep. 108:9-112:8; Ciuzio 20</u>

<u>(GAP105-GAP106).</u>

106.    On August 13, 2014 at 9:38 AM, Flavoni returned Smith's phone call, and Smith

introduced himself, explained that Labate is now in Manhattan, and wanted to discuss the Old

Navy job with Flavoni.  Smith explained that there is a laborer coming in only once a week,

which is a problem for Smith because if there are any other trades on board, "labor should be

there."  Smith requested that the laborer come in three (3) times a week. Flavoni explained that

the laborer was put on the Old Navy job once a week as a direct result of negotiations and that

there was no agreement to increase the number of days the laborer was present.  <u>Smith Dep.</u>

<u>128:25-135:10; Smith 3 (8132014 93846 AM.m4a; Flavoni Aff. ¶¶ 28, 33).</u>

107.    On August 14, 2014, Flavoni corresponded with Kruse and others about the fact that a

new business agent - Smith - had been contacting BD and demanding that a laborer be placed on

the Old Navy job site for three (3) days per week as opposed to one (1) day per week as

previously agreed to.  Faced with the advent of triple the cost for a cost the Gap did not want in

the first place, Kruse agreed with Flavoni that there will be no further agreements regarding

Local 79 laborers on the Old Navy job site.  Ciuzio Dep. 112:9-113:22; Ciuzio 21 (GAP113-GAP115).

108.   On August 19, 2014, at 9:26 AM, Christie Johnson (hereinafter "Johnson"), a representative of Linear Contracting, Inc. (hereinafter "Linear"), notified BD that "[i]n light of the circumstances surrounding between BD Development and Local 79, effective immediately, Linear Contracting will no longer be providing the Local 79 [l]aborer for the Old Navy Kings Plaza project." P570.

109.   On August 19, 2014, at 11:34 AM, Smith and Flavoni had another telephone conversation.  Smith informed Flavoni that Linear is pulling off the job, which was news to Flavoni (as he only received an e-mail from Linear a couple of hours earlier).  Smith asked that Flavoni agree to put a laborer on for three (3) days a week, and Flavoni informed Smith that his client did not agree to that.  Smith responded by threatening to put a picket line up.  Smith specifically asked Flavoni to call his client and let them know what Smith said.  Flavoni responded that they already made an agreement and expressed his disappointment with the threat made by Smith.  Smith responded by again requesting that Flavoni reach out to his client about Smith's request.  Smith also said that he would give Flavoni until the end of the week to attempt to resolve this dispute before he puts up a picket line, explaining that he would rather not put a picket line up.  Flavoni confirmed that he will reach out to his client pursuant to Smith's request and get back to him.  Smith Dep. 139:20-146:2.

110.   On August 19, 2014, Flavoni relayed to Gap and Macerich representatives that he received a call from Smith threatening a picket line if BD does not increase the amount of time a laborer is placed on the Old Navy job site.  Zito replied to ask for Smith's number, and Flavoni

responded to provide it.  Zito does not recall any conversation with Smith, but understood that the line threatened by Smith was a picket line.  Zito Dep. 85:6-88:5; Zito 8 (MACERICH77).

111.    On August 19, 2014, Flavoni wrote to Kruse and Ciuzio advising them of the filing of the instant lawsuit.  Additionally, Flavoni advised that Smith reached out to BD seeking a laborer for three (3) days per week with a new threat to picket the Mall if BD does not acquiesce to Local 79's demands.  Ciuzio understood Smith's threat to be a threat of picketing, and the threat raised concerns about Local 79 interfering with work on the Old Navy project in light of a picket line. Ciuzio 115:2-117:2; Ciuzio 22 (GAP253-GAP254).

112.    Ciuzio agreed with Jennifer Rondholz's (hereinafter "Rondholz") (another Gap employee) assertion that Local 79 was bullying the Gap and that the Gap was otherwise being taken advantage of.  Ciuzio also agreed with Kruse's sentiment that Local 79 was terrorizing the Gap.  Ciuzio Dep. 117:4-122:6; Ciuzio 23 (GAP247-GAP248).

113.    This being the third time that Local 79 made threats to picket the Mall, and the second time Local 79 reneged on a compromise, representatives of Macerich stepped in and – somehow – convinced Local 79 to back off, informing representatives of BD and Gap as much on August 20, 2014.  BD continued to hold their end of the bargain throughout the completion of the Old Navy project.  Ciuzio Dep. 124:4-126:14; Ciuzio 25 (GAP24-GAP26).

***Local 79's Threats and Conduct towards the Mall and the Gap Caused BD Harm***

114.    Every time Local 79 made a threat or conducted any union activity at the Mall, Flavoni and/or Deliteris spoke to Zito, Lindsey, DeClara, Ciuzio, and/or Kruse about it.  Flavoni Aff. ¶ 34.

115.    Zito, Lindsey, DeClara, Ciuzio, and/or Kruse and other representatives of Macerich and/or the Gap referred their communications from Local 79 to Flavoni and/or Deliteris.  Flavoni Aff. ¶ 35.

116.    Zito, Lindsey, DeClara, Ciuzio, and/or Kruse and other representatives of Macerich and/or the Gap wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity.  Flavoni Aff. ¶ 36.

117.    When Local 79 agents discussed the Old Navy Job Site or any threats or union activity directed at the Mall or the Gap, Flavoni informed the Local 79 agents that he would relay their message to Zito, Lindsey, DeClara, Ciuzio, and/or Kruse and other representatives of Macerich and/or the Gap.  Flavoni Aff. ¶ 37.

118.    As a direct result of Local 79 apparently being forced to back down on the Old Navy project, agents of Local 79 began to picket the Gap at its corporate office on 55 Thomas Street, New York, NY and other Gap locations.   The union activity was apparently short-lived, however, as they were forced to leave because they were blocking the sidewalk.  Ciuzio Dep. 126:15-133:7, 154:17-155:16.

119.    There were financial penalties in BD's contract with the Gap for BD's failure to complete its work within the schedule set forth by the Gap.  Ross Dep. 109:14-110:2.

120.    Ciuzio's assessment of BD as a company was directly impacted by Local 79's union activity.  Ciuzio Dep. 145:18-151:15.

121.    If Gap had its preference, it would not have had Local 79 on the Old Navy project at all, as it relates to participating in the cost to pay for a Local 79 laborer.  Ciuzio Dep. 253:10-255:3.

122.    Labate and the other business agents raised concerns about "rogue unions" on the Old Navy project and that they should not be working at the Mall.  Zito Dep. 104:8-105:19.

123.    Zito had conversations with Labate about what it would take for Labate to stop harassing Zito and threatening union activity at the Mall.  Zito Dep. 127:19-23.

124.    In assessing the differences between Cully and Labate, Zito found that Cully was a gentleman who was very diplomatic, political, and professional, while Labate was much more pushy, aggressive, intimidatory, and constantly arrived unannounced.  Zito Dep. 24:17-21, 138:11-139:6.

125.    If a picket line had formed, he would have locked BD out of the Old Navy job site.  Zito Dep. 139:20-140:14.

126.    Ciuzio recalls that there were threats of shutting down the power to the Mall, threats of picketing, and other unions threatening to picket the Old Navy job site.  Because of the delays caused by these threats, Ciuzio had to visit the Old Navy job site more frequently than before, and he estimated that the Gap collectively spent about forty (40) hours dealing with these union issues.  Ciuzio Dep. 54:24-66:6.

127.    Smith confirmed that he wanted Flavoni to contact Macerich and the Gap as a result of this conversation, and wanted Flavoni to relay his threats to BD's client.  Smith Dep. 156:13-157:4.

128.    Smith's goal in relaying these threats is to get Local 79 laborers to work on the job.  Smith Dep. 157:16-20.

129.    Smith hoped that Flavoni would relay his threat to the client.  Smith Dep. 160:20-162:23.

130.    Smith spoke to Lindsey at Macerich and mentioned setting up a picket line at the shopping mall where the Old Navy job site was.  Lindsey responded with words to the effect of "oh, G-d.  Not again[,]" expressed that he did not want to be dealing with this, and pleaded with Smith to avoid setting up a picket line.  Smith Dep. 196:5-197:21.

131.    A picket line was eventually set up at Brookdale.  Smith Dep. 197:22-25.

132.    Labate admits to threatening to put up a picket line, and that the reason for doing so is because he is not getting any response from the contractor.  Labate Dep. 283:2-284:19.

133.    Local 79 hopes that good union members will honor a picket line, and one of the intentions of having the rat up is to let others know as a signal.  Zecca Dep. 47:19-50:23.

134.    All union activity stops once a resolution is reached either by a signed contract with Local 79, a signed paymaster agreement, if a substantial resolution (something in writing).  Labate Dep. 119:4-121:14.

