**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**BD DEVELOPMENT, LLC,**

                          **Plaintiff,**

      **-against-**


**LOCAL 79, LABORERS INTERNATIONAL**
**UNION OF NORTH AMERICA,**

                         **Defendant.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.: **2:14-cv-4876 (JS) (AKT)**

<u>**ORAL ARGUMENT REQUESTED**</u>


<u>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**</u>
<u>**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>


**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ...................................................................1

II.  STANDARD OF REVIEW ......................................................................4

    A.  Summary Judgment Standard.................................................................4

    B.  Labor Management Relations Act § 303 ................................................6

III.  FACTS ......................................................................................................8

    i.  Local 79's conduct was unlawfully coercive. ..........................................8

    ii.  Local 79 had an unlawful object..........................................................12

    iii.  Local 79's conduct damaged BD .........................................................12

IV.  ARGUMENT ...........................................................................................13

    A.  LOCAL 79 ENGAGED IN UNLAWFUL CONDUCT AND MADE
        ILLEGAL THREATS .....................................................................13

    i. Contrary to Local 79's claims, it unlawfully coerced the Secondary
       Employers. ...........................................................................................14

    ii. Contrary to Local 79's claims, it picketed the Secondary Employers ...................16

    iii. Contrary to Local 79's claims, it issued unlawful threats to the Secondary
       Employers ...........................................................................................18

    iv. Local 79's speech and conduct is not protected by the First Amendment ...........20

    v. Local 79 failed to discourage and, in fact, encouraged secondary effects ..............24

    B.  LOCAL 79 ACTED WITH AN UNLAWFUL OBJECTIVE................................26

    C.  A CLEAR CAUSAL CONNECTION EXISTS BETWEEN LOCAL 79'S
        VIOLATIONS AND BD'S DAMAGES................................................27

V.  CONCLUSION .........................................................................................30

i

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ............................................................................................ 6, 14

Associated Imports, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO,
  609 F. Supp. 595 (S.D.N.Y. 1985) ........................................................................ 6

BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners,
  90 F.3d 1318 (8th Cir. 1996) ................................................................................ 8

C&D Restoration, Inc. v. Laborers Local 79,
  2004 U.S. Dist. LEXIS 5752, 2004 WL 736915 (S.D.N.Y. Apr. 5, 2004) ................. 7, 20

Carpet, Linoleum, Soft Tile, etc. Local 419 (Sears) v. NLRB,
  467 F.2d 392 (D.C. Cir. 1972) .............................................................................. 6

Carrier Air Conditioning, Co. v. NLRB,
  547 F.2d 1178 (2d Cir. 1976) ............................................................................ 8, 9

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ............................................................................................ 5

Del Turco v. Speedwell Design,
  623 F. Supp. 2d 319 (E.D.N.Y. 2009) .................................................................. 7

Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,
  485 U.S. 568 (1988) .......................................................................................... 10

Fid. Interior Constr., Inc. v. Southeastern Carpenters Reg'l Counsel,
  675 F.3d 1250 (11th Cir. 2012) ........................................ 10, 11, 17, 18, 20, 21, 22

Florida Sugar Marketing and Terminal Association, Inc. v. Local No. 3,
  668 F. Supp. 173 (S.D.N.Y. 1987) ................................................................. 20, 21

Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.,
  511 F.2d 839 (4th Cir. 1975) .............................................................................. 10

Int'l Longshoremen's Ass'n v. Allied Int'l,
  456 U.S. 212 (1982) .......................................................................................... 18

Int'l Union of Operating Eng'rs, Local 150 v. NLRB,
  47 F.3d 218 (7th Cir. 1995) .............................................................................. 10

Kaynard v. Independent Routemen's Ass'n,
    479 F.2d 1070 (2d Cir. 1973) ......................................................... 15

Kentov v. Sheet Metal Workers Local 15,
    418 F.3d 1259 (11th Cir. 2005) ................................................ 10, 19

Landstrom v. Chauffers, Teamsters, etc.,
    476 F.2d 1189 (2d Cir. 1973) ......................................................... 15

Major League Baseball Props., Inc. v. Salvino, Inc.,
    542 F.3d 290 (2d Cir. 2008) ........................................................... 13

McClellan v. Smith,
    439 F.3d 137 (2d Cir. 2006) ........................................................... 14

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ....................................................................... 14

Nat'l Packing Company v. NLRB,
    377 F.2d 800 (10th Cir. 1967) ................................................. 13, 19

Nat'l Woodwork Mfrs. Ass'n v. NLRB,
    386 U.S. 612 (1967) ......................................................................... 9

NLRB v. Carpenters Dist. Council (Kaaz Woodwork Co.),
    383 F.2d 89 (8th Cir. 1967) ........................................................... 15

NLRB v. Denver Bldg. & Constr. Trades Council,
    341 U.S. 675 (1951) ....................................................................... 13

NLRB v. Fruit & Vegetable Packers Local 760,
    377 U.S. 58 (1964) ........................................................................... 8

NLRB v. IBEW Local 453 (Delp Refrigeration Co.),
    432 F.2d 965 (8th Cir. 1970) ......................................................... 15

NLRB v. Int'l Union of Operating Eng'rs,
    377 F.2d 528 (2d Cir. 1697) ........................................................... 15

NLRB v. Local 182, Int'l Bhd. of Teamsters,
    314 F.2d 53 (2d Cir. 1963) ....................................................... 13, 19

NLRB v. Local 25, IBEW,
    383 F.2d 449 (2d Cir. 1967) ........................................................... 16

NLRB v. Local 3, IBEW,
    471 F.3d 399 (2d Cir. 2006)................................................................. 19

NLRB v. Local 3 Int'l Bhd. of Elec. Workers,
    730 F.2d 870 (2d Cir. 1984)................................................................. 7

NLRB v. Local 445 (Edward L. Nezelek, Inc.)
    473 F.2d 249 (2nd Cir. 1973)............................................................. 15

NLRB v. Local 825, Int'l Union of Operating Eng'rs,
    400 U.S. 297 (1971)................................................................. 16, 18

NLRB v. Operating Engineers,
    317 F.2d 638 (8th Cir. 1963) ............................................................. 15, 16

NLRB v. Retail Store Employees Union,
    447 U.S. 607 (1980)................................................................. 11, 18

Quinn v. Syracuse Model Neighborhood Corp.,
    613 F.2d 438 (2d Cir. 1980)............................................................. 12

Ramey Constr. Co., Inc. v. Local Union No. 544, Painters, Decorators, & Paperhangers of Am.,
    472 F.2d 1127 (5th Cir. 1973) ............................................................. 17

Sailors' Union of the Pacific, AFL and Moore Dry Dock Company,
    92 NLRB 547 (1950) ............................................................. 17

Scotto v. Almenas,
    143 F.3d 105 (2d Cir. 1998)............................................................. 13

Senno v. Elmsford Union Free Sch. Dist.,
    812 F. Supp. 2d 454 (S.D.N.Y. 2011)....................................................... 13, 14

Serv. Emps. Int'l Union Local 87,
    312 NLRB 715 (1993) ............................................................. 10

Serv. Emps. Int'l Union Local 525,
    329 NLRB 638 (1999) ............................................................. 10

Snyder v. Phelps,
    562 U.S. 443 (2011)................................................................. 10

Superior Derrick Corp. v. NLRB,
    273 F.2d 891 (5th Cir. 1960) ............................................................. 10

Tufariello v. Long Island R. R. Co.,
    458 F.3d 80 (2d Cir. 2006).................................................................................................. 6

**Statutes**

29 U.S.C. § 158(b)(4), *et seq*... .................................................................. 1, 4, 5, 6, 7, 9, 13, 20, 24

29 U.S.C. § 187.................................................................................................................. 1, 4, 6, 7

**Rules**

Fed. R. Civ. P. 56................................................................................................................. 5

I.   **PRELIMINARY STATEMENT**[1]

Defendant Local 79, Laborers International Union of North America ("Defendant" or "Local 79") engaged in an effective campaign of illegal coercion and threats against BD Development LLC's ("Plaintiff" or "BD") clients and other secondary employers to force BD to stop performing work so that Local 79 could perform the work it claims for itself.  In moving for summary judgment, Local 79 tells only part of the story, misrepresents the record, cites the wrong law, and buries its head in the sand hoping that BD and this Court will not notice.  However, because this Court must determine whether Local 79 violated the Labor Management Relations Act ("LMRA") and the National Labor Relations Act ("NLRA") under the "totality of the circumstances," and because this Court should not subscribe to Local 79's myopic and incomplete version of the facts and citations to incorrect law, this ostrich must be pulled out of the sand.  As set forth below, Defendant's motion for summary judgment must – at a minimum – be denied, and this Court should instead grant Plaintiff's cross-motion for summary judgment on the issue of liability.

