UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BD DEVELOPMENT, LLC,

                **Plaintiff,**

  -against-

LOCAL 79, LABORERS INTERNATIONAL
UNION OF NORTH AMERICA,

                **Defendant.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Case No.: 2:14-cv-4876 (JS) (AKT)**

**ORAL ARGUMENT REQUESTED**

# PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  REPLY STATEMENT OF UNDISPUTED FACTS ....................................................1

III. ARGUMENT ..................................................................................................................5

    A. Local 79 Misstates the Standard for Determining Coercion Violative of § 8(b)(4). ......................................................................................................................5

    B. Local 79's Attempts to Preclude Allegedly Inadmissible Evidence Fail. ......................5

    C. Local 79's Reference to the NLRB Proceedings is Inappropriate. ................................6

    D. Local 79's Remaining Arguments are Unavailing............................................................7

IV.  CONCLUSION .............................................................................................................10

i

## TABLE OF AUTHORITIES

**Cases**

Bloedorn v. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees & Helpers Local 695,
    No. 89-C-0539-C, 1989 WL 165246 (W.D. Wis. June 26, 1989) ...................................... 10

Constr. Tech., Inc. v. Cybermation, Inc.,
    No. 91-CIV.-7474 , 1996 WL 376601 (JGK) (S.D.N.Y. Apr. 30, 1996) ............................ 7

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,
    485 U.S. 568 (1988) ........................................................................................................ 10

Fleming v. Neptune World Wide Moying, Inc.,
    No. 89-CIV.-6106, 1990 WL 180553 (S.D.N.Y. Nov. 15, 1990) ......................................... 7

Gerstle v. Nat'l Credit Adjusters, LLC,
    76 F. Supp. 3d 503 (S.D.N.Y. 2015) .................................................................................. 8

Local Union No. 38, Sheet Metal Workers' Intern, Ass'n, AFL CIO v. Hollywood Heating & Cooling. Inc.,
    1 Fed. Appx. 30 (2d Cir. 2001) .......................................................................................... 6

Mazza v. Dist. Council of N.Y.,
    No. 00-CIV.-6854 (BMC) (CLP), 2007 WL 2668116 (E.D.N.Y. Sept. 6, 2007) ................. 6

Mendez v. Int'l Food House Inc.,
    No. 13-CIV.-2651 (JPO), 2014 WL 4276418 (S.D.N.Y. Aug. 28, 2014) ......................... 5-6

Nat'l Woodwork Mfrs. Ass'n v. NLRB,
    386 U.S. 612 (1967) .......................................................................................................... 5

NLRB v. Denver Bldg. & Constr. Trades Council,
    341 U.S. 675 (1951) .......................................................................................................... 9

NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of N.Y. & Vicinity, Local Union No. 638,
    429 U.S. 507 (1977) .......................................................................................................... 5

NLRB v. Local 25, Int'l Bhd. of Elec. Workers, AFL-CIO,
    383 F.2d 449 (2d Cir. 1967) .............................................................................................. 9

NLRB v. Plumbers Union of Nassau County, etc.,
    299 F.2d 497 (2d Cir. 1962) .............................................................................................. 9

Penberg v. HealthBridge Mgmt.,
    823 F. Supp. 2d 166 (E.D.N.Y. 2011) ................................................................................. 6

**Statutes**

29 U.S.C. § 158(b)(4), *et seq*............................................................................................ 5, 8, 9, 10

**Rules**

Fed. R. Evid. 801 ............................................................................................................................ 6

Fed. R. Evid. 803 ............................................................................................................................ 6

Fed. R. Evid. 804 ..................................................................................................................1, 1 n. 3, 7

## I.     PRELIMINARY STATEMENT

In seeking to avoid summary judgment against Defendant Local 79, Laborers International Union of North America (hereinafter "Defendant" or "Local 79") on liability, Local 79 argues that numerous disputes of material facts exist, all the while arguing out of the other side of its mouth that no such disputes of fact exist in *its* motion for summary judgment seeking dismissal of BD Development LLC's (hereinafter "Plaintiff" or "BD") complaint.[1]  As more fully articulated herein, Local 79's purported disputed facts are all either immaterial or misrepresentations of the facts.  This Court should therefore grant BD's summary judgment motion on liability.

