UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
BD DEVELOPMENT, LLC,

<u>MEMORANDUM & ORDER</u>

                       Plaintiff,        14-CV-4876(JS)(AKT)

        -against-

LOCAL 79, LABORERS INTERNATIONAL UNION
OF NORTH AMERICA,

                       Defendant.
--------------------------------------X
APPEARANCES
For Plaintiff:     Joseph M. Labuda, Esq.
                  Emanuel Kataev, Esq.
                  Michael J. Mauro, Esq.
                  Milman Labuda Law Group, PLLC
                  3000 Marcus Avenue, Suite 3W3
                  Lake Success, NY 11042

For Defendant:     Tamir W. Rosenblum, Esq.
                  Mason Tenders District Council
                  520 8th Avenue, Suite 650
                  New York, NY 10018

                  Joseph J. Vitale, Esq.
                  Cohen Weiss and Simon LLP
                  330 West 42nd Street, 25th Floor
                  New York, NY 10036

SEYBERT, District Judge:

        This is a case involving a contractor, a labor union, and a series of alleged threats and coercive conduct spanning four jobsites and several years.  Pending before the Court are (1) Defendant Local 79, Laborers International Union of North America's ("Defendant" or "Local 79") motion for summary judgment (Def.'s Mot., Docket Entry 67) and (2) Plaintiff BD Development, LLC's ("Plaintiff" or "BD") motion for summary judgment on the

issue of liability (Pl.'s Mot., Docket Entry 75.)  The parties'
briefs total approximately 175 pages and their statements and
counterstatements of facts total over 240 pages and over 1,600
paragraphs.  Under the relevant law, the Court is required to
examine these facts in detail.  See Capitol Awning Co. v. Local
137 Sheet Metal Workers Int'l Ass'n, 698 F. Supp. 2d 308, 322
(E.D.N.Y. 2010).  For the following reasons, Defendant's motion is
GRANTED IN PART and DENIED IN PART, and Plaintiff's motion is
DENIED.

BACKGROUND[1]

I.   The Parties

        BD is a general contractor in the construction industry
and Domenico Flavoni ("Flavoni") is its President.  (Def.'s 56.1
Stmt. ¶¶ 31-32.)  At all relevant times, BD was a signatory to a
collective bargaining agreement with United Construction Trades
and Industrial Employees Local 621 ("Local 621"), which represents
some of BD's employees, such as carpenters and laborers.  (Def.'s

---

[1] The following facts are taken from the parties' Local Civil
Rule 56.1 Statements and Responses.  Any relevant factual
disputes are noted.  Internal quotation marks and citations have
been omitted.  Citations are as follows: Plaintiff's 56.1
Statement (Pl.'s 56.1 Stmt., Docket Entry 55-1); Defendant's
56.1 Response (Def.'s 56.1 Resp., Docket Entry 55-2);
Defendant's 56.1 Statement (Def.'s 56.1 Stmt., Docket Entry 70);
and Plaintiff's 56.1 Response (Pl.'s 56.1 Resp., Docket Entry
93).

56.1 Stmt. ¶¶ 35, 41.)   Neither BD nor Local 621 has an apprenticeship program for laborers.  (Def.'s 56.1 Stmt. ¶ 58.)

Local 79 is a labor organization representing general laborers in the five boroughs of New York City.  (Def.'s 56.1 Stmt. ¶ 1.)  Local 79 laborers perform construction work in connection with, inter alia, demolition and general conditions work, which includes cleaning the worksite and keeping it safe.  (Def.'s 56.1 Stmt. ¶¶ 1-2.)  Local 79 is part of the Building and Construction Trades Council of Greater New York (the "BCTC"), which is a group of unions representing workers in the construction industry. (Def.'s 56.1 Stmt. ¶ 6.)   Local 621 is not associated with the BCTC.  (Def.'s 56.1 Stmt. ¶ 66.)

Local 79 employs business agents, including George Zecca ("Zecca"), Mike Labate ("Labate"), and Barry Smith ("Smith"), who monitor construction sites, visit contractors that are signatories to a collective bargaining agreement with Local 79 ("Local 79 signatories" and each a "Local 79 signatory"), address grievances, and "look for other locations where work within the Local's jurisdiction is being performed."  (Def.'s 56.1 Stmt. ¶ 8; Pl.'s 56.1 Stmt. ¶¶ 6-8.)[2]  Additionally, Local 79 employs a number of

_____

[2] Plaintiff purports to "lack[ ] sufficient information to admit or deny" this fact.  (Pl.'s 56.1 Resp, ¶¶ 7-8.)  Where Plaintiff has failed to explicitly deny and controvert a fact, the Court will deem it admitted.  See Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be

field organizers in its Market Development Department, including Dennis Lee ("Lee") and Anthony Williamson ("Williamson"), with Chaz Rynkiewicz ("Rynkiewicz") serving as the Department's Director. (Def.'s 56.1 Stmt. ¶¶ 10-11.) While the parties dispute the means the Market Development Department uses to achieve its goals, they do not dispute one of the goals itself: "to increase Local 79's market share" by convincing developers to use Local 79 signatories. (Def.'s 56.1 Stmt. ¶ 9; Pl.'s 56.1 Resp. ¶ 9.) In connection with its efforts, the Market Development Department sometimes distributes handbills and employs a "prop," such as a large, inflated rat. (Def.'s 56.1 Stmt. ¶ 12.)

II. <u>The Bank of America Job</u>

In 2012, CBRE, a Bank of America ("BofA") project manager, hired BD as a general contractor to build BofA's new branch (the "BofA Job") located at 95 Wall Street, New York, New York ("95 Wall Street"). (Def.'s 56.1 Stmt. ¶¶ 68, 70; Pl.'s 56.1 Stmt. ¶¶ 140-41.) BD began work on the BofA Job with its own workforce--Local 621 laborers--sometime prior to October 2012. (Pl.'s 56.1 Stmt. ¶¶ 142-43.)

BofA's lease with its landlord at 95 Wall Street contained an industry-standard "union harmony clause," providing

_____

deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

that "[u]nion labor shall be used by all contractors and subcontractors performing any and all Alterations within the Building" and that "[a]ll contractors and subcontractors . . . shall work in close harmony with one another." (Def.'s 56.1 Stmt. ¶¶ 71-72.) The contract between CBRE and BD also contained a union harmony clause. (Def.'s 56.1 Stmt. ¶ 73.)

Zecca, a Local 79 business agent, learned of the BofA Job sometime prior to April 25, 2013. (Def.'s 56.1 Stmt. ¶¶ 78-79.) After discovering that BD was not a Local 79 signatory, Zecca informed Rynkiewicz, the Director of Local 79's Market Development Department, about the BofA Job. (Def.'s 56.1 Stmt. ¶¶ 81-82.) Rynkiewicz "looked into" BD and discovered that it did not have a state-certified apprenticeship program. (Def.'s 56.1 Stmt. ¶ 83.) While Plaintiff avers that his investigation was flawed and that BD prioritizes safety, Rynkiewicz testified that BD's lack of an apprenticeship program led him to conclude that BD's employees were being exploited, and that "the public needed to be notified about that." (Def.'s 56.1 Stmt. ¶¶ 83-84; Pl.'s 56.1 Resp. ¶¶ 83-84; Rynkiewicz Dep., Vitale Decl. Ex. C, Docket Entry 81-3, 60:15-21.) Accordingly, Rynkiewicz assigned Local 79 organizer Lee to take action at 95 Wall Street, the nature of which is disputed. (Def.'s 56.1 Stmt. ¶ 86; Pl.'s 56.1 Resp. ¶ 86.)

A.  <u>Local 79's Activity at the BofA Job</u>

On April 25, 2013, Lee, Zecca, and other Local 79 members went to 95 Wall Street, erected a large, inflatable rat, and distributed handbills, which read, in pertinent part, "Shame on You BD Development[.]  No Worker Deserves to be Exploited!!!  BD Development is allowing the exploitation of construction workers at their Bank of America Project at 95 Wall St. . . .  Tell BD Development all workers deserve a living wage!"  (Def.'s 56.1 Stmt. ¶¶ 86, 91; Lee Dep., Vitale Decl. Ex. A, Docket Entry 81-1, 86:25-87:17, 92:22-93:3; BofA Leaflet, Wheeler Decl. Ex. 60, Docket Entry 68-60.)  Lee testified that this was an "informational action," during which Local 79 handed out fliers and talked to the public. (Lee Dep. 17:9-18:8.)  Zecca testified that there was no "organized picketing," (Zecca Dep., Vitale Decl. Ex. E, Docket Entry 81-5, 109:12-16), and that no bullhorns, placards, or pickets were used, (Zecca Dep. 64:9-65:3).

Jonathan Lapidus ("Lapidus"), a BD laborer on the BofA Job, arrived at 95 Wall Street that morning at 7:30 a.m., an hour later than scheduled.  (Pl.'s 56.1 Stmt. ¶¶ 146, 151.)  He testified that he saw a fifteen-foot-tall "rat blown up in front of the building and about five . . . [Local 79] workers standing in front of [his] egress doors handing out fliers and picketing." (Lapidus Dep., Kataev Decl. Ex. D, Docket Entry 76-4, 27:20-28:5.)

However, he indicated that no one was actually "holding picket signs." (Lapidus Dep. 30:4-7.)

Lapidus also testified that he approached the entrance to the jobsite and told the individuals standing in front of the doors "[e]xcuse me[,] I need to get into the job site," but they "just stood there." (Lapidus Dep. 30:20-22.) He testified that a minute or two later, he repeated his request, and they then let him through. (Lapidus Dep. 30:23-31:9.) According to Lapidus, it took him "about two to three minutes to get into the job site," (Lapidus Dep. 31:13-19), and he felt intimidated, (Pl.'s 56.1 Stmt. ¶ 155). Zecca and Lee deny that they or anyone else from Local 79 blocked Lapidus' or anyone else's entry to the jobsite. (Zecca Decl., Docket Entry 73, ¶ 2; Lee Decl., Docket Entry 72, ¶ 2.)

Additionally, when Lapidus arrived at the jobsite, BD subcontractors NYMEC and More Air Mechanical were waiting outside for Lapidus to open the site. (Def.'s 56.1 Stmt. ¶¶ 88-89; Pl.'s 56.1 Resp. ¶ 89.) However, Lapidus testified that no one from New York City Acoustics, Inc. ("NYC Acoustics")--which BD had hired to perform the carpentry work at the BofA Job--was present, even though its workers were scheduled to be there at 6:30 a.m.[3] (Def.'s 56.1 Stmt. ¶¶ 76, 125; Pl.'s 56.1 Stmt. ¶ 144; Lapidus Dep. 49:3-7.) NYC Acoustics is a signatory to a collective bargaining

---

[3] Defendant disputes that NYC Acoustics was supposed to be present at the BofA Job at 6:30 a.m. (Def.'s 56.1 Resp. ¶ 160.)

agreement with the New York City District Council of Carpenters
(the "Carpenters' Union"), which, like Local 79, is affiliated
with the BCTC. (Def.'s 56.1 Stmt. ¶ 77; Pl.'s 56.1 Stmt. ¶ 16.)
Lapidus testified that he called Salvatore DePetro ("DePetro"),
NYC Acoustics' foreman, (Def.'s 56.1 Stmt. ¶ 121; Lapidus Dep.
49:8-50:4), who said "[w]e cannot show up at the job until
everything is squared off outside. . . . We're not allowed to cross
the line. We have been asked not to cross the line. . . . We
would be over after everything was resolved," (Lapidus Dep. 51:11-
52:19). According to Lapidus, DePetro did not identify who
requested that NYC Acoustics not "cross the line." (Def.'s 56.1
Stmt. ¶ 127.) That morning, Lapidus also sent an email to Flavoni
and BD's Vice President Jimie Deliteris ("Deliteris"), (Def.'s
56.1 Stmt. ¶ 33), explaining that NYC Acoustics "told me that they
were asked not to cross the line and to wait till it is resolved,"
(Apr. 25, 2013 Lapidus Email, Joseph Decl. Ex. 27, Docket Entry
78-27). Additionally, Angela Giovinazzi, an assistant project
manager at BD, (Giovinazzi Dep., Labuda Decl. Ex. O, Docket Entry
77-15, 10:20-23), testified that Michael Ceciliani, NYC Acoustics'
President, (Def.'s 56.1 Stmt. ¶ 120), told her that his employees
"wouldn't cross a picket line."[4] (Giovinazzi Dep. 65:8-66:22.)

---

[4] Defendant objects to Lapidus' and Giovinazzi's testimony about
these conversations on hearsay grounds. (Def.'s 56.1 Resp. ¶¶
165-67.) See infra n. 28.

DePetro, on the other hand, testified that he did not recall seeing an inflated rat or whether there was a work stoppage, (DePetro Dep., Labuda Decl. Ex. F, Docket Entry 77-6, 32:1-9), did not speak to anyone from Local 79 regarding 95 Wall Street, and did not recall a conversation with Lapidus about being asked not to work, (Def.'s 56.1 Stmt. ¶¶ 123-24, 128).  In response, Plaintiff highlights that DePetro appears to recall little about that day.  (Pl.'s 56.1 Resp. ¶¶ 123, 128; see DePetro Dep. 47:22-48:3 ("Have you ever experienced any type of job actions from Local 79 on any jobs you have worked on with NYC Acoustics?  A.  Not that I can remember.  Q.  How good is your memory, by the way?  A. Well, this all happened then.  Not too good, I would think."), 35:21-36:14 ("I am not saying that [I didn't call NYC Acoustics to find out what the story is about honoring or not honoring the picket line].  I don't recall it happening.").)  DePetro testified that generally, as a member of the Carpenters' Union, if he were to see a union's inflated rat, he would inform his office and Local 79 "would contact the other trades working on that job and ask them to honor the picket line . . . or the action."[5]  (DePetro Dep. 28:11-29:2.)  He continued that someone from NYC Acoustics would

---

[5] When asked whether there was an agreement that other BCTC unions would help Local 79 in protest activity, Zecca testified "hopefully, if you're a good union guy, maybe you'd like to honor that picket line.  That would be up to you. . . .  There's no written agreement, that I know of."  (Zecca Dep. 47:7-48:7.)

then contact the Carpenters' Union, his office "would confirm it if [they are] honoring the strike," and a Carpenters' Union delegate would confer with a Local 79 delegate and give "direction as to whether or not [he is] supposed to continue working." (DePetro Dep. 29:3-30:24.) DePetro would work at the site "[u]ntil they said stop." (DePetro Dep. 29:19-23.) DePetro also testified that on other jobs, he and his coworkers have stopped work and honored another union's strike until the dispute was resolved. (DePetro Dep. 30:20-31:24.)

## B. Resolution

After entering the jobsite, Lapidus called Deliteris and Flavoni to tell them about Local 79's activities. (Def.'s 56.1 Stmt. ¶ 96; Pl.'s 56.1 Resp. ¶ 96.) Flavoni and Zecca then spoke, and Zecca told Flavoni that BD could resolve the issue by using a Local 79 laborer at the BofA job. (Def.'s 56.1 Stmt. ¶ 97; Pl.'s 56.1 Resp. ¶ 97.) Flavoni informed Zecca that BD had used Riteway Internal Removal Inc. ("Riteway"), a Local 79 signatory, for demolition or carting work at the site, and the two agreed that BD would use Riteway as a paymaster[6] for a Local 79 laborer to perform

---

[6] A paymaster is a Local 79 signatory that accepts payment for a Local 79 laborer from a contractor that is not a Local 79 signatory. (Pl.'s 56.1 Stmt. ¶ 180; Def.'s 56.1 Resp. ¶ 180.) This arrangement allows a non-Local 79 contractor to use a Local 79 laborer. (Labate Dep., Vitale Decl. Ex. F, Docket Entry 81-6, 83:25-84:8.) A paymaster ultimately costs a contractor more money because it "marks up" the labor rates that the contractor has to pay. (Labate Dep. 85:11-15.)

work.  (Def.'s 56.1 Stmt. ¶ 97; Pl.'s 56.1 Resp. ¶ 97; Pl.'s 56.1

Stmt. ¶ 179; Def.'s 56.1 Resp. ¶ 179.)  Once Riteway confirmed

that it would provide BD with a laborer, Local 79 ceased its

activity, and neither CBRE nor BofA were involved in the

resolution.  (Def.'s 56.1 Stmt. ¶¶ 100-02; Pl.'s 56.1 Resp. ¶¶

100-02.)  BD informed CBRE that Local 79 had inflated a rat and

picketed at the job and that BD resolved the issue "within 30

minutes."  (Def.'s 56.1 Stmt. ¶ 104; Apr. 2014 Flavoni Email,

Wheeler Decl. Ex. 11, Docket Entry 68-11.)  CBRE did not reimburse

BD for the cost of the laborer.  (Pl.'s 56.1 Stmt. ¶ 194.)

     With respect to NYC Acoustics, Lapidus testified that

its employees ultimately came to the BofA Job at about 10:30 a.m.,

after Local 79's activities had concluded, then left after

approximately fifteen minutes without having done any work.

(Lapidus Dep. 71:2-72:2.)

C.  <u>CBRE's and BofA's Involvement</u>

     Lee and Zecca testified that they did not speak to CBRE,

BofA, or NYC Acoustics regarding Local 79's activities at the BofA

Job.  (Lee Dep. 80:14-82:21; Zecca Dep. 66:4-7; 75:20-77:9.)

However, Plaintiff cites Giovinazzi's testimony that BofA

representative Jeannie Choi ("Choi") and either CBRE's Director of

Project Management Christine Wilde ("Wilde") or CBRE's Project

Manager Howard Martin ("Martin") called BD about Local 79.  (Pl.'s

56.1 Stmt. ¶¶ 171-73; Giovinazzi Dep. 26:23-27:19, 28:21-29:24.)

Giovinazzi acknowledges that she was not part of those conversations, (Giovinazzi Dep. 27:8-29:24), and Defendant objects to her testimony on hearsay grounds, (Def.'s 56.1 Resp. ¶ 171). Flavoni also testified that he did not speak to anyone at BofA about the job, but that he discussed Local 79's rat with Martin. (Flavoni Dep., Kataev Decl. Ex. F, Docket Entry 76-6, 61:21-62:23.) Additionally, Deliteris testified that he and/or Flavoni notified a CBRE representative--probably Martin--about Local 79's activities at the BofA Job, and that the CBRE representative said "we need to make them stop, we need to make them go away." (Deliteris Dep., Kataev Decl. Ex. G, Docket Entry 76-7, 82:24-84:20.) Wilde testified that she learned of Local 79's alleged conduct at the BofA Job from Martin. (Pl.'s 56.1 Stmt. ¶ 175; Def.'s 56.1 Resp. ¶ 175.) She considers Local 79 to be a "very dirty union" because it "coerced people into hiring their laborers with the rat up in front of buildings." (Def.'s 56.1 Stmt. ¶ 106.)

D.    BofA Recommends Against Using BD on High-Profile Jobs

The BofA Job was BD's first large, high-profile job--that is, a job worth over $500,000 in the five boroughs--for BofA. (Def.'s 56.1 Stmt. ¶¶ 113-14.) From approximately April 2013 until approximately April 2015, BofA recommended that CBRE not use BD on such jobs, including five or six jobs during that period. (Def.'s 56.1 Stmt. ¶¶ 113, 116.) While Wilde testified that she did not know specifically why BofA asked that CBRE exclude BD from large,

high-profile bids, she thought it was because of "reputational risk," that BD was "too small" and that there was "too much risk" "[w]ith respect to protest activity by Local 79." (Wilde Dep., Labuda Decl. Ex. G, Docket Entry 77-7, 88:2-23.) Additionally, based on conversations with BofA, she testified that BofA was apprehensive about using BD on these projects because of "protest activity" at the BofA Job and the "potential for more protests," which "paints the image" that CBRE and BofA are nonunion. (Wilde Dep. 59:18-60:13.) Further, she testified that BofA never requested that BD be removed from the invited vendor list prior to the protest activity at the BofA Job. (Wilde Dep. 88:24-89:4.)