135.    Labate considers it normal to threaten picket lines at jobs.  Labate failed to deny that he threatened a picket line to Zito.  Macerich representatives may have told him they were threatened with picketing just to shake Flavoni up and that "[m]aybe they don't want an issue either."  Labate further testified that "I might have said, hey, you got to get this thing resolved or these guys are going to do a picket line here."  Labate testified that it is more accurate for him to say if we do not get things resolved, I am going to turn it over to the organizers, who may place a rat up, do leafletting, or picketing,, and that it sounded to him like the people at Macerich were "trying to shake this tree to do something."  Labate testified that he did not feel the need to disagree with what Flavoni said because Labate threatened picket lines so often.  Labate Dep. 304:15-309:14.

136.    Kruse agreed with Rondholz that the Gap was being downright bulled.  In response, Kruse wrote: "They are like terrorists.  And we don't negotiate with terrorists."  Kruse felt like she was being extorted by Local 79's demands to add its laborers to its job site and Local 79's threats.  Kruse Dep. 96:16-98:8; Ciuzio 23 (GAP247-GAP248).

137.   Kruse observed that Local 79 agents placed a rat outside of the Gap's corporate headquarters at 55 Thomas Street, New York, NY - where Kruse worked - and had four or five Local 79 agents picketing with signs.  Kruse called 311 and complained that Local 79's picketing was blocking their entrance and the rat was taken down.  The rat and/or the protesters blocked the entrance to the building for Gap employees.      Kruse   Dep.   99:10-100:22;   Ciuzio   26 (GAP21-GAP23)

138.   Once Lindsey at Macerich no longer had any concerns about Local 79, neither did Kruse at the Gap.  Kruse Dep. 164:19-166:2.

139.   BD incurred damages as a result of Local 79's conduct, including lost Gap bids.  Flavoni 7.

**The Bank of America Job at 95 Wall Street, New York, NY**

**_BD is an Approved General Contractor for CBRE and is Awarded a job for BofA_**

140.   BD serves as a construction company that executes construction projects for CB Richard Ellis (hereinafter "CBRE") throughout Bank of America (hereinafter "BofA") branches, while CBRE serves as the project manager for various BofA branch projects.  Wilde Dep. 9:25-10:15.

141.   In or about April 27, 2012, CBRE – as construction  manager for BofA – awarded BD a contract to perform general contractor services for a branch located at 95 Wall Street, New York, NY (hereinafter the "BofA Job Site").  Wilde Dep. 10:16-23, 11:11-15; Flavoni Dep. 53:5-7.

142.   BD commenced work at the BofA Job Site before October 2012.  Lapidus Dep. 14:2-25.

143.   BD used its own work force – Local 621 laborers – to perform laborers work at the BofA job site.  Weigel Dep. 11:10-13; 28:20-29:5; Ferazzoli Dep. 11:19-21; Williamson Dep. 37:11-23; Capozza Dep. 8:9-9:3; Lapidus Dep. 6:21-7:16; Ross Dep. 12:3-21; Giovinazzi Dep. 54:18-55:25.

144.    BD hired a subcontractor called New York City Acoustics, Inc. (hereinafter "NYC Acoustics") to perform the carpentry work at the BofA job site.  Lapidus Dep. 86:3-5; DePetro Dep. 14:23-25; Flavoni Dep. 55:11-17.

145.    NYC Acoustics is signatory to the Carpenters' Union.  Flavoni Dep. 55:11-17.

146.    Jonathan Lapidus (hereinafter "Lapidus") is an employee of BD who works as a laborer and began working at the BofA Job Site in February 2013 until mid-May 2013, and worked at the BofA Job Site regularly from 6:30 AM to 3:30 PM.  Lapidus Dep. 6:13-20, 10:4-10, 14:2-25, 15:1-6, 16:6-17:8.

147.    Giovinazzi was employed by BD from November 1, 2012 through March 13, 2015, primarily as an assistant project manager.  Giovinazzi Dep. 9:15-22, 10:5-23, 12:25-3:5.

### *Local 79 Descends Upon BofA and CBRE*

148.    In early April, Zecca stopped by the BofA Job Site and represented himself to be a business agent of Local 79.  Lapidus Dep. 17:12-18:24.

149.    On April 25, 2013, without any prior notice that it would do so, agents of Local 79 arrived at the entrance of the BofA Job Site and: (i) inflated a rat balloon; (ii) formed a picket line; (iii) blocked the entrance to the job site; and (iv) handed out leaflets. Lapidus Dep. 27:25-28:5, 29:14-30:13, 30:16-31:17, 32:3-8, 32:9-12, 40:22-41:2; Lee 1 (L79:8); Lapidus 3-14 (P14-P24); Lapidus 1 (P106-P107); Lapidus 2 (P315-P317); Lee Dep. 69:3-7, 71:24-72:2., 106:13-107:13, 107:14-24, 107:25-109:6, 110:16-19; Zecca Dep. 62:8-65:15; Flavoni Dep. 60:2-9.

150.    There were four or five Local 79 agents present, including Lee, an organizer, and Zecca, the business agent.  Lee Dep. 55:7-10, 108:6-109:6.

151.    Lapidus arrived at 7:30 AM on the day the rat was blown up instead of his usual arrival time of 6:30 AM because the bus was running late that morning.  Lapidus Dep. 27:16-24.

121

152.    When Lapidus arrived, he saw a rat blown up in front of the building and about five agents of Local 79 standing in front of the doors handing out fliers and picketing.  Lapidus recognized Zecca was present amongst the Local 79 agents.  Lapidus Dep. 27:25-28:5, 29:3-13.

153.    Local 79's agents were handing out fliers and Lapidus collected one of them.  Lapidus Dep. 29:14-30:13; Lee 1 (L79:8).

154.    When Lapidus arrived, the Local 79 agents were stationed in front of the BofA Job Site entrance, blocking it.  After Lapidus asked the Local 79 agents to move twice, they moved and Lapidus walked into the job site.  Lapidus Dep. 30:16-31:17, 32:3-8, 32:9-12.

155.    Lapidus was intimidated by the Local 79 agents.  Lapidus Dep. 34:13-35:3.

156.    Lapidus took photos of Local 79's union activity and e-mailed the photos to Flavoni and Deliteris.  Lapidus Dep. 32:13-33:12, 35:4-36:18, 37:3-38:9; Lapidus 3-14 (P14-P24); Lapidus 1 (P106-P107); Lapidus 2 (P315-P317).

***Carpenters' Union Employees Stand in Solidarity with Local 79's Picketing***

157.    Sal DePetro (hereinafter "DePetro") works for NYC Acoustics and performed services as a carpenter foreman at the BofA Job Site and was at the BofA Job Site every day.  DePetro Dep. 10:7-20, 13:4-8, 20:25-21:13.

158.    DePetro has been a member of the Carpenters' Union and an employee of NYC Acoustics for fifteen (15) years.  DePetro Dep. 13:21-25, 14:4-18.

159.    DePetro has seen inflatable rats before and understands that the rats symbolize a labor dispute.  DePetro Dep. 27:6-11.

160.    NYC Acoustics' carpenters were expected to be present at the BofA Job Site at 6:30 AM on the day Local 79 conducted its union activity.  Lapidus called DePetro because they were

supposed to be doing sheetrock and framing, and DePetro said that they arrived and left because of the presence of Local 79 agents.  Lapidus Dep. 49:1-51:14; Lapidus 1 (P106-P107).

161.    The protocol for a Building Trades local member arriving to work at a job site where a rat is present is to: (i) call their employer to inform them of the presence of the rat; (ii) go inside to work while the employer assesses the situation; (iii) meanwhile, the employer calls the union to inform them and a business agent is occasionally dispatched to the job site; (iv) the employer finds out whether to honor the picket line (simply by the presence of the rat) and informs the employee; and (v) if the employee is told to honor the picket line, the employee stops all work and leaves, but if the employee is told not to honor the picket line, the employee will continue working.  DePetro Dep. 28:11-29:23.

162.    It would be commonplace for an employee who is a member of another Building Trades local to speak with the business agent for the Building Trades local who is conducting the union activity.  It would also be common for the business agent to speak to the other Building Trades local's business agent to assess the situation.   Also, DePetro had previously been told by business agents to honor another Building Trades local's picket line whereby he would drop all of his tools and go outside of the job site to stand outside with the Building Trades' union agents until the dispute was resolved.  DePetro Dep. 29:24-30:14, 30:15-31:24.

163.    DePetro has no recollection – and did not expressly deny – that he honored any picket line or protest activity Local 79 conducted at the BofA Job Site by stopping all work and leaving the BofA Job Site.  DePetro Dep. 31:25-32:9.

164.    DePetro concedes that there have been instances where an incident like the one at the BofA Job Site occurs and Carpenters' members are asked to honor another union's picket line, it

would not be unusual for Carpenters not to cross a picket line at the BofA job site in which the Local 79 conducted union activity.  DePetro Dep. 44:2-46:1.