Local 79 argues that it, at most, used an inflated rat and distributed leaflets against the Secondary Employers.  This is patently false.  Local 79 did so much more to illegally coerce and threaten the neutral employers to force BD out so it could do the work. On the Old Navy project at the Kings Plaza Mall, Local 79 swarmed upon Macerich's operations manager, with a fifteen (15) business agent posse threatening to picket the mall and have a sister union shut down the mall's power.  Zito characterized the meeting as a "show of force" and "intimidation tactic."  Even after BD fed Local 79 with the demolition portion of the project, it denied BD manpower to cause BD to fall further behind on the project when BD denied 79 more work.  Later, Local 79 issued an ultimatum and again directly threatened the mall with a picket line to obtain additional work.

---

[1] BD incorporates by reference all material facts and exhibits annexed to BD's Response to Defendant's Statement of Undisputed Material Facts and Plaintiff's Counter-Statement of Facts dated November 4, 2016.

At Bank of America, Local 79 blocked the entrance to the job site and had members of a local sister union engage in work stoppages, which Local 79 encouraged when it placed a rat outside to unlawfully signal a labor dispute. Similarly, at Brookdale and Mt. Sinai hospitals, Local 79 engaged in picketing near the hospital entrances and handed out fliers calling into question the hospital's ability to care for its patients.

Based on the above facts, it is clear that Local 79 is living in a fantasy land when arguing that it simply inflated a rat and leafletted the likes of Gap, Inc. (the "Gap"), Macerich Management Company ("Macerich"), Mt. Sinai Health System, Inc. ("Mt. Sinai"), Bank of America ("BofA"), CB Richard Ellis ("CBRE"), and Brookdale Hospital ("Brookdale") (collectively the "Secondary Employers"). Local 79's threats of picketing, actual picketing, work stoppages, and other conduct was clearly coercive and unlawful under § 303.

Further, in an attempt to justify its deplorable behavior and explain its purported motives for its actions, Local 79 argues that it engaged in such conduct because BD *somehow* allegedly mistreated its workers. However, the record is barren as to any evidence of how BD treats – let alone mistreats – its workers. Rather, Local 79's motive or purpose is clearly entrenched in the record – Local 79 coerced the Secondary Employers in order to force them to either stop using BD or require BD to use Local 79 laborers instead of their own. In fact, Local 79 readily and repeatedly admits that all of its efforts were to get Local 79 laborers on BD's Projects.

Lastly, recognizing that BD was substantially harmed by increased costs on the Projects and lost future work opportunities, Local 79 points the finger at everyone but itself. It argues that the Carpenters are to blame despite the fact that both unions are affiliated with the Building Trades and appear at each other's grievances in solidarity. It points the finger at BD claiming that it is responsible for losing its clients based on common, run-of-the-mill construction delays.

2

However, in reality, *but for* Local 79's campaign of illegal conduct and threats, the record establishes that there would not have been any material problems or delays on BD's projects and BD would not have lost opportunities with the Secondary Employers. Indeed, in light of the totality of the circumstances standard applied in secondary boycott cases, Defendant's arguments, deliberate disregard of adverse facts, and narrow dissection of the facts must be rejected. Local 79 tortiously interfered with BD's contractual relationships with the Secondary Employers. The totality of the circumstances readily evinces that Local 79 engaged in a coordinated and concerted effort to unlawfully apply pressure to the Secondary Employers to claim its work. At each Project, Local 79 conveyed its demands and threats directly to the Secondary Employers or through BD, understanding that BD would convey Local 79's message to the Secondary Employers. At each Project, Local 79 engaged in unlawful picketing, blocking entrances, intimidation, sympathy strikes, defamatory statements, and/or illegal threats to shut down and picket BD's Projects and also made vague threats of "problems" in order to "claiming their jurisdictional work.".

This exact conduct by Local 79 is proscribed by § 301 of the LMRA which was designed to avoid having secondary employers caught in the cross-fire of a dispute between a union and a primary employer. Local 79's conduct invariably caused BD damages in the form of construction delays, lost opportunities, administrative cost, and loss of good will. Local 79 violated § 8(b)(4)(i) of the NLRA when, *inter alia*: (i) Labate threatened Macerich that the mall's power would be shut down if BD was not removed from the project; (ii) Smith asked BD to tell a Secondary Employer that Local 79 is threatening to set up a picket line in front of the Secondary Employer's premises unless Local 79 laborers were hired for the project; (iii) Local 79 unlawfully pressured Brookdale to hire its laborers; (iv) Local 79 told Mt. Sinai that it would be picketed if its laborers were not hired; (v) picketed Brookdale Hospital and targeted it with flyers calling into question its ability to

3

provide proper medical treatment to its patients; and (vi) picketed Mt. Sinai Hospital.  Similarly, Local 79 violated § 8(b)(4)(ii) of the NLRA when, *inter alia*: (i) Local 79 men blocked the entrance to the BofA project; and (ii) engaged members of the Carpenters' Union in a sympathy strike in which members of sister local unions dropped their tools and walked off the job site.

Accordingly, as fully articulated herein, BD will demonstrate that Local 79's conduct violated § 8(b)(4) as a matter of law. Defendant's motion for summary judgment must therefore be denied.  Rather, this Court should instead grant BD's motion for summary judgment on the issue of liability and order a hearing to determine the damages that BD should be awarded.

## II.    STANDARD OF REVIEW

### A.  Summary Judgment Standard

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c).  The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). On a summary judgment motion, the Court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving any ambiguities in the non-moving party's favor. See Tufariello v. Long Island R. R. Co., 458 F.3d 80, 85 (2d Cir. 2006).

Local 79 may argue that there is no direct evidence supporting BD's claims on each and every Project.  Not only is this inaccurate because there is direct evidence – including testimony from Local 79's agents – but BD may also rely on circumstantial evidence in opposing summary judgment.  Indeed, the Second Circuit has consistently held that "[c]ases are often proved by way of circumstantial evidence—and there is no reason why such evidence cannot raise a triable issue of fact for trial."  See Verint Sys. Inc. v. Red Box Recorders Ltd., No. 14-CIV.-5403 (KBF), 2016 WL 7177844, at *1 (S.D.N.Y. Dec. 7, 2016) (in deciding a summary judgment motion) (citing, e.g., Williams v. KFC Nat'l Mgmt. Co., 391 F.3d 411, 422 (2d Cir. 2004) (concluding that plaintiff presented "sufficient circumstantial evidence" to survive summary judgment); Kronish v. United States, 150 F.3d 112, 126 (2d Cir. 1998) (holding that plaintiff's "circumstantial evidence" was sufficient to "entitle him to proceed to trial").  In that regard, Courts deny summary judgment to a moving party that misrepresents the record.  See Kelly v. Ret. Plan Comm., No. 3:11-CV-01890 (WGY), 2016 WL 2963417, at *15 (D. Conn. May 20, 2016) (denying summary judgment for misrepresentation of the record).