## II.     REPLY STATEMENT OF UNDISPUTED FACTS[2]

Local 79 submits that there was no picketing at Brookdale because no one saw any picketing.  However, Local 79's own attendance sheets that reference "picket line" constitute an admission that it engaged in unlawful picketing.  SMF ¶¶ 169, 171-73, 175, 177, 184-85, 187, 192, 194, 197, 223.  Further, Smith, an agent of Local 79, also testified that a picket line was ultimately set up at Brookdale.  Vitale Decl. ¶ 5, Ex. D at 196:5-197:25.[3] ("Q. Did you ever set one up at Brookdale? A. Eventually, one did get set up at Brookdale").  As a result, it is irrelevant whether anyone at Brookdale witnessed any picketing because Local 79 readily admits to picketing.  These documents and testimony are admissions against interest and cannot be discounted by Local 79.  FRE § 804(b)(3).  Therefore, there is ample admissible evidence of picketing.

---

[1] Such a contradictory position speaks volumes about the merits of Defendant's own motion for summary judgment. In deciding the parties' cross-motions for summary judgment, the Court should, at a minimum, deny Defendant's motion for its unwitting admission therein.

[2] This Court is respectfully referred to Plaintiff's Statement of Undisputed Material Facts for a complete list of the undisputed facts and support in the record.

[3] Indeed, while Williamson asserted at his deposition over a year later with counsel present that this was an "error," the fact that so many members attended coupled with documented police involvement and close scrutiny by Brookdale's private security of Local 79's activities presents enough circumstantial evidence to rebut Williamson's after-the-fact assertion. Kataev Decl. ¶¶ 22-23, Exs. T and U; FRE § 804(b)(3).

1

Further, Local 79 also threatened to fight "tooth and nail" to get the entire work at Brookdale. Rosenblum Decl. ¶ 30, Ex. 28 at 2. Contrary to Local 79's contention, Connolly understood Local 79's threat to mean that if Local 79 laborers were not hired, it would set up rats and picket lines at Brookdale Hospital. Labuda Decl. ¶ 11, Ex. I at 74:6-19, 104:21-105:10 ("When they say tooth and nail, I would assume [Local 79] would take every possible option that they had in their arsenal").

Local 79 submits that its purpose in harassing and defaming Brookdale was to "inform the public and encourage Brookdale to address the way it did business." This is inaccurate. Local 79 acted in order to claim BD's work for itself. SMF ¶ 229; Kataev Reply Decl. ¶ 3, Ex. A. In fact, Labate testified that he would make threats to picket in order to "shake up" neutral employers to obtain work. Vitale Decl. ¶ 7, Ex. F at 304:15-309:15; Rosenblum Decl. ¶ 12, Ex. 10.

Local 79 further submits that there is no evidence that BD bore the expense of laborers it coerced Brookdale into having BD hire. This is similarly false. Flavoni testified that that BD paid AMG for the laborers and that Brookdale did not reimburse BD for this additional expense. Kataev Decl. ¶ 8, Ex. F at 77:7-78:22. Local 79 additionally submits that BD was not precluded from being given additional work at Brookdale despite its dispute with Local 79. However, BD has not been awarded any additional work as a result of Local 79's conduct. SMF ¶ 325.

With respect to the Mt. Sinai Job, Local 79 claims that the sole reason its laborers were hired were based on the recommendation of BD's own employees. This is not true. Local 79 was hired as a result of a conversation between Mt. Sinai and BD where Mt. Sinai informed BD that there would be problems if Local 79 was not hired. Kataev Decl. ¶ 8, Ex. F at 95:3-8. Indeed, despite any issues they had outside of Local 79's conduct, BD completed its work to Mt. Sinai's satisfaction and sought additional work. Id. at ¶ 8, Ex. F at 94:15-17; Kataev Oppo. Decl. ¶ 3, Ex. A.