Because she thought that BD was as an excellent contractor, Wilde was able to have BofA reconsider its decision and BD was put back on the approved vendors list. (Pl.'s 56.1 Stmt. ¶¶ 332-33.) Since approximately April 2015, BofA has allowed CBRE to use BD on large, high-profile projects, and BD bid successfully on five jobs for BofA in 2014 and 2015. (Def.'s 56.1 Stmt. ¶¶ 117-18.)

III. The Mount Sinai Job

In June 2012, BD entered an agreement with The Mount Sinai Hospital ("Mount Sinai") to renovate a twenty-bed observation unit (the "Mount Sinai Job"). (Def.'s 56.1 Stmt. ¶ 469; Pl.'s 56.1 Stmt. ¶ 197.) Mount Sinai uses only union contractors. (Def.'s 56.1 Stmt. ¶ 476.) Edward Chang ("Chang"),

the Director of Facilities, Design, and Construction for Mount Sinai, confirmed that BD was a union contractor before it started the Mount Sinai Job, and Mount Sinai's contract with BD contained boilerplate language that required BD to "use all reasonable efforts to maintain good relations with labor unions . . . to maintain peaceful laborer relations and a trouble-free job site." (Def.'s 56.1 Stmt. ¶¶ 468, 474-77; Pl.'s 56.1 Stmt. ¶ 199 (ellipsis in original).)

A.   <u>Union Action at Mount Sinai</u>

Chang received a call from a union--though he did not recall whether it was a carpenters union or a laborers union-- which told him that Mount Sinai had to use the union's members. (Def.'s 56.1 Stmt. ¶ 471; Chang Dep., Labuda Decl. Ex. M, Docket Entry 77-13, 13:25-14:25.)  When asked at his deposition whether the union mentioned "picketing," Chang testified "Yeah. . . .  I heard that [the] union will be, you know, putting up a rat." (Chang Dep. 17:10-23.)  Chang later testified that he did not believe the union talked about picketing, shutdowns, or slowdowns. (Chang Dep. 25:20-26:3.)

Further, while BD was working on the Mount Sinai Job, a union erected a rat.  (Def.'s 56.1 Stmt. ¶¶ 478, 481.)  Chang testified that there were people stationed near the rat handing out pamphlets, though he did not identify which union was responsible for the activity.  (Chang Dep. 22:18-23:11, 24:17-

25:8.)  According to Chang, rats are erected so often at Mount Sinai that he does not pay much attention to them.  (Def.'s 56.1 Stmt. ¶ 479.)  However, Chang testified that he had a conversation with BD in which he asked it to resolve the dispute so that the rat in front of the hospital would be taken down.  (Chang Dep. 26:4-20.)

Citing an affidavit containing the testimony of Flavoni (the "Flavoni Affidavit"), Plaintiff avers that the union that called Chang was Local 79.  (Flavoni Aff., Docket Entry 101, ¶ 117.)  In the affidavit, Flavoni testifies that Local 79 inflated the rat and "actually picketed Mt. Sinai," (Flavoni Aff. ¶ 118), and asserts that Flavoni relayed Local 79's threats to Mount Sinai, (Pl.'s 56.1 Stmt. ¶¶ 204-07; Flavoni Aff. ¶¶ 42-45).  Defendant denies these contentions, citing Flavoni's and Deliteris' deposition testimony that they did not speak to anyone from Local 79 regarding the Mount Sinai Job, (Def.'s 56.1 Resp. ¶¶ 204, 207; Flavoni Dep. 84:25-85:6; Deliteris Dep. 28:4-7), and Flavoni's testimony that he was unsure whether anyone from BD spoke to anyone from Local 79 regarding the Mount Sinai Job, (Flavoni Dep. 85:7-10).

However, Flavoni did speak to Ken Bluhm of the Carpenters' Union about the Mount Sinai job.  (Def.'s 56.1 Stmt. ¶ 473.)  Further, Giovinazzi testified that a BD superintendent told her that Local 79 was behind the union activity at Mount

15

Sinai, but that she does not recall much about the job and does not know the difference between Local 79 and the Carpenters' Union.[7]  (Giovinazzi Dep. 43:6-45:14.)

B.  BD Hires Linear

BD used Linear Contracting ("Linear"), a Local 79 signatory, to serve as a paymaster to provide a laborer on the Mount Sinai Job.  (Def.'s 56.1 Stmt. ¶ 483; Pl.'s 56.1 Stmt. ¶ 208.)  At his deposition, Flavoni testified that he hired Linear to perform general conditions cleanup based on the recommendation of BD superintendent Mel Conroy ("Conroy"), who said that BD had to use Local 79 because Mount Sinai has had problems with the union in the past.  (Flavoni Dep. 91:24-93:7, 95:15-21.)  Flavoni testified that Chang did not direct BD to hire a Local 79 signatory and did not care which union BD used.  (Flavoni Dep. 93:12-94:21.) Further, Flavoni testified that Michael Cain ("Cain"), Mount Sinai's project manager for the job, agreed with BD's decision to use Local 79, but that he spoke with Cain only after BD hired Linear.  (Flavoni Dep. 95:3-95:21.)  Citing the Flavoni Affidavit, however, Plaintiff claims that BD was forced to hire a Local 79 laborer because of Local 79's picketing and threat of union activity.  (Pl.'s 56.1 Resp. ¶ 483; Flavoni Aff. ¶¶ 117-18.)

---

[7] Defendant objects to her testimony on hearsay grounds.  (Def.'s 56.1 Resp. ¶ 203.)  See Discussion infra Section V.B.

C.   End to a Troubled Relationship

BD and Mount Sinai's relationship became strained.  BD
was unhappy with Mount Sinai during the job, telling it in October
2013 that it wanted to finish the work and "be gone."  (Def.'s
56.1 Stmt. ¶ 486.)   From Mount Sinai's perspective, Chang was
concerned about the frequency with which BD submitted change orders
seeking additional compensation for work BD claimed was outside
the scope of its contract.   (Def.'s 56.1 Stmt. ¶ 484.)   Chang
testified that he was concerned that BD was "playing games with
change orders," (Chang Dep. 61:12-22, 62:15-18), and had slowed
its work because Mount Sinai had not approved and paid change
orders, (Chang Dep. 75:11-15).   Citing the Flavoni Affidavit, BD
disputes Chang's testimony.  (Pl.'s 56.1 Resp. ¶¶ 485, 487; Flavoni
Aff. ¶¶ 121-22.)

Mount Sinai considered terminating BD mid-job because BD
refused to continue to work unless Mount Sinai paid outstanding
change orders, though BD ultimately completed the job to Mount
Sinai's satisfaction.  (Def.'s 56.1 Stmt. ¶ 488; Pl.'s 56.1 Resp.
¶ 488.)  Additionally, Chang decided mid-job that he was not going
to invite BD to submit bids on future work.   (Def.'s 56.1 Stmt.
¶ 489.)  Chang testified that he made this decision not because of
the inflation of a rat, but because of his negative experiences
with and being "held hostage by" BD.  (Chang 96:2-97:17, 118:25-
119:8.)   Again, Plaintiff disputes Chang's testimony with

Flavoni's affidavit testimony that "Local 79's conduct affected Mt. Sinai's assessment of BD because Mt. Sinai never awarded BD any more projects following what occurred at the Mt. Sinai job site." (Flavoni Aff. ¶ 123.)

IV. <u>The Brookdale Job</u>

In 2014, Brookdale Hospital Medical Center ("Brookdale" or "Brookdale Hospital") began a project that involved expanding a family care clinic in Brooklyn, New York (the "Brookdale Job"), and it used BD as its construction manager.[8] (Def.'s 56.1 Stmt. ¶¶ 129, 146-47.) Brookdale Hospital is located at 1 Brookdale Plaza and the clinic--the site of the Brookdale Job--is located at 1110 Pennsylvania Avenue; the two locations are approximately one-and-a-half miles apart. (Pl.'s 56.1 Stmt. ¶¶ 210-12.) Construction on the Brookdale Job began around mid-April 2014 and concluded in approximately February 2015. (Def.'s 56.1 Stmt. ¶ 153.) In line with its general practice, Brookdale required BD to use union labor on the Brookdale Job. (Def.'s 56.1 Stmt. ¶¶ 136, 149.)

A. <u>Local 79 Learns of the Brookdale Job</u>

Labate, a Local 79 business agent, came to the Brookdale Job on or about April 24, 2014. (Def.'s 56.1 Stmt. ¶¶ 160-61.) He went into a project meeting and introduced himself, and

---

[8] Plaintiff notes that Brookdale used BD as its general contractor. (Pl.'s 56.1 Resp. ¶ 147.)

Deliteris escorted him out of the meeting. (Def.'s 56.1 Stmt. ¶ 162.) Labate then asked Deliteris if any Local 79 laborers would be performing work at the Brookdale Job, since it was within Local 79's jurisdiction. (Def.'s 56.1 Stmt. ¶ 163.)

Rynkiewicz testified that he then assigned Local 79 organizer Williamson "to do hand billing at Brookdale Hospital because there w[ere] workers being exploited" there. (Rynkiewicz Dep. 36:2-10.) Williamson testified that he was concerned about BD and wanted Brookdale "to look into the way they are doing business," (Williamson Dep., Vitale Decl., Ex. B, Docket Entry 81-2, 23:2-14), and that his actions at Brookdale were directed toward "[i]nforming the public about what the hospital was doing." (Williamson Dep. 26:6-21.)

Williamson also called Brookdale directly on three occasions, (Pl.'s 56.1 Stmt. ¶ 229), because he wanted Brookdale to "look into the way [it was] doing business by hiring credible contractors who treat their workers with dignity and respect." (Williamson Dep. 28:9-16.) Williamson added that he felt BD was not a "credible contractor," (Williamson Dep. 28:17-19), and conceded that when he contacted Brookdale directly, he was not trying to inform the public about Brookdale. (Pl.'s 56.1 Stmt. ¶ 232.) Williamson testified that he wanted Brookdale to use a Local 79 contractor, though he did not express that sentiment the first time he spoke to Brookdale. (Williamson Dep. 23:15-21.)

B. <u>BD Hires AMG for Demolition Work</u>

On May 12, 2014, BD entered into an agreement with AMG Environmental Restoration LLC ("AMG"), a Local 79 signatory, to perform demolition work at the Brookdale Job. (Def.'s 56.1 Stmt. ¶¶ 155-56, 158.) BD chose AMG because Brookdale had instructed BD to use women-owned businesses where possible, a woman owns AMG, and AMG's bid was reasonable. (Def.'s 56.1 Stmt. ¶ 155.) The record is unclear as to who paid the additional expense of using AMG for demolition work. (Def.'s 56.1 Stmt. ¶ 157; Pl.'s 56.1 Resp. ¶ 157; Pl.'s 56.1 Stmt. ¶ 323; Def.'s 56.1 Resp. ¶ 323.) Jay Fast ("Fast"), Brookdale's Director of Planning, Design, and Transition, (Def.'s 56.1 Stmt. ¶ 131), testified that he did not remember discussing whether BD would pay the increased cost for using Local 79 laborers for demolition work, (Def.'s 56.1 Stmt. ¶ 157; Fast Dep., Labuda Decl. Ex. D, Docket Entry 77-4, 38:12-16). Plaintiff claims that it paid the additional cost, citing the testimony of Gerard Connolly ("Connolly"), Brookdale's Senior Vice President of Facility Planning and Development, (Def.'s 56.1 Stmt. ¶ 130), that "[a]ny money above the agreed upon budget that didn't have a purchase order attached, we wouldn't pay. . . . If [BD] didn't get [Brookdale's] approval to spend any money, whether it's [Local] 79 or whatever, [Brookdale] wouldn't pay for it." (Pl.'s 56.1 Resp. ¶ 157; Connolly Dep., Labuda Decl. Ex. I, Docket Entry 77-9, 51:6-52:4.) However, Plaintiff cites no evidence

showing whether it requested or received such approval from Brookdale.

The parties also dispute why BD did not use its own workforce for demolition. (Def.'s 56.1 Stmt. ¶ 154; Pl.'s 56.1 Resp. ¶ 154.) Nicola Capozza ("Capozza"), BD's project manager for the Brookdale Job, (Pl.'s 56.1 Stmt. ¶ 221), testified that he believed BD did not have the manpower to handle the work, (Capozza Dep., Kataev Decl. Ex. C, Docket Entry 76-3, 46:3-21). However, Deliteris testified that BD initially intended to do the demolition work with its own employees, but that when "there was pressure put on Brookdale, that's when [BD] decided to go with" AMG. (Deliteris Dep. 34:16-36:25.) Additionally, Fast testified that he understood that BD used a Local 79 demolition contractor at the beginning of the Brookdale Job to appease Local 79. (Fast Dep. 74:18-25.)

C.   Union Activity at Brookdale

1.   Local 79's Presence at Brookdale

On May 12, 2014, after AMG was selected by BD and began demolition work at the Brookdale Job, Local 79 inflated a rat opposite Brookdale Hospital's main entrance and near the Brookdale urgent care center.[9]  (Def.'s 56.1 Stmt. ¶¶ 169, 176; Pl.'s 56.1

---

[9] Plaintiff denied that it issued a contract to AMG before Local 79 inflated a rat balloon at Brookdale on May 12, 2014, stating that BD selected AMG after "Local 79 commenced its campaign of threatening to conduct union activity." (Def.'s 56.1 Stmt.

Resp. ¶ 169.)   William Duggan ("Duggan"), Vice President of Security for Brookdale, (Def.'s 56.1 Stmt. ¶ 132), testified that he remembered that the rat was in "close proximity" to the urgent care center's entrance, and that he "believe[d] at one time there was a dialogue with the police" and Local 79 but did not recall whether it resulted in the rat being moved, (Duggan Dep., Labuda Decl. Ex. C, Docket Entry 77-3, 22:9-14; 27:6-21).   And while Duggan did have safety concerns over Local 79's activity, the concerns related to it being "a very congested area" in front of a hospital, where there are "a lot of vehicle accidents" and where large crowds might gather; "[i]t had nothing to do with this rat thing."   (Duggan Dep. 31:12-32:13.)

---

¶ 155, 176; Pl.'s 56.1 Resp. ¶¶ 155, 176.)   However, Plaintiff does not cite evidence that supports its denial:   The cited evidence shows only that the Brookdale Job began in April 2014, (Capozza Dep. 13:24-14:6), that a Brookdale employee was concerned about Local 79's possible inflation of a rat on May 13, 2014, (Connolly Dep. 53:15-54:15), and that BD and AMG entered into their contract on May 12, 2014 (AMG Contract, Wheeler Decl. Ex. 38, Docket Entry 68-38 (The Court notes that Plaintiff also mischaracterized this evidence, claiming that "BD and AMG entered into a subcontract agreement later that day," when the contract is silent as to the time of day it was entered.)).   (Pl.'s 56.1 Resp. ¶ 176.)   This evidence does not undermine or contradict the testimony of Plaintiff's own employees that AMG was selected and began work before Local 79 inflated its rat at Brookdale.   (Deliteris Dep. 37:5-15 ("Q:   So AMG was selected before the rat went up?   A:   Yes."); Weigel Dep., Kataev Decl. Ex. A, Docket Entry 76-1, 134:18-135:1 (Q: . . . [H]ad AMG already started to perform demo work as of May 12th?   A: Yes, they did.   Q: Had they been doing the demo work prior to May 12th during the day?   A: Yes.").)

In addition to inflating the rat, two to five people near the rat handed out leaflets, which read, in part, "Shame on Brookdale Hospital Medical Center. Brookdale Hospital Medical Center is allowing BD Development LLC to exploit construction workers @ 1110 Pennsylvania Ave. in Brooklyn." (Def.'s 56.1 Stmt. ¶ 171; Brookdale Leaflet 1, Wheeler Decl. Ex. 78, Docket Entry 68-78.) A disclaimer in small text at the bottom of the leaflet provided: "This leaflet is directed at the public and is not an inducement for anyone to stop working or making deliveries." (Brookdale Leaflet 1.) A different leaflet also appears to have been distributed, (Brookdale Leaflet 2, Kataev Decl. Ex. W, Docket Entry 76-23), which read, in relevant part: "Brookdale Hospital Medical Center is allowing BD development to exploit construction workers @ 1110 Pennsylvania Ave in Brooklyn. Brookdale's theory to hire exploitive contractors to cut costs may potentially result in workers being exposed to unsafe work conditions that can lead to them becoming patients at Brookdale Hospital. We hope Brookdale doesn't have the same theory for their Medical Practices. We demand quality, safe construction!" (Brookdale Leaflet 2.) This leaflet contained the same disclaimer as the other. (Brookdale Leaflet 2.) Connolly testified that he believed that this leaflet was damaging to Brookdale's reputation and "would create the perception in the people that walked in the door that we are not providing quality healthcare." (Connolly Dep. 90:4-92:9.)

Connolly was also concerned that the flyer would create undue anxiety for Brookdale's patients. (Pl.'s 56.1 Stmt. ¶ 260; Def.'s 56.1 Resp. ¶ 260.)

Williamson testified that this job action targeted Brookdale, not BD, (Williamson Dep. 38:2-8), with the "objective" of getting Brookdale to meet with business agents to "resolve the situation," (Williamson Dep. 39:5-14, 41:19-42:6). He also testified that "this was basically a publicity campaign informing the public of Brookdale's way of doing business," and that he "wanted to put pressure on Brookdale to hire contractors that treat their workers with dignity, respect, and pay a good wage." (Williamson Dep. 63:16-25.)

Local 79 denies ever picketing or engaging in activity other than inflating a rat and handing out leaflets at Brookdale. In support, Defendant cites the deposition testimony of Brookdale employees Duggan, Fast, Connolly, and Khari Edwards ("Edwards")-- Vice President of External Affairs for Brookdale (Def.'s 56.1 Stmt. ¶ 134)--none of whom reported witnessing additional union activity. (Def.'s 56.1 Stmt. 187.)

Plaintiff responds that Local 79 set up a picket line at Brookdale on May 12, 13, 16, 19, 20, and 21, 2014. (Def.'s 56.1 Stmt. ¶ 194; Pl.'s 56.1 Resp. ¶ 194.) Plaintiff cites the deposition testimony of Deliteris that Local 79 agents were "walking back and forth on the sidewalk" and handing out leaflets

near the rat. (Pl.'s 56.1 Resp. ¶ 172; Deliteris Dep. 93:7-95:17.)
Additionally, Plaintiff points to attendance sheets from Local
79's action at Brookdale, on which Williamson wrote "picket line"
as the description of the "Event." (Def.'s 56.1 Stmt. ¶ 194; Pl.'s
56.1 Resp. ¶ 194; May 2014 Brookdale Attendance Sheets, Wheeler
Decl. Ex. 80, Docket Entry 68-80.) Williamson, who completed the
attendance sheets, testified that writing "picket line" was a
"sloppy" or "old time" way of referring to Local 79's activity at
Brookdale, and that he should have written "informational" or "job
action." (Def.'s 56.1 Stmt. ¶ 191; Williamson Dep. 70:25-71:11.)
Rynkiewicz also testified that Williamson did not complete the
attendance sheets properly. (Rynkiewicz Dep. 138:12-141:4.)