165.    When Lapidus spoke to DePetro, DePetro informed him that they cannot show up to the job site to perform work due to the presence of Local 79 agents outside.  Lapidus Dep. 51:8-52:5.

166.    In fact, DePetro informed Lapidus that he and his coworker were not allowed to cross the line and have been asked not to cross the line.  DePetro furthermore told Lapidus that he would return to perform work after everything was resolved.  Lapidus Dep. 52:6-54:12.

167.    Giovinazzi spoke to Michael Ceciliani (hereinafter "Ceciliani"), the owner of NYC Acoustics, regarding the BofA Job Site.  Ceciliani told Giovinazzi that his employees could not cross the picket line.  Giovinazzi Dep. 63:17-69:23; Giovinazzi 9 (P815-P816).

168.    Lapidus sent daily logs of events that occurred at the BofA Job Site.  Lapidus' daily log for April 25, 2013 – which he sent the following day – stated, among other things, "7am in front of building a rat was blown up and picketers were handing out flyers.  Local 79 representative George Zecca was on scene organizing this protest.  After about 45 minutes I was informed by domenic Flavoni that it was resolved and the rat was taken down and everyone left."  Lapidus Dep. 54:13-55:22; Lapidus 15 (P44-P45).

169.    Lapidus e-mailed Flavoni and Deliteris, among others, on the morning of April 25, 2013 regarding Local 79's conduct at the BofA Job Site.  His e-mail said, in part:

(i)    "This morning when I arrived at 95 wall street to work.  There were 3 guys handing out flyers and there was a very large inflatable rat blown up in a truck right in front of door on water street.  I got to the doors where the guys were standing at first they didn't move then after I said to them That I needed to enter they moved from the front of the doors and proceeded to hand out the flyers … At around 720am Mr. George Zecca from local 79 arrived on the scene[;]"

(ii)    "The contractors … were all here … I called nyc acoustics to ask what time they would come here … they told me that they were asked not to cross the line and to wait till it is resolved[;]"

(iii)    "George zecca said that a laborer had to be on site and that the rat would be up until the issue is resolved[;]" and

(iv)    "After speaking with bd on the phone and George zecca … the rat was taken down and they left the site … at 830 am."

Lapidus Dep. 58:12-65:19; Lapidus 1 (P106-P107).

170.    As a result of Local 79's union activity, the NYC Acoustics' employees stopped working and/or refused to work and left the BofA Job Site.  Lapidus Dep. 67:21-68:13, 71:1-4.

171.    At some point in time, Jeannie Choi (hereinafter "Choi") – a representative of BofA – contacted BD to discuss Local 79's conduct.  Specifically, Choi stated that BofA had been contacted by Local 79.  Giovinazzi Dep. 25:18-28:18.

172.    Christine Wilde (hereinafter "Wilde") is the Director of Project Management at CBRE at all relevant times.  Wilde Dep. 6:10-25.

173.    Howard Martin (hereinafter "Martin") was the Project Manager at CBRE for the BofA Job Site at all relevant times.  Wilde Dep. 16:13-25; Lapidus Dep. 25:2-14.

174.    Furthermore, Flavoni and/or Deliteris spoke with Martin to discuss Local 79's conduct. In no uncertain terms, CBRE requested that BD take care of this problem immediately.  Deliteris Dep. 82:24-84:25.

175.    Wilde learned from Martin that: (i) Local 79 had set up an inflatable rat with three men handing out fliers; (ii) Lapidus was blocked from entering the job site; and (iii) that NYC Acoustics informed BD that they were asked not to cross the line and to wait until the problem was resolved.  Wilde Dep. 22:16-25:16.

176.    Both CBRE and BofA have serious concerns about any union activity going on at their job sites because both CBRE and BofA are union-friendly companies and any union activity would give the impression that either company performs non-union work.  Moreover, any union

activity at a BofA site causes distress to the relationship between CBRE and BofA, which – in turn – causes distress to the relationship between CBRE and BD.  Wilde Dep. 21:13-23, 21:24-22:8, 58:18-59:2.

### *Pressured by Local 79, CBRE and BofA Insist on BD Hiring a Laborer*

177.    BD was forced to put a Local 79 laborer on the job site to have Local 79 cease its union activity as a result of Local 79's union activity directed at BofA.  Wilde Dep. 35:25-36:12; Giovinazzi Dep. 31:21-35:11; Giovinazzi 2 (P10); Giovinazzi 3 (P6).

178.    Flavoni spoke to Zecca and asked him what it would take to get the rat out of there, and – as a result – arranged for BD to have Riteway provide a laborer at the BofA Job Site in exchange for Local 79 to cease its union activity at the BofA Job Site.  Flavoni Dep. 60:10-61:4.

179.    Riteway is a carting and demolition company.  They performed carting services at the BofA job site.  After BD acquiesced to Local 79's demands to put a laborer on, Riteway was used as a paymaster for a Local 79 laborer, who started working on Monday the following week. Lapidus Dep. 77:6-78:14; Piecora Dep. 8:13-9:14, 12:19-13:8, 13:9-15:19.

180.    A paymaster is a company which is signatory to Local 79 which agrees to accept payment from a non-Local 79 contractor in order to pay for a laborer provided by Local 79. Piecora Dep. 12:22-13:8.

181.    Riteway is part of a collective bargaining agreement with Local 79 as an employer that is part of the Interior Demolition Contractors Association.  Piecora Dep. 49:14-53:6; Rodopoulos 1 (L79:126-129).

182.    On April 26, 2013, at 11:15 AM, a representative of BD sent Piecora (the Secretary of Riteway) e-mail correspondence recounting how Local 79 agents arrived at the BofA Job Site and conducted various union activity such as setting up an inflated rat, distributing fliers, and

picketing.  As a result of Local 79's conduct, BD agreed to put a laborer on the BofA job site with Riteway as a paymaster, in accordance with the agreement BD reached with Riteway, in order to have Local 79 cease its union activity.   On April 30, 2013 at 5:28 PM, Piecora responded to confirm the agreement between BD and Riteway.  Piecora understood that Riteway was being hired because Local 79 was picketing and protesting at the BofA job site and both BofA and CBRE wanted to avoid further activity by Local 79.   Piecora Dep. 6:25-7:24, 25:8-27:23; Riteway 1 (P48-P49).

### *Local 79's Threats and Conduct towards the CBRE and BofA Caused BD Harm*

183.   Every time Local 79 made a threat or conducted any union activity at BofA or CBRE, Flavoni and/or Deliteris spoke to Choi, Wilde, or Martin about it.  Flavoni Aff. ¶ 38.

184.   Choi, Wilde, Martin and other representatives of BofA and CBRE, respectively, referred all communications from Local 79 to Flavoni and/or Deliteris.  Flavoni Aff. ¶ 39.

185.   Choi, Wilde, Martin and other representatives of BofA and CBRE, respectively, wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity.  Flavoni Aff. ¶ 40.

186.   When Local 79 agents discussed the BofA Job Site or any threats or union activity directed at BofA and/or CBRE, Flavoni informed the Local 79 agents that he would relay their message to Choi, Wilde, Martin, and its representatives at BofA or CBRE, respectively.  Flavoni Aff. ¶ 41.

187.   Local 79's conduct jeopardized BD's status as an approved vendor of CBRE.  Wilde Dep. 59:3-8.

188.    As a result of Local 79's conduct, BofA became apprehensive about using BD on large high-profile projects and has recommended against using BD for particular projects.  Wilde Dep. 39:13-22, 60:9-61:4, 73:19-74:19, 82:14-18; CBRE3 (CBRE614-CBRE615).

189.    In fact, a BofA project in Brooklyn on Flatbush Avenue worth approximately two million dollars ($2,000,000.00), which was similar to the job performed by BD at the BofA Job Site, was considered to be a high profile job in which – though BD was the lowest bidder – a decision was made not to use BD at that job site due to concerns about Local 79's propensity for conducting union activity at BD's job sites.  Wilde Dep. 81:13-82:13, 82:19-83:4, 83:5-9.

190.    BD was also excluded from all bids by BofA and were not invited to bid on many other New York City projects worth over $500,000.00 due to BofA's recommendation and decision not to approve BD as a bidder for such jobs for nearly eighteen (18) months.  Wilde Dep. 83:10-23, 84:5-86:14, 88:2-5.

191.    BD was excluded from bids for this period time due to reputational risk to BofA and/or CBRE as a direct result of Local 79's conduct.  Wilde Dep. 88:13-23.

192.    Prior to Local 79's union activity at the BofA job site, BofA never requested that BD be removed from the approved list of general contractors.  Wilde Dep. 88:24-89:4.