Here, Local 79's motion should be denied on the basis that: (i) its arguments inappropriately paint an incomplete picture of the relevant events and otherwise misrepresent the record; and (ii) those facts that Local 79 brings to this Court's attention are mostly inaccurate and not examined in the light most favorable to, and drawing all inferences in favor of, the non-movant, BD, as required in a summary judgment motion and reviewing the record under the totality of the circumstances.  See Point Ruston, LLC v. Pac. Northwest Reg'l Council of the United Bhd. of Carpenters & Joiners of Am., 2010 U.S. Dist. LEXIS 94456 (W.D. Wash. Sep. 10, 2010) (summary judgment denied because jury needed to consider the totality of the circumstances to assess whether the union's conduct was unlawfully coercive).

5

## B.  Labor Management Relations Act § 303

BD brings this action against Local 79 under § 303 of the LMRA which prohibits pressure in the form of threats, coercion, and restraint against secondary employers.[2]  The purpose of Section 8(b)(4) is to "shield neutrals from labor disputes that were not their own, on the basis that, *inter alia*, neutrals were often powerless to comply with the union's demands."  See Carpet, Linoleum, Soft Tile, etc. Local 419 (Sears) v. NLRB, 467 F.2d 392 (D.C. Cir. 1972).

§ 8(b)(4)(b) of the NLRA "prohibits a union from engaging in or inducing or encouraging strikes and picketing against  an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer." See NLRB v. Local 3 Int'l Bhd. of Elec. Workers, 730 F.2d 870, 875-76 (2d Cir. 1984).  Unlawful secondary activity is recognized as "both effective and unlawful precisely because it disrupts the business relations of two parties" and constitutes "an interference by one party with … two others." See C&D Restoration, 2004 U.S. Dist. LEXIS 5752, 2004 WL 736915, at *3.

A labor union engages in unfair labor practices with respect to a secondary employer in violation of § 8(b)(4)(ii) when it (i) threatens, coerces or restrains a neutral party, (ii) with the object coercing that party to cease doing business with the plaintiff, and (iii) there is a causal connection between the violation and the harm plaintiff suffered. See Del Turco v. Speedwell Design, 623 F. Supp. 2d 319, 348 (E.D.N.Y. 2009).[3]

The first criterion requires a determination regarding "the *nature* of the union's conduct: whether the union or its agents … threatened … or restrained any person." Id. at 1189

---

[2] BD hereby incorporates by reference its motion for summary judgment in its entirety.

[3] As noted above, Local 79 also violated § 8(b)(4)(ii) when it induced employees working at Bank of America and Brookdale to stop working.

(emphasis in original). In this regard, the Second Circuit acknowledges "Congress's intention to outlaw a fairly broad range of economic pressure tactics." *Id.* at 1191. Courts have recognized that "in cases involving ambiguous statements the line between lawful persuasion and unlawful threats is not easily drawn." See, e.g., BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners, 90 F.3d 1318, 1331 (8th Cir. 1996). To determine whether certain conduct or statements rise to the level of unlawful "threats, coercion, or restraints" under the secondary boycott provisions, courts consider the objective circumstances surrounding the conduct or statements rather than the subjective interpretation of the recipient. See, e.g., BE & K Constr. Co., 90 F.3d at 1331 ("To determine whether particular statements constitute a prohibited threat, the specific language and the surrounding facts and circumstances are examined, not the subjective interpretation of the listener"). Thus, where conflicting evidence exists about what message was intended, an issue of fact exists. Id.

The second criterion involves a determination related to the *"purpose* of the Union's conduct: whether an object was to force [the neutral party] to cease handling the products of, or doing business with, [the plaintiff]." See Carrier Air, 547 F.2d 1178, 1189 (2d Cir. 1976). Courts must determine whether "under all the surrounding circumstances, the Union's objective was preservation of work for [the boycotted or picketed employer's] employees ... or whether the ... [related activities] were tactically calculated to satisfy union objectives elsewhere." See Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 644 (1967).

The facts here fit squarely within the conduct and purpose prohibited under Section 8(b)(4). In this instance, BD was the "primary employer" with whom Local 79 had a labor dispute.

7

However, rather than focusing directly on BD, Local 79 directed its pressure against the Secondary Employers, all of whom were "neutral employers" within Section 8(b)(4).  By placing such pressure on the Secondary Employers, Local 79 succeeded in coercing those employers to change their business relationship with BD (*i.e.*, forcing BD to hire Local 79's laborers against its will and removing BD from future projects) to everyone's detriment, especially BD.   Local 79's conduct and purpose behind the conduct were both unlawful and substantially damaged BD in violation of §§ 8(b)(4)(i) and (ii).  Accordingly, Local 79's motion must be denied.

**III.    FACTS**

Plaintiff respectfully refers the Court's attention to its Response to Defendant's Statement of Undisputed Material Facts ("Resp.") and Plaintiff's Counter-Statement of Facts ("CSF") for a complete statement of the factual record.  However, Plaintiff addresses Local 79's substantial and serious misrepresentations in its memorandum of law below.[4]

**i.    Local 79's conduct was unlawfully coercive.**

On the Old Navy Project, Local 79 claims that the fifteen (15) business agent mob from the Building Trades' met with Labate at Macerich's offices because it was a "convenient" location. However, the Building Trades' locals (including Local 79) are not located in Brooklyn and the Mall is located on the outer edges of Brooklyn.  Local 79 also asserts that Zito does not recall any reference to picket lines or a shutdown, but the record is very clear, as Zito testified:

> **[A.] I remember [Mike Labate of Local 79] being concerned about -- as typical, he asked -- he would try to get information prior to the job starting, who the GC was, and when I informed that it would be BD he was -- seemed anxious about it and concerned, being very verbal about how he felt that there could or would be problems with the construction job.  … I think he**

---

[4] References to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment shall be referred to as "Def. Mem."

> **referenced him having problems with them in the past and that we should anticipate -- we -- that -- that there was going to be problem -- problems with them for this.**  Q. With any of the conversations that you had with Mike Labate, did he either say directly or indirectly that problems that might arise with the use of BD might include a picket line to [the] mall? **A. Yes.**  … Q. Okay. And if -- is it fair to say that through these conversations you had with Local 79 and these BAs that, if BD did not do that, that there were going to be problems, picket lines, rats, shutdowns, things of that nature as a result? **A. Yes.**  Q. And is it fair to say that if BD did not utilize Local 79 laborers, it was Local 79's position that BD should not be doing the work at the mall? ... **A. Yes.**

See Labuda Decl. ¶ 13, Ex. K at 25:12-20, 26:5-9, 29:10-15, 47:25-48:16.  Moreover, another agent of Local 79, Barry Smith, openly admitted to directly threatening Brian Lindsey from Macerich with picketing.  See CSF ¶ 130.  Indeed, Smith himself testified:

> [Q] With the conversation that you had with Domenic about setting up the line and the reference to the picket line, when you spoke with Brian over at Kings Plaza, did you ever mention setting up a picket line? **A. I mentioned it to Brian, yes, I did.**  Q. And do you remember the context and what he said to you?  **A. "Oh, God. Not again."**  Q. That's what he said? **A. Yeah. "Oh, God, please, you know, like -- you know, this, you know..." -- he didn't -- he didn't -- he didn't want to -- he didn't want to -- he didn't want -- he didn't want to have to go through dealing with this ...**

See Vitale Decl. ¶ 5, Ex. D at 196:5-22.

Incredible.  Local 79's claim that it never threatened the Secondary Employers with a picket line is truly incredible and outrageous in light of the above testimony from the Secondary Employers and Local 79's agents.  Local 79 also states that Linear, a Local 79 contractor, would no longer provide a laborer because BD refused to pay invoices.  This is also inaccurate.  Linear pulled out due to Local 79's campaign against BD. See Kataev Oppo. Decl. ¶ 4, Ex. B ("In light of the circumstances surrounding between BD … and Local 79, effective immediately Linear … will no longer be providing the Local 79 Laborer for the Old Navy Kings Plaza project").