2

At the Old Navy Project, Local 79 claims that Zito has no recollection as to whether Local 79 made any threats. The record clearly reflects the contrary. Zito testified that in his conversations with Local 79 and the other business agents, he was told there would be problems, picket lines, rats, shutdowns and things of that nature if BD did not utilize Local 79's laborers. Labuda Decl. ¶ 13, Ex. K at 25:12-20, 26:5-9, 29:10-15, 47:25-48:16. Local 79 also claims that there is no record evidence that BD already hired a different demolition company. This is irrelevant. BD had earmarked $80,000.00 towards demolition and expected to hire a contractor or use its own labor force for that amount. Rather, BD was forced to pay $113,000.00 for demolition to be performed by Local 79. Resp. ¶¶ 154, 362; Joseph Decl. ¶ 26, Ex. 24. Local 79 argues that there is no evidence that it effectively shut down the Old Navy Project. This is belied by the record. SMF ¶ 103 (The Gap marked the Old Navy Project as "high risk" due to delays); Id. at ¶ 105 (Store Effective Date moved primarily due to "labor actions (work stoppages)[.]"). The circumstantial evidence in the record readily establishes that All City was manipulated by Local 79 to "put the screws to BD" and prevent BD from timely completing the Old Navy Project. SMF ¶¶ 79-91; Kataev Decl. ¶ 4, Ex. B at 66:17-67:15. Local 79 similarly argues that Linear's work stoppage was not the result of Local 79's handiwork, but rather a dispute over two (2) hours' "show up" pay for a Local 79 laborer. However, Linear's own communications establish that it walked off the job due to Local 79 telling it to do so. SMF ¶ 108; Kataev Oppo. Decl. ¶ 4, Ex. B.

Additionally, Local 79 denies that it picketed Gap's offices as a result of its dispute with BD. However, this denial is suspect since the picketing began shortly after Macerich informed the Gap and BD that Local 79 will no longer be a problem at the Old Navy Project. SMF ¶¶ 113, 118; Joseph Decl. ¶ 24, Ex. 22. In addition, Local 79's denial that Smith never threatened Macerich with a picket line is also belied by the record.

3

Smith himself admits that he threatened Lindsey of Macerich with a picket line, and quoted Lindsey's response – "'Oh, God. Not again.' Q. That's what he said? A. Yeah. 'Oh, God, please, you know, like -- you know, this, you know…' … -- he didn't want to have to go through dealing with this …" Vitale Decl. ¶ 5, Ex. D at 196:5-22.

Local 79's contention that BD was not the lowest bidder on any of the projects is also inaccurate. BD was the lowest bidder on the Banana Republic job at 105 Fifth Avenue. Resp. ¶ 417; Kataev Reply Decl. ¶ 4, Ex. B. In light of this fact and the Banana Republic project's "very high-profile location," the Gap's concerns with respect to Local 79's actions at the Old Navy Project would only have been heightened. SMF ¶¶ 97, 111; Resp. ¶¶ 377, 392, 396-97, 458. BD is a good contractor who performed quality work for its first project with the Gap in the face of great adversity due to Local 79's actions. But for Local 79's conduct (which was the major problem on the project in the Gap's view), BD would have continued to perform work for the Gap. In fact, the majority of the issues complained of by the Gap stem directly from Local 79's conduct whom the Gap likened to "terrorists." SMF ¶¶ 50, 114-139; Resp. ¶ 421.

With respect to the Bank of America Project, Local 79 denies any picketing. This is similarly belied by the record where workers walked off the job based on Local 79's inducements. Specifically, the owner and a foreman at NYC Acoustics were told not to cross the Local 79 picket line. Resp. ¶¶ 126-27. Indeed, DePetro testified about the protocol for Building Trades' members to honor a picket line upon seeing a rat and it was followed at the Bank of America Project: (i) Local 79 shows up; (ii) DePetro saw a rat; (iii) DePetro and everyone at NYC Acoustics stops working; and (iv) work resumes after NYC Acoustics receives confirmation it is okay to return to work because the "issue" has been "resolved." SMF ¶¶ 64, 161, 166-67, 169, 175.