   2. <u>Brookdale's Reaction</u>

  On May 12, 2014, Mark Toney ("Toney"), Brookdale's
President and CEO, (Def.'s 56.1 Stmt. ¶ 129), emailed Connolly and
others that he thought the dispute between Local 79 and BD had
been resolved and that he understood the dispute to be "one union
against another,"[10] (Pl.'s 56.1 Stmt. ¶ 234). Connolly then wrote
to Fast that BD had to "rescue this now," (Pl.'s 56.1 Stmt. ¶ 234),
by which he meant that BD should "deal directly with Local 79 and

---

[10] Connolly and Fast also understood that Local 79's activity
arose out of a dispute between Local 79 and Local 621. (Pl.'s
56.1 Stmt. ¶¶ 235, 277.)

resolve the issue," potentially by getting a Local 79 laborer, (Connolly Dep. 46:16-47:18).

### 3. Efforts to End Local 79's Activity

On May 13, 2014, Local 79 again demonstrated at Brookdale. (Def.'s 56.1 Stmt. ¶ 169; Pl.'s 56.1 Resp. ¶ 169.) Connolly sent Deliteris, and Flavoni an email about the rat. (Pl.'s 56.1 Stmt. ¶ 244.) He testified that his email was meant to get BD to take action to remove the rat and that he believed Local 79 was using the rat to coerce Brookdale into using Local 79 labor. (Pl.'s 56.1 Stmt. ¶ 244.) Later that day, Flavoni called Labate, who explained that Local 79 had erected the rat at Brookdale because BD and Local 79 had not resolved whether Local 79 laborers would be performing work on the Brookdale Job. (Pl.'s 56.1 Stmt. ¶ 239; May 13, 2014 Audio Tr., Rosenblum Decl. Ex. 1, Docket Entry 69-1, at 2-3.)[11] Labate told Flavoni that he wanted to "claim [his] jurisdictional . . . work" and "get some general conditions work." (Pl.'s 56.1 Stmt. ¶ 246.) Flavoni then emailed Connolly that Labate "clearly stated what he is looking for," and Connolly testified that he recalled this to mean "he was looking for all of the general conditions," which he understood to include

---

[11] Flavoni recorded some of his conversations with Local 79 agents and employees, as well as those with various third parties, (Flavoni Dep. 12:7-13:16), and Defendant produced transcripts of those conversations, (Rosenblum Decl., Docket Entry 69, ¶ 2).

"the project manager, the paperwork and the laborer to clean up the site." (Pl.'s 56.1 Stmt. ¶ 248; Def.'s 56.1 Resp. ¶ 248; Connolly Dep. 68:15-69:23.) At Toney's request, Connolly asked "BD to reach out to Local 79 at Brookdale's behest to find out what [Local] 79 wanted in order to end this protest activity with the . . . rat and the flyers." (Connolly Dep. 69:24-70:14.)

Flavoni called Labate to schedule a meeting, (Pl.'s 56.1 Stmt. ¶ 250), and Local 79 did not inflate the rat on May 14, 2014 so they could meet, (Def.'s 56.1 Stmt. ¶ 178). The two discussed using a Local 79 laborer for general conditions work, in which case Local 79 would consider ceasing its organizing activities. (Def.'s 56.1 Stmt. ¶ 179; Pl.'s 56.1 Resp. ¶ 179; May 14, 2014 Audio Tr., Rosenblum Decl. Ex. 4, Docket Entry 69-4, at 5, 7, 14-15, 20-21.) Labate said that BD's use of its own workers is "going to be an issue, unless you want to sign with" Local 79. (May 14, 2014 Audio Tr. at 5.) Additionally, Labate said that, typically, if he cannot resolve a job situation and no one from the job calls him back, his boss will direct him to "put a line up," and that that is "kind of" what happened at Brookdale.[12] (May 14, 2014 Audio Tr. at 6.)

---

[12] While listening to portions of the recording of that conversation at his deposition, however, Labate testified that "put the line up" is "just a term," which he agreed could include "putting up a picket line or a rat or doing leafleting or something along those lines." (Labate Dep. 283:8-284:19.)

That same day, BD filed unfair labor practice charges with the National Labor Relations Board ("NLRB") challenging Local 79's alleged "illegal activities." (Def.'s 56.1 Stmt. ¶ 181.)

### 4. BD Declines to Use a Local 79 Laborer

On May 15, 2014, Flavoni told Labate that BD would not use a Local 79 laborer to perform general conditions work at Brookdale. (Def.'s 56.1 Stmt. ¶¶ 182-83.) During their conversation, Labate told Flavoni that Local 79's organizing department "does those picket lines," and that there were a few issues Local 79 had with BD: (1) "the area standard from New York which [BD is] not paying"; (2) "the certified apprenticeship program by the state, which [BD doesn't] have"; and (3) "the jurisdictional work," regardless of whether BD is union or nonunion. (May 15, 2014 Audio Tr., Rosenblum Decl. Ex. 5, Docket Entry 69-5, at 1-2.) Flavoni emailed Connolly that day to inform him that BD and Local 79 could not reach an agreement. (Pl.'s 56.1 Stmt. ¶ 253.)

On May 16 and May 19 through 21, 2014, Local 79 resurrected its rat and resumed its activities at Brookdale. (Def.'s 56.1 Stmt. ¶¶ 184-85; Pl.'s 56.1 Resp. ¶¶ 184-85.) On May 20, Connolly sent an email stating that if the NLRB did not make a decision by noon, Connolly would have to "step in" and direct BD to hire four or five Local 79 laborers to end the protest activity. (Pl.'s 56.1 Stmt. ¶ 254; Def.'s 56.1 Resp. ¶ 254.) He

testified that he would have to "readjust the cost" to "see if we could take money from somewhere else" to pay for the laborers. (Connolly Dep. 84:11-22.)

On May 21, 2014, the NLRB dismissed the unfair labor practice charge filed by BD. (Def.'s 56.1 Stmt. ¶ 199.)

### 5. BD hires Local 79 to Perform General Conditions Work

On May 21, 2014, Connolly informed BD that the rat was back up, that there was a new flyer with Toney's name on it, and that he believes it would be in everyone's best interest to resolve the issue quickly. (Pl.'s 56.1 Stmt. ¶ 269.) That day, BD arranged with AMG to serve as paymaster for a Local 79 laborer to perform general conditions work,[13] and entered an agreement with AMG to that effect on May 27, 2014. (Def.'s 56.1 Stmt. ¶¶ 200-01; Pl.'s 56.1 Resp. ¶ 201; Pl.'s 56.1 Stmt. ¶ 279.) According to Williamson, BD used Local 79 workers because of Local 79's actions at Brookdale, and the situation was resolved. (Williamson Dep. 56:3-24.)

BD's use of Local 79 laborers resulted in an increase to the cost of the Brookdale Job. (Pl.'s 56.1 Stmt. ¶ 323.) However,

---

[13] Plaintiff purports to deny this fact, but does not cite evidence that contradicts it. (Pl.'s 56.1 Resp. ¶ 200.) Instead, Plaintiff cites testimony that Toney was upset about the inflation of the rat at Brookdale, that Brookdale felt pressured by Local 79's union activity, and that Brookdale, in turn, pressured BD. (Pl.'s 56.1 Resp. ¶ 200; Fast Dep. 60:09-63:10.)

it is unclear who bore the additional cost; Defendant highlights Fast's testimony that the cost of the laborers would be "sent to the hospital," because it was "paying for the job," (Pl.'s 56.1 Stmt. ¶ 323; Def.'s 56.1 Resp. ¶ 323; Fast Dep. 35:24-36:10).

### 6. The Carpenters' Union

Around the same time, the Carpenters' Union--part of the BCTC, like Local 79--was protesting at Brookdale. (Weigel Dep. 142:15-143:3.) Weigel, a BD construction superintendent who became superintendent for the Brookdale Job in the spring of 2014, testified that their activity generally started around 7:00 or 8:00 a.m. and ended around 1:00 or 2:00 p.m. (Weigel Dep. 134:8-17.) Weigel testified that Local 79 signatory AMG requested permission to perform its demolition work starting at 4:00 p.m. so that the Local 79 laborers would not see the Carpenters' Union's picket line and refuse to cross it. (Weigel Dep. 133:4-19.)

### D. The Job Stops but the Dispute Continues

Due to a structural issue, the Brookdale Job was put on hold from approximately June 2014 until November 2014. (Def.'s 56.1 Stmt. ¶ 206.)

### 1. Smith Speaks with Brookdale and BD

In August 2014, Smith, a Local 79 business agent, took over for Labate and became involved in the Brookdale Job. (Def.'s 56.1 Stmt. ¶¶ 217-18; Pl.'s 56.1 Stmt. ¶ 282.) Smith called Connolly on October 8, 2014, and left a message. (Pl.'s 56.1 Stmt.

¶ 283.)  As a result of Smith's call to Connolly, Flavoni contacted

Smith and stated that he did not plan to continue to use a Local

79 laborer for general conditions work, and Smith responded that

he was "trying to make sure we don't have a problem here."  (Pl.'s

56.1 Stmt. ¶ 284; Def.'s 56.1 Resp. ¶ 284.)  Flavoni ultimately

declined Smith's request to have Local 79 laborers at the Brookdale

Job.  (Pl.'s 56.1 Stmt. ¶ 285.)

Smith also spoke directly to Connolly in October 2014,

requesting that a Local 79 laborer be used to perform the general

conditions work.  (Def.'s 56.1 Stmt. ¶ 219; Pl.'s 56.1 Stmt. ¶

286.)  Connolly responded that he thought the issue had been

resolved, (Def.'s 56.1 Stmt. ¶ 219), and he testified that Smith

did not threaten him with rats, placards, flyers, or "anything

like that."  (Connolly Dep. 161:18-24.)  Smith also testified that

he did not make such threats.  (Smith Dep., Vitale Decl. Ex. D,

Docket Entry 81-4, 241:2-242:13.)

### 2.  BD and Local 79 Cannot Reach a Deal

On October 15, 2014, Flavoni again rejected Smith's

appeal to use a Local 79 laborer for general conditions work,

(Def.'s 56.1 Stmt. ¶ 221), and Smith expressed concern that Local

621 was doing Local 79's "jurisdictional work" and that BD's

employees are not covered by a BCTC local union, (Pl.'s 56.1 Stmt.

¶ 287).  Flavoni proposed a compromise pursuant to which Local 79

laborers would perform the masonry and stucco work.  (Def.'s 56.1

Stmt. ¶ 221.)  Smith notified Flavoni on October 17, 2014 that
Local 79 rejected BD's offer.  (Def.'s 56.1 Stmt. ¶ 222.)  Smith
told Flavoni that the "deal was off the table" and that if Local
79 has "to fight it tooth and nail, we will." (Oct. 17, 2014 Audio
Tr., Rosenblum Decl. Ex. 28, Docket Entry 69-28, at 1.)  Smith
acknowledged that Flavoni would discuss Local 79's message with
Brookdale and noted that he was also speaking directly with
Connolly.  (Oct. 17, 2014 Audio Tr. at 3.)

       Connolly learned of Local 79's "tooth and nail" comment
and testified that he understood it to mean that the unions'
dispute "was a broader fight across Brooklyn and a couple of other
jobs that were going on at the time." (Connolly Dep. 102:13-16.)
Additionally, he assumed Local 79 would re-inflate the rat and
pass out leaflets. (Connolly Dep. 104:9-20.)  When asked if he
thought Local 79 would picket with placards or signs, he testified,
"I'm not sure what they would do. . . .  I would assume it would
take every possible option that they had in their arsenal they
would use, yes.  So whatever that means." (Connolly Dep. 105:4-
10.)

    E.  Local 79's Activity, and the Job, Resume

       Local 79 restarted its activity at Brookdale on
October 21, 2014, as well as October 27 through 31, November 3
through 6, 10 through 14, and 18 through 21, 2014. (Def.'s 56.1
Stmt. ¶ 223; Pl.'s 56.1 Resp. ¶ 223.)  Again, Williamson described

this activity as a "picket line" in the "Event" space of the attendance sheets he completed. (Fall 2014 Brookdale Attendance Sheets, Kataev Decl. Ex. U, Docket Entry 76-21.)

When work resumed at the Brookdale Job, BD did not use AMG or a Local 79 laborer for general conditions work. (Def.'s 56.1 Stmt. ¶ 207.)

F. <u>Impact on BD and Brookdale</u>

1. <u>Generally</u>

Connolly and Edwards considered Local 79's rat and leafletting to be an embarrassment and a public relations nightmare. (Connolly Dep. 112:7-13; Edwards Dep., Labuda Decl. Ex. H, Docket Entry 77-8, 52:10-23.) Edwards and Fast testified that they were not worried that Local 79's activities would lead to any work stoppages by Brookdale's own employees, though Edwards expressed concern that a union representing some hospital workers would be "sympathetic to the cause." (Edwards Dep. 84:23-86:21; Fast Dep. 65:17-66:4.) Additionally, Fast thought that Local 79's activities might cause delays in the project, (Fast Dep. 30:10-13, 31:17-23), though he ultimately concluded that the Brookdale Job was not delayed by Local 79's protest activity. (Fast Dep. 104:9-12.)

2. <u>Brookdale's Relationship with BD and Future Work</u>

Connolly and Fast rated BD's performance on previous jobs very highly, (Pl.'s 56.1 Stmt. ¶¶ 335, 337), and Brookdale

never considered removing BD from the job, (Def.'s 56.1 Stmt. ¶ 229). Both Fast and Connolly testified that they would use BD again and have no concerns about BD as a result of Local 79's activities. (Fast Dep. 114:9-17; Connolly Dep. 28:10-13, 82:13-19 ("Did you have any concern about being able to use BD on future projects as a result of this protest activity by Local 79? . . . A. No, absolutely not.").) Citing the Flavoni Affidavit, Plaintiff disputes this testimony and claims that "Brookdale has not awarded BD any work since the completion of the clinic job." (Pl.'s 56.1 Resp. ¶ 235.)

Fast testified that since the Brookdale Job, Brookdale has issued one request for proposal ("RFP") for work on Intensive Care Units (the "ICU Job"), and it sent the RFP to BD, among others. (Fast Dep. 95:18-96:13, 99:9-13.) Connolly testified that BD did not win the ICU Job because BD was the second lowest bidder and the job was awarded to the lowest bidder, and he explicitly stated that "I [would not] direct anybody[ ] not to select . . . BD based on this experience [such as protest activity from Local 79] that happened here." (Connolly Dep. 123:2-124:14.) Fast testified that BD did not win the job because "[t]hey were on the higher end of the bid." (Fast Dep. 96:14-23.) Further, Fast testified that he sent BD the RFP for the ICU Job despite BD's issues with the Carpenters' Union and Local 79, and that he would be willing to send BD RFPs in the future. (Fast Dep. 114:5-17.)

However, while he testified that Brookdale did not consider the labor dispute with Local 79 in making its decision on the ICU Job, (Fast Dep. 96:14-97:13), he also testified that he would consider the fact that BD has had labor disputes with Local 79 to be a negative factor in deciding whether to award future work to BD, (Fast Dep. 97:14-23, 113:10-18, 114:24-115:7).

Plaintiff denies that there was only one subsequent RFP and that Brookdale has not awarded additional work to BD simply because it was not the lowest bidder. (Pl.'s 56.1 Resp. ¶¶ 230-31.) According to Flavoni's affidavit testimony, "BD has placed bids on other projects for Brookdale since the completion of the [Brookdale Job], and has not been awarded any work thus far," and he has "reason to believe that Brookdale no longer awards BD work as a result of Local 79's conduct." (Flavoni Aff. ¶¶ 88-89.)

V.    The Old Navy Job

In 2014, the Gap relocated an Old Navy Store[14] to the Kings Plaza Mall ("Kings Plaza"), which is owned by Macerich Management Company ("Macerich") and located in Brooklyn, New York. (Def.'s 56.1 Stmt. ¶¶ 241-42; Pl.'s 56.1 Stmt. ¶¶ 24-25.) Lucien Zito ("Zito"), Macerich's operations manager who oversaw construction jobs at Kings Plaza, (Def.'s 56.1 Stmt. ¶ 245), described Kings Plaza as a "blue collar mall" that is "intense[ly]

---

[14] The Gap owns Old Navy. (Pl.'s 56.1 Stmt. ¶ 19.)

concern[ed]" about and sensitive to "any type of union . . . action at the mall," (Zito Dep., Labuda Decl. Ex. K, Docket Entry 77-11, 34:7-18). Accordingly, the Gap's lease at Kings Plaza required the Gap to maintain union harmony. (Def.'s 56.1 Stmt. ¶ 255.)

In early 2014, the Gap approved BD as a prequalified contractor. (Pl.'s 56.1 Stmt. ¶ 21.) BD then bid on and won its first project for the Gap, an Old Navy Store construction project at Kings Plaza (the "Old Navy Job"). (Def.'s 56.1 Stmt. ¶ 271; Pl.'s 56.1 Stmt. ¶¶ 22-23.) BD was the lowest qualified bidder, though BD's bid was still $500,000 to $600,000 above the Gap's estimated costs. (Def.'s 56.1 Stmt. ¶¶ 269-70.) The Old Navy Job was a union project, and the Gap's contract with BD required that BD maintain union harmony. (Def.'s 56.1 Stmt. ¶¶ 272-73.)

A.  Kings Plaza Power Plant and Local 3

Kings Plaza has a stand-alone power generation plant, independent of the main power grid, that generates Kings Plaza's electricity. (Def.'s 56.1 Stmt. ¶ 276; Zito Dep. 20:8-19.) If Kings Plaza's power were to be shut down, there would be no backup energy source and the entire mall and its stores would be forced to close. (Pl.'s 56.1 Stmt. ¶ 60.) Members of Local 3 of the International Brotherhood of Electrical Workers ("Local 3"), a BCTC member like Local 79 and the Carpenters' Union, (Pl.'s 56.1 Resp. ¶ 275), maintain the plant, and BD needed Local 3's

cooperation at the Old Navy Job, (Def.'s 56.1 Stmt. ¶¶ 277-78).
BD selected EG Electric, Inc. to perform the electrical work on
the Old Navy Job, though it is not a signatory to a collective
bargaining agreement with Local 3. (Def.'s 56.1 Stmt. ¶¶ 274-75.)

B. Local 79 Contacts Macerich Before Construction Begins

Local 79 business agent Labate learned about the Old
Navy Job and contacted Zito before it began. (Pl.'s 56.1 Stmt.
¶¶ 33-34.) Zito testified that Labate "seemed anxious about [BD
being used as the general contractor] and concerned, being very
verbal about how he felt that there could or would be problems
with the construction job." (Zito Dep. 25:8-20.) Zito speculated
that Labate was hoping to dissuade the Gap from using BD "with
whatever influence [Zito] may or may not have." (Zito Dep. 26:15-
24.) Labate testified that he called Zito and/or Steve DeClara
("DeClara")--Zito's superior and Macerich's senior manager (Def.'s
56.1 Stmt. ¶¶ 244, 246)--to say that if BD would be performing the
Old Navy Job, "you have issues because they are not a [Local 79]
signatory," (Labate Dep. 174:19-176:8). Additionally, Labate told
Flavoni on May 15, 2014 that Local 79 would have an issue with BD
if it performed general conditions work at the Old Navy Job without
using a Local 79 laborer. (Def.'s 56.1 Stmt. ¶¶ 182-83.)