193.    Local 79's conduct was coercive.  Wilde Dep. 72:9-16.

194.    Though Wilde knew that Local 79 demanded to put a laborer on the BofA job in order to cease its union activity, CBRE would not concern itself with the cost of a Local 79 laborer because it is BD's responsibility to keep union harmony under its agreement with CBRE.  Wilde Dep. 30:12-31:25; Riteway 1 (P48-P49).

195.    The union activity conducted by Local 79 at the BofA Job Site could have led to the termination of BD from the project.  Wilde Dep. 59:3-8.

196.    BD incurred damages as a result of Local 79's conduct.  Flavoni 7.

**The Mount Sinai Job at One Gustave L. Levy Place, New York, NY**

*__BD is Awarded the Emergency Room Observation Unit Job for Mt. Sinai__*

197.    On June 21, 2012, BD and The Mount Sinai Hospital (hereinafter "Mt. Sinai") entered into an agreement for general contractor services to renovate a twenty (20) bed observation unit at Mt. Sinai.  Chang 18 (MS-954 – MS-999).

198.    Mt. Sinai is located at One Gustave L. Levy Place, New York, NY on Madison Avenue between 98th and 102nd Streets (hereinafter the "Mt. Sinai Job Site").  Id.; Chang Dep. 20:5-15.

199.    Edward Chang (hereinafter "Chang") served as the Director of Facilities, Design and Construction at Mt. Sinai from 2012 through 2015.  Chang Dep. 7:18-8:6.

*__Local 79 Descends Upon Mt. Sinai__*

200.    There was a union issue at the Mt. Sinai Job Site.  In fact, he was contacted by Local 79 and informed that Mt. Sinai must use Local 79 to perform work under their jurisdiction.  Chang Dep. 13:21-16:3.

201.    Indeed, threats were made by Local 79 to conduct union activity at Mt. Sinai directly to representatives of Mt. Sinai, which were relayed to the President of Mt. Sinai.  Local 79 made good on its threat by engaging in union activity while BD was performing work at the Mt. Sinai Job Site, and Chang witnessed the union activity.  Chang Dep. 17:6-20, 19:7-12, 22:18-23:11, 24:9-25:19.

202.    Chang spoke with representatives of BD and informed them that Mt. Sinai needs the issue with Local 79 resolved because having the rat out is not a good thing for Mt. Sinai.  Chang Dep. 26:4-20.

203.     Giovinazzi similarly recalls that union activity was conducted by Local 79 at the Mt. Sinai Job Site.  Giovinazzi Dep. 42:9-45:5.

### *Local 79's Threats and Conduct towards Mt. Sinai Caused BD Harm*

204.     Every time Local 79 made a threat or conducted any union activity at Mt. Sinai, Flavoni and/or Deliteris spoke to Chang about it.  Flavoni Aff. ¶ 42.

205.     Chang and other representatives of Mt. Sinai referred all communications from Local 79 to Flavoni and/or Deliteris.  Flavoni Aff. ¶ 43.

206.     Chang and other representatives of Mt. Sinai wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity.  Flavoni Aff. ¶ 44.

207.     When Local 79 agents discussed the Mt. Sinai Job Site or any threats or union activity directed at Mt. Sinai, Flavoni informed the Local 79 agents that he would relay their message to Mt. Sinai and its representatives.  Flavoni Aff. ¶ 45.

208.     Local 79 threatened to picket the Mt. Sinai Job Site and – as a result – BD hired Linear Contracting to serve as a paymaster for Local 79 labor.  Flavoni Dep. 91:19-95:21.

209.     BD incurred damages as a result of Local 79's conduct.  Flavoni 7.

### The Brookdale Job at 1110 Pennsylvania Avenue, Brooklyn, NY

### *BD is Awarded the Brookdale Clinic Job*

210.     Brookdale is located at 1 Brookdale Plaza, Brooklyn, NY on Rockaway Parkway between Church Avenue and Avenue B.  Weigel Dep. 32:23-33:5; Weigel 5; Williamson Dep. 12:5-10.

211.    The Brookdale Job Site was located at 1110 Pennsylvania Avenue, between Cozine and Flatlands.  Weigel Dep. 15:3-7, 15:14-17; Weigel 5; Williamson Dep. 12:11-13; Capozza Dep. 13:21-23.

212.    Brookdale Hospital and the Brookdale Job Site are located about a mile-and-a-half away from each other.  Ferazzoli Dep. 17:13-18; Dugan Dep. 10:2-17.

213.    The scope of the work for the Brookdale Job Site was the building of a twelve (12) exam room clinic with a pharmacy, waiting areas, support space, registration, and reception.  Fast Dep. 14:24-15:5.

214.    Gerard Connolly (hereinafter "Connolly") was the Senior Vice President of Facility Planning and Development, and has held that position at all relevant times.  Connolly Dep. 7:8-15.

215.    Jay Fast (hereinafter "Fast") was the Director of Planning, Design, and Transition at Brookdale Hospital, has held that position at all relevant times, and reports to Connolly.  Fast Dep. 6:9-16, 8:23-24.

216.    William Dugan (hereinafter "Dugan") was the Vice President of Security at all relevant times. Dugan Dep. 6:18-24.

217.    Khari Edwards (hereinafter "Edwards") was the Vice President of External Affairs at Brookdale Hospital at all relevant times.  Edwards Dep. 6:17-7:8.

218.    Mark Toney (hereinafter "Toney") was the President and CEO of Brookdale Hospital at all relevant times.  Fast Dep. 51:17-23; Edwards Dep. 7:12-20.

219.    BD performed construction work at the Brookdale Job Site.  Weigel Dep. 14:2-8.

220.    Robert Weigel (hereinafter "Weigel") is an employee of BD who served as a superintendent at all relevant times, and became the superintendent for the Brookdale Job Site in the Spring of 2014, approximately a month before work started at the Brookdale Job Site. Weigel Dep. 15:23-16:4, 18:21-25.

221.    Nicola Capozza (hereinafter "Capozza") served as the project manager for the Brookdale Job Site.  Weigel Dep. 17:19-21.

222.    Labate first learned of BD by finding the Brookdale Job Site.  Labate Dep. 47:19-51:12.

223.    A business agent from Local 79 once visited the Brookdale Job Site approximately a month after construction commenced.  Weigel Dep. 21:15-22, 22:6-12.

224.    Deliteris spoke with the business agent from Local 79 – who Weigel later understood to be Labate – and left after speaking to Deliteris.  Weigel Dep. 23:12-14, 24:18-21, 26:16-24, 66:16-24, 66:25-67:24.

225.    Business agents continued to appear at the Brookdale Job Site.  Weigel Dep. 24:25-25:4.

226.    Weigel kept a daily log of operations on job sites at the Brookdale Job Site.  Weigel Dep. 118:5-119:23; Weigel 8 (P733).

***Local 79 Descends Upon Brookdale Hospital***

227.    Weigel's log for April 24, 2014 states, in relevant part: "Rep from Local [79] came into our meeting.  Talked with Jimie re this job.  We told him we are with Local 621.      He said they don't recognize that union.  Him and Jimie walked out to parking lot and he left."  Weigel Dep. 124:1-24; Weigel 8 (P608).

228.    Williamson is an organizer for Local 79.  Williamson Dep. 87:8-9.

229.    Williamson called representatives of Brookdale Hospital three (3) times claiming the work by stating that Local 79 has no representation on the Brookdale Job Site.  Williamson Dep. 14:17-15:20, 24:13-25:2.

230.    Every non-Local 79 contractor does not treat their employees with dignity and respect, while every Local 79 contractor does.  However, Williamson also did not do any research on BD as to whether BD's employees are treated the same as Local 79's members, basing his conclusions on "the past" and "historically speaking."  Williamson Dep. 19:14-25, 21:2-20.

231.    Williamson called Brookdale Hospital with the objective of having Brookdale Hospital use a Local 79 contractor and in order to have BD removed from the Brookdale Job Site.  Williamson Dep. 23:15-17, 28:9-19.

232.    Williamson concedes that when he was contacting representatives of Brookdale Hospital, he was not trying to inform the public about what Brookdale Hospital was doing.  Williamson Dep.  26:13-21, 26:22-28:8.

233.    Williamson organized a picket line at Brookdale Hospital on six (6) different days: May 12, 13, 16, 19, 20, and 21, 2014.   Williamson Dep. 32:22-34:22, 68:21-70:24, 71:6-7; Williamson 5 (L79:117-122).

234.    On May 12, 2014, at 10:52 AM, Toney said to Connolly and others that he thought the dispute between BD and Local 79 was resolved already and understood that this dispute was one union against another.  On the same day at 11:17 AM, Connolly wrote to Fast stating "[t]hey have to rescue this now[,]" referring to BD, and meaning that BD has to resolve the issue.  Fast Dep. 38:20-39:21; Brookdale 1 (BROOK2).