Local 79's inducement of Linear to stop working with BD violated § 8(b)(4)(ii).

Local 79 also falsely claims that the Gap was concerned about Local 79's conduct only by way of the labor harmony clause in its lease with Macerich.  However, the Gap's main concern was about timely completing its construction project, cost controls, and how any conduct or materialized threat from Local 79 would affect the Gap in that regard.  See Resp. ¶¶ 331-32, 432, 438; see also CSF ¶¶ 97, 126.

Local 79 argues that other factors contributed to delays on the Old Navy Project and that Local 79's issues were not the predominant reason for the delays there.  However, the record establishes that Local 79's conduct constituted the lion's share for the delays.  See Resp. ¶¶ 377, 392, 396-97, 458.  Moreover, the Gap's main concern was Local 79, whom it deemed "terrorists."  See CSF ¶ 136 ("They are like terrorists[.] And 'we don't negotiate with terrorists'").

On the Brookdale Project, Local 79 claims that there was never any picketing because the Brookdale representatives testified that they did not see any picketing.  However, the testimony of Barry Smith (a Local 79 agent) and attendance sheets from Local 79 itself establish that Local 79 picketed Brookdale.  See Resp. ¶¶ 169, 171-73, 175, 177, 184-85, 187, 192, 194, 197, 223; see also Kataev Decl. ¶¶ 22-23, Exs. T and U; Vitale Decl. ¶ 5, Ex. D at 196:5-22.  Local 79 also argues that threat to Connolly to fight "tooth and nail" was not coercive.

However, Connolly testified he understood the comment to mean that: (i) there was going to be a "full-out turf war;" (ii) Local 79 was "not going to give an inch;" and (iii) "you could tell from my response that I was concerned."  See Resp. ¶ 224; see also Labuda Decl. ¶ 11, Ex. I at 101:11-103:14.  Moreover, Connolly understood that if Local 79 laborers were not hired, Local 79 would set up rats and picket lines at Brookdale Hospital.  See Labuda Decl. ¶ 11, Ex. I at 74:6-19,

10

104:21-105:10 ("When they say tooth and nail, I would assume [Local 79] would take every possible option that they had in their arsenal they would use").

Local 79 furthermore submits that BD hired AMG at Brookdale for reasons unrelated to Local 79. This is inaccurate. BD hired AMG because of concerns with Local 79 and threats to Brookdale of work disruptions and the like. See Resp. ¶ 155. BD similarly hired All City on the Old Navy Project for substantially the same reasons. Id. at ¶ 282.

With respect to the BofA Project, Local 79 claims that the record does not establish that it actually told workers at NYC Acoustics to stop working. However, this is belied by readily made inferences from the record. See Verint Sys. Inc., *supra*. Local 79 set up a rat at Bank of America. NYC Acoustics is signatory to the Carpenters' Union, which is affiliated with the Building Trades, as is Local 79. DePetro testified that Local 79 would generally contact other trades working on a job and ask them to honor the picket line. See Declaration of Joseph M. Labuda, Esq. ("Labuda Decl.") ¶ 8, Ex. F at 28:11-23. Lapidus testified that NYC Acoustics refused to work until the "issue was resolved" because they could not "cross the line" set up by Local 79. See Declaration of Emanuel Kataev, Esq. ("Kataev Decl.") ¶ 6, Ex. D at 51:15-52:11. There is both sufficient direct and circumstantial evidence to establish that Local 79 was behind the work stoppage.

With respect to the Mt. Sinai Project, Local 79 claims that there is no direct evidence that it was the union who contacted Mt. Sinai. However, this is similarly belied by overwhelming circumstantial evidence. See Verint Sys. Inc., *supra*. BD intended to use its own employees to perform laborers' work. After Mt. Sinai was threatened by a union, BD hired a Local 79 contractor and paid $228,000.00 in laborer costs when it had its own available laborers, and no other union signatory contractors were hired.

Indeed, Flavoni's sworn affidavit readily establishes that Local 79 was the union which engaged in unlawful activity to coerce Mt. Sinai into forcing BD to hire its laborers.  See Affidavit of Domenico Flavoni ("Flavoni Aff.") ¶¶ 117-18.

Local 79 furthermore submits that Mt. Sinai and BD had problems unrelated to its conduct at the job site and that Mt. Sinai was more concerned about those problems.   This is also untrue. Despite some problems between BD and Mt. Sinai unrelated to Local 79, BD completed its work to Mt. Sinai's satisfaction and offered to work with Mt. Sinai in the future.  See Declaration of Emanuel Kataev, Esq. in Opposition ("Kataev Oppo. Decl.") ¶ 3, Ex. A.  It is hard to fathom how Local 79 can get the facts so wrong when it says that it only "erected a rat" and "distributed leaflets," but it did.  See Def. Mem. at 4, 9, 11. This Court should not trust any ink drawn on Defendant's motion, as it has proven itself untrustworthy by its narrow view and flat out misrepresentations.

### ii.  Local 79 had an unlawful object.

Local 79 argues that it launched a campaign against BD was the result of learning that BD has no state certified apprenticeship program and that the public needed to be notified.  See Def. Mem. at 5.  Local 79's actual intent was to claim BD's work for itself.  See Resp. ¶¶ 87, 168, 175, 316, 405-06, 408, 413; CSF ¶¶ 229, 245-46, 252, 299; see also Declaration of Joseph J. Vitale ("Vitale Decl.") ¶ 3, Ex. B at 26:18-27:2, 28:2-8 ("Q. When you called Brookdale directly you weren't informing the public, correct? Brookdale is not the public, right? … **A. Yes**").

### iii.  Local 79's conduct damaged BD.

Local 79 submits that even if its conduct was unlawfully coercive (which it was), and even if Local 79's purpose was for an unlawful objective (which it was), BD cannot prove that its damages flow from Local 79's conduct.  This is belied by the record.

Due to pressure Local 79 exacted upon the Secondary Employers, BD was forced to remove its own workers and hired Local 79 laborers, forcing it to spend substantially more on laborer costs.   Moreover, BD lost future work too.  All of BD's clients regarded BD highly as a contractor.  See CSF ¶¶ 332-337.  Yet, following Local 79's conduct, all of them stopped giving work to BD.  See Resp. ¶¶ 235-37, 399-400, 413-16, 421, 425-26, 428, 430, 448, 489-90; see also CSF ¶¶ 187, 192, 325.  There was no other reason for the loss of future work other than Local 79's intimidation tactics.

**IV.   ARGUMENT**

**A.  LOCAL 79 ENGAGED IN UNLAWFUL CONDUCT AND MADE ILLEGAL THREATS**

Local 79 argues that BD has failed to prove it engaged in coercive conduct within the meaning of § 8(b)(4).  As noted above, Local 79 misrepresented the facts and now it misconstrues the law.  In order to determine whether a union has conducted a secondary boycott prohibited by section 158(b)(4)(ii)(B), courts must look at the actual conduct of the union.  See Fid. Interior Const., Inc. v. Se. Carpenters Reg'l Council of United Bhd. of Carpenters & Joiners of Am., 675 F.3d 1250, 1259 (11th Cir. 2012).

Under the NLRA, all secondary picketing is illegal. See R.M. Perlman, Inc. v. N.Y. Coat, Suit, Dress, Rainwear & Allied Workers' Union Local 89-22-1, ILGWU, 833 F. Supp. 238, 245 (S.D.N.Y.), aff'd, 33 F.3d 145 (2d Cir. 1994). Secondary picketing is defined as "picketing which is calculated to involve neutral employers and employees in a union's dispute with [the] primary employer." See Hawaii Elec. Light Co. v. Int'l Bhd. of Elec. Workers, Local 1186, AFL-CIO, 844 F. Supp. 1381, 1387 (D.Haw. 1993), aff'd, 73 F.3d 369 (9th Cir. 1995).