4

Perhaps the most compelling evidence of Local 79's coercive conduct comes directly from Wilde at CBRE, which was directed by Bank of America to remove BD from its approved vendors list as a direct result of Local 79's conduct. SMF ¶¶ 187-190; Labuda Decl. ¶ 9, Ex. G at 21:13-22:15, 33:16-34:14, 45:9-47:4, 61:5-62:2, 72:9-12.

It must be emphasized that Local 79 knew (and asked that) its threats were relayed to the Secondary Employers. On every project, at their request, BD informed the Secondary Employers about Local 79's threats in order to allow its clients to understand and make a decision. Moreover, BD informed the Secondary Employers about Local 79's demands because BD intended to pass on any costs due to Local 79's demands to its clients. SMF ¶¶ 114-117, 183-186, 204-207, 319-322.

### III. ARGUMENT

#### A. Local 79 Misstates the Standard for Determining Coercion Violative of § 8(b)(4).

Local 79 argues that a court may only look to the totality of the circumstances to determine whether a union's intent or object is unlawful. Local 79 misses the mark. The Supreme Court held in NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of N.Y. & Vicinity, Local Union No. 638 that in order to determine whether a union's (or its agent's) conduct constituted forbidden secondary coercion, the court must review this question under the totality of the circumstances. See 429 U.S. 507, 520 (1977) (citing Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612 (1967) (union conduct judged by circumstances)).

#### B. Local 79's Attempts to Preclude Allegedly Inadmissible Evidence Fail.

Local 79 argues that every statement in the audio recordings is inadmissible hearsay. This argument is meritless. Audio recordings, like any other statements, are not hearsay when they constitute admissions by Defendants' agents made on matters within the scope of their employment under the admissions against interest exception. Mendez v. Int'l Food House Inc., No.

5

13-CIV.-2651 (JPO), 2014 WL 4276418, at *2 (S.D.N.Y. Aug. 28, 2014) (citing FRE 801(d)(2)(D)). Here, all of the recordings constitute admissions by Local 79 to threaten picketing or otherwise issuing general, unqualified threats to the Secondary Employers. Rosenblum Decl., Exs. 1-28; Flavoni Aff. ¶¶ 19-33 and Flavoni Reply Aff. ¶¶ 5-24 (authenticating all recordings).

Similarly, Local 79 attempts to exclude an e-mail amongst Brookdale representatives (Joseph Decl. ¶ 40, Ex. 38 at BROOK5) which evinces the coercive nature of its conduct, despite the fact that these e-mails are made and kept in the ordinary course of business. FRE 803; Penberg v. HealthBridge Mgmt., 823 F. Supp. 2d 166, 187 (E.D.N.Y. 2011) (holding that e-mails are admissible under Rule 803(6) if made and maintained in ordinary course of business). Here, Brookdale's Senior Vice President of Human Resources (who deals with Brookdale's unions) reported Local 79's union activity to Connolly, the head of Brookdale's construction arm. Any e-mails concerning labor disputes would be part of Brookdale's regular business of managing construction projects. Fast, who also received the e-mail, testified that such e-mails are made and kept in the ordinary course of business. Labuda Decl. ¶ 6, Ex. D at 42:15-44:8. The e-mail is therefore admissible under the business records exception.

### C. Local 79's Reference to the NLRB Proceedings is Inappropriate.

Local 79 argues that a decision in the NLRB proceedings BD instituted against Local 79 constitute *res judicata* for the proposition that it "did not establish that Union representatives engaged in any unlawful picketing conduct." However, Local 79's argument is entirely inappropriate. Mazza v. Dist. Council of N.Y., No. 00-CIV.-6854 (BMC) (CLP), 2007 WL 2668116, at *9 (E.D.N.Y. Sept. 6, 2007) (citing Local Union No. 38, Sheet Metal Workers' Intern, Ass'n, AFL CIO v. Hollywood Heating & Cooling. Inc., 1 Fed. Appx. 30, 34 (2d Cir. 2001) ("the decision of the NLRB … not to bring unfair labor practice charges has no collateral effects in

6

federal court"); Fleming v. Neptune World Wide Moving, Inc., No. 89-CIV.-6106, 1990 WL 180553, *2 n. 1 (S.D.N.Y. Nov. 15, 1990) ("[t]he NLRB's decision not to file a complaint has no *res judicata* effect 'as it is not a final decision on the merits'"). Accordingly, this Court should disregard any reference to the NLRB proceedings.