C.   The Grievance and Demolition Work

1.   Local 79 Files a Grievance

On or about May 16, 2014, Labate filed a grievance with the BCTC that BD was "non-union," which Labate testified meant that he and other "card-carrying [union] members" did not see Local 621 as a union for a number of reasons.  (Def.'s 56.1 Stmt. ¶ 288; Pl.'s 56.1 Stmt. ¶ 64; May 16, 2014 Grievance Email, Wheeler Decl. Ex. 43, Docket Entry 68-43; Labate Dep. 183:14-184:19.)  A BCTC local union may file a grievance for the purpose of informing other unions of an issue with a particular contractor, and notice of the grievance is typically sent to all of the BCTC local unions. (Pl.'s 56.1 Stmt. ¶ 63.)  Local 79 business agent Smith testified that when another BCTC local union files a grievance and requests the presence of Local 79, it will attend, and that "if Local 79 requests other trades to come down to a grievance, the other trades have to go."  (Smith Dep. 108:12-23.)

2.   BD Hires All City for Demolition Work

Also on May 16, 2014, BD subcontracted the demolition work on the Old Navy Job to All City Interior Contracting Inc. ("All City"), a Local 79 signatory, (Def.'s 56.1 Stmt. ¶¶ 20, 282), which cost BD an additional $33,717.84, (Def.'s 56.1 Stmt. ¶ 409; Ciuzio Dep., Labuda Decl. Ex. N, Docket Entry 77-14, 70:21-23). Construction at the Old Navy Job began on May 20, 2014, and demolition was performed on May 21, 2014.  (Def.'s 56.1 Stmt.

¶¶ 286-87.)  All City ultimately worked for nineteen (19) days and finished its demolition work on June 18, 2014.  (Def.'s 56.1 Stmt. ¶ 373.)

While the Gap and BD did not discuss whether BD would subcontract the demolition work, citing the Flavoni Affidavit and a conversation among Flavoni, the Gap, and Macerich, Plaintiff notes that it hired All City in an attempt to placate Local 79 and make a good first impression with the Gap.  (Def.'s 56.1 Stmt. ¶ 285; Pl.'s 56.1 Resp. ¶ 285; Flavoni Aff. ¶ 97; July 1, 2014 Audio Tr., Rosenblum Decl. Ex. 8, Docket Entry 69-8, at 5 ("Flavoni: . . . [W]e heard that there was going to be an issue with [Local] 79.  So in an effort to mitigate that and maintain the harmony, we actually hired a demolition contractor who is Local 79.").)  Additionally, Ken Ross ("Ross"), BD's Project Manager for the Old Navy Job, (Def.'s 56.1 Stmt. ¶ 265), testified that he recommended All City to Flavoni and Deliteris because of "the union issue" (Ross Dep., Kataev Decl. Ex. E, Docket Entry 76-5, 45:9-15).  He continued that "[w]e wanted to have a union guy in there with Local 79.  They were more expensive than the other contractors."  (Ross Dep. 45:9-15.)

3.  <u>The Grievance Meeting</u>

During the morning of May 21, 2014, Zito received an unexpected visit at the management office of Kings Plaza from Labate and business agents from several other unions, including

the Carpenters' Union and Local 3, regarding Local 79's BCTC grievance.[15] (Def.'s 56.1 Stmt. ¶¶ 293, 295; Pl.'s 56.1 Resp. ¶¶ 293, 295; Zito Dep. 38:22-39:16.) BD was not present at the meeting. (Pl.'s 56.1 Stmt. ¶ 78.) While it is common for several business agents to attend a BCTC grievance meeting, (Def.'s 56.1 Stmt. ¶ 294), Zito testified that "the fact that there were 15 [business agents] at [his] office that showed up unexpected[ly]" was "clearly an intimidation tactic," (Zito Dep. 40:9-16). However, Labate testified that Local 79's BCTC grievance meeting was held at Kings Plaza not to intimidate, but because it was a "convenient spot to meet." (Labate Dep. 214:20-215:4.)

The parties dispute the nature of Local 79's interaction with Zito, other than that one of several issues raised at the meeting was BD's failure to use Local 79 laborers at the Old Navy Job. (Pl.'s 56.1 Stmt. ¶ 51; Def.'s 56.1 Resp. ¶ 51.) According to Labate, Zito asked what the issue was and he responded "[t]his is about BD Development, they are not going to use [Local] 79." (Labate Dep. 207:8-14.) Additionally, Labate testified that while he "never mentioned a picket line," a power shutdown, the Market Development Department, inflatable rats, or leafleting, (Labate

---

[15] After reviewing an email that he sent the day of the meeting, Zito testified that approximately fifteen (15) business agents came to his office, (Zito Dep. 38:2-7), but Labate testified that he recalls that there were no more than eight (8) union representatives at the meeting, (Labate Dep. 206:15-207:7).

Dep. 211:20-212:4, 217:3-25), he did tell Zito that "there will be issues with BD," (Labate Dep. 213:10-214:3).

Zito recalls the grievance meeting differently. The morning of the meeting, he emailed BD's Ross and Gap's Senior Project Manager, John Ciuzio ("Ciuzio"), copying DeClara and Macerich's senior manager and tenant coordinator Brian Lindsey ("Lindsey"), (Def.'s 56.1 Stmt. ¶¶ 243, 260), informing them that "[i]f a picket line was established you b[ear] the re[sponsibility] of having our plant potentially shut down. **We cannot have union issues here.**"[16] (May 21, 2014 Zito Email, Wheeler Decl. Ex. 70, Docket Entry 68-70.) When asked about his email, Zito testified "[h]onestly, I don't recall [whether there were comments made by business agents about a picket line.] If I wrote it, then there probably was. I don't believe any of the [business agents] would have mentioned that, except for . . . Labate." (Zito Dep. 40:19-

---

[16] The email reads, in full, "John/Ken, Apparently we have some big union issues with your build out. I was just unexpectedly greeted with about 15 [business agents] that all had issues with the subs on your job. Most notably, Local 3 - electricians as well as carpenters, carting, laborers and painters. This mall is a stand-alone power generator. If a picket line was established you bare the reasonability of having our plant potentially shut down. **We cannot have union issues here.** From talking to the crowd I get the impression BD development is going to have a hard time satisfying their requirements, but I leave that to you to decide. These issues need to go away now. Based on the severity and depth of this union grievance, through this e-mail I suggest the job be put on hold until the issues are resolved." (May 21, 2014 Zito Email.)

41:3, 41:16-24 (agreeing that he did not "have a specific recollection of any of the [business agents] specifically using the term 'picket line,' but [his] general belief is that, since [he] used it in e-mail, it was most likely referenced by the [business agents,] . . . [and m]ore specifically, by Mike Labate").) Zito also testified that while his email referenced a plant shutdown, he did not believe it was likely that anyone actually threatened a shutdown; rather, he was "extrapolating the fact that if there was a picket line, there might be a plant shutdown." (Zito Dep. 42:7-23.) He testified that his reference to "union issues" referred to "potential picket lines," "[r]ats being set up at the mall," "[p]otential shutdown by honoring the picket lines," "materials disappearing," and sabotage. (Zito Dep. 42:24-43:25.)

In total, five or six different union representatives, including those from the Carpenters' Union[17] and Local 3, expressed concerns during their meeting with Zito. (Def.'s 56.1 Stmt. ¶¶ 298-302.) Additionally, Zito testified that it was "fair to say that through these conversations [he] had with Local 79" and the other business agents, if BD did not hire Local 79 laborers,

---

[17] Plaintiff cites irrelevant testimony in support of its denial that the Carpenters' Union's business agent told Zito that he had an issue with BD using non-union carpenters, (Pl.'s 56.1 Resp. ¶ 300), so the Court deems the fact admitted.

"there were going to be problems, picket lines, rats, shutdowns, things of that nature." (Zito Dep. 47:17-48:8.)

4. <u>The Shutdown</u>

Macerich shut the job down because of labor issues from May 21--the day of the grievance meeting--to May 27, 2014, and work resumed on May 29, 2014. (Def.'s 56.1 Stmt. ¶ 312.) The parties dispute which union's actions led to the shutdown. (Pl.'s 56.1 Stmt. ¶ 53; Def.'s 56.1 Resp. ¶ 53.)

Zito testified that he shut the Old Navy Job down "[b]ecause of the issues between . . . Local 79 and BD," (Zito Dep. 54:20-55:20), and "[b]ecause there was pressure that an imminent threat of a picket line and a rat would be put up," (Zito Dep. 57:14-58:14). He also testified that "as long as BD wasn't doing work, [he] didn't believe there would be any type of picket line or job action by Local 79 or any other union," which is what he "recall[s] being communicated as . . . the action that Local 79 wanted [Macerich] to take." (Zito Dep. 58:21-59:7.) However, after the BCTC grievance meeting, Local 3 threatened to "lock [BD] out by locking electrical panels," and Macerich locked the Gap out of an electrical room that BD needed to access. (Def.'s 56.1 Stmt. ¶¶ 310-11.) In addition, Lauren Kruse ("Kruse"), the Gap's Director of Construction for the Northeast at the time, (Def.'s 56.1 Stmt. ¶ 259), testified that she believed that the shutdown was "a[n] electrical union issue," and that the "root of the issue"

43

of Macerich locking BD out of an electrical room "had to do with a different union initially than Local 79," (Kruse Dep., Labuda Decl. Ex. P, Docket Entry 77-16, 13:10-22, 52:7-16). After reviewing Local 79's grievance notice at her deposition, however, she agreed that it was "fair to say that Local 79 was also involved in that first labor issue with Macerich in terms of the possible shutdown of the job." (Kruse Dep. 52:18-53:16.)

### 5. Demolition Delays

The demolition phase of the Old Navy Job was delayed, and BD blames Local 79's conduct and interference for the bulk of the delay. Specifically, while the parties agree that the Old Navy Job required more demolition work than originally anticipated, (Def.'s 56.1 Stmt. ¶ 376), they dispute whether Local 79 signatory All City needed "more men" to do the job and whether Local 79's failure to provide manpower constituted a "shutdown and/or slowdown" related to Local 79's dispute with BD. (Def.'s 56.1 Stmt. ¶¶ 363, 365; Pl.'s 56.1 Resp. ¶¶ 363, 365.) BD's Weigel testified that All City ultimately finished its work approximately two (2) weeks behind schedule. (Weigel Dep. 79:5-80:10, 86:3-10.)

BD's Ross believed All City needed to supply more labor to be able to finish the demolition on time, and he and three BD employees admonished All City for falling behind schedule. (Pl.'s 56.1 Stmt. ¶¶ 80-81.) Ross testified that he spoke to a field project manager three to five times and requested more workers on

the jobsite, and that he also informed John Rodopoulos ("Rodopoulos"), All City's president and sole owner, (Def.'s 56.1 Stmt. ¶ 359), that the manpower at the site "was not sufficient to get the job done" in time, (Ross Dep. 58:4-60:24). However, Rodopoulos believed that he did not need more men for the job. (Def.'s 56.1 Stmt. ¶ 364.) Rodopoulos testified that he made a request to Local 79 for one or two workers for a single night, that he did not believe he needed the additional workers, and that he did not believe his failure to get additional manpower affected All City's ability to complete its work on schedule. (Rodopoulos Dep., Labuda Decl. Ex. B, Docket Entry 77-2, 44:4-18, 75:10-76:15.)

Ross testified that he believed BD had "trouble getting [All City] labor to do the demolition" because of the "labor issue." (Ross Dep. 57:13-58:7.) He testified that he received pushback from All City's field project manager, who told him that Local 79 was having difficulty supplying workers. (Ross Dep. 60:25-62:10.) Additionally, at BD's request, All City wrote to BD on June 2, 2014, stating, "As per your request, we are requesting additional labor from union hall and they don't have available laborers."[18] (Def.'s 56.1 Stmt. ¶¶ 365, 378.) Local 79's Rynkiewicz, however, testified that there are not always individuals on the hiring hall list "that are ready, willing, and

---

[18] Local 79 has a "hiring hall" that maintains a list of laborers seeking work. (Def.'s 56.1 Stmt. ¶ 19.)

able to go to actual jobs." (Rynkiewicz Dep. 91:2-9.) Further, even if the hiring hall did not have a match for BD, BD could have used any worker it wanted, including a non-union worker. (See Def.'s 56.1 Stmt. ¶ 24.) Moreover, All City worked for BD at night, and Luann Piecora ("Piecora"), Riteway's Secretary, testified that she generally did not experience problems requesting men from Local 79's hiring hall, except sometimes "on weekends or night work." (Def.'s 56.1 Stmt. ¶ 375; Pl.'s 56.1 Stmt. ¶ 87; Def.'s 56.1 Resp. ¶ 87.) However, Local 79's Labate testified that it "would never happen" that All City would "not be able to get enough manning on" the Old Navy Job, since there are many demolition workers available, and that "[m]ost of the demo jobs are done at night." (Labate Dep. 71:11-72:7, 76:10-77:10.)

Overall, there were many delays at the Old Navy Job, including those relating to permits, an asbestos investigation, and a sprinkler shutdown, among others. (Def.'s 56.1 Stmt. ¶¶ 384-91.) The Gap's Kruse testified that the Local 79 union issues "with respect to a lack of manpower" was "definitely one of the factors" that slowed demolition progress. (Kruse Dep. 85:18-25.) However, she also testified that with all of the issues at the Old Navy Job--including those caused by BD and others caused by unforeseen site conditions (Kruse Dep. 132:21-133:13)--union issues were not "the predominant reason" for the job delays, (Kruse Dep. 164:14-18). Conversely, the Gap's Ciuzio testified that Local

79's conduct was the biggest contributor to the delays at the Old Navy Job. (Ciuzio Dep. 226:9-22.)

D. <u>July 2014 Activity and General Conditions Work</u>

BD intended to use its own employees to perform general conditions cleanup on the Old Navy Job, but Local 79 also wanted the work. (Def.'s 56.1 Stmt. ¶¶ 324-25.)

On July 1, 2014, Flavoni emailed Zito about setting up a conference call regarding "Local 79's latest threat towards" Macerich of a "picket line," and Zito responded that the matter now required Lindsey's involvement. (July 1, 2014 Emails, Wheeler Decl. Ex. 72, Docket Entry 68-72.) Zito testified that he thought Macerich needed to meet with "BD and/or Gap" to help resolve the issue, (Zito Dep. 74:20-75:4), and representatives of the Gap, BD, and Macerich had a conference call about union harmony on July 1, 2014, which Flavoni recorded, (Def.'s 56.1 Stmt. ¶ 317; Pl.'s 56.1 Resp. ¶ 317). Lindsey told the group "[t]he unions are stating that their calls are not being returned. . . . So you guys need to resolve this, and you need to return the unions' calls or we[']re going to have a picket line and we're going to have to shut the job site down." (Def.'s 56.1 Stmt. ¶ 317; Pl.'s 56.1 Resp. ¶ 317; July 1, 2014 Audio Tr. at 2.) He told Flavoni that "[w]here you stand right now is if a picket line is formed, or a rat is blown up, either one of them, we will have to shut down the job. If that occurs on Friday or it occurs a month from now,

47

that's just a requirement.  We shut it down until you resolve the issue."[19]  (Def.'s 56.1 Stmt. ¶ 321.)

       1.  <u>Local 79's Offer</u>

In an attempt to resolve the Local 79 issue, Flavoni called Labate on July 3, 2014, and Labate suggested that BD use a paymaster to provide a Local 79 laborer to perform general conditions work at the Old Navy Job "three days a week . . . unless you need him more."  (Def.'s 56.1 Stmt. ¶¶ 325-26.)  During the call, Labate did not dispute the allegation that he threatened Macerich with picket lines.  (July 3, 2014 Audio Tr., Rosenblum Decl. Ex. 10, Docket Entry 69-10, at 2.)  When asked about these alleged threats of picketing at his deposition, Labate testified that he "never threatened the mall," though he acknowledged that "the action of putting up a picket line" is "normal," rather than "significant" to him.  (Labate Dep. 305:17-306:17.)  Labate testified that it is fair to say that because putting up a picket line is "not that big of an event" to him, he might have said, "if we don't get things resolved, I'm going to turn it over to the organizers and they are going to do whatever they are going to do. They may do the rat, they may do leafleting, they may do picketing."  (Labate Dep. 308:8-309:4.)  Labate also speculated

---

[19] Zito also testified that if a picket line had formed, he would have locked BD out of the Old Navy Job.  (Pl.'s 56.1 Stmt. ¶ 125.)

that Macerich might have told BD that Labate threatened picketing "to shake [BD] up." (Labate Dep. 307:4-22.)

### 2. A Short-Lived Compromise

On July 8, 2014, Macerich, Gap, and BD representatives again discussed the Local 79 issue, and Macerich emphasized that it wanted the "public image of having union harmony" and was highly averse to picket lines and rats. (Def.'s 56.1 Stmt. ¶¶ 327-28.) Separately, Lindsey informed Kruse that Macerich considered both picketing and the inflation of a rat to be very bad, and Kruse was concerned that any union disputes would cause the Gap to violate the union harmony clause in its lease. (Def.'s 56.1 Stmt. ¶¶ 330-31.)

On July 16, 2014, the Gap agreed to a compromise to pay a Local 79 laborer to work one day per week at the Old Navy Job for a cost not to exceed $4,500. (Def.'s 56.1 Stmt. ¶ 333.) BD then used Linear to provide a laborer to perform general conditions work at the Old Navy Job in July and August 2014, for a total cost of $1,975.60. (Def.'s 56.1 Stmt. ¶¶ 334, 343.) Flavoni explained to Macerich that BD's use of a Local 79 laborer for one day per week is expected to "satisfy Local 79 for the remainder of the project." (Def.'s 56.1 Stmt. ¶ 335.) Labate, however, testified that Flavoni anticipated that work would be slow in the beginning, and that Labate had suggested that Flavoni "establish [Local 79] labor on the job, . . . see if you like them. Start off a couple

of days a week, it goes to three.  If it's three days, great.  If it goes to five, even better . . . but start them out a couple, two days a week to see how it goes."  (Labate Dep. 228:10-25.)

   3.   Renewed Tensions

   On August 13, 2014, Smith, who took over for Labate, (Smith Dep. 46:21-25), spoke to Flavoni and expressed concern that the Old Navy Job had "picked up" but that a Local 79 laborer was working only one day per week.  (Def.'s 56.1 Stmt. ¶ 346.)  Smith asked if BD could use the laborer three times per week, and Flavoni declined.   (Def.'s 56.1 Stmt. ¶¶ 346-47.)   Kruse agreed with Flavoni's decision.  (Aug. 14, 2014 Emails, Joseph Decl. Ex. 18, Docket Entry 78-18.)

   On August 14, 2014, BD and Linear exchanged emails disputing whether a Local 79 laborer on the Old Navy Job was entitled to two (2) hours of "show up" time.  (Def.'s 56.1 Stmt. ¶¶ 348-50.)   Then, on August 19, 2014, Linear informed BD that "[a]s of today I still have not received a response in regards to my email below.  In light of the circumstances surrounding between [sic] BD Development and Local 79, effective immediately Linear Contracting will no longer be providing the Local 79 Laborer for the Old Navy Kings Plaza project."  (Def.'s 56.1 Stmt. ¶ 351.)  Flavoni spoke to Linear about this issue on August 26, 2014, and Linear referenced the two (2) hours of show-up time and explained

that it had ceased providing services because it did not receive a response to its email.[20]   (Def.'s 56.1 Stmt. ¶¶ 355-56.)