235.    Fast understood that Local 79's dispute was with another union – Local 621, BD's union.  Fast Dep. 39:22-40:10; Brookdale 1 (BROOK2).

236.    On May 12, 2014, at 11:17 AM, Connolly inquired of Deliteris whether the rat would still be placed at Brookdale Hospital the following morning because he was concerned about its continuing presence at the hospital.  Connolly Dep. 53:15-54:15; Brookdale 1 (BROOK7).

237.    Minutes later, at 11:21 AM, Connolly inquired of Flavoni and Deliteris again, stating that he needs a report "stat for what is the status and strategy" and that this is "for the CEO and [the] people at [the Department of Health, which provide Brookdale Hospital with funding]"  Connolly Dep. 54:16-57:24; Brookdale 3 (BROOK9).

238.    On May 12, 2014 at 11:42 AM, Margaret Brubaker (hereinafter "Brubaker") – the Senior Vice President of Human Resources at Brookdale Hospital – e-mailed many Brookdale representatives on behalf of Connolly to advise that Local 79 is conducting union activity at Brookdale Hospital and explained that there is a dispute because Local 79 wants the entire project at the Brookdale Job Site.  Brookdale provided explanations to representatives of various unions that deal with Brookdale about Local 79's conduct.  Fast's understood that Local 79 wanted all of the "laborers' work."  Fast Dep. 40:11-41:22; Brookdale 1 (BROOK5).

239.    The following day, at 1:40 PM, Flavoni called Labate back to inquire on the status of taking the rat down.  Labate said that he had trouble reaching the organizing director, but he reached out to the organizer himself.  Describing this, Labate told Flavoni: "I said, you know, finish up early … the rat area.  And they're not going to put it up tomorrow[.]"  Flavoni and Labate then agreed to meet the following day.  5132014 14003 PM.m4a; Flavoni Aff. ¶¶ 22, 33.

240.    Brookdale Hospital representatives did not choose the subcontractors for the Brookdale Job Site; representatives of BD did, as the general contractor.  Fast. Dep. 18:11-14.

241.    BD was performing the work at the Brookdale job site using workers from Local 621. Brookdale was contemplating using Local 79 laborers, even though it was going to cost more, in order to avoid any further union issues with Local 79.  Fast Dep. 56:16-17, 56:21-57:4.

242.    On May 12, 2014, BD signed an agreement with AMG Environmental Restoration LLC (hereinafter "AMG") to perform demolition work to appease Local 79.  Flavoni 4 (P844-P867).

243.    AMG is a demolition contractor which is signatory to Local 79.  Weigel Dep. 30:10-14.

244.    On the following day, May 13, 2014, at 8:02 AM, Connolly wrote to Flavoni and Deliteris to inform them that Local 79 came back with the rat again.  Connolly testified that: (i) both the rat and Local 79 agents were outside of the hospital standing around the rat and handing out fliers; (ii) the purpose of his e-mail was to get BD to take action to remove the rat; (iii) that he believed Local 79 placed the rat up in order to coerce Brookdale into using Local 79 labor; (iv) if Local 79 did not conduct any union activity, there would be no need to have a conversation with BD about hiring Local 79 laborers at the Brookdale clinic job site; (v) Brookdale did not like having a rat outside the front entrance of the hospital, nor did Brookdale like having individuals passing out fliers in front of the hospital.  Connolly Dep. 62:18-65:23; Brookdale 5 (BROOK16).

245.    Connolly understood that Local 79 claimed the work at the Brookdale Job Site for themselves and that "they wanted whatever 'everything' meant."  Connolly Dep. 65:24-66:16.

246.    On May 13, 2014, at approximately 10:25 AM, Flavoni and Labate had a telephone conversation regarding Local 79's union activity.  Flavoni insisted to have the rat taken down the very same day, but Labate declined.  Flavoni inquired about what the problem was, and Labate answered: "I [would] like to claim [my] jurisdictional work;" "I'm trying to get some general conditions work, you know, that's what I'm trying to do."  During the call, Labate repeatedly

intimated that he had spoken to Connolly. Though Labate told Flavoni he does not control the rat, he later said: "Tell you what I'll do. It's 11 o'clock. Why don't I do this: Tomorrow there'll be no rats in front of the hospital 'til we have a conversation. How about that? Fair enough?" 5132014 102550 AM.m4a; Flavoni Aff. ¶¶ 21, 33.

247.    On May 13, 2014 at 10:39 AM, Connolly wrote to Flavoni (with copies to Deliteris and Fast) that Local 79's conduct is becoming problematic for Brookdale. Fast knew that Local 79 was looking for all of the laborers' work, and that Local 79 was putting pressure on Brookdale Hospital to give Local 79 laborers' work by putting the rat out and by passing out fliers. Fast Dep. 41:23-45:9; Brookdale 6 (BROOK18).

248.    On Tuesday, May 13, 2014, at 11:01 AM, in response to an e-mail from Connolly at 10:39 AM stating that "Labate needs to get this down" and that Local 79's union activity "is becoming problematic[,]" Flavoni responded to inform Connolly that Labate clearly stated what he is looking for, which was "all of the general conditions" (which is, generally, a laborer or laborers who clean up after the trades). Connolly Dep. 67:22-71:13.

249.    Connolly asked Flavoni to find out what Local 79 wants at the direct request of Toney. In effect, Connolly wanted BD to reach out to Local 79 at Brookdale's behest to find out what Local 79 wanted in order to end Local 79's union activity. The rat and the fliers being handed out in front of Brookdale Hospital was a very difficult message for Brookdale to handle, which was why Connolly told Flavoni that "this is becoming problematic." Connolly specifically said that Local 79's union activity had to go away. Id.

250.    On May 14, 2014, at 11:14 AM, Flavoni called Labate to schedule a meeting as a result of Brookdale Hospital's urging. They agreed to meet at the Brookdale Job Site at 1:00 PM. 5142014 111405 AM.m4a; Flavoni Aff. ¶¶ 23, 33.

251.    The same day, at 12:47 PM, Flavoni and Labate meet.  Labate told Flavoni that Local 79 is entitled to do the work at the Brookdale Job Site because it is a hospital.  Though Labate concedes that there is no contract between Brookdale and Local 79, Labate cited the union harmony clause.  Flavoni inquired about BD's desire to use its own men under Local 621 and Labate said that "it's going to be an issue, unless you want to sign with me …"  Labate explained that when he is not getting anywhere (in terms of having Local 79 laborers hired or signing up a contractor), he informs his boss and his boss instructs him to "put a line up."  Labate further explained that the rat was placed up because no one returned his call.  Flavoni asked and Labate confirmed that the only reason the rat is down now is because Flavoni has agreed to meet and talk to Labate.  When Flavoni asked how he can avoid being targeted by Local 79 with the rat, Labate explained that since he cannot sign with Local 79, the "only way to suffice" for BD is to hire a laborer through a paymaster agreement, which Labate explained was a contract signed with the local that carries the payroll for a contractor.  Labate also explained that the Local 79 laborer cannot work alongside a non-Local 79 laborer.  When Flavoni asked what other options he has, Labate responded "You should have signed with me, not 621," and, referring to Local 79, said "Hey listen, it's a force."  Labate commiserated with Flavoni and said "if I was in your position, I don't know what I would do."  He reiterated: "you asked me what's the resolution. The resolution is either sign … or we figure out a paymaster situation …"  <u>5142014 124711 PM.m4a; Flavoni Aff. ¶ 24, 33.</u>

252.    On May 15, 2014, at 2:59 PM, Labate called Flavoni and spoke to him together with Deliteris on the phone.  When Flavoni informed Labate that they will not "bow down" to Local 79, Labate responded that he knows about the Old Navy job at Kings Plaza (hereinafter the "Old Navy Job" or "Old Navy") and that Local 79 and BD will – in effect – bump heads.  Labate

declined to inform his boss that BD is a union shop under Local 621 and should be left alone; rather, Labate threatened that his organizing department "does those picket lines" and explained that it does not matter whether BD is union or non-union because he is "claiming the jurisdictional work." 5152014 25938 PM.m4a; Flavoni Aff. ¶¶ 25, 33.

253.    On Thursday, May 15, 2014, at 3:28 PM, Flavoni informed Connolly that BD and Local 79 could not come to terms.  Flavoni attempted to work something out with Local 79 upon Connolly's directive.  Connolly understood that Local 79 wanted its men on the job, and that if BD did not acquiesce to Local 79's demands, Local 79 would continue to conduct its union activity outside of Brookdale Hospital.  Connolly Dep. 72:22-75:4; Brookdale 9 (BROOK43).

254.    If Connolly he had to "step in" and "end this[,]" he would have instructed BD to hire the laborers Local 79 demanded to have on the Brookdale Job Site.  Connolly did not want to – nor could afford to – hire Local 79 laborers, but would find a way to do so to end Local 79's union activity.  Connolly Dep. 82:24-84:22; Brookdale 16 (BROOK69-BROOK70).