13

To prevail, Plaintiffs must prove that Union members engaged in coercive activity with the intent of disrupting the Plaintiffs' business. See Beelman Truck Co. v. Chauffeurs, Teamsters, Warehousemen & Helpers, Local Union No. 525, 33 F.3d 886, 890 (7th Cir.1994); see also Constar, Inc. v. Plumbers Local 447, 748 F.2d 520, 522 (9th Cir. 1984).

Although some forms of conduct like peaceful handbilling may not be coercive within the meaning of the Act (see, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 588 (1988)), a fact-finder may consider the content of handbills, warning letters, banners, and threats to picket to determine whether the union intended to enmesh neutral employers in its dispute with the primary employer.  See, e.g., Int'l Union of Operating Eng'rs, Local 150 v. NLRB, 47 F.3d 218, 224 (7th Cir. 1995); Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., 511 F.2d 839, 843-44 (4th Cir. 1975); Serv. Emps. Int'l Union Local 87, 312 NLRB 715, 745 (1993). Often the content of handbills, banners, and warning letters, "when evaluated in light of ... [the] entire campaign strategy and conduct [of a union] offer[s] telling evidence of secondary intent." See Serv. Emps. Int'l Union Local 525, 329 NLRB 638, 682 (1999).

**i.     Contrary to Local 79's claims, it unlawfully coerced the Secondary Employers.**

Local 79 argues that the terms "coerce" and "restrain" must be interpreted with caution and not be given a broad sweep based on NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, 362 U.S. 274 (1960).  Local 79 cites to the wrong law.  In Local Union No. 639, cited by Defendant, the Court discusses those terms in the context of peaceful recognitional picketing pursuant to § 8(b)(1)(a) (not § 8(b)(4)), which deals with unlawful coercion and restraints by a union of employees in the exercise of their § 7 rights to organize, not by unions against secondary

employers.  This is quite different than unlawful secondary boycott activity under § 8(b)(4).
Similarly, DeBartolo is inapposite to this case because the union there only engaged in peaceful
handbilling, whereas Local 79 threatened Secondary Employers with pickets, shut downs,
"problems," and actually engaged in such unlawful conduct.  Indeed, the record easily establishes
that Local 79's conduct in this case was coercive for several reasons.

      First, at the Old Navy project, Local 79's repeated threats of picketing reverberated
between representatives of Macerich, the Gap, and BD in frenetic conferences and frenzied
e-mails following a show of force in which Local 79 stormed Macerich's offices to intimidate
them into shutting down the project.  See CSF ¶¶ 33-112.  Later, Local 79 also issued an ultimatum
that picketing would ensue if its demands to have laborers hired at the Old Navy project were not
met by the Fourth of July.  Id.  The threats of picketing launched Macerich and the Gap into action
to do whatever it could to appease Local 79.  This, in turn, forced BD to use Local 79 laborers
against its will in clear violation of § 8(b)(4).

      Second, at both Brookdale and Mt. Sinai, Local 79 issued threats – whether directly to the
hospitals or through BD as a liaison[5] – that the hospitals will be picketed if BD performs work
without hiring Local 79 laborers.  In fact, evidence from Local 79 establishes that it did picket
Brookdale.  See Kataev Decl. ¶¶ 22-23, Exs. T and U.  The record evidence supports that
Brookdale was hyper-concerned about any union activity because three (3) unions represented
large swaths of the hospital's staff and Brookdale took preemptive action to forestall any union
sympathizers from taking action as a result of Local 79's picketing.  See Resp. ¶¶ 188, 237.

---

[5] Local 79 inappropriately ignores all the threats it issued to the Secondary Employers through BD.  At all times, Local
79 knew that its communications (including its threats) to BD were conveyed to the Secondary Employers.  At one
point, Smith even directly asked BD to convey a particular threat of picketing to Macerich.  See Resp. ¶ 346.

Third, Local 79 directed its activities at Brookdale Hospital rather than at the actual Brookdale Project, a mile-and-a-half away.   Indeed, at both hospitals, Local 79 picketed near the front entrance of the hospital,[6] accosted patients and visitors to the hospitals with flyers, delivered threats of picketing and threats of "problems" directly or through BD, and inflated a large rat.

Fourth, Local 79's flyer at Brookdale called into question the hospital's ability to provide proper medical treatment while arguing that BD was an "exploitive" [*sic*] contractor.  See Resp. ¶ 13.  Coupled with the picketing, the rats, and the flyers, the CEO of Brookdale was, in its own words, "apoplectic" and there was "chaos in the executive suite" as a result of Local 79's conduct. See CSF ¶ 255.

Fifth, contrary to Local 79's claim, there is no record evidence whatsoever that BD exploits its workers.  Local 79's sole support for its argument is that BD does not have a state sponsored apprenticeship program, an obvious after-thought manufactured to defend itself.

Sixth, documentary and testimonial evidence establish that, at Bank of America, members of a sister local union saw an inflatable rat (which served as a signal to members), dropped their tools, walked off the job, and waited until they received instructions before returning to work.  See Resp. ¶¶ 16-17, 127, 292.   Indeed, the members were not allowed to cross the line[7] until "everything was resolved."  See Id. at ¶¶ 126-27.  Local 79's argument that no work stoppage occurred because DePetro could not remember it is unavailing, as Lapidus testified that there was a work stoppage.  See Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.

---

[6] Incredibly, Local 79 denies that any picketing occurred at Brookdale despite the fact that Local 79's own attendance sheets describe their activity as picketing.  See Resp. ¶¶ 169, 171-73, 175, 177, 184-85, 187, 192, 194, 197, 223. Indeed, Smith testified that a picket line was ultimately set up at Brookdale.  See Vitale Decl. ¶ 5, Ex. D at 196:5-22.
[7] This record evidence conclusively establishes that Local 79 picketed BofA and CBRE at the BofA Project.

1980) (a witnesses' recollection of events prevails if another witness cannot recall the same events to rebut them).  Accordingly, on the whole, Local 79's conduct was coercive as a matter of law.

**ii.    Contrary to Local 79's claims, it picketed the Secondary Employers.**

Refusing to come to terms with the truth, Local 79 relies on misrepresentations and half-truths to argue that its conduct really was not picketing.  Local 79's arguments are akin to a thief caught red-handed explaining that he was only borrowing the money.

A review of both the facts and the application of the law based on the totality of the circumstances renders Local 79's arguments wholly unconvincing. Picketing is unlawful where the object is to exert pressure on a secondary employer.  See NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675 (1951) (§ 8(b)(4) prohibits peaceful picketing, as well as other peaceful means of inducement and encouragement, [to further a proscribed] objective …"); see also NLRB v. Local 182, Int'l Bhd. of Teamsters, 314 F.2d 53, 58-59 (2d Cir. 1963) (holding that if one of the Union's purposes of informational picketing is recognition, then that picketing is unlawful); Nat'l Packing Company v. NLRB, 377 F.2d 800, 803 (10th Cir. 1967) (same).  In this case, Local 79 conducted unlawful picketing at every specified BD project because its object and purpose was to force BD employees out and replace them with Local 79 laborers.

At Brookdale, Local 79 admits to picketing in its own contemporaneously held daily attendance sheets by Anthony Williamson, who wrote "**Event[:] Picket Line**" on each and every single one of the daily attendance sheets.  See Resp. ¶¶ 169, 171-73, 175, 177, 184-85, 187, 192, 194, 197, 223; see also Kataev Decl. ¶¶ 22-23, Exs. T and U (emphasis added).

At Bank of America, contrary to Local 79's claim, the record evidence establishes that Local 79 engaged in unlawful blocking because about five (5) business agents stood in front of the BofA project entrance and other workers stopped working because they were asked not to cross the

line.  See Resp. ¶¶ 16-17, 127, 292.  The record evidence also establishes that Local 79 unlawfully picketed Bank of America, as DePetro testifies that he stops all work when he sees a picket line and Lapidus testified that DePetro stopped working on the day Local 79 reared its ugly face at the BofA Project.  Id.  Indeed, Lapidus testified that DePetro discussed a picket line with him, and Giovinazzi (another BD employee) also testified that the owner of NYC Acoustics discussed a picket line.  These facts support a finding that Local 79 picketed Bank of America.