**D.    Local 79's Remaining Arguments Are Unavailing.**

At the Old Navy Project, Local 79 argues that there is a dispute regarding what was said when Labate stormed Macerich's offices with fifteen (15) business agents. No such dispute exists. In support of its contentions, Local 79 rests on the mere denials of Mike Labate – a directly interested party – to rebut the subpoenaed, third party, disinterested, unbiased, and unadulterated testimony of Lucien Zito, who – during the time of his testimony years later – had long moved on from working at Macerich and established his own business. However, Labate's general denials are unavailing against the testimony of a neutral third-party witness. Constr. Tech., Inc. v. Cybermation, Inc., No. 91 CIVIL 7474, 1996 WL 376601 (JGK), at *2 (S.D.N.Y. Apr. 30, 1996) ("The testimony is, in fact, more probative than other testimony because it is testimony by a disinterested third party"). Zito's testimony is far more credible and believable than that of Labate, and Zito's testimony clearly establishes that Labate threatened Zito directly with picketing. Labate's denials must also be weighed against his own admissions that he regularly threatened to picket secondary employers to "shake them up" and obtain work. FRE 804(b)(3).

Contrary to Local 79's claims, Zito's testimony establishes that Local 79 was the primary impetus behind the work stoppages on the Old Navy Project: (i) in the beginning, by threatening Lucien Zito; (ii) during demolition, by denying All City manpower; and (iii) after demolition, by inducing Linear to walk off the Project. Moreover, it defies all reasonable inferences to argue that another union caused the initial shutdown when Local 79 itself called all of these other unions for

7

its "grievance." Joseph Decl. ¶ 11, Ex. 9. As a result, Local 79 is liable for all the other Building Trades' local union members' conduct because § 8(b)(4) holds a union <u>and</u> <u>its</u> <u>agents</u> liable for unlawful secondary boycott activity. See NLRA § 8(b) ("It shall be an unfair labor practice for a labor organization <u>and</u> <u>its</u> <u>agents</u>…"); Gerstle v. Nat'l Credit Adjusters, LLC, 76 F. Supp. 3d 503, 510 (S.D.N.Y. 2015) (To establish agency, a party need show that one engaged in conduct "in relation to [the alleged] transaction for the benefit of and with the knowledge and consent of the … defendants and that they exercised some control over [one] in the matter").

Local 79 wants this Court to get lost in the facts. However, there is evidence, both direct and circumstantial, that all picketing at the Gap was a result of Local 79's dispute with BD. The close temporal proximity to Local 79's rejection on the Old Navy Project and the commencement of picketing at the Gap alone establishes this inference. Local 79 argues that BD's other issues on the Old Navy Project somehow deteriorated its budding relationship with the Gap more than its purposefully destructive interference. In Local 79's fantasy world, all construction projects run smoothly in perfect harmony without any issues. However, construction projects are inherently fraught with delay, complications, and disruptions <u>without</u> Local 79's unlawful coercive conduct. This became the focus of the Gap's and BD's conversations (together with the otherwise standby party for ministerial issues, Macerich) rather than completion of the construction project. In fact, each and every representative of the Gap testified that the substantial issue on the project was Local 79's "terrorist"-like conduct and interference.