Smith told Flavoni on August 19, 2018, that Linear was "pulling off the job" and asked if BD could have a laborer at the Old Navy Job "two or three days a week." (Aug. 18, 2014 Audio Tr., Rosenblum Decl. Ex. 18, Docket Entry 69-18, at 1-2.)  Flavoni declined, and Smith responded "I'm going to have to throw a line up over there. . . .  If Linear pulls out, I'm going to have to throw a line up there where I have the other bidders . . . coming out there.  And then we have a discussion in front of the job sites as [far] as moving the manpower off the job until they put labor on board." (Aug. 18, 2014 Audio Tr. at 2-3.)  Flavoni asked if Smith meant "picket line," and Smith responded "[a] grievance, yeah." (Aug. 18, 2014 Audio Tr. at 3.)  Smith then asked that Flavoni "call the client and ask the client" if it would agree to having a Local 79 laborer on for more than one day per week. (Aug. 18, 2014 Audio Tr. at 1, 4.)  Finally, Flavoni asked "how much time are you giving me before you put up the picket line," and Smith answered "[s]ir, I'll give you to the end of this week. . . .  I don't want to put a picket line up." (Aug. 18, 2014 Audio Tr. 4.)

---

[20] Plaintiff maintains that "Linear is not credible." (Pl.'s 56.1 Resp. ¶¶ 355-56.)

However, when asked at his deposition about his references to a "picket line" during this call, Smith testified that "I made a mistake . . . . I said a [BCTC] grievance. . . . Acutally, I didn't mean a picket line." (Smith Dep. 152:15-153:22.) He testified further that he did not correct Flavoni's statement regarding a picket line "[b]ecause basically I already knew I wasn't going to throw a picket line up. I was going to throw a [BCTC] grievance." (Smith Dep. 154:5-20.) Similarly, he testified that he referenced other trades coming to the "line" because "[i]t was a grievance. . . . Throwing up a line wouldn't . . . entail having business agents to be there." (Smith Dep. 155:10-156:8.) Smith also testified that he asked Flavoni to relay the conversation to the client, the Gap, for the purpose of trying to get a Local 79 laborer on the Old Navy Job two to three times per week. (Smith Dep. 156:4-157:20.) Finally, Smith testified that he spoke to Lindsey directly and "mentioned" "setting up a picket line," though he later clarified that "[i]t was never any line or anything mentioned. I told him that there may be a strong possibility that there may be another [BCTC] grievance that would be with BD." (Smith Dep. 196:5-12, 201:24-202:12.)

After Flavoni spoke with Smith, he informed Kruse and Ciuzio of the Gap that Linear was "pulling out because they cannot provide a laborer for one day per week" and that Smith "said that

if we don't put a laborer on for 3 days per week . . . they will be 'putting up a line.'" (Aug. 19, 2014, Flavoni Email, Wheeler Decl. Ex. 44, Docket Entry 68-44, at 2-3.) Kruse forwarded that email to Lindsey informing him that the Gap would not agree to Local 79's request, and Lindsey responded, "I will be reaching out to [Local 79] this morning. You met their agreement and they need to live with it. Don't worry about any further action." (Aug. 19, 2014 Flavoni Email.)

That afternoon, BD also emailed the Gap and Macerich representatives, informing them of his call with Smith. (Pl.'s 56.1 Stmt. ¶ 110.) Zito and Ciuzio understood the reference to "put up a line" to mean picketing or putting up a picket line, and Ciuzio was concerned that Local 79's picketing could cause Macerich to interfere with work at the Old Navy Job. (Pl.'s 56.1 Stmt. ¶¶ 110-11; Def.'s 56.1 Resp. ¶¶ 110-11; Ciuzio Dep. 116:21-117:2.) Ciuzio testified that he felt the Gap was "being taken advantage of" by Local 79. (Ciuzio Dep. 118:21-119:7.)

4. <u>Resolution</u>

While the parties disagree regarding the manner in which the conflict was resolved, they do not dispute that it ultimately was resolved without BD using a Local 79 laborer any more often than it had been.[21] (Pl.'s 56.1 Stmt. ¶ 113; Def.'s 56.1 Resp.

---

[21] BD asserts that Local 79 began to picket the Gap's corporate office and other Gap locations as a direct result of Local 79's

¶ 113; Ciuzio Dep. 126:3-13.)  Once Lindsey no longer had any concerns about Local 79, neither did the Gap.  (Pl.'s 56.1 Stmt. ¶ 138; Def.'s 56.1 Resp. ¶ 138.)

### 5. Carpenters' Union

During the same general time, BD was experiencing issues with the Carpenters' Union.  On July 2, 2014, representatives from the Gap and BD had a conference call during which they discussed issues with the Carpenters' Union, and Flavoni indicated that BD shifted its "carpentry crew to the night shift to try to avoid-- be out-of-sight, out-of-mind."  (Def.'s 56.1 Stmt. ¶ 322; Pl.'s 56.1 Resp. ¶ 322; July 2, 2014 Audio Tr., Rosenblum Decl. Ex. 9, Docket Entry 69-9, at 4-5, 8.)  Additionally, in its complaint against the Carpenters' Union in a separate lawsuit, BD alleged that it threatened the Gap and Macerich with shutting down the Old

---

"being forced to back down on the Old Navy [Job]."  (Pl.'s 56.1 Stmt. ¶ 118.)  The testimony it cites, however, does not support, and seemingly contradicts, its assertion.  (Ciuzio Dep. 130:18-131:22 ("I can't specifically say [the Local 79 activity] was in relationship to the Kings Plaza project . . . ."); Ciuzio Dep. 126:15-129:5 (testifying about Aug. 2014 Kruse Email to Macerich, Wheeler Decl. Ex. 23, Docket Entry 68-23 (Local 79 is "picketing our offices but I don't believe there is anything further you can do as they are referencing another project")); Ciuzio Dep. 154:17-155:16 (testifying about Aug. 2014 Kruse Email to Gap, Wheeler Decl. Ex. 27, Docket Entry 68-27 ("Gap Outlet Flatbush Ave[.]  Local 79 began picketing and handing out flyers when they reached out to Allright construction and demanded they be put on the project[.]  When we turned them down they started setting the rat up in different Gap locations throughout Manhattan.  They are now in front of 55 Thomas . . . .")).)

Navy Job and putting up a picket line at Kings Plaza. (Def.'s
56.1 Stmt. ¶ 464.)

E. BD Loses Its Place on the Gap's Approved Vendor List

The Gap removed BD from its approved vendor bid list, a
decision Kruse approved. (Def.'s 56.1 Stmt. ¶ 398.) She testified
that her decision to remove BD from the list "was more about how
[BD] handled the situation with [Local 79] as opposed to the union
issue itself," and that "there were other issues completely
unrelated to the union." (Kruse Dep. 66:24-67:23.) However, Kruse
expressed frustration with Local 79's conduct and acknowledged
that union issues played a "small part" in the decision to "let BD
Development go." (Kruse Dep. 81:1-82:22.) She testified that she
felt bullied by Local 79 and that it felt like extortion for Local
79 to demand to add labor to the Old Navy Job. (Kruse Dep. 97:5-
98:8.) Additionally, the "Store Effective Date" had to be
extended, in part, because of union issues and "labor actions (work
stoppages)," (Pl.'s 56.1 Stmt. ¶ 105; Def.'s 56.1 Resp. ¶ 105),
and Kruse testified that she attributed a two-week delay to the
union and that the Old Navy Job was a "high risk" project partially
because of union issues, (Kruse Dep. 66:17-23, 77:23-80:2).

Ciuzio testified that he expressed concern to Kruse
about using BD again in the future, citing BD's change order
management, scheduling challenges, and potential quality issues--
BD's work was better than average, a "B+," but not "top notch"--

but acknowledged that the "union protest activity" could have impacted those issues. (Ciuzio Dep. 147:3-9, 150:2-15, 173:10-174:8.) He also testified that BD's cost control measures "definitely needed improvement," due in part to union issues, but "[m]ore having to do with . . . not fully capturing the scope of work in the bid." (Ciuzio Dep. 148:16-149:21.)

A number of other factors and events contributed to the Gap's decision to remove BD from the approved vendor list. For example, in June 2014, BD submitted a change order to the Gap regarding the additional cost to use Local 79 laborers for demolition. (Def.'s 56.1 Stmt. ¶ 409.) Kruse was surprised by and unhappy with BD's request, and its decision to submit the change order rather than to absorb the cost influenced her decision to remove BD from its approved vendor list. (Def.'s 56.1 Stmt. ¶¶ 411-13.) Similarly, in October 2014, BD refused to reimburse Macerich for a $5,000 invoice regarding a fire alarm, and the Gap felt that BD's refusal was unprofessional and contributed to the its decision to remove BD from the list. (Def.'s 56.1 Stmt. ¶¶ 424-25.) Moreover, while Ciuzio believed BD's communication skills with respect to work progress and the union issues to be "outstanding," (Ciuzio Dep. 147:10-148:12), Kruse testified that she was dissatisfied with BD's communication, which was another reason she removed BD from the list, (Kruse Dep. 127:10-24).

An additional reason motivating Kruse's decision to remove BD, among "other issues completely unrelated to the union," was BD's failure to win bids for other jobs. (Def.'s 56.1 Stmt. ¶¶ 414-15.) Before Kruse removed BD, it bid on seven projects and lost all but the Old Navy Job. (Def.'s 56.1 Stmt. ¶ 416.) BD appears to have been the lowest bidder on only one of the projects that it bid on, a Banana Republic job at 105 Fifth Avenue, New York, New York (the "Banana Republic Job"). (Def.'s 56.1 Stmt. ¶¶ 417-18; Pl.'s 56.1 Resp. ¶¶ 417-18; Ciuzio Dep. 144:19-145:12.) However, Kruse testified that she had decided by June 2, 2014 to recommend Schimenti Construction Company ("Schimenti") for the Banana Republic Job because the job was in a "high-profile location" and Schimenti had "an all-inclusive number" and "the right team to do the work." (Def.'s 56.1 Stmt. ¶ 458; Kruse Dep. 104:17-23, 106:23-107:16.) Kruse created a report on the selection of a contractor for the Banana Republic Job, and she testified that BD's ratings reflected in the report were not influenced by what happened at the Old Navy Job, but only based on "how [BD] showed up for this project." (Def.'s 56.1 Stmt. ¶ 454; Kruse Dep. 113:6-116:14.) Kruse testified that BD did not give her confidence that it had considered schedule strategy or cost controls, that it did not have any "proactive suggestions," and that she "wasn't convinced they had a lot of experience with projects like this." (Kruse Dep. 114:23-115:11.) She testified further that BD's union

issues did not play a role in the Gap's selection of Schimenti over BD. (Kruse Dep. 107:4-22.) Ciuzio testified that generally, union issues similar to those at the Old Navy Job do not influence the Gap's decision to award work to particular contractors. (Ciuzio Dep. 134:19-135:15.) Additionally, while BD seems to have been the lowest bidder on the job by $30,000, (Def.'s 56.1 Stmt. ¶ 462), many of BD's clients do not award jobs to the lowest bidder, (Def.'s 56.1 Stmt. ¶ 422), and a $30,000 difference would not be considered significant (Def.'s 56.1 Stmt. ¶ 462).

Finally, Defendant notes that the Gap awarded another construction project to a non-union general contractor, All-Right Construction, and Local 79 inflated a rat and distributed leaflets at Gap stores regarding its use of All-Rite. (Def.'s 56.1 Stmt. ¶¶ 439-42, 444-46.) However, the Gap did not remove All-Rite from its list of approved vendors after that activity. (Def.'s 56.1 Stmt. ¶ 447.)

VI. <u>Procedural History</u>

Plaintiff filed its Complaint on August 15, 2014, asserting four claims for damages against Defendant under Section 303 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 187. (Compl., Docket Entry 1, ¶ 1.) Plaintiff alleges that Defendant is liable for conduct in violation of Section 8(b)(4)(ii) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4), including Defendant's alleged unfair labor

practices at the BofA Job, the Brookdale Job, and the Old Navy Job.[22] (Compl. ¶¶ 1, 71-94.) Defendant answered on September 12, 2014. (Def.'s Answer, Docket Entry 8.) Defendant filed its motion for summary judgment on January 31, 2017, and Plaintiff filed its motion for summary judgment on the issue of liability on February 1, 2017. (See generally Def.'s Mot.; Pl.'s Mot..) Defendant and Plaintiff filed their briefs in support of their motions on February 1 and February 2, 2017, respectively, their opposition briefs on March 1 and March 2, 2017,[23] respectively, and their reply briefs in further support of their motions on March 15, 2017.[24]

## DISCUSSION

I.   Plaintiff's Misrepresentations of the Record

At the outset, the Court notes that the resolution of the parties' motions has been significantly delayed by Plaintiff's frequent misrepresentations and mischaracterizations of the

---

[22] Plaintiff's Complaint does not contain allegations regarding the Mount Sinai Job.

[23] Plaintiff filed a substitute brief in opposition to Defendant's motion on March 6, 2017, which this Court will treat as Plaintiff's opposition for present purposes. (See Mar. 6, 2017 Letter, Docket Entry 96.)

[24] Citations to the parties' briefs are as follows: Defendant's Brief (Def.'s Br., Docket Entry 82); Plaintiff's Brief (Pl.'s Br., Docket Entry 85); Defendant's Opposition Brief (Def.'s Opp. Br., Docket Entry 92); Plaintiffs' Opposition Brief (Pl.'s Opp. Br., Docket Entry 96-1); Defendant's Reply Brief (Def.'s Reply Br., Docket Entry 97); and Plaintiff's Reply Brief (Pl.'s Reply Br., Docket Entry 98).

record.  For instance, Defendant asserted that "[a]t its interview for the Banana Republic project, the Gap told BD it was looking for [a] bidder who had longevity and experience with the brand." (Def.'s 56.1 Stmt. ¶ 451.)  Plaintiff responded:  "**Admit,** but note that . . . [the Gap] rejected BD because of its union issues with Local 79."  (Pl.'s 56.1 Resp. ¶ 451.)  However, the testimony supporting this proposition provides only that "[t]he Gap invited BD to bid on the Banana Republic job at 105 Fifth Avenue." (Flavoni Aff., Docket Entry 101, ¶ 114.)  This is only one of many instances of Plaintiff's misrepresentation of the record.

Plaintiff also frequently denied allegations with string citations to irrelevant testimony, forcing the Court--and presumably, defense counsel--to sift through the voluminous record, only to conclude that the evidence that Plaintiff cited does not contradict Defendant's assertion.  For example, as detailed in supra note 9, Plaintiff attempted to obfuscate the timing of its selection of AMG at the Brookdale Job with citations to evidence that did not support its denial of Defendant's allegation.

In light of the liberties it took with the record, the Court directs Plaintiff's counsel to review its duties under Federal Rule of Civil Procedure 11(b) and to ensure that all future submissions comply with their obligations under the Rule.

II.  Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial."  Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).  Conclusory allegations or denials will not defeat summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

III. The LMRA and NLRA

Under Section 303(a) of the LMRA, it is unlawful "for any labor organization to engage in any activity or conduct defined as an unfair labor practice in" Section 8(b)(4) of the NLRA. 29 U.S.C. § 187(a). In relevant part, Section 8(b)(4) provides:

> It shall be an unfair labor practice for a labor organization or its agents-- . . . .
>
> (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles,

materials, or commodities or to perform any services; or

(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-- . . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, . . . .

29 U.S.C. § 158(b)(4) (emphasis in original). Section 303(b) provides a private right of action for anyone "injured in his business or property by reason o[f] any violation of subsection (a)." 29 U.S.C. § 187(b).

A.  Section 8(b)(4)(B) and 8(b)(4)(D)

A union engages in "primary activity" when it targets a "primary employer"--an employer with whom it has a dispute--and engages in "secondary activity" when it targets a third party or

a "secondary" or "neutral" employer--an employer with whom it does not have a dispute. Capitol Awning Co., 698 F. Supp. 2d at 322 (citing C&D Restoration, Inc. v. Laborers Local 79, No. 02-CV-9448, 2004 WL 736915, at *3 (S.D.N.Y. Apr. 5, 2004)). A union that places enough pressure on a secondary employer "might coerce a secondary employer to change its own business relationship with a primary employer, in such a way that is detrimental to the primary employer." C&D Restoration, Inc., 2004 WL 736915, at *3. In so doing, the union succeeds in pressuring the "primary employer indirectly, until that employer capitulates to the union's demands. Such conduct runs counter to the public policy expressed in the NLRA." Id. Thus, Section 8(b)(4)(B), commonly called the "'secondary boycott'" provision of the NLRA, proscribes certain secondary activities. Capitol Awning Co., 698 F. Supp. 2d at 322 (quoting Carrier Air Conditioning Co. v. N.L.R.B., 547 F.2d 1178, 1188 (2d Cir. 1976)). Specifically, it "'prohibits a union from engaging in or inducing or encouraging strikes and picketing against an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer.'" Capitol Awning Co., 698 F. Supp. 2d at 322 (quoting N.L.R.B. v. Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO, 730 F.2d 870, 874–75 (2d Cir. 1984)).

Under Section (8)(4)(D), it is an unfair labor practice "'for a labor organization to induce the employees of any employer

to strike in the hopes of forcing an employer to assign particular work to employees in a particular labor organization.'" C&D Restoration, Inc., 2004 WL 736915, at *4 (quoting Int'l Tel. & Tel. Corp., Commc'ns Equip. & Sys. Div. v. Local 134, Int'l Bhd. of Elec. Workers, AFL-CIO, 419 U.S. 428, 430–31, 95 S. Ct. 600, 42 L. Ed. 2d 558 (1975)).  While the typical example "is when two unions both have collective bargaining agreements with one employer, and each seeks to obtain the disputed work for its own members through activities proscribed by this section," C&D Restoration, Inc., 2004 WL 736915, at *4, Section 8(b)(4)(D) "also applies to neutrals . . . and there is no indication that Congress intended either [Section 8(b)(4)(B) or 8(b)(4)(D)] to have exclusive application" N.L.R.B. v. Local 825, Int'l Union of Operating Engineers, AFL-CIO, 400 U.S. 297, 306, 91 S. Ct. 402, 408, 27 L. Ed. 2d 398 (1971).  Thus, as explained by the Second Circuit, where a union "in striking and picketing against [a neutral employer], sought to coerce an employer to assign particular work to members of a particular union, . . . . there was reasonable cause to believe there had been a violation of [§] 8(b)(4)(D)."  Kaynard for & on Behalf of N.L.R.B. v. Local 282, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 576 F.2d 471, 476 & n.8 (2d Cir. 1978).  In Kaynard, the Second Circuit held that where the union violated the "overlap[ping]" provisions Section 8(b)(4)(B) and 8(b)(4)(D), the

65

remedy was to prohibit "any strike or picketing against [the neutral employer] which has as its objective the coercion of [the primary] either to alter its employment practices concerning on-site [work] or to leave the site." Id. at 476 n.7, 478 ("Because [the union's] actions against [the neutral employer] have largely been aimed at achieving reassignment of work currently done by [the primary employer's] employees, the injunction of the district court against [§] 8(b)(4)(D) violations reaches, in large part, potential violations of [§] 8(b)(4)(B) as well."); see also Local 825, 400 U.S. at 304-306, 91 S. Ct. 402, 27 L. Ed. 2d 398 (holding that Section 8(b)(4)(B) applied to coercive conduct directed toward secondary employer even where union primarily demanded that employers reassign work).