255.    On May 19, 2014, Weigel visited Brookdale Hospital and took video footage of Local 79's union activity as he walked towards the rat and inquired of the Local 79 agents what they were picketing.  The Local 79 agents did not deny that they were picketing the Hospital.  The rat was across the street from the main entrance of Brookdale Hospital.  Approximately six (6) Local 79 agents were standing around the rat and handing out fliers.  Weigel Dep. 57:6-10, 41:16-19, 42:6-8, 32:35-36:4, 42:9-24, 41:20-42:2, 57:16-25, 49:22-50:4, 60:10-23, 58:2-11, 50:20-51:2; Video.MOV; Weigel 3 (P277-P278) ; Weigel Aff. ¶¶ 4-5, 9.

256.    In response to an e-mail from Flavoni to Connolly dated May 20, 2014 at 7:03 AM asking whether the rat has returned, Connolly responded at 7:20 AM the same day and stated "Yes It is becoming a challenge[.]"  When Flavoni replied at 7:22 AM to provide an update that

BD expects to apprise Connolly of further developments at noon (only about four hours later), Connolly responded at 7:33 AM that he is "[n]ot sure [they] can hold off the chaos in the [executive] suite."  Additionally, Connolly forwarded the aforementioned correspondence to Fast stating that: "[Toney] was apoplectic yesterday.  He actually went to the demonstrators to tell them to leave ... I will not be able to hold [Toney] off. He wants to call a press conference and call [Local 79] out."  Toney was very angry and wanted the rat to go away, which put pressure on Connolly and Fast to resolve the issue.  Fast Dep. 50:13-55:23; Brookdale 12 (BROOK63-BROOK64).

257.    When Connolly wrote that "[i]t is becoming a challenge[,]" Connolly was referring to the fact that it was a challenge to make the rat go away (as well as the fliers), and that Brookdale wanted to eliminate all Local 79 union activity at Brookdale.  Fast Dep. 57:5-17; Brookdale 12 (BROOK63-BROOK64).

258.    On May 20, 2014, at 8:16 AM, Connolly wrote to Toney to advise him that he believes Brookdale should wait before acting, and that failing other efforts to have Local 79 cease and desist from its conduct, Connolly would step in late this afternoon and "end this[.]"  At 8:35 AM, Toney e-mailed Connolly to ask whether the rat was on site.  In response, Connolly forwarded Deliteris' update on the status of a proceeding instituted against Local 79 before the National Labor Relations Board (hereinafter "NLRB") (stating that there should be a decision by noon that day) to Toney and stated that he believes that they should wait for the decision and that he would end this issue if there is no decision by noon.  Connolly further remarked in a forwarded e-mail at 8:50 AM to Fast, Flavoni, and Deliteris that he is afraid this will be a difficult day. Connolly said this because the rat was up again and Toney was very angry about it.  Fast Dep. 60:9-63:10, 90:492:9; Brookdale 18 (BROOK76-BROOK80), Brookdale 20 (BROOK89).

259.    Connolly forwarded the e-mail to Flavoni and Deliteris because Local 79 resumed its union activity at Brookdale after it previously ceased its union activity, and wanted to inform them about it so that they can resume discussions about how to resolve this problem.  The flier damaged the reputation of Brookdale, and thought that the leaflet implied that Brookdale's medical practices are unsafe.  Connolly testified that he believed handing out this flier would create the perception that Brookdale was not providing quality health care.  Connolly Dep. 90:4-92:9; Brookdale 20 (BROOK89).

260.    While Connolly was unsure whether the flier would persuade individuals not to utilize Brookdale in seeking medical attention, Connolly was adamant that the flier could and would create anxiety amongst patrons of Brookdale because the flier and Local 79's dispute with BD and Local 621 "is the last thing they need to be dealing with." Connolly Dep. 92:10-93:8.

261.    Dugan was notified that the rat was placed in close proximity to Brookdale Hospital. Dugan Dep. 33:22-34:16.

262.    Dugan contacted the police to notify them of Local 79's conduct because he had safety concerns regarding the rat's placement.  Dugan Dep. 24:17-26:21, 27:14-21, 31:12-22.

263.    Williamson admits that he knew that BD is represented by Local 621.  Williamson Dep. 37:11-23.

264.    Williamson's goal of conducting his campaign was to get Brookdale to sit down with a business agent of Local 79. [cite] ("my job is to get [Brookdale] to meet with [Local 79] … That's my objective.  My objective is to bring Brookdale … to the table to resolve the situation").  Williamson Dep. 38:9-23, 41:19-42:6.

265.   Even if BD offered its employees exactly what Local 79 offered to its members, Williamson would still be out there conducting union activity against Brookdale Hospital for using a non-Local 79 contractor.  Williamson Dep. 42:15-43:14.

266.   Local 79's jurisdiction covers the five (5) boroughs of New York City, and that his department's goal is to increase Local 79's market share.  Williamson Dep. 48:3-5, 49:20-50:5.

267.   Every job action Williamson takes is to further the goal of the Local 79's Market Development Department.  Williamson Dep. 52:25-53:6.

268.   If someone asked him what to do when they see a rat, Williamson testified that: (i) he would ask them to acknowledge the problem and stay in solidarity with whatever the issue was; (ii) good members know what to do; and (iii) standing in solidarity could mean all sorts of things.  Williamson Dep. 73:18-79:2.

269.   On May 21, 2014, at 7:43 AM, Connolly wrote to Flavoni and Deliteris that he believes it is in everyone's best interest to resolve this quickly, and mentioned that the rat is at Brookdale today.  At 9:07 AM, Connolly followed up and wrote that there is a new flier with Toney's name on it, which Toney would not look at kindly.  He ended his correspondence by stating that he cannot stress how important resolution is today.    Fast Dep. 57:18-60:3; Brookdale 14 (BROOK58).

270.   On May 21, 2014, Weigel noted in his log that a Local 79 laborer will be at the Brookdale Job Site after demolition is over.  Weigel Dep. 136:19-139:25; Weigel 10 (P610).

271.   Connolly saw the flier.  Connolly Dep. 33:3-36:11; Brookdale 2 (BROOK4).

272.   Connolly was less upset about the fact that his name was on the flier than the fact that Local 79 decided to engage another union in a public debate outside the front door of a hospital regarding a job that is a mile-and-a-half away, and the many people that walk in through the

front door of the hospital are not having a good day as it is, and that being accosted by Local 79 - even with a smile - without being told what the real problem is (that Local 79 wants the work that another union obtained) was problematic for Connolly.  Connolly Dep. 36:12-37:21.

273.    Connolly understood that Local 79 wanted its members to perform the work, and did not want a different union's members performing the work.  Local 79 engaged in this union activity in order to get representation on the Brookdale clinic job.  Connolly Dep. 37:23-38:21.

274.    When Connolly discussed Local 79's union activity with representatives of BD, the conversation would be about how to get Local 79 to cease conducting union activity.  Connolly wanted and insisted that BD acquiesce to Local 79's demands in order to get Local 79 to cease conducting its union activity at Brookdale Hospital.  This is despite the fact that Connolly learned that adding a Local 79 laborer on is a complicated process with paymasters.  Connolly Dep. 38:22-40:15.

275.    Connolly was as upset about the rat Local 79 placed at the hospital as Toney was, especially about the fact that the Brookdale clinic job site was a mile-and-a-half away. Personally, Connolly was more upset about fliers being handed out to people visiting the hospital.  Connolly Dep. 44:2-45:3.

276.    Local 79's union activity caused Brookdale to put pressure on BD to resolve the dispute by doing whatever needs to be done, because Local 79's union activity placed pressure on Brookdale.  Connolly Dep. 45:4-48:25.

277.    Connolly explained to Toney that Local 79's union activity arises out of a dispute between Local 79 and Local 621 where Local 79 did not approve of Local 621.  Connolly Dep. 49:2-15.

278.    Any additional costs incurred on the project would have to be assumed by BD because Brookdale did not permit BD to spend whatever money they wanted on the Brookdale clinic job site.  Costs not specifically approved by Brookdale – especially those costs which would cause Brookdale to go over its budget – were not going to be paid by Brookdale.  Connolly Dep. 49:16-53:14.

279.    On May 27, 2014, BD signed an agreement with AMG for AMG to serve as paymaster for a Local 79 laborer.  Flavoni 5 (P832-P843).

280.    The Brookdale Job Site was later shut down for a few months due to a structural slab issue.  Capozza Dep. 48:8-50:2.

281.    On August 13, 2014, Smith and Flavoni spoke on the phone where Smith stated that he is the area business agent for Local 79, he just inherited Brooklyn, and that Labate was the area business agent for Brooklyn but he left for Manhattan.  8132014 93846 AM.m4a; Flavoni Aff. ¶ 28, 33.