Local 79's argument that the record evidence of a "momentary blocking" of the BofA Project entrance is insufficient to constitute a violation under § 8(b)(4) is meritless.  See Bloedorn v. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees & Helpers Local 695, No. 89-C-0539-C, 1989 WL 165246, at *3 (W.D. Wis. June 26, 1989) (granting temporary restraining order against union where union blocked truck for two minutes one day, and for about one minute on two other days).

At Mt. Sinai, both Chang and Flavoni testified that Local 79 engaged in unlawful picketing.  See Resp. ¶¶ 18, 471-72, 482; see also CSF ¶¶ 199-202.  While it is true that Local 79 did not picket the Kings Plaza Mall in which BD performed work on the Old Navy project, it is important to note that threats of picketing ran rampant between Local 79 and Macerich as further discussed below.  Indeed, while Local 79 did not picket the mall, it did storm the mall's management office in an apparent intimidation tactic, and Labate of Local 79 visited the mall's management office, uninvited and unannounced, every two to three days threatening Macerich that he will picket and shut down the entire mall.  As noted below, Local 79's threats of picketing were illegal.  Accordingly, Local 79 conducted unlawful picketing at every specified BD project.

**iii.    Contrary to Local 79's claims, it issued unlawful threats to the Secondary Employers.**

Courts have long held and recognized that threats of strikes alone by a union made to a neutral third-party amounts to illegal coercive conduct.  See Landstrom v. Chauffers, Teamsters, etc., 476 F.2d 1189, 1193 (2d Cir. 1973) (upholding verdict against union upon finding that threat of picket was unlawful); see also Kaynard v. Independent Routemen's Ass'n, 479 F.2d 1070, 1073 (2d Cir. 1973) (general threats of picketing unlawful); NLRB v. Int'l Union of Operating Eng'rs, 377 F.2d 528, 530 (2d Cir. 1697) (threats of picketing and threats of work stoppages unlawful).

Further, vague and/or veiled threats are enough to constitute unlawful coercive activity under § 8(b)(4).  In NLRB v. Local 445 (Edward L. Nezelek, Inc.), the Second Circuit held that a union's threat to picket accompanied by the words, "not a wheel will turn period, nothing will move" constituted a threat under the NLRA.  See 473 F.2d 249 (2nd Cir. 1973); see also NLRB v. IBEW Local 453 (Delp Refrigeration Co.), 432 F.2d 965 (8th Cir. 1970) (specific threats to picket made to neutral third-parties constituted unlawful secondary activity); NLRB v. Carpenters Dist. Council (Kaaz Woodwork Co.), 383 F.2d 89 (8th Cir. 1967) (same).  Additionally, in NLRB v. Operating Engineers, a union representative stated that "if you don't have Layne-Western shut down, I am going to have to shut you down."  See 317 F.2d 638, 641 (8th Cir. 1963).   The "ambiguity" cited by the Court was that the union also said it was not going to strike, but added that there would be "trouble" if Layne was used in the future.  Id.

The undisputed facts in this case evince Local 79's hell-bent approach of applying pressure on the Secondary Employers to squeeze BD into hiring its laborers to preserve its "market share."  Indeed, the record is rife with instances of Local 79 pressuring and coercing the Secondary Employers, with threats of picketing, shutdowns, and "problems" if they continued using BD.  On the Old Navy Project, Local 79 repeatedly threatened Zito at Macerich that the mall was going to

19

be picketed.  Zito was threatened at the mob-style "grievance" meeting which he called a "show of force."  Before the job started, Labate issued unlawful general unqualified threats of "problems" that may arise if BD is to perform work on the Old Navy Project.  Based on Local 79's threats, Zito was concerned about a mall shutdown and picketing, all illegal threats.  See NLRB v. Local 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 304 (1971); see also NLRB v. Local 25, IBEW, 383 F.2d 449, 452 (2d Cir. 1967) (threat of "work stoppages" unlawful).

Local 79 engaged in similar conduct at the Brookdale Project.  There, Smith refused to compromise with BD and said Local 79 was going to "fight tooth and nail" if it had to.  See Declaration of Tamir W. Rosenblum ("Rosenblum Decl.") ¶ 30, Ex. 28 at 2.  As with all of Local 79's statements, BD conveyed the threat to Brookdale.  In its own words, Brookdale understood that Local 79 would employ every weapon in its arsenal to picket, engage in work stoppages, entrance blocking, erecting a rat, and distributing defamatory leaflets.  That's why Brookdale told BD to hurry up and finish the job – to avoid Local 79.

Indeed, Local 79 conveyed its threats to the Secondary Employers through BD.  On the Old Navy Project, Smith directly asked BD to convey his threats of picketing to the Gap and Macerich. When Local 79 was not conveying threats through BD, it did so directly.  Smith himself testified that Lindsey from Macerich groaned and said **"Oh God, no, not again!"** when he threatened to picket the mall.  See Declaration of Brett W. Joseph ("Joseph Decl.") ¶ 14, Ex. 12 (July 17, 2014 4:58 PM correspondence).  This thug-like extortive conduct by Local 79 was unlawful because it pressured the Secondary Employers to, in turn, pressure BD to acquiesce to Local 79's demands for work.  Further supporting the coercive nature of these threats is the fact that BD paid Local 79 contractors for laborers it did not need and which inherently delayed its projects in exchange for added costs and a poor first impression with a new client, the Gap.  Not a very good deal for BD.

See Fid. Interior Const., Inc., 675 F.3d at 1263 (whether secondary employer used good business judgment with primary employer considered to determine whether union's conduct was coercive). However, BD had to take the deal due to the pressure it was receiving from the Secondary Employers.

**iv.      Local 79's speech and conduct is not protected by the First Amendment.**

Local 79 cannot seek refuge behind the First Amendment for its unlawful conduct. The Supreme Court has "consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment." See Int'l Longshoremen's Ass'n v. Allied Int'l, 456 U.S. 212, 227 (1982) (citing, e.g., NLRB v. Retail Store Employees Union, 447 U.S. at 616. It is even "clearer that conduct designed not to communicate but coerce merits still less consideration under the First Amendment." Int'l Longshoremen's Ass'n v. Allied Int'l, 456 U.S. at 227.

Indeed, although the First Amendment protects picketing in other contexts (see, e.g., Snyder v. Phelps, 562 U.S. 443 (2011)), the First Amendment offers no refuge to unfair labor practices, which include secondary boycotts marked by coercive picketing with unlawful intent (see, e.g., NLRB v. Retail Store Emps. Union, Local 1001, 447 U.S. 607, 611-616 (1980)). See Fid. Interior Const., Inc., 675 F.3d 1250, 1259 (11th Cir. 2012). Although peaceful handbilling without other action is not picketing, the "existence of placards on sticks is not a prerequisite to a finding that a union engaged in picketing." Id. Here, Local 79's handbilling was accompanied by threats and other illegal conduct which renders any handbilling equally coercive and illegal because Local 79's motive was not to inform the public but to coerce the Secondary Employers into submission.

Furthermore, where a union tells a neutral that it "claims work" in a particular "jurisdiction" for itself the First Amendment provides no quarter from § 8(b)(4)(i) or (ii) violations. See NLRB v. Local Union 25, IBEW, 491 F.2d 838, 840-1 (2d Cir. 1974); NLRB v. Local Union No. 3, IBEW, 467 F.2d 1158, 1160 (2d Cir. 1972); NLRB v. Local 25, IBEW, 396 F.2d 591, 593 (2d Cir. 1968); Douds v. Int'l Longshoremen's Ass'n, 242 F.2d 808, 810 (2d Cir. 1957). Local 79 repeatedly claimed BD's work for itself, as the record sufficiently establishes.