At the Brookdale Project, Local 79 argues that BD had hired AMG to perform demolition work prior to Local 79's erection of a rat. However, Local 79 ignores the myriad evidence establishing that its agents had repeatedly contacted and threatened representatives of Brookdale. <u>SMF</u> ¶¶ 229, 231-32. Local 79 also argues that its conduct was somehow limited to installing a rat

8

and distributing leaflets for informational purposes. This is simply wrong. Moreover, a union cannot engage in informational picketing when its purpose is to coerce a neutral employer into giving it work. NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 691 (§ 8(b)(4) "prohibits peaceful picketing, as well as other peaceful means of inducement and encouragement, in furtherance of an objective proscribed therein"); NLRB v. Plumbers Union of Nassau County, etc., 299 F.2d 497, 501 (2d Cir. 1962) (no effort to identify the primary indicates unlawful secondary activity). The fact that Local 79 agreed to stop conducting all union activity once it obtained work for its members readily demonstrates the real objective behind Local 79's conduct – obtaining work, not informing the public. As a result, Local 79's informational picketing is an unlawful sham. NLRB v. Local 25, Int'l Bhd. of Elec. Workers, AFL-CIO, 383 F.2d 449, 453 (2d Cir. 1967) (use of informational signs were sufficiently ambiguous such that they were being used as a signal to strike and that this type of sham informational picketing has been held illegal).

Local 79 further argues that its threats to the Secondary Employers issued through BD are somehow not considered coercive conduct. This is as inaccurate as it is nonsensical. BD repeatedly informed Local 79 that it was attempting to resolve Local 79's demands on behalf of its clients and would be reporting back on its conversations with Local 79 to its clients. Any threats of picketing to BD were relayed back to BD's clients and Local 79 knew this.

With respect to Mt. Sinai Project, Local 79 argues that nothing in the record supports an § 8(b)(4) violation. However, Local 79 ignores both crucial direct and circumstantial evidence that: (i) Local 79 threatened Mt. Sinai directly and claimed BD's work for itself; (ii) Mt. Sinai informed BD that it should hire Local 79; and (iii) BD was forced to hire Local 79 to appease Mt. Sinai. SMF ¶¶ 197-209. Under the totality of the circumstances, BD would not have hired Linear at an additional cost of ~$208,000.00 but for Local 79's unlawful threats.

9

With respect to the Bank of America Project, Local 79's argument that the record evidence of a "momentary blocking" of the entrance is insufficient to constitute a violation under § 8(b)(4) is meritless. Bloedorn v. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees & Helpers Local 695, No. 89-C-0539-C, 1989 WL 165246, at *3 (W.D. Wis. June 26, 1989) (granting temporary restraining order against union where union blocked truck for two minutes one day, and for about one minute on two other days).

Finally, Local 79 relies heavily on DeBartolo, in which a union's peaceful handbilling of businesses in a shopping mall was conducted where neither the mall nor any of the other tenants had any contractual right to influence the selection of contractors. The facts here are quite distinguishable from DeBartolo. Here, all of the Secondary Employers had complete authority to terminate BD (including Macerich, who had the power to ban BD from the mall). Further, the Court in DeBartolo did not hold, as Local 79 insists, that the First Amendment prohibits any abridgment of handbilling and picketing. In fact, DeBartolo is quite clear that handbilling with picketing could be coercively unlawful under § 8(b)(4). See 485 U.S. 568, 584.

### IV. CONCLUSION

Local 79 argues that there exist genuine disputes of material facts warranting denial of BD's motion for summary judgment.[4] However, when, properly filtered according to the totality of the circumstances, it is clear that Local 79 violated § 8(b)(4) and BD was injured as a result. Accordingly, BD's motion for summary judgment on the issue of liability should be granted, and this Court should order a hearing to determine BD's damages.

---

[4] For this reason, Local 79's motion for summary judgment must be denied since it concedes that issues of material fact exist.

Dated: Lake Success, New York
March 15, 2017

**MILMAN LABUDA LAW GROUP PLLC**

__/s Joseph M. Labuda, Esq._____
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com
joe@mllaborlaw.com

*Attorneys for Defendants*

To:  Cohen Weiss & Simon LLP
<u>Attn:</u> Joseph J. Vitale, Esq.
330 West 42nd Street, 25th Floor
New York, NY 10036-6979
Tel: 212.356.0238
Fax: 646.473.8238
Cell: 917.514.9478
jvitale@cwsny.com