B.   Elements of Section 8(b)(4) Claim

Plaintiffs alleging LMRA claims based on unlawful conduct under Section 8(b)(4) must establish three elements. The first relates to the nature of the conduct, the second to the purpose of the conduct, and the third to causation. Tru-Art Sign Co. v. Local 137 Sheet Metal Workers Int'l Ass'n, 573 F. App'x 66, 67 (2d Cir. 2014).

1.   Nature of Conduct

First, relating "to the nature of the union's conduct," the plaintiff must show that "the union or its agents engaged in, induced, or encouraged a refusal to perform services (a

§ 8(b)(4)(i) claim), or threatened, coerced, or restrained any person (a § 8(b)(4)(ii) claim)." <u>Id.</u> (emphasis in original) (citing <u>Carrier Air Conditioning Co.</u>, 547 F.2d at 1189–91).

### a.   Section 8(b)(4)(i)

"A union violates § 8(b)(4)(i) when it induces or encourages the employees of a secondary employer to strike against or to refuse to handle goods for an employer" for an unlawful purpose. <u>Capitol Awning Co.</u>, 698 F. Supp. 2d at 327 (citing <u>N.L.R.B. v. Servette, Inc.</u>, 377 U.S. 46, 50–54, 84 S. Ct. 1098, 12 L. Ed. 2d 121 (1964); <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg.</u>, 485 U.S. 568, 584, 108 S. Ct. 1392, 1402, 99 L. Ed. 2d 645 (1988)). "[C]laims filed under § 8(b)(4)(i) are limited to instances in which a union targets the <u>employees</u> of a secondary employer and encourages those <u>employees</u> to strike or to refuse to perform their duties for that secondary employer." <u>Id.</u> at 327-28 (citing Labor and Employment Law, Ch. 21, § 21.02[1] (2009)) (emphasis in original).

### b.   Section 8(b)(4)(ii)

Section 8(b)(4)(ii) targets union conduct that threatens, coerces, or restrains. 29 U.S.C. § 158(b)(4)(ii). Not all conduct directed toward a secondary employer is prohibited under Section 8(b)(4)(ii); rather, the "touchstone for unlawful activity under Section 8(b)(4)(ii) is its coercive nature, whether the activity is secondary picketing, boycotting, or other acts."

Capitol Awning Co., 698 F. Supp. 2d at 323 (citing N.L.R.B. v. Fruit & Vegetable Packers Local 760, 377 U.S. 58, 68, 84 S. Ct. 1063, 1069, 12 L. Ed. 2d 129 (1964)). The Supreme Court found that "the phrase 'to threaten, coerce, or restrain' in Section 8(b)(4) must be interpreted narrowly to avoid conflict with the First Amendment" and held that 'peaceful handbilling, unaccompanied by picketing, urging a consumer boycott of a neutral employer,' was not conduct proscribed by Section 8(b)(4)[(ii)]." W2005 Wyn Hotels, L.P. v. Abestos, Lead & Hazardous Waste Laborers' Local 78, No. 11-CV-1249, 2012 WL 955504, at *2 (S.D.N.Y. Mar. 8, 2012) (quoting DeBartolo, 485 U.S. at 584, 108 S. Ct. 1392 at 1402, 99 L. Ed. 2d 645). The Second Circuit noted that Congress intended "'to outlaw a fairly broad range of economic pressure tactics,'" Capitol Awning Co., 698 F. Supp. 2d at 323 (quoting Carrier Air, 547 F.2d at 1191), but "'more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii),'" id. (quoting DeBartolo, 485 U.S. at 578, 108 S. Ct. at 1399, 99 L. Ed. 2d 645). Moreover, "Section 8(b)(4) does not prohibit a union from informing secondary employers of its intention to picket a primary employer or from picketing a primary employer at a site under the control of a secondary employer, so long as the picketing is primary in nature." Id. (citing N.L.R.B. v. Ironworkers Local 433, 850 F.2d 551, 554–55 (9th Cir. 1988)).

"'[I]n cases involving ambiguous statements[,] the line between lawful persuasion and unlawful threats is not easily drawn.'" Id. (quoting BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners, 90 F.3d 1318, 1331 (8th Cir. 1996)). Courts consider "the objective circumstances surrounding" the statements, "rather than the subjective interpretation of the listener," to determine whether they constitute unlawful "threats, coercion, or restraints" under Section 8(b)(4). Id. (citing BE & K Constr. Co., 90 F.3d at 1331). "Thus, where inconsistent or conflicting evidence exists about what message was intended, there may be a fact question to be decided by a jury." Id. (citing BE & K Constr. Co., 90 F.3d at 1331).

### 2. Purpose of Conduct

Second, relating "'to the purpose of the [u]nion's conduct,'" the question is "whether 'under all the surrounding circumstances, the [u]nion's objective was preservation of work for [the boycotted or threatened employer's] employees . . . or whether the . . . [union's activities] were tactically calculated to satisfy union objectives elsewhere.'" Id. (emphasis in original) (quoting Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 644, 87 S. Ct. 1250, 18 L. Ed. 2d 357 (1967)). "'[W]hether a union's conduct had an improper object is a question of fact; moreover, that object need not be the only one.'" Del Turco v. Speedwell Design, 623 F. Supp. 2d 319, 348 (E.D.N.Y. 2009)

(alteration in original) (quoting Bedding, Curtain, & Drapery Workers Union v. N.L.R.B., 390 F.2d 495, 499 (2d Cir. 1968)). However, if a plaintiff cannot show that the defendant engaged in prohibited conduct, its claims fail regardless of whether the defendant had an unlawful secondary objective. See Laborers Int'l Union of N. Am., Local 872 & NAV-LVH, LLC, 363 NLRB No. 168, n.14 (Apr. 29, 2016). In this action, BD alleges that Local 79's improper objectives were to coerce secondary employers to stop using BD or to force BD to assign work to Local 79 laborers.

"Allegations of secondary boycotting are most difficult to unravel when they involve the actions and intentions of a labor union picketing at a work site where more than one employer hires laborers represented by more than one union, often known as common situs picketing." Fla. Sugar Mktg. & Terminal Ass'n, Inc. v. Local No. 3, Int'l Longshoremen's Ass'n, AFL–CIO, 668 F. Supp. 173, 179 (S.D.N.Y. 1987). In common situs situations, courts have weighed the evidence under the NLRB's decision in Sailor's Union of the Pacific, AFL and Moore Dry Dock Co., 92 N.L.R.B. 547 (1950) ("Moore Dry Dock"). Florida Sugar Mktg., 668 F. Supp. at 179; see Eber Bros. Wine & Liquor Corp. v. Teamsters Local Union No. 118, No. 02-CV-6229, 2005 WL 290142, at *3-4 (W.D.N.Y. Feb. 7, 2005) (analyzing union's conduct under Moore Dry Dock factors). The Moore Dry Dock factors suggest that common situs picketing is primary and lawful if:

(a) The picketing is strictly limited to times
        when the situs of dispute is located on the
        secondary employer's premises;
        (b) at the time of the picketing the primary
        employer is engaged in its normal business at
        the situs;
        (c)  the  picketing  is  limited  to  places
        reasonably close to the location of the situs;
        and
        (d) the picketing discloses clearly that the
        dispute is with the primary employer.

Florida Sugar Mktg., 668 F. Supp. at 179 (quoting Moore Dry Dock,

92 N.L.R.B. at 549).  Indicia of an improper motive include:

        (1) the picketing union beforehand makes known
        to other unions its intent to picket;
        (2) the picketing union knows that it is the
        policy of other unions to honor all pickets on
        the  jobsite  and  not  to  cross  such  picket
        lines;
        (3)  an  understanding  between  a  secondary
        employer  and  the  picketing  union  that  work
        interruptions will cease if and when a picket
        is removed;
        (4) threats, veiled or otherwise, by picketing
        union that a secondary employer was not using
        good business judgment in doing business with
        the primary employer;
        (5)  picketing  only  at  jobsites  where  other
        unions  are  working  and  not  at  jobsites  where
        only non-union workers are employed, and where
        picketing  is  never  done  at  the  primary
        employer's home office; and
        (6)  the  failure  of  a  picketer  to  answer
        inquiries of others as to the purpose of the
        picketing.

Eber Bros. Wine & Liquor Corp., 2005 WL 290142, at *4 (quoting

Florida Sugar Mktg., 668 F. Supp. at 179).

3.   Causation

Third, relating to causation, the plaintiff must show
that the "unlawful conduct was a proximate cause of the damage."
Tru-Art Sign Co., 573 F. App'x at 67 (citing Landstrom v.
Chauffeurs, Teamsters, Warehousemen & Helpers Local Union No. 65,
476 F.2d 1189, 1195 (2d Cir. 1973)).   Put differently, a
"[p]laintiff must show that there is a causal nexus between the
unlawful secondary activity and the injury suffered by the
plaintiff.   A causal nexus requires a showing that the unlawful
activity was a 'substantial factor or material cause' of the
plaintiff's injury."   Del Turco, 623 F. Supp. 2d at 348 (quoting
C&D Restoration, Inc., 2004 WL 736915, at *4).

IV.  The Bank of America Job

A.   The Parties' Arguments

Plaintiff argues that (1) Defendant unlawfully coerced
secondary employers CBRE and BofA (2) with the purpose of
pressuring them to end their relationship with Plaintiff or to
force Plaintiff to assign work to Local 79 laborers, (3) which
resulted in additional costs in hiring a Local 79 laborer and
caused CBRE to remove BD from its approved vendors list for two
years.  (Pl.'s Br. at 22, 29, 36, 40-41, 44-45).  Specifically,
Plaintiff argues that Local 79 unlawfully picketed at the BofA Job
by inflating a rat, leafletting, blocking the entrance to the

jobsite, and incited a member of the Carpenters' union to engage
in a sympathy strike.  (Pl.'s Br. at 29.)

Defendant argues that Plaintiff cannot establish
liability as a matter of law.  It contends that it did not picket,
but simply passed out leaflets and inflated a rat, and that even
if it momentarily blocked a BD employee from entering the jobsite-
-which it denies happened--the blockage was de minimis.  (Def.'s
Br. at 37.)  Moreover, it argues that BD cites no admissible
evidence that Local 79 ever contacted BofA or that it requested
that a Carpenters' Union worker not "cross the line."  (Def.'s Br.
at 38; Def.'s Opp. Br. at 21.)  Defendant argues that BD employee
Lapidus' testimony regarding carpenter DePetro's statements is
inadmissible hearsay and that DePetro testified to having no memory
of a conversation with Lapidus.  (Def.'s Br. at 38.)  Further,
Local 79 argues that there is a factual dispute as to Local 79's
objective.  (Def.'s Br. at 29).  Finally, Defendant contends that
BD's injuries are tied only to what it argues was legal conduct--
inflating a rat--and are unrelated to any alleged unlawful conduct,
like blocking the jobsite or encouraging DePetro to refuse to work.
(Def.'s Br. at 42.)

    B.  Application

      1.  Conduct

There are issues of fact that preclude summary judgment
in either party's favor.  With respect to Local 79's conduct,

Plaintiff cites the testimony of Lapidus that there was picketing at the site, that he felt intimidated by Local 79's activity, and that there was a confrontation with Local 79; namely, he testified that Local 79 agents were standing in front of an entrance and blocked him from entering or opening the jobsite for several minutes, after initially refusing to let him pass.[25] (Lapidus Dep. 27:25-28:5, 30:13-31:19, 34:15-16.) Defendant, citing the testimony of two Local 79 business agents, denies that there was

---

[25] The Court has considered Defendant's argument that even if it occurred, the blocking was de minimis and not coercive in light of its brevity and effect on a single employee. (Def.'s Br. at 37.) However, other subcontractors needed Lapidus to open the jobsite before they could enter, (Def.'s 56.1 Stmt. ¶ 89; Pl.'s 56.1 Resp. ¶ 89), so any blockage would have affected more than just BD's employee. In any event, the cases Defendant cites in support of its argument are inapposite. They involve non-confrontational, very brief blockages (or no blockages at all). (Def.'s Br. at 37 n.122 (citing Laborers Int'l Union of N. Am., Local 872 & NAV-LVH, LLC, 363 NLRB No. 168 at 4 (finding any blockage that may have occurred to be de minimis where, among other things, there was no evidence of an actual blockage or confrontation); In re United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506, 355 NLRB 797, 806 & n.30 (2010) (finding that "peaceful, stationary holding of banners announcing a 'labor dispute'" was not coercive and noting that "if union agents block ingress or egress," the NLRB will find it coercive unless it is "not significant, i.e., it is de minimis"); In re Metro. Reg'l Council of Philadelphia & Vicinity, United Bhd. of Carpenters & Joiners of Am., AFL-CIO, 335 NLRB 814, 814 n.1, 823, 825-827 (2001) (finding no Section 8(b)(4) violation where a picketer blocked an employee from entering neutral gate for five (5) seconds), enf'd, 50 F. App'x 88 (3d Cir. 2002); United Union of Roofers, Local 135, 266 NLRB 321, 324-25 (1983) (finding no Section 8(b)(4) violation where a picketer walked across a road causing driver to "stop momentarily").).

picketing, that they blocked anyone from entering the jobsite,[26] and that they did anything other than peacefully protest with leaflets and an inflated rat. (Lee Dep. 17:9-18:8, 80:6-8; Zecca Dep. 64:9-65:3, 109:12-16; Lee Decl. ¶ 2; Zecca Decl. ¶ 2.) Viewing the facts in the light most favorable to Plaintiff,[27] a jury could conclude that Local 79's activity violated Section 8(b)(4)(ii).[28]  See W2005 Wyn Hotels, L.P., 2012 WL 955504, at *2-3 (denying motion to dismiss where the defendants distributed literature and used a rat prop, but where plaintiffs also alleged that defendants "[i]mped[ed] the travel of employees, guests and deliveries to and from the hotels" and "[p]ickete[ed] the front

---

[26] To the extent that Plaintiff is asserting a separate claim under Section 8(b)(4)(i) based on the blockage, (Pl.'s Opp. Br. at 4), the factual dispute surrounding the blockage precludes summary judgment.

[27] In their briefs, the parties discuss whether Local 79's inflation of a rat was protected by the First Amendment and whether it could nonetheless be deemed "coercive" under Section 8(b)(4). (See, e.g., Pl.'s Br. at 37-39; Def.'s Br. at 31-33.) However, because Plaintiff alleged that Local 79 engaged in activity other than and in addition to simply inflating a rat, the Court need not reach the parties' First Amendment arguments. See N.L.R.B. v. Local 3, Int'l Bhd. of Elec. Workers, 471 F.3d 399, 407 n.7 (2d Cir. 2006) ("declin[ing] to reach the legality of the inflatable rat balloon under all circumstances").
[28] There is an issue of fact regarding whether Defendant engaged in unlawful conduct even without considering Lapidus' and Giovinazzi's testimony about their conversations with DePetro and Ceciliani, respectively. Because of the issues of fact with respect to Local 79's conduct--and, as described below, its purpose--the Court need not resolve the hearsay issues raised by BD's employees' testimony at this time. The parties will have the opportunity to fully brief the issues in motions in limine before trial.

entrances . . . and engag[ed] in confrontational conduct with people seeking to enter into and do business with the" hotels (internal quotation marks omitted) (alterations in original)).

Conversely, viewing the facts in the light most favorable to Defendant, a jury could find that Local 79's activity was not coercive. "[P]eaceful handbilling, unaccompanied by picketing, urging a consumer boycott of a neutral employer" is not proscribed by Section 8(b)(4), DeBartolo, 485 U.S. at 584, 108 S. Ct. at 1402, 99 L. Ed. 2d 645, and a jury could conclude that the inflation of a rat, without more, was not prohibited conduct, see, e.g., Laborers Int'l Union of N. Am., Local 872 & NAV-LVH, LLC, 363 NLRB No. 168 (noting that the NLRB has concluded that "stationary union inflatables" "at a secondary/neutral employer's premises notifying the public of a labor dispute does not constitute picketing or disruptive or otherwise coercive nonpicketing conduct violative of Section 8(b)(4)(ii)(B) of the Act." (citations omitted)); cf. Local 3, 471 F.3d at 403, 407 n.7 (upholding finding that union violated Section 8(b)(4) where rat was inflated in conjunction with picketing, delays, and disruptions of secondary employer, but "declin[ing] to reach the legality of the inflatable rat balloon under all circumstances"). Thus, a reasonable jury could conclude that Local 79's handbilling and inflation of a rat, without any additional conduct, was not coercive conduct under Section 8(b)(4)(ii).

2.  <u>Purpose</u>

There are issues of fact as to whether Local 79's objective was unlawful; for example, whether it intended to pressure CBRE or BofA to stop using BD or to force BD to reassign work to Local 79 laborers or simply to lawfully inform others that BD's workers were being "exploited."  Local 79 told BD that it could resolve the activity at the job by using a Local 79 laborer, (Def.'s 56.1 Stmt. ¶ 97), and when BD hired a Local 79 laborer, Local 79 ended its protest activity, (Def.'s 56.1 Stmt. ¶ 100; Pl.'s 56.1 Resp. ¶ 100).  Plaintiff also highlights DePetro's testimony that as a member of the Carpenters' Union, he would defer to his office regarding whether to honor another union's job actions. (DePetro Dep. 29:3-23.) According to Defendant, however, Local 79 commenced its job action against BD at the BofA Job because it was concerned about BD's lack of an apprenticeship program and felt that BD's employees were being exploited under dangerous working conditions.  (Def.'s 56.1 Stmt. ¶¶ 83-84; Rynkiewicz Dep. 60:15-21.)  It handed out leaflets stating "Shame on You BD Development . . . .  BD Development is allowing the exploitation of construction workers at their Bank of America Project at 95 Wall St."  (Def.'s 56.1 Stmt. ¶ 91; Pl.'s 56.1 Resp. ¶ 91.)  Defendant also cites DePetro's testimony that if he encountered a job action at a site, he would work until his office told him to stop.  (DePetro Dep. 29:19-23.)  Additionally, the

parties dispute whether a secondary employer knew of or was pressured by Local 79's allegedly unlawful conduct. (Deliteris Dep. 82:24-84:13 (testifying that he told a CBRE representative about Local 79's alleged conduct at the BofA Job); Def.'s 56.1 Stmt. ¶ 102 ("Neither CBRE nor [BofA] was involved in the resolution."); Lee Dep. 80:14-82:21 (denying contacting BofA, CBRE, or NYC Acoustics regarding Local 79's activity).)

Thus, issues of fact prevent the Court from determining that Local 79's purpose was unlawful. For example, weighing the Moore Dry Dock factors, though Local 79's conduct continued while BD was on the site and the leaflets suggested that BD was the subject of the dispute, Local 79 began its activity before BD arrived on site and the leaflets referenced Bank of America. In addition, while Flavoni testified that Local 79 never picketed at BD's home office, (Flavoni Aff. ¶ 81), there are questions of fact regarding other indicia of improper motive. For instance, relating to DePetro's statements, the parties dispute whether "the picketing union [knew] that it is the policy of other unions to honor all pickets on the jobsite and not to cross such picket lines." Eber Bros. Wine & Liquor Corp., 2005 WL 290142, at *4.