282.    Smith found the Brookdale Job Site by canvassing the area when he took over the Brooklyn area and that he did not speak to Labate about the Brookdale Job Site beforehand.  Smith Dep. 50:25-51:9, 54:25-55:6, 62:21-64:4.

283.    On October 8, 2014, Smith contacted Connolly and left a message with a secretary for him.  Smith's message was that Local 79 has no representation at the Brookdale Job Site.  Smith Dep. 57:10-15, 58:10-59:16; Smith 2 (P569).

284.    On the same day, Flavoni contacted Smith as a result of Smith's contacting Connolly.  Smith asked Flavoni whether AMG will continue to serve as the paymaster for general conditions work now that demolition work is completed.  Flavoni responded that he was not planning on it.  Smith said that AMG is obligated to stay on the job for the general conditions

work.  When Flavoni informed Smith that he is not interested in doing that, Smith said "All right, Domenico, I'm trying to make sure we don't have a problem here …"  Flavoni asked Smith about what happens to his employees covered under a CBA with Local 621.  Smith responded that they are not connected with the Building Trades and that Local 621 men are irrelevant because they are not signatory with Local 79.  1082014 32430 PM.m4a; Flavoni Aff. ¶¶ 29, 33.

285.    In a follow up conference the same day at 3:38 PM, Smith called Flavoni back to inquire about whether there is a chance that BD's union – Local 621 – has a reciprocal with Local 79. Smith reiterated that BD should be signed with Local 79, which Flavoni declined because he already has a contract with Local 621.  When Smith asked whether he can have Local 79 laborers at the Brookdale Job Site, Flavoni declined.  Smith said he will call him back.  1082014 33829 PM.m4a; Flavoni Aff. ¶¶ 30, 33.

286.    The next time Smith called Brookdale Hospital directly, he spoke to Connolly, introduced himself, and inquired about the Brookdale Job Site, to which Connolly responded that he thought this issue was resolved already.  Smith Dep. 60:2-13, 66:18-68:4.

287.    On October 15, 2014, at 10:19 AM, Smith called Flavoni and demanded again to have Local 79 laborers at the Brookdale Job Site.  When Flavoni declined, Smith responded that he spoke with Connolly.  Flavoni explained that if he brings Local 79 laborers on, he will have a problem with Local 621.  Smith responded that the problem is Local 621 has no reciprocal and that this is basically a "spit in our face" because Local 621 is doing Local 79's "jurisdictional work."  When Flavoni asked for an explanation, Smith responded that the union BD's employees are covered by is not a Building Trades local.  Flavoni explained that there is no law requiring him to use Local 79 laborers.  In response, Smith stated that "this is where we have the right to organize, you understand?"  Flavoni continued to ask for how he is supposed to deal with Local

621, and Smith responded that BD can sign with Local 79.  Smith also said, grimly, that "if you're going to be in the city, in the five boroughs, you're going to come across this again." Smith further explained that though Local 621 is signatory to BD, they are not recognized. Flavoni offered Smith a portion of the work and Smith requested whether he can get back to Flavoni with an answer.  10152014 101905 AM.m4a; Flavoni Aff. ¶¶ 31, 33.

288.   On October 17, 2014, at 11:36 AM, Smith called Flavoni to confirm that Flavoni received a message Smith left for Flavoni the other day.  Flavoni confirmed receipt of the message and recounted that the message left was along the lines of "[the] deal is off the table, not acceptable" or something along those lines.  Smith confirmed this and stated that if Local 79 has to fight "tooth and nail," they will, meaning Local 79 will go as far as they have to – generally speaking – but would still like to resolve it and offered BD to become signatory to Local 79 again, which Flavoni promptly rejected.  Flavoni expressed his disdain for Local 79 because of the way they threaten and work against BD, but stated that he would speak to his client about a potential resolution.  Smith responded that he had been in contact with Connolly and remains in contact with him.  Smith Dep. 246:23-251:9; Smith 3 (10172014 113652 AM.m4a; Flavoni Aff. ¶¶ 32-33).

289.   On October 21, 2014, at 8:17 AM, Brubaker told various Brookdale representatives that the rat is back and provided a summary of what the leaflet Local 79 is handing out states. Connolly forwarded this e-mail to Fast, Flavoni, and Deliteris at 8:50 AM the same day.  Fast Dep. 63:11-25; Brookdale 20 (BROOK89).

290.   On October 21, 2014 at 12:34 PM, Deliteris sent Connolly an e-mail outlining the history of what transpired with respect to the Brookdale clinic job site and Local 79's activity.  Local 79's conduct prior to the structural issue at the job site resulted in two (2) Local 79 laborers

being brought on to perform work at the Brookdale Job Site.  After work resumed there, Local 79 pushed for more work and – despite being offered a portion of the work – Local 79 rejected this and said that they would fight BD "tooth and nail."   Fast Dep. 69:8-72:21; Brookdale 22 (BROOK92).

291.    In response to the e-mail from Deliteris, Connolly responded to say – among other things – "just keep pushing[.]"  Connolly asked Deliteris that BD work on getting the job done because, if there is no more construction, there can no longer be any dispute.   Connolly recalls conversations with Flavoni and Deliteris about BD giving Local 79 the work they wanted and coming to some sort of compromise at Brookdale's behest because Connolly wanted to resolve the issue.  In Deliteris' summary, he relayed Smith's message that Local 79 was going to fight BD "tooth and nail" unless BD puts Local 79 laborers on the job site.  Connolly testified that he understood the "tooth and nail" comment as a broader fight across Brooklyn and other jobs going on, i.e., a "full-out turf war, they were not going to give an inch."   Commenting on Connolly's response to that e-mail at 12:57 PM later that day, Connolly was concerned and wanted to finish the project.   Connolly was concerned because he thought Local 79 would resume its union activity with the rat and the fliers, and - in addition - that Local 79 would picket Brookdale Hospital.  Connolly Dep. 93:11-105:10; Brookdale 22 (BROOK92).

292.    Weigel visited Brookdale Hospital a second time on October 21, 2014.  This time, he drove by and took videos of the rat and Local 79 agents picketing around the rat.  The rat was across the street from the main entrance of the hospital. Weigel Dep. 59:12-24, 34:14-17, 35:2-4, 36:24-37:2,   35:25-36:4,   37:3-17,   39:2-40:15,   42:25-43:9,   57:11-15;   IMG_0758.mov; IMG_0759.mov; IMG_0760.mov;[3] Weigel 4 (L79:9-10); Weigel Aff. ¶¶ 7-9.

---

[3] The reference to a file ending with ".mov" refers to a video.

293.    Connolly reiterated twice on November 11, 2014 that Brookdale wants to complete work at the Brookdale Job Site as soon as possible to end Local 79's union activities there.  Connolly Dep. 108:25-110:4; Brookdale 32 (BROOK124).

294.    On November 11, 2014, at 12:20 PM, Connolly forwarded Flavoni, Deliteris, and Fast correspondence from Edwards in which Edwards stated that he was at a political conference and Brookdale was the topic of some conversation.  Additionally, Edwards characterized Local 79's union activity as a "public relations nightmare," which Connolly agreed with Edwards' assessment.  Connolly Dep. 110:5-112:13; Brookdale 33 (BROOK126-127).

295.    On November 14, 2014, at 5:15 PM, Flavoni sent Connolly a list of options for dealing with both the Carpenters' and Local 79's union activity.  The options included: (i) continue as-is and endure the union activity; (ii) direct BD to hire the Building Trades locals members in addition to the current work force; (iii) direct BD to replace its workforce with Building Trades locals' members; or (iv) replace BD all together.  Connolly inquired about having BD and the Building Trades locals work together in an effort to cease all union activity at Brookdale.  One way or another, Connolly's objective was to avoid any union activity at the hospital and remain within budget for the project, two priorities that Connolly must balance.  Connolly would be willing to pay money within their budget to avoid union activity at Brookdale.  Connolly Dep. 118:3-121:4; Brookdale 37 (BROOK165-BROOK168).

296.    Local 79 picketed Brookdale Hospital on October 21, 27, 28, 29, 30, 31 and November 3, 4, 5, 6, 10, 11, 12, 13, 14, 18, 19, 20, 21.  L79:155-179.

297.    During his deposition, Smith conceded that if Local 79 laborers are to perform work at the Brookdale Job Site, Local 621 members would necessarily not be performing that work. Smith Dep. 191:19-192:2.

298.    Smith's job with a contractor like BD is to try and get BD to use Local 79 men if BD is performing covered work under Local 79's CBA.  Smith Dep. 18:19-24.

299.    According to Smith, the work being done was Local 79 work, and that Smith was claiming this work for Local 79.  Smith Dep. 194:22-195:9.