Local 79 cites to NLRB v. Servette, Inc. in support of its contention that its conduct was lawful. See 377 U.S. 46 (1964). In Servette, handbills were passed out asking the public not to buy named items distributed by Servette in front of its stores. That was it. Here, Local 79 engaged in more than mere handbilling, as the record overwhelmingly establishes that its agents issued threats to the Secondary Employers, engaged in picketing, and farcically distributed leaflets to establish a cover for their unlawful intent to remove and replace BD with its own workers. Courts have held that conduct directed at a neutral employer receives no First Amendment protection. See NLRB v. International Union of Operating Engineers, 400 U.S. 297, 304 (U.S. 1971. Thus, Local 79's reference to NLRB v. Servette, Inc., 377 U.S. 46 (1964) and DeBartolo are therefore inapplicable to this case of threats and inducements directed at the Secondary Employers.

Local 79's reliance on DeBartolo is similarly misplaced.  The DeBartolo Court did not hold, as 79 wants believed, that the First Amendment prohibits any abridgement of handbilling and picketing. DeBartolo is quite clear that handbilling with picketing could be coercively unlawful under § 8(b)(4). See 485 U.S. 568, 584. Therefore, the law, including DeBartolo, holds that handbilling, picketing, or setting up inflatable rats (as outlined below) that are directed at the neutral for the purpose of pressuring the neutral is unlawful and therefore so would a threat of such conduct.

Local 79 also argues that all it did was inflate a rat, which is supposedly well within their constitutional right.  However, many Courts have held that the use of the "rat" is illegal when accompanied by other conduct.  See, e.g., W2005 Wyn Hotels v. Asbestos, Lead & Hazardous Waste Laborers' Local 78, No. 11-CIV.-1249, 2012 WL 955504, at *3 (S.D.N.Y. Mar. 8, 2012) (noting that the issue of an inflatable rat in labor disputes is sometimes, but not always, protected by the First Amendment).

Indeed, Local 79's "rat" argument myopically fails to account for the various other coercive conduct accompanying its menacing, inflatable rat.  The use of an inflatable rat in addition to conduct violates the NLRA.  See NLRB v. Local 3, IBEW, 471 F.3d 399, 402 (2d Cir. 2006) (using a rat while conducting a "shop-in" violative of the NLRA); see also Kentov v. Sheet Metal Workers Local 15, 418 F.3d 1259, 1265 (11th Cir. 2005) (placement of rat at mock funeral procession deemed violative of the NLRA).  Here, Local 79 similarly used the rat in conjunction with illegal activity.  At Bank of America, Local 79 blocked the job site entrance and picketed in conjunction with the rat.  Similarly, at Brookdale and Mt. Sinai, Local 79 issued unlawful threats and picketed both Hospitals in conjunction with the rat.  The inflation of a balloon rat is also not per se lawful as Local 79 suggests.  See NLRB v. Local 3, IBEW, 471 F.3d 399 (2d Cir. 2006)(Local 3's inflation of a balloon rat at Hertz rental car with whom it did not have a dispute to protest a non-union contractor was illegal and union held in contempt).

In support of its contention that the use of a rat is lawful, Local 79 cites to Microtech Contracting.  However, that case is inapposite, as it deals with an alleged breach of a collective bargaining agreement under § 301 of the LMRA between a contractor and a local, rather than a claim under § 303 of the LMRA.  Local 79 similarly cites to New York Times Co. v. Sullivan, which is a First Amendment press case.  It incorrectly argues that Linn v. United Plan Guard

Workers of Am., Local 114, Old Dominion Branch No. 496 v. Austin, and Metropolitan Opera Ass'n v. Local 100, Hotel Employees & Restaurant Employees Int'l Union support its position, when the first two (2) cases are defamation actions against unions while the third involved the technical invalidation of a temporary restraining order and preliminary injunction on the grounds that it was impermissibly vague. None of these cases discuss freedom of speech in the context of secondary boycott activity, under which a careful balancing of interests – the tipping point of which is unlawful coercion – can result in a finding that proscribed speech and conduct is not protected under the First Amendment.

Here, the rat at Brookdale was accompanied by several Local 79 agents marching, walking, and distributing flyers to patients and visitors who had a lot more to be concerned about than Local 79's greedy pursuit of additional work. Egregiously, Local 79 accosted people who were already preoccupied with greater concerns with flyers intended to make them concerned about the medical care they and their loved ones were receiving at the Hospital. See Kataev Decl. ¶ 25, Ex. W. The target was clearly Brookdale, since BD was nowhere in sight working miles away. The record establishes, furthermore, that the rat had to be moved because it was placed very close to an entrance. Similarly, accompanying the rat and leafletting at Bank of America were several Local 79 agents who intimidated a BD employee and physically prevented him from coming into the BofA job site by blocking the entrance.

Further, Local 79's picketing was not "informational" in nature, as Local 79 had no idea what BD was paying its employees and failed to launch an inquiry into same to determine area standards. It is well-established that courts deem such picketing as not "informational" in nature, but rather as unlawful recognitional picketing. See Local 182, Int'l Bhd. of Teamsters, 314 F.2d at 58-59 (holding that if one of the Union's purposes of informational picketing is recognition, then

24

that picketing is unlawful); Nat'l Packing Company, 377 F.2d at 803 (same); accord United States Info. Sys. v. IBEW Local Union No. 164, 2012 U.S. App. LEXIS 20698 (3d Cir. 2012) (alleged purpose of publicizing the lack of area standards being complied with insufficient to escape coercive effect of picketing.). As noted earlier, Local 79's intent was clearly not to inform the public. Rather, Local 79 sought to get its members work on BD's Projects as its agents readily and repeatedly testified.

Local 79 also engaged in signal picketing, which is activity that acts as a signal that sympathetic action on the part of neutral employees is desired by the union, IronWorkers Dist. Council of Pac. Northwest (Hoffman Constr.), 292 NLRB 562, 563 n. 2 (1989), and can constitute illegal secondary activity violative of the NLRA. See Kennedy & Co., Inc. v. International Broth. of Teamsters Local Union No. 90, 315 F. Supp. 2d 992 (S.D. Iowa 2004) (denying summary judgment to both contractor and union in LMRA § 303 case based on disputed issues of fact). Here, Local 79's use of the rat constituted a signal to neutral employees to stop all work. Indeed, DePetro testified that he would call to find out what he had to do whenever he saw a rat, and Williamson testified that he expected union members to "do the right thing" when they saw a rat. The record establishes that employees working at Bank of America dropped their tools and went outside when they saw the rat. See Carrier Air, 547 F.2d at 1191, 1192 (stating that a recommendation, explicit or implicit, to refuse to perform service would violate § 8(b)(4)(i)); see also NLRB v. Local 3, IBEW, 542 F.2d at 863; NLRB v. Local Union No. 3, IBEW, 477 F.2d 260, 263 (2d Cir. 1973) ; McLeod on behalf of NLRB v. International Brotherhood of Teamsters, etc., 345 F.2d 142, 145 (2d Cir. 1965). Accordingly, Local 79 conducted unlawful signal picketing.

## B.  LOCAL 79 ACTED WITH AN UNLAWFUL OBJECTIVE

The intent of a union is unlawful when its "conduct is calculated to force the secondary employer to cease doing business with the primary employer." See Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15, 418 F.3d 1259, 1263 (11th Cir. 2005).  "If any object of the picketing is to subject the secondary employer to forbidden pressure then the picketing is illegal. It need not be the sole or even main purpose." See Superior Derrick Corp. v. NLRB, 273 F.2d 891, 896 (5th Cir. 1960) (citations omitted).