### 3. Causation

There is no genuine dispute that Local 79's conduct was a proximate cause of BD's using Local 79 labor at the BofA Job. (Pl.'s 56.1 Stmt. ¶ 178; Def.'s 56.1 Resp. ¶ 178.) However, with

respect to BofA's recommendation to exclude BD from high-profile jobs, CBRE's Wilde testified that she did not specifically know why BofA made that request, but that she thought it was because BofA "felt [BD was] too small" and that there was "too much risk with issues like they were having"--"protest activity by Local 79." (Wilde Dep. 88:2-23.)  This ambiguous testimony is based on CBRE's "understanding" of BofA's decision, and thus the cause of BofA's recommendation is an issue for trial.  Moreover, as discussed above, there are issues of fact as to whether Local 79's activities were prohibited[29] or whether it had an unlawful objective.  Therefore, summary judgement is DENIED as to the BofA Job.

---

[29] Defendant argues that only damages flowing from illicit conduct are recoverable and that only its lawful inflation of a rat and leafletting, and not any alleged blocking or refusal to work, caused BD harm.  (Def.'s Br. at 42.)  Issues of fact defeat Defendant's argument.  For example, Wilde testified broadly to Local 79's "protest activity," and not simply to the rat as the perceived cause of BofA's reluctance to use BD. (Wilde Dep. 88:2-23.)  Similarly, there are issues of fact as to what specific conduct led to BD's use of a Local 79 laborer. (See Apr. 2014 Flavoni Email at 1 (informing CBRE that BD arrived at 95 Wall Street, "found a rat and picket line," and resolved the "situation"); Zecca Dep. 62:8-63:22 (testifying that he received a phone call from BD to "look to go resolve it," without specifically identifying the rat as the concern) (emphasis added).)

V.   The Mount Sinai Job

     A.   The Parties' Arguments

          Plaintiff argues that Local 79 (1) threatened and
picketed Mount Sinai (2) with the objective of pressuring Mount
Sinai to force BD to assign work to a Local 79 laborer, (3) which
caused BD to use Local 79 labor and Mount Sinai not to award future
work to BD.  (Pl.'s Br. at 20-21.)  Defendant contends that there
is no evidence that Local 79 took any action at Mount Sinai, let
alone unlawful action.  (Def.'s Br. at 35-36.)  Further, Defendant
argues that even if it were responsible for the conduct alleged,
the conduct did not violate Section 8(b)(4), nor did it cause
Plaintiff to lose future work.  (Def.'s Br. at 36, 41.)

     B.   Local 79's Connection to the Conduct

          Plaintiff cites Giovinazzi's deposition testimony and
Flavoni's affidavit testimony in support of its contention that
Local 79 contacted Mount Sinai's Chang or "picketed" at Mount
Sinai.  (See, e.g., Pl.'s 56.1 Stmt. ¶ 203; Pl.'s 56.1 Resp.
¶ 471.)  Giovinazzi testified that she believed that the
superintendent at the Mount Sinai Job called her to tell her that
"Local 79 showed up," though she acknowledged that she did not
know the difference between Local 79 and the Carpenters' Union.
(Giovinazzi Dep. 43:6-45:14.)  However, Giovinazzi's testimony
regarding Local 79's presence at the Mount Sinai Job, offered for
its truth, is inadmissible hearsay that cannot defeat summary

judgment. Chansamone v. IBEW Local 97, 523 F. App'x 820, 822 n.4 (2d Cir. 2013) ("We do not consider [plaintiff's] testimony that co-workers told him that [a hiring supervisor] would not hire him 'as an Asian,' because that testimony is inadmissible hearsay.") (citing Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985)).

Thus, the issue is whether Plaintiff can connect Local 79 to the union activity at the Mount Sinai Job. To do so, Plaintiff cites the Flavoni Affidavit, which it seems to have created in response to Defendant's Local Rule 56.1 Statement. (See Vitale Decl., Docket Entry 81, ¶¶ 8-18.). In the Flavoni Affidavit, Flavoni testified, among other things: "I understand that Local 79 conducted picketing at the . . . Mt. Sinai job site[ ]," (Flavoni Aff. ¶ 58), "Local 79 was the union who contacted Chang and threatened to picket Mt. Sinai," (Flavoni Aff. ¶ 117), and "Local 79 actually picketed Mt. Sinai and inflated a rat where Local 79 agents were picketing," (Flavoni Aff. ¶ 118). Similarly, Flavoni testified that "[w]hen Local 79 agents discussed the Mt. Sinai Job Site or any threats or union activity directed at Mt. Sinai, I informed the Local 79 agents that I would relay their message to Mt. Sinai and its representatives." (Flavoni Aff. ¶ 45.) Plaintiff's transparent attempt to use the Flavoni Affidavit to rescue its Mount Sinai Job claims--which were not in the Complaint--ultimately fail, as set forth below.

"Conclusory allegations cannot create a genuine issue of fact," Clayborne v. OCE Bus. Servs., 381 F. App'x 32, 35 (2d Cir. 2010) (citing Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)), "nor may a party 'create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony,'" id. (quoting Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)) (citing Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997)). Flavoni's testimony regarding relaying communications between Local 79 and Mount Sinai, (Flavoni Aff. ¶¶ 42, 45), is directly contradicted by his deposition testimony that he never spoke to anyone at Local 79 regarding the Mount Sinai Job and was unsure if others from BD had, (Flavoni Dep. 84:22-85:10), and as a result, the Court disregards it. See Clayborne, 381 F. App'x at 35. Similarly, the Court will not consider the Flavoni Affidavit to the extent that he testifies that BD hired Local 79 laborers "[a]s a result of pressure by representatives of Mt. Sinai" and a warning from Mount Sinai's Cain. (Flavoni Aff. ¶¶ 117-19.) That testimony directly contradicts his prior deposition testimony that BD opted to use a Local 79 laborer before speaking to Cain and in reaction to BD's superintendent's understanding that there had been Local 79 activity during previous jobs at Mount Sinai. (Flavoni Dep. 91:24-93:7, 95:15-21.) However, the Court will consider the testimony

in the Flavoni Affidavit that "Local 79 was the union who contacted Chang and threatened to picket Mt. Sinai" and "Local 79 actually picketed Mt. Sinai and inflated a rat where Local 79 agents were picketing." (Flavoni Aff. ¶¶ 117-18.)

C. <u>Application</u>

Even if Flavoni's testimony connecting Local 79 to the union conduct at the Mount Sinai Job is true and even if Local 79 took coercive action at the Mount Sinai Job for an illicit secondary purpose, Plaintiff cannot establish that Local 79's conduct caused it any harm. As discussed above, BD selected a Local 79 laborer for the Mount Sinai Job--before talking to Mount Sinai--because BD superintendent Conroy understood that Local 79 had picketed Mount Sinai in the past, not because Local 79 threatened Chang or picketed the Mount Sinai Job. (Flavoni Dep. 91:24-93:7, 95:15-21.) The costs for hiring a Local 79 laborer are thus not attributable to Chang's threats or Local 79 having "actually picketed" in connection with the Mount Sinai Job. (Flavoni Aff. ¶¶ 117-18.)

Further, Chang testified that Mount Sinai's decision not to award work to BD after the Mount Sinai Job was rooted in issues with change orders and being "held hostage by" BD, not any kind of union activity. (Chang Dep. 61:12-22, 62:15-18, 75:11-15, 96:2-97:17, 118:25-119:8.) Chang explicitly testified that he "didn't get the connection" between "not inviting BD to bid [on] job[s]

83

and the rat," and that his "decision to no longer invite BD to submit bids was based upon purely [his] experience and interaction with BD." (Chang Dep. 96:24-97:17.) Additionally, Flavoni acknowledged that Mount Sinai considered firing BD mid-job over disputes about change orders, (Flavoni Dep. 168:22-169:22), and during the job, BD told Mount Sinai that it did not want to build a relationship, but that it wanted to finish its job and "be gone."[30] (Def.'s 56.1 Stmt. ¶ 486.)

Flavoni's testimony that "Local 79's conduct affected Mt. Sinai's assessment of BD because Mt. Sinai never awarded BD any more projects following what occurred at the Mt. Sinai job," (Flavoni Aff. ¶ 123), does not create an issue of fact as to why Mount Sinai ended its relationship with BD. First, even if Local 79's conduct abstractly "affected Mt. Sinai's assessment of BD," (Flavoni Aff. ¶ 123), that testimony does not contradict or undermine Chang's testimony regarding his specific reasons for not soliciting bids from BD--not union issues, but because of Mount Sinai's concerns about change orders and feeling that BD held it hostage. (Chang Dep. 96:2-97:17, 118:25-119:8.) Second, the testimony cannot defeat summary judgment "with assertions that are

---

[30] That Flavoni apparently changed his mind about Mount Sinai after the job is of no moment. (Feb. 2014 Flavoni Email, Kataev Decl. Ex. A, Docket Entry 94-1.) The fact that BD wished to revive the relationship says nothing of Mount Sinai's motivation for not awarding work to BD.

conclusory or based on speculation." Casciani v. Nesbitt, 392 F.
App'x 887, 888 (2d Cir. 2010) (quoting Major League Baseball
Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008));
see Trustees of Local 807 Labor-Mgmt. Health & Pension Funds v.
River Trucking & Rigging, Inc., No. 03-CV-3659, 2005 WL 2290579,
at *6 (E.D.N.Y. Sept. 20, 2005) (finding that conclusory testimony
in affidavits could not defeat summary judgment "because, standing
alone, they simply do not raise a genuine issue of material fact")
(citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.
Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990)). At his deposition,
Flavoni testified that he did not know which factors Chang
considered in deciding whether to solicit bids from particular
contractors and did not discuss with Chang why Mount Sinai and BD
no longer worked together, but "think[s]" Local 79's actions
contributed to Chang's decision. (Flavoni Dep. 171:3-21.)
Contrary to his affidavit testimony, Flavoni's understanding of
Mount Sinai's motivation is not based on "personal knowledge of
the facts," (Flavoni Aff. ¶ 4), but rather, mere speculation about
what Flavoni thought, (Flavoni Dep. 171:3-21). Clayborne, 381 F.
App'x at 35 (quoting Hayes, 84 F.3d at 619) (citing Raskin, 125
F.3d at 63). Additionally, in his affidavit, Flavoni essentially
testified that because Mount Sinai no longer awards work to BD,
Local 79's conduct, rather than any other circumstance at the Mount
Sinai Job, must have affected Mount Sinai's view of BD. Flavoni

cites no specific facts in support of this understanding, which is unsurprising given that he did not discuss the matter with Mount Sinai. (Flavoni Dep. 171:8-21.)

Thus, no reasonable jury could conclude that Local 79's alleged unlawful conduct was "a substantial factor or material cause to" BD's injuries, and BD may not recover for them. See C&D Restoration, Inc., 2004 WL 736915, at *4. In light of the above, with respect to the Mount Sinai Job, Defendant's motion is GRANTED and Plaintiff's claims are DISMISSED.

## VI. The Brookdale Job

### A. The Parties' Arguments

Regarding the Brookdale Job, Plaintiff argues that (1) Local 79 threatened to picket and actually picketed Brookdale (2) with the purpose of pressuring Brookdale to either force BD off the job or to assign work to Local 79 laborers, (3) which resulted in damages when BD (a) hired a Local 79 signatory for demolition work, (b) hired a Local 79 signatory for general conditions work, and (c) was overlooked on future job opportunities with Brookdale. (Pl.'s Br. at 29, 32-33, 36, 39, 41, 44-46.) Defendant contends that it did not picket or threaten to picket Brookdale, (Def.'s Br. at 33-35), that there is a dispute as to Local 79's purpose at the Brookdale Job, (Def.'s Opp. Br. at 29), and that Local 79's actions at the Brookdale Job did not damage BD. (Def.'s Br. at 42-43.)

B.  Application

1.  Conduct

With respect to Local 79's allegedly coercive and
threatening conduct at Brookdale, clear issues of fact preclude
resolution in either party's favor.

First, the parties dispute whether Local 79 engaged in
prohibited picketing at the Brookdale Job.  For example, Plaintiff
highlights Local 79's attendance sheets from its campaign that
label the activity a "picket line" and cites Deliteris' testimony
that Local 79 agents were "walking back and forth on the sidewalk"-
-arguably patrolling--and handing out leaflets near the rat.[31]
(Def.'s 56.1 Stmt. ¶ 194; Pl.'s 56.1 Resp. ¶¶ 172, 194; Deliteris
Dep. 93:7-95:17.)  Defendant cites testimony from the Local 79
organizer who completed the attendance sheets that he filled them
out in error and that Local 79 did not picket Brookdale.  (Def.'s
56.1 Stmt. ¶¶ 197-98.)  Defendant claims its activity was limited
to leafleting and the inflation of a rat, and points to the
testimony of four Brookdale employees that they did not witness
picketing.  (Def.'s 56.1 Stmt. ¶¶ 187, 169-74.)  Therefore, there
are genuine issues of material fact regarding whether Local 79's
activities rose to the level of coercive picketing.  See, e.g.,

---

[31] As discussed at supra note 27, because Plaintiff alleged that
Defendant engaged in conduct in addition to the mere inflation
of a rat, the Court need not reach the parties' First Amendment
arguments.

DeBartolo, 485 U.S. at 578, 108 S. Ct. at 1399, 99 L. Ed. 2d 645
(finding that leafletting was not coercive where it was peaceful
and there was no "picketing" or "patrolling").

Second, the parties dispute whether Local 79 threatened
Brookdale in violation of Section 8(b)(4)(ii). For example, before
the alleged picketing began, Local 79's Williamson called
Brookdale to have it "look into the way [it was] doing business by
hiring credible contractors"--unlike BD--"who treat their workers
with dignity and respect." (Pl.'s 56.1 Stmt. ¶ 229; Def.'s 56.1
Resp. ¶ 229; Williamson Dep. 28:9-19.) During BD's work at the
Brookdale Job, Local 79's Labate told Flavoni that BD's use of its
own laborers was "going to be an issue, unless you want to sign
with" Local 79. (May 14, 2014 Audio Tr. at 5.) Further, Labate
said in situations like at Brookdale, where he is "not getting
anywhere," his boss will tell him to "put a line up." (May 14,
2014 Audio Tr. at 6.) However, when asked about that conversation
at his deposition, he agreed that the "line" could mean "doing
whatever, the rat, the leafleting, [or] picketing," and that it
would be "put up to draw attention to the job and to try to get
some sort of resolution . . . [f]rom the contractor." (Labate
Dep. 283:8-284:19.) Labate also told Flavoni that Local 79's
"organizing department does those picket lines." (May 15, 2014
Audio Tr., at 1.) Flavoni then relayed his impressions of his
conversations with Labate to Brookdale's Connolly. (May 2014

88

Flavoni Email, Wheeler Decl. Ex. 1, Docket Entry 68-1.)  Similarly, Local 79's Smith later told Flavoni that he was "trying to make sure we don't have a problem here."  (Pl.'s 56.1 Stmt. ¶ 284; Def.'s 56.1 Resp. ¶ 284.)  Smith and Connolly also spoke, but Connolly testified that Smith did not threaten him with rats, placards, flyers, "anything like that"--Smith just called about "getting men onto the job."  (Connolly Dep. 161:18-162:3.)  Smith spoke to Flavoni again and warned that Local 79 would "fight it tooth and nail" if it had to, a message that Smith understood Flavoni would convey to Connolly.  (Oct. 17, 2014 Audio Tr., at 1, 3.)

Because (1) many of the above statements are ambiguous, (2) there are issues of fact as to whether Local 79's conduct was coercive, and (3) there is inconsistent and conflicting evidence about what message Local 79 intended to convey, there are issues of fact regarding whether Local 79's statements rose to the level of unlawful threats.  See Capitol Awning Co., 698 F. Supp. 2d at 325-26 (finding issue of fact for jury regarding whether union's statements were threatening).

    2.  Purpose

While Local 79 may have had more than one purpose for its activities--for example, beginning a "publicity campaign informing the public of Brookdale's way of doing business," (Williamson Dep. 63:16-25)--there is no genuine dispute that Local

89

79 directed its action against Brookdale partly for the purpose of "achieving reassignment of work currently done by [BD's] employees." Kaynard, 576 F.2d at 476 n.7. That improper objective need not have been Local 79's only objective to be proscribed. Del Turco, 623 F. Supp. 2d at 348 (quoting Bedding, Curtain, and Drapery Workers Union, 390 F.2d at 499).

It is clear that at least one of Local 79's objectives was to achieve reassignment of work, based on the following: (1) Local 79 engaged in its activity at Brookdale Hospital, rather than at the Brookdale Job site where BD was working, (Def.'s 56.1 Stmt. ¶ 169; Pl.'s 56.1 Resp. ¶ 169); (2) one of Local 79's leaflets brought Brookdale into the fray, (Brookdale Leaflet 2 ("Brookdale's theory to hire exploitive contractors to cut costs may potentially result in workers being exposed to unsafe work conditions that can lead to them becoming patients at Brookdale Hospital. We hope Brookdale doesn't have the same theory for their Medical Practices"); (3) Local 79 agents called Brookdale's Connolly directly about "getting men onto the job," (Connolly Dep. 161:25-162:3); (4) Local 79 agents called Flavoni, "claiming" work and taking issue with BD's performance of Local 79's "jurisdictional work," who then relayed their messages to Connolly, (May 15, 2014 Audio Tr., at 1-2; Pl.'s 56.1 Stmt. ¶ 287; Def.'s 56.1 Resp. ¶ 287); and (5) Local 79 (initially) ceased its activity once BD opted to use Local 79 labor for general conditions

work, (Williamson Dep. 56:3-24). Thus, no genuine dispute exists that under all the surrounding circumstances, <u>an</u> objective--if not the only objective--of Local 79's activities was improper under Section 8(b)(4). <u>See</u> <u>Kaynard</u>, 576 F.2d at 476 n.7.

### 3. Causation

Because there are issues of fact regarding whether Local 79's conduct was coercive or threatening, summary judgment may not be granted in Plaintiff's favor for any damages flowing from that conduct. However, if Plaintiff cannot show that Defendant's conduct caused a particular harm, Plaintiff may not recover for that harm regardless of whether Defendant's conduct was improper. <u>See</u> <u>C&D Restoration, Inc.</u>, 2004 WL 736915, at *4.

Defendant argues that BD arranged to use AMG, a Local 79 signatory, for demolition at the Brookdale Job not because of Local 79's activity, which began after BD opted to use AMG, but because the price was reasonable and Brookdale had instructed BD to use woman-owned businesses like AMG. (Def.'s Br. at 12, 43.) Further, it contends "there is no evidence that Brookdale ever required BD" to hire AMG to provide a Local 79 laborer for general conditions work, highlighting that BD did so the same day the NLRB dismissed BD's allegations against Local 79. (Def.'s Br. at 43.) With respect to the AMG laborers, it also argues that BD "admits that it passed the costs of construction on to Brookdale." (Def.'s Br. at 43.) Finally, Defendant maintains that there is no evidence

that BD lost any future work with Brookdale because of Local 79. (Def.'s Br. at 43.)

There are issues of fact as to whether BD used AMG for demolition as a result of Local 79's conduct. BD's Capozza testified that he believed BD did not use its own workforce for demolition because it did not have enough manpower at the time, (Capozza Dep. 46:3-21), but Deliteris testified that BD decided to use AMG after "there was pressure put on Brookdale," (Deliteris Dep. 34:16-36:25). That Local 79 had not yet inflated the rat when BD selected AMG is not dispositive; Local 79 contacted Brookdale before erecting the rat, and a jury could conclude that Local 79's pressuring Brookdale--which, as discussed above, may have been proscribed--resulted in BD's hiring AMG. Additionally, it is unclear from the record whether BD or Brookdale paid for AMG to perform demolition work.