300.    Ferazzoli recalls that Local 79 agents issued leaflets to people as they picketed Brookdale Hospital.  Ferazzoli Dep. 60:9-13.

301.    Toney was extremely upset by the presence of the rat and was angry because it was becoming a problem for the hospital.  Toney did not want the embarrassment of the rat in front of Brookdale Hospital.  Edwards Dep. 28:18-29:19, 52:10-53:11.

302.    Toney was bothered by the rat because it was harming Brookdale Hospital's brand and standing within the community.  Edwards Dep. 54:16-55:18.

303.    Fast understood that Local 79 conducted its union activities because Brookdale was not using Local 79 laborers, and Local 79 was trying to put pressure on Brookdale to change contractors.  Fast Dep. 26:19-27:6, 27:8-11.

304.    In Fast's view, Local 79 was attempting to harass and upset Brookdale by issuing leaflets in which it stated that Brookdale was allowing BD to exploit construction workers at the clinic job site, may result workers being exposed to unsafe work conditions which can lead to the workers becoming patients at Brookdale, and that Local 79 hopes Brookdale does not have the same theory for their medical practices because the statements made within the flier were not true.  Fast Dep. 64:22-65:10; Brookdale 20  (BROOK89); Brookdale 2 (BROOK4).

305.    Fast had concerns about the fact that Local 79's union activity would cause issues with other unions involved with Brookdale Hospital.    Fast  Dep.  65:11-66:10;  Brookdale  1 (BROOK5).

306.    Fast expected Local 79 to cease their union activity if they hired Local 79 laborers to perform work at the Brookdale Job Site.  Fast Dep. 72:2-21; Brookdale 22 (BROOK92).

307.    Local 79's placement of the rat outside of Brookdale Hospital caused Fast concern in that it gave the impression that Brookdale was doing something wrong and because Brookdale has union contractions with 1199 and another union.  Fast Dep. 27:12-28:18.

308.    Fast informed Connolly when he observed the rat and the Local 79 agents picketing outside, and they discussed their concerns regarding same.  Fast Dep. 28:19-29:2.

309.    Fast also had concerns with respect to delays that the Brookdale Job Site might incur as a result of Local 79's union activities, as Brookdale Hospital had certain deadlines they wanted to meet, and labor disagreements would hold up the project.  Fast Dep. 30:10-18, 31:17-23.

310.    Though Fast did not  have any conversations with any member of Local 79, business agents and organizers of Local 79 communicated with Fast and other representatives of Brookdale through Flavoni and Deliteris.  Additionally, Local 79 agents reached out directly to Connolly.  Fast Dep. 110:18-111:14; Brookdale 28 (BROOK106).

311.    In Fast's view, the motive behind Local 79's actions was to have Local 79 workers perform some or all of the labor work on the Brookdale Job Site.  Fast Dep. 32:21-34:8.

312.    If Local 79 did not conduct any union activity, Brookdale Hospital would not have requested that BD hire a Local 79 laborer.  Fast Dep. 75:13-76:2.

313.    Brookdale Hospital was so concerned about Local 79's conduct (for which it recognized it could not do anything about), that it hired an outside public relations firm to prepare a statement addressing the union activity.  Edwards Dep. 75:20-78:7.

314.    Edwards had concerns about Local 79's union activity because of 1199's heavy presence at Brookdale Hospital and the risk that 1199 could become sympathetic to Local 79's union activity and supporting Local 79 to Brookdale Hospital's detriment.  Edwards Dep. 84:12-85:5.

315.    Edwards was under pressure to get the rat down by any means possible.  Edwards Dep. 26:13-27:9.

316.    To Connolly's knowledge, Brookdale has no contract with Local 79.  Connolly Dep. 150:21-151:2.

317.    Connolly does not recall any conversation with Smith and that Local 79 wanted its members to perform the work at Brookdale to the exclusion of everyone else.  Connolly Dep. 141:6-143:22.

318.    Connolly confirmed that – based on Connolly's conversation with Smith – he understood that the rat and the fliers would go away if Local 79 members were placed on the job.  Connolly Dep. 177:9-17.

***Local 79's Threats and Conduct towards Brookdale Hospital Caused BD Harm***

319.    Every time Local 79 made a threat or conducted any union activity at Brookdale Hospital, Flavoni and/or Deliteris spoke to Connolly and/or Fast about it.  Flavoni Aff. ¶ 46.

320.    Connolly, Fast, and other representatives of Brookdale referred all communications from Local 79 to Flavoni and/or Deliteris.  Connolly Dep. 160:3-16; Flavoni Aff. ¶  47.

321.    Connolly, Fast, and other representatives of Brookdale wanted to be informed of everything Local 79 told Flavoni and/or Deliteris with respect to their threats and union activity.  Flavoni Aff. ¶ 48; Brookdale 3 (BROOK9).

322.     When Local 79 agents discussed the Brookdale Job Site or any threats or union activity directed at Brookdale Hospital, Flavoni informed the Local 79 agents that he would relay their message to Brookdale Hospital.  Flavoni Aff. ¶ 49.

323.     BD ultimately hired Local 79 laborers as a result of Local 79's conduct, and this resulted in an increase to the cost of the Brookdale Job Site.  Fast Dep. 35:24-36:5.

324.     As a result of the Brookdale Hospital union activity conducted by Local 79, which pressured Brookdale Hospital, BD acquiesced to Local 79's demands by hiring a Local 79 laborer in exchange for Local 79's cessation of union activity at the Brookdale Job Site. Williamson Dep. 56:4-57:19.

325.     BD incurred damages as a result of Local 79's conduct.  Additionally, BD was not considered for at least one (1) other project and Brookdale considers the fact that Local 79 may interfere with BD's performance on a project as a negative factor in deciding whether to award BD any future work.  Fast Dep. 89:21-97:23, 114:24-115:11; Flavoni 7; Brookdale 22 (BROOK92).

### *Local 79 Does Not Have A Contract With Any of the Secondary Neutral Employers*

326.     BofA is not signatory to any contract with Local 79.  Lee Dep. 84:21-85:23.

327.     CBRE is not signatory to any contract with Local 79.  Lee Dep. 84:21-85:23.

328.     Mount Sinai is not signatory to any union in the construction industry.  Chang Dep. 10:5-9; Lee Dep. 84:21-85:23.

329.     Brookdale is not signatory to any contract with Local 79.  Lee Dep. 84:21-85:23.

330.     The Gap is not signatory to any union contracts with Local 79.  Ciuzio Dep. 20:6-9.

331.     Macerich is not signatory to any union contracts with Local 79.  Lee Dep. 84:21-85:23.

**_BD is Highly Regarded by its Clients_**

332.    Wilde from CBRE rates BD as excellent as a contractor.  Wilde Dep. 57:3-5.

333.    Wilde regards BD so highly as a contractor that, after BofA removed them from the approved vendors list, Wilde was able to have BofA reconsider and put them back on the list. Wilde Dep. 82:3-84:18.

334.    Dan Richardson (hereinafter "Richardson") is the Vice President and Senior Construction Discipline Manager at Bank of America.  On October 2, 2014, Richardson provided Wilde and others notes regarding BD and noted that BD has completed over 200 projects for BD over the last five (5) years, and completed various projects with perfect scores of 100 by Bank of America's score design team.   Wilde remarked that BD's work quality is exceptional. Richardson noted that Bank of America does not see any issues with unions on this project. Wilde Dep. 40:4-44:20; CBRE4 (CBRE618-CBRE619).

335.    Connolly described BD's performance at previous jobs as "the best" and "very competent." Connolly Dep. 11:10-12, 12:9-19.

336.    Connolly credits BD with saving the Brookdale Job Site and getting it to completion. Connolly Dep. 25:14-27:5.

337.    BD was an outstanding performance with respect to previous projects Fast had awarded to BD.  Fast Dep. 15:14-16.

338.    Ciuzio said that BD is a good contractor.  Ciuzio Dep. 147:3-9.

339.    Chang said that BD performed quality and satisfactory work.   Chang Dep. 27:9-20, 67:10-18.

Dated:  Lake Success, New York
        November 4, 2016

**MILMAN LABUDA LAW GROUP, PLLC.**


_____/s_____

Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

cc: Joseph J. Vitale, Esq. (via e-mail, on consent)

<u>CERTIFICATE OF SERVICE</u>

I hereby affirm that on this date a copy of the foregoing Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Plaintiff's Counter-Statement of Facts Pursuant to Local Rule 56.1 in Support of its Motion for Summary Judgment was e-mailed on consent to:

>   Joseph J. Vitale
>   Cohen, Weiss and Simon LLP
>   330 West 42nd Street
>   New York, NY 10036
>   jvitale@cwsny.com
>
>   Counsel for Defendant

Dated:  November 4, 2016

>   */s/ Emanuel Kataev, Esq.*
>   Emanuel Kataev, Esq.