Local 79 essentially concedes that its motive was for an unlawful purpose.  In its only slim and scant argument for a fabricated lawful motive, Defendant states that its Director of the Market Development Department discovered that BD did not have a state certified apprenticeship program and that, *to him*, this meant that the employees of BD were exploited by dangerous work conditions and that the public had to be notified.  Local 79's actual intent was to force BD's laborers – members of Local 621 – off of BD's Projects and replace them with its own Local 79 members.  This is an unlawful object under § 8(b)(4)(i)(D) and 8(b)(4)(ii)(D).  See NLRA § 8(b)(4) ("(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class,").  Accordingly, Local 79 acted with an unlawful objective.

## C.  A CLEAR CAUSAL CONNECTION EXISTS <br> BETWEEN LOCAL 79'S VIOLATIONS AND BD'S DAMAGES

A plaintiff suing under LMRA § 303 must demonstrate that the unlawful activity was a "substantial factor or material cause" of the plaintiff's injury. See C&D Restoration, 2004 U.S. Dist. LEXIS 5752, 2004 WL 736915, at *4.

In the instant case, it is clear that as a direct result of Local 79's conduct and threats, BD was damaged and incurred increased labor costs, administrative costs, and lost opportunities for future work with the Secondary Employers.  A causal connection exists when "the injury alleged was precisely the type of loss that the claimed violations would be likely to cause."  See Florida Sugar Mktg. & Terminal Assn. Inc. v. Local No. 3, Int'l Longshoremen's Ass'n, 668 F. Supp. 173, 182 (S.D.N.Y. 1987) ("Florida Sugar").

In Florida Sugar, the union's disruption of work directly led to a direct negative financial impact on the plaintiff there.  It was obvious that the negative financial impact never would have resulted absent the unlawful union activity.  Id.  The same reasoning applies here.  At each of the Projects, Local 79's coercive conduct applied enough pressure on the Secondary Employers to, in turn, force BD to hire Local 79 laborers.

BD's hiring of Local 79's laborers to perform work increased expenses and cut into its profits.  At each project, BD had its own laborers lined up to perform work.  Because of Local 79's interference, BD was required to pay more.  For instance, BD had budgeted $80,000.00 towards the demolition work on the Old Navy project, while hiring Local 79 cost BD $113,000.00, resulting in a $33,000.00 loss.  Compounding the added costs, BD did not send its own workforce home.  Rather, BD kept its own employees working elsewhere as it did not want to hurt its employees because of Local 79's unlawful conduct and did not want its employees to quit.   In that regard, it is also worthy to note that BD was forced to pay each Local 79 laborer $106.44 per hour (not including the premium paid to paymasters), who BD was required to use in order to place Local 79 laborers since the paymaster had the collective bargaining agreement with Local 79.  Finally, BD did not profit from the Projects as it would have absent Local 79's conduct and threats.

27

Additionally, every time Local 79 issued a threat, BD, through its principals and staff, had numerous conferences with its clients, meetings and conferences with Local 79, exchanged countless e-mails, and took time away from focusing on its work – the completion of the Projects – to focus on the problems created by Local 79.  These increased administrative costs were directly attributable to Local 79's illegal conduct and threats against BD's clients.  Further, BD's lost future work is also recoverable.  See Fid. Interior Constr., Inc., 675 F.3d at 1261, 1265 ("A [bar] against recovery for damages based on lost opportunities to bid would eviscerate the secondary boycott law. If primary employers cannot recover damages for lost opportunities to bid, unions will have every incentive to engage in secondary boycotts because the unions ordinarily will suffer, at most, minimal financial liability, no matter how strong the proof of greater injury").

The Court in Fid. Interior Constr., Inc. further held: "This . . . go[es] beyond the Union's alleged desire to . . . 'level the playing field'; this is the blatant elimination of competition." Id. Such was Local 79's aim here.  With the Gap, BD was not awarded a single other job after the Old Navy Project and was removed from the approved vendors list in short order.  With CBRE, BD was placed on the bench for two (2) years at the direction of BofA after conducting two hundred (200) projects for BofA and consistently obtaining perfect quality scores.[8]  There is no other reason or cause for this other than Local 79's illegal coercive conduct.

In the case at bar, the Gap acknowledged that the union issues BD faced at the Old Navy Project was a substantial factor in their decision to remove BD from the approved contractors list.  Specifically, two (2) representatives of the Gap testified that the union issues were the major factor in determining whether to remove BD from the approved vendors list.  Moreover, prior to its removal, BD was not awarded the Banana Republic job on Fifth Avenue because it was a "high

---

[8] See Kataev Decl. ¶ 26, Ex. X.

28

profile" project, despite the fact that BD was the lowest bidder.  Similarly, BofA forced CBRE to remove BD from its approved contractors list for a period of two (2) years as a direct result of Local 79's activities at the BofA Project.

All of the Secondary Employers believed and understood, based on Local 79's conduct and threats, that BD's continued involvement would subject their respective project to strikes, slowdowns, and "problems" by Local 79.  This was a risk that the Secondary Employers did not want to face on future projects.  The easy solution was to keep BD out in order to avoid future problems with Local 79.  As a result, BD was no longer awarded work.  BD went from being a superstar on to an outcast as a direct result of Local 79's unlawful secondary pressure activity.

Further evidence of causal connection can be easily gleaned from Zito's email, which effectively spawned the beginning of the end of BD's budding relationship with the Gap.  It could not have been clearer as to the ultimate cause of BD's removal:

> **We cannot have union issues here.**  … These issues need to go away now.  Based on the severity and depth of this union grievance, … **I suggest the job be put on hold until the issues are resolved.**

See SMF ¶ 41 (emphasis added).  Zito from Macerich had never been mobbed by fifteen (15) business agents in such a manner in the course of his tenure as operations manager despite working on much more difficult jobs than the Old Navy Project.  Accordingly, BD has established that its damages are a direct result of Local 79's unlawful conduct.

## V.    CONCLUSION

Local 79 created disaster and wreaked havoc and chaos on BD's Projects.  Local 79 unlawfully pressured the Secondary Employers with picketing, slowdowns, threats, and other conduct in order to force the Secondary Employers to stop using BD and use Local 79 laborers at increased costs.  As a result, BD was no longer being invited to bid on future projects.  Such a swift

and decisive fall from grace can be attributed to only one reason – Local 79's unlawful threats and conduct against the Secondary Employers.  Indeed, Local 79 continued to harass the Secondary Employers during the pendency of this action by picketing a different Bank of America project shortly after the completion of discovery in this case.  In that regard, it is no wonder that the Secondary Employers chose the path of least resistance by ceasing to hire BD for future work.

Local 79 threatened and coerced the Secondary Employers that if they continued using BD, Local 79 would engage in picketing, shut downs, walk-offs, and other union activity.  The clear purpose of the threat was to force BD to use Local 79 laborers and force the Secondary Employers to stop doing business with BD.  The evidence shows, as a result, that BD incurred increased costs on the Projects and was subsequently removed from consideration for future jobs due to Local 79's conduct and threats of slowdowns and work stoppages.  For the reasons set forth above, BD respectfully requests that Defendant's motion for summary judgment be denied, that Plaintiff's motion for summary judgment on the issue of liability be granted instead, and that this Court order a hearing to determine the damages that BD should be awarded.

Dated: Lake Success, New York
     March 1, 2017

           **MILMAN LABUDA LAW GROUP PLLC**

           __/s Joseph M. Labuda, Esq._____
           Joseph M. Labuda, Esq.
           Emanuel Kataev, Esq.
           3000 Marcus Avenue, Suite 3W8
           Lake Success, NY 11042-1073
           (516) 328-8899 (office)
           (516) 328-0082 (facsimile)
           emanuel@mllaborlaw.com
           joe@mllaborlaw.com

           *Attorneys for Defendants*

To:    Cohen Weiss & Simon LLP
       <u>Attn:</u> Joseph J. Vitale, Esq.
       330 West 42nd Street, 25th Floor
       New York, NY 10036-6979
       Tel:  212.356.0238
       Fax: 646.473.8238
       Cell: 917.514.9478
       jvitale@cwsny.com

31