There is no genuine issue of material fact, however, that Local 79's conduct was a cause of BD's decision to hire AMG to perform general conditions work. Brookdale pressured BD to resolve its dispute with Local 79, (see Pl.'s 56.1 Stmt. ¶¶ 249-50, 254; Connolly Dep. 69:24-70:14), and Williamson testified that BD used Local 79 laborers for general conditions work as a result of its action at Brookdale, (Williamson Dep. 56:3-24). The NLRB's dismissal, which may have led BD to hire Local 79 laborers when it saw its grievances would not be redressed, cannot be separated

from Local 79's activity. However, it is again unclear whether Brookdale or BD paid the additional cost for AMG to provide general conditions laborers.

Finally, the Court finds that no reasonable jury could conclude that BD lost the ICU Job because of Local 79's activities at Brookdale. Brookdale's Fast and Connolly both testified that they would use BD for future work and that Local 79's activities did not lead them to have concerns about BD. (Connolly Dep. 28:10-13; Fast Dep. 114:9-17.) Fast testified that he invited BD to bid on the ICU Job, (Fast Dep. 95:18-96:13), and Connolly testified that BD did not get the job because it was not the lowest bidder, (Connolly Dep. 123:7-124:14). Fast testified that BD did not win the ICU Job because "[t]hey were on the higher end of the bid," (Fast Dep. 96:20-23), that he did not consider the labor dispute with Local 79 in deciding whether to award the work to BD, (Fast Dep. 96:14-23), and that he would be willing to solicit bids from BD on jobs in the future, (Fast Dep. 114:5-17). Additionally, when asked whether protest activity from Local 79 influenced Brookdale's decision not to award the job to BD, Connolly testified that he would not "direct anybody[ ] not to select . . . BD based on this experience [with Local 79] that happened here." (Connolly Dep. 124:3-14.)

Fast's testimony that he would consider Local 79's activity to be a negative factor in deciding whether to award BD

work in the future, (Fast Dep. 97:14-19, 114:24-115:7), and Flavoni's speculative testimony that he has "reason to believe that Brookdale no longer awards BD work as a result of Local 79's conduct," (Flavoni Aff. ¶ 89), does not change the result. It is undisputed that with respect to awarding the ICU Job specifically, Brookdale did not consider Local 79's activities and awarded the job to the lowest bidder, which was not BD.

However, there is an issue of fact as to whether Brookdale excluded BD from any additional work at the hospital; Flavoni's testimony that it "has placed bids on other projects for Brookdale since the completion of the [Brookdale Job], and has not been awarded any work thus far," (Flavoni Aff. ¶ 88), conflicts with Fast's testimony that Brookdale has invited a bid for only one other project since the Brookdale Job, (Fast Dep. 95:18-96:13).

For the foregoing reasons, with respect to the Brookdale Job, Plaintiff's motion is DENIED, Defendant's motion is GRANTED IN PART and DENIED IN PART, and BD's claim for damages for its failure to win the ICU Job is DISMISSED. BD may seek damages for its remaining claims, including the additional cost of using Local 79 laborers, if it can prove that it incurred such costs. Further, the Court finds that an objective of Local 79's conduct was improper and that Local 79's conduct proximately caused BD to use a Local 79 laborer for general conditions work, though questions of fact preclude resolution of whether the conduct was lawful.

VII. The Old Navy Job

    A.   The Parties' Arguments

        Plaintiff contends that Local 79 (1) threatened Macerich and the Gap with picketing at Kings Plaza on several occasions, (2) with the purpose of pressuring them to force BD off the job or to have BD assign work to Local 79 laborers, (3) which led to (a) BD's removal from the Gap's approved vendors list, (b) its failure to win bids on other projects, and (c) its increased costs in hiring Local 79 laborers for demolition and general conditions work.  (Pl.'s Br. at 31, 36, 44-47.)  Defendant argues that even if it had an unlawful objective, the evidence does not support the claim that Local 79 threatened Macerich or the Gap,[32] and in any event, that its alleged threats did not cause BD's damages. (Def.'s Br. at 29, 39-40, 44-47.)

    B.   Application

        1.   Conduct

        With respect to Local 79's alleged threats of unlawful conduct, issues of material fact are pervasive.  For example, Labate testified that before the job began, he contacted Macerich regarding BD's work on the Old Navy Job, and said "you have issues because they are not a [Local 79] signatory."  (Labate Dep. 174:19-

---

[32] However, Defendant concedes in its opposition brief that there are issues of fact with respect to whether it threatened secondary employers at the Old Navy Job.  (Def.'s Opp. Br. at 29.)

177:16.)  Zito testified that he believed Labate hoped to leverage Zito's influence with the Gap to discourage it from using BD. (Zito Dep. 26:15-24.)  Additionally, with respect to the grievance meeting on May 21, 2014, Zito testified that he did not recall whether business agents talked about a picket line, but that if he wrote it in an email, "then there probably was.  I don't believe any of the [business agents] would have mentioned that, except for . . . Labate."  (Zito Dep. 40:19-41:3.)  Labate testified that "I never talked about a picket line against the mall.  I told [Zito] what the grievance was about . . . .  I didn't call it a picket line.  I called a grievance."  (Labate Dep. 212:19-213:6.) Zito also testified that in other conversations with Labate, "there were threats that there would . . . or could be a picket line . . . if there wasn't cooperation regarding" BD's use of Local 79 laborers.  (Zito Dep. 28:24-31:4.)  Labate, however, testified that he "never threatened the mall."  (Labate Dep. 305:17-306:8.)  Moreover, regarding the July 2014 round of alleged threats, Zito testified that it "sound[ed] accurate" that a "meeting was scheduled to discuss Local 79's latest threat towards [Zito] that if [BD] did not meet [Labate's] demands by Friday, they would set up a picket line and, as a result, [Zito] would shut down [BD's] project for The Gap."  (Zito Dep. 73:13-74:12; July 3, 2014 Audio Tr., at 2.)  Labate denied that he made these threats, but he testified that he might have said something to the

effect of "if we don't get things resolved, I'm going to turn it over to the organizers and they are going to do . . . the rat, . . . [or] picketing." (Labate Dep. 305:7-16, 308:8-309:4.) Similarly, when Smith replaced Labate, he told Flavoni "[i]f [Local 79 signatory] Linear pulls out, I'm going to have to throw a line up there where I have the other bidders . . . coming out there." (Aug. 18, 2014 Audio Tr. at 2-3.) Flavoni asked if "a line" meant "picket line," and Smith responded "[a] grievance, yeah." (Aug. 18, 2014 Audio Tr. at 3.) Smith testified that his reference to a "picket line" was a mistake and that he meant a BCTC grievance. (Smith Dep. 152:15-153:22.) Smith also testified that he spoke to Macerich's Lindsey and mentioned "setting up a picket line," but later stated that "[i]t was never any line or anything mentioned. I told him that there may be a strong possibility that there may be another [BCTC] grievance that would be with BD." (Smith Dep. 127:3-7, 196:5-12, 201:24-202:12.) As these conflicting or ambiguous statements make clear, issues of fact prevent the Court from finding whether Local 79's communications with Macerich rose to the level of unlawful threats.

Similarly, there are issues of fact as to whether Local 79 delayed All City's demolition work or encouraged Linear to stop providing a laborer for general conditions work. All City's Rodopoulos did not believe that his inability to get additional workers from the Local 79 hiring hall impacted All City's ability

to finish its work on schedule, (Rodopolous Dep., 44:4-18, 75:10-76:15), while BD's Ross testified that there was not enough manpower to finish the demolition in time, (Ross Dep. 58:4-60:24). Moreover, there are issues of fact regarding whether Local 79 purposefully denied BD available workers; Rynkiewicz testified that there are not always workers available from the hiring hall, (Rynkiewicz Dep. 91:2-9), while Labate testified that it "would never happen" that All City would be unable to get enough demolition workers for the job, (Labate Dep. 71:11-72:7). Finally, there is a dispute over whether Linear stopped providing a laborer on the Old Navy Job because of Linear's issues with BD, or because of Local 79's pressure.[33] (Def.'s 56.1 Stmt. ¶¶ 351, 355-56; Pl.'s 56.1 Resp. ¶¶ 355-56; Aug. 18, 2014 Audio Tr. at 1-2 (recording of Smith telling Flavoni that Linear is "pulling out" because it is "hard to get somebody to come out for" "one day a week" and suggesting that BD use a Local 79 laborer "two or three days a week").)

### 2. Purpose

As with the Brookdale Job, however, there is no genuine dispute that at least one objective of Local 79's conduct was

---

[33] Because of this issue of fact, summary judgment is inappropriate on Plaintiff Section 8(b)(4)(i) claim--referred to as a Section 8(b)(4)(ii) claim in Plaintiff's Opposition Brief--regarding Local 79's alleged "inducement of Linear to stop working with BD." (Pl.'s Opp. Br. at 10.)

improper--to pressure secondary employers to force BD off the job or to assign work to Local 79 laborers.  For example, before the job began, Zito thought Labate hoped to convince the Gap not to use BD "with whatever influence [Zito] may or may not have" with the Gap.  (Zito Dep. 26:15-24.)  Additionally, Labate testified that he told Zito at the grievance meeting "[t]his is about BD Development, they are not going to use [Local] 79," (Labate Dep. 207:8-14), and Smith told Flavoni to "call the client and ask the client" if it would agree to using a Local 79 laborer for more than one day per week, (Aug. 18, 2014 Audio Tr. at 4).  Smith also testified that he asked Flavoni to tell the Gap about their conversation with the goal of having a Local 79 laborer on the job two to three times per week.  (Smith Dep. 156:4-157:20.)  Thus, Local 79's activities had an improper objective under Section 8(b)(4).  See, e.g., Kaynard, 576 F.2d at 476 n.7, 478.

### 3.  Causation

Defendant argues that Plaintiff's damages for the cost of using Local 79 signatory All City to perform demolition, the cost of using Local 79 signatory Linear to perform general conditions work, and the profits that it lost on future jobs for the Gap are not related to Local 79's alleged threats.[34]  (Def.'s

---

[34] Defendant also argues that any damages its actions may have caused were the result of Macerich's aversion to all union activity, lawful or unlawful, and Defendant therefore cannot be held liable for any resulting damages.  (Def.'s Br. at 46-47.)

Br. at 44.)  Plaintiff responds that it incurred additional costs
by hiring All City and that the Gap removed BD from its approved
contractors list in substantial part because of union issues at
the Old Navy Job.  (Pl.'s Opp. Br. at 27-29.)  The parties
specifically argue over the Gap's failure to select BD for the
Banana Republic Job despite the fact that BD seems to have been
the job's lowest bidder.  (Def.'s Br. at 45; Pl.'s Opp. Br. at 28-
29.)

        There is a genuine dispute as to whether Local 79's
alleged unlawful secondary conduct caused BD to use All City.
(Def.'s 56.1 Stmt. ¶¶ 282, 285; Pl.'s 56.1 Resp. ¶¶ 282, 285.)
Defendant highlights that when BD hired All City on May 16, 2014,
Local 79 had not yet met with Zito and purportedly threatened him
regarding its grievance with BD.  (Def.'s Br. at 44; Def.'s 56.1
Stmt. ¶¶ 282, 293.)  Additionally, Defendant points out that the
Gap did not have any discussions with BD about subcontracting
demolition work.  (Def.'s Br. at 17; Def.'s 56.1 Stmt. ¶ 285.)
However, Plaintiff refers to Labate's testimony that before the
job began, he called Macerich and warned of "issues" with BD,
(Pl.'s Br. at 4; Labate Dep. 174:19-177:16), and Flavoni testified
that "BD preemptively hired All City at a loss to BD to avoid any

---

This argument is unavailing.  Defendant's alleged unlawful
conduct is not immunized simply because the secondary employer
was also concerned about lawful union activity.

union issues by Local 79," (Flavoni Aff. ¶ 97; see also July 1, 2014 Audio Tr., at 5 ("Flavoni: . . . [W]e heard that there was going to be an issue with [Local] 79. So in an effort to mitigate that and maintain the harmony, we actually hired a demolition contractor who is Local 79.")).

Additionally, issues of fact exit with respect to BD's removal from the approved vendors list. The testimony of the Gap's Kruse does not resolve whether Local 79's conduct, assuming it was threatening or coercive, was a substantial factor in or a material cause of the Gap's decision. See C&D Restoration, Inc., 2004 WL 736915, at *4. Kruse testified that her decision to remove BD "was more about how [BD] handled the situation with [Local 79] as opposed to the union issue itself," and noted that "there were other issues completely unrelated to the union" that led her to her decision. (Kruse Dep. 66:24-67:23.) She testified that union issues played a "small part" in BD's removal. (Kruse Dep. 81:1-82:22.) Similarly, the Gap's Ciuzio testified that he expressed concern to Kruse about using BD after the Old Navy Job because of scheduling issues, change order management problems, and potential quality issues, though he acknowledged that "union protest activity" could have affected those issues. (Ciuzio Dep. 147:3-9, 150:2-15, 173:10-174:8.)

There are also issues of fact regarding whether Local 79's conduct was a proximate cause of BD's failure to win jobs for

the Gap (with the exception of the Banana Republic Job, discussed below). (Def.'s 56.1 Stmt. ¶ 419; Pl.'s 56.1 Resp. ¶ 419.) While BD was not the lowest bidder on the jobs, (Def.'s 56.1 Stmt. ¶¶ 417-18; Pl.'s 56.1 Resp. ¶¶ 417-18), many of BD's clients do not award bids to the lowest bidder, (Def.'s 56.1 Stmt. ¶ 422). Additionally, Kruse testified that "[t]hose projects were awarded to the most qualified bidder,"[35] (Kruse Dep. 156:8-24 (emphasis added)), and suggested in her testimony that her view of BD was affected by Local 79, (Kruse Dep. 66:24-67:20, 81:1-82:22). Further, her testimony that BD was not actually "disqualified from being considered a qualified bidder by virtue of what happened" at the Old Navy Job, (Kruse Dep. 156:25-157:4), does not mean that Local 79's conduct did not affect her assessment of whether BD was the "most qualified bidder" on those jobs. Thus, summary judgment is inappropriate at this stage.

However, there is no dispute that the Gap, not BD, paid for BD's use of Linear for general conditions work, (Def.'s 56.1 Stmt. ¶¶ 333-34; Pl.'s 56.1 Resp. ¶¶ 333-34), and BD may not recover for the cost of that laborer.

---

[35] Kruse also testified that nothing that BD did at the Old Navy Job influenced the Gap's decision to award a Gap outlet job on Flatbush Avenue, Brooklyn to another contractor. (Kruse Dep. 156:8-12.) That testimony does not resolve whether Local 79's conduct at the Old Navy Job impacted the Gap's assessment of BD, however.

Further, there is no genuine dispute that the Gap did not award the Banana Republic Job to BD for issues entirely unrelated to Local 79's activity at the Old Navy Job. Kruse cited a number of reasons for not using BD after interviewing BD, including that Schimenti--the winning bidder--had an "all-inclusive number" and the "right team to do the work," (Kruse Dep. 104:17-23, 106:23-107:3), while BD did not have "proactive suggestions" and did not give her confidence that it had fully considered all aspects of the job, (Kruse Dep. 114:23-115:11). Additionally, Flavoni testified that the Gap told him they were looking for a contractor with longevity and experience with the brand, and Schimenti had worked with the Gap for about ten years while BD had been with the Gap for less than one year. (Flavoni Dep. 132:21-133:12.) Moreover, while Kruse and Ciuzio indicated that Local 79's conduct affected their view of BD, (see Kruse Dep. 90:25-91:7; Ciuzio Dep. 150:2-15), Kruse unambiguously testified that BD's union issues at the Old Navy Job played no role in the Gap's selection of Schimenti over BD, and Ciuzio testified that he did not know why BD was not awarded the job. (Kruse Dep. 107:4-16; Ciuzio Dep. 136:10-137:6.) Further, even though BD appears to have been the lowest bidder on the Banana Republic Job by $30,000, the Gap did not view that difference as material. (Def.'s 56.1 Stmt. ¶ 462.)

While Plaintiff attempts to create an issue of fact by citing Flavoni's Affidavit testimony that "Local 79 . . . contributed to BD not being awarded future work," (Pl.'s 56.1 Resp. ¶ 450; Flavoni Aff. ¶ 111), Flavoni previously testified that he did not know what factors the Gap considered for any of the jobs it awarded, but can "only speculate." (Def.'s 56.1 Stmt. ¶ 421; Pl.'s 56.1 Resp. ¶ 421; Flavoni Dep. 128:9-20.) "A party may not avoid summary judgment with 'assertions that are conclusory or based on speculation.'" Casciani, 392 F. App'x at 888 (quoting Major League Baseball Props., Inc., 542 F.3d at 310). Thus, Flavoni's Affidavit testimony does not create an issue of fact as to whether Local 79's conduct was a "substantial factor" in or a "material cause" of BD's failure to win the Banana Republic Job.[36] See C&D Restoration, Inc., 2004 WL 736915, at *4.

In light of the foregoing, Plaintiff's motion with respect to the Old Navy Job is DENIED and Defendant's motion is GRANTED IN PART and DENIED IN PART. Plaintiff's claims for damages for the costs of hiring Linear and for its lost profits in connection with the Banana Republic Job are DISMISSED. If it can prove causation, Plaintiff may pursue its remaining claims for

---

[36] Similarly, Flavoni's testimony that "The Gap invited BD to bid on the Banana Republic job at 105 Fifth Avenue," (Flavoni Aff. ¶ 114), does not create an issue of fact regarding the Gap's decision.

damages, including its costs for hiring All City, its removal from the Gap's approved vendors list, and its lost profits for the other bids it lost. Additionally, Plaintiff has established that Local 79 had an unlawful objective at the Old Navy Job, but issues of fact preclude summary judgment in either party's favor with respect to the lawfulness of Local 79's conduct.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion (Docket Entry 75) is DENIED and Defendant's motion (Docket Entry 67) is GRANTED IN PART and DENIED IN PART. Specifically, Defendant's motion is DENIED with respect to the BofA Job; GRANTED with respect to the Mount Sinai Job; GRANTED IN PART and DENIED IN PART with respect to the Brookdale Job; and GRANTED IN PART and DENIED IN PART with respect to the Old Navy Job. Accordingly, Plaintiff's Mount Sinai Job claims are DISMISSED; Plaintiff's Brookdale Job claim for damages for failing to win the ICU Job is DISMISSED; and Plaintiff's Old Navy Job claims for the cost of hiring Linear and for BD's lost profits in connection with the Banana Republic Job are DISMISSED. However, Plaintiff has established that Defendant had an improper objective at the Brookdale Job and the Old Navy Job.

The parties shall file letters within fourteen (14) days of the date of this Memorandum and Order setting forth their respective positions on scheduling a settlement conference with

Judge A. Kathleen Tomlinson. Additionally, the parties are directed to file a joint proposed pretrial order within sixty (60) days of the date of this Memorandum and Order and are further directed to appear for a pre-trial conference with Judge Tomlinson on June 7, 2018 at 10:30 a.m.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     March __19__, 2018
           Central Islip